**ORAL ARGUMENT SCHEDULED FOR MARCH 20, 2023**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 22-7063

AMERICAN SOCIETY FOR TESTING AND MATERIALS; NATIONAL FIRE PROTECTION ASSOCIATION, INC.; AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR-CONDITIONING ENGINEERS, INC.,

*Plaintiffs-Appellants,*

*v.*

PUBLIC.RESOURCE.ORG, INC.,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:13-cv-1215-TSC, Honorable Tanya S. Chutkan*

# FINAL BRIEF FOR DEFENDANT-APPELLEE
# PUBLIC.RESOURCE.ORG, INC.

| | | |
|---|---|---|
| Andrew P. Bridges | Corynne McSherry | David Halperin |
| abridges@fenwick.com | corynne@eff.org | davidhalperindc@gmail.com |
| Matthew B. Becker | Mitchell L. Stoltz | 1805 9th Street NW |
| mbecker@fenwick.com | mitch@eff.org | Washington, DC 20005 |
| Fenwick & West LLP | Electronic Frontier Fndn. | Phone: (202) 905-3434 |
| 801 California Street | 815 Eddy Street | |
| Mountain View, CA 94041 | San Francisco, CA 94109 | |
| Phone: (415) 875-2300 | Phone: (415) 436-9333 | |

*Attorneys for Defendant-Appellee Public.Resource.Org, Inc.*

February 3, 2023

PUBLIC COPY – SEALED MATERIAL DELETED

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellee Public.Resource.Org, Inc., certifies as follows:

### A.     Parties and Amici

Appellants, who were Plaintiffs and Counter-Defendants in the district court, are:

- American Society for Testing and Materials d/b/a/ ASTM International ("ASTM");

- National Fire Protection Association, Inc. ("NFPA"); and

- American Society of Heating, Refrigerating, and Air-Conditioning Engineers, Inc. ("ASHRAE")

Appellee is Public.Resource.Org, Inc. ("Public Resource"), which was the Defendant/Counterclaimant in the district court.

The following individuals and entities submitted briefs to the district court as *amici curiae*:

- Ann Bartow

- American Insurance Association

- American Library Association

- American National Standards Institute, Incorporated

- American Property Casualty Insurance Association

i

- American Society of Safety Engineers

- Brian L. Frye

- David Ardia

- Elizabeth Townsend Gard

- Institute of Electrical and Electronics Engineers, Incorporated

- International Association of Plumbing & Mechanical Officials

- International Code Council, Inc.

- James Gibson

- Jessica Silbey

- Jennifer Urban

- Jonathan Zittrain

- Knowledge Ecology International

- National Electrical Manufacturers Association

- North American Energy Standards Board

- Pamela Samuelson

- Public Knowledge

- Rebecca Tushnet

- Reporters Committee for Freedom of the Press

- Sina Bahram

- Stacey Dogan

- Stacey M. Lantagne

- Underwriters Laboratories Inc.

The following entities have appeared as *amici curiae* so far in this Court:

- American Dental Association

- American Hospital Association

- American Medical Association

- American National Standards Institute

- American Society of Civil Engineers

- The Copyright Alliance

- International Code Council

- The Institute of Electrical and Electronics Engineers, Incorporated

- National Electrical Manufacturers Association

- North American Energy Standards Board

- ULSE Incorporated

**B.     Rulings Under Review**

The rulings under review are as follows:

- Order, Dkt. 240 (Chutkan, J.), filed on March 31, 2022, by the U.S. District Court for the District of Columbia in No. 13- cv-1215, for which no reported citation exists; and

- Memorandum Opinion, Dkt. 239 (Chutkan, J.), and the Appendix thereto, Dkt. 239-1 (Chutkan, J.), filed on March 31, 2022, by the U.S. District Court for the District of Columbia in No. 13- cv-1215, available at 2022 WL 971735.

## C.    Related Cases

This case was previously before this Court in No. 17-7035, American Society for Testing, *et al*. v. Public.Resource.Org, Inc.

Counsel are not aware of any other related cases before this Court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1), Defendant–Appellee Public.Resource.Org, Inc. submits the following:

Public.Resource.Org, a California public benefit not-for-profit corporation, certifies that it has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ..........................................................v

GLOSSARY OF ABBREVIATIONS ................................................... xvii

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE.................................................................1

I.     BACKGROUND .............................................................................1

       A.     The Parties...........................................................................1

              1.     Carl Malamud and Public Resource ...........................................1

              2.     Plaintiffs and the Volunteers They Convene to Draft
                     Standards.................................................................................3

              3.     Plaintiffs' Shifting Claims of Copyright Ownership ..................4

       B.     Public Resource's Archive and the Incorporation Process ..................5

              1.     The Process of Incorporation .........................................................5

              2.     Governments Define the Scope of Incorporation and
                     Typically Incorporate Entire Documents....................................6

              3.     Agencies That Incorporate Standards by Reference
                     Express Those Standards as Government Policy with
                     Governmental Authority, and Incorporated
                     Documents Have the Force and Effect of Law..........................6

              4.     Every Standard as to Which the District Court Found
                     Fair Use Has Been Incorporated by Reference Into
                     Law But Is Otherwise Superseded...............................................7

       C.     Standards Incorporated by Reference into Law Can Be Hard
              to Find or Use. ......................................................................8

**TABLE OF CONTENTS**
**(Continued)**

Page

D.    Public Resource's Archive Has Not Harmed Sales of
Plaintiffs' Standards. ................................................................10

II.    PROCEDURAL HISTORY ..............................................................12

A.    The District Court's First Summary Judgment Order........................12

B.    This Court Vacated the Injunction, Reserving the Question
of Copyright Enforceability of Standards Incorporated into
Law. .................................................................................12

C.    On Remand, the District Court Found Fair Use as to 185
Standards and Declined to Enter a Permanent Injunction..................14

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................15

ARGUMENT ............................................................................18

I.    THE GOVERNMENT EDICTS DOCTRINE FORBIDS
COPYRIGHT RESTRICTIONS ON DOCUMENTS
INCORPORATED BY REFERENCE INTO LAW ....................................18

A.    The Supreme Court's *Georgia* Holding Naturally Extends to
Laws Incorporated by Reference........................................19

B.    Multiple Circuits Have Concluded That Standards
Incorporated by Reference into Law Are Not Copyrightable.............22

C.    The First, Fifth and Fourteenth Amendments Protect Public
Resource's Right to Provide the Public with Means to
Access, Analyze, and Criticize the Law...............................24

D.    A Long History of Precedent Forbids Copyright Restrictions
on Dissemination of the Law. ..........................................26

E.    The Plain Text of the Copyright Act Also Excludes
Standards Incorporated into Law. .....................................27

F.    The "Takings" Argument of Amici Is a Red Herring....................28

## TABLE OF CONTENTS
### (Continued)

Page

II.   PUBLIC RESOURCE'S ARCHIVE OF LAWS BY
      INCORPORATION IS ALSO A LAWFUL FAIR USE. .............................30

      A.   The District Court Correctly Held That the Purpose and
           Character of Public Resource's Archive Favor Fair Use. ..................30

           1.   Public Resource's Noncommercial Purpose Favors
                Fair Use. .................................................................................30

           2.   Public Resource's Transformative Purpose—Creating
                and Posting a Comprehensive Archive of Standards
                Incorporated Into Law—Favors Fair Use. ...............................31

                a.   The incorporation by reference process precisely
                     identifies what is and is not the law. ...............................32

                b.   Plaintiffs misread this Court's opinion to narrowly
                     circumscribe transformativeness. ...................................36

                c.   Small discrepancies and updates do not change the
                     analysis of fair use. ........................................................38

                d.   Public Resource's archive is very different from
                     Plaintiffs' restrictive and burdensome "reading rooms."
                     …………… ...................................................................40

      B.   The "Nature of the Copyrighted Works" Favors Fair Use
           Wherever Formal Incorporation Occurred. .........................................42

           1.   Formal Incorporation of Standards and Their
                Adoption as Law Controls the Second Fair-Use
                Factor. .......................................................................................42

           2.   The Standards Are Factual, Even Before They
                Became Legal Facts. ................................................................44

      C.   Public Resource Posted What Was Necessary to Achieve Its
           Transformative Purpose. ....................................................................45

**TABLE OF CONTENTS**
**(Continued)**

Page

D.    The District Court Correctly Found That Plaintiffs Have Not
Suffered Market Harm and Are Unlikely To Do So in the
Future.............................................................................................47

1.    The District Court Correctly Required Plaintiffs to
Show Meaningful Likelihood of Harm....................................48

2.    Plaintiffs Cannot Overcome Their Own Admissions
by Speculation.........................................................................49

3.    Answers to This Court's Questions Favor Fair Use. ...............50

4.    Plaintiffs Do Not Need Copyright Incentives..........................51

5.    Public Resource's Benefits Outweigh Any Harm. ..................53

III.   THE DISTRICT COURT CORRECTLY DECLINED TO
ENJOIN POSTING OF THE REMANING STANDARDS........................55

A.    Plaintiffs Have Not Proved Ownership..............................................56

B.    Irreparable Injury Will Not Occur......................................................56

C.    The Balance of Hardships and the Public Interest Weigh
Against an Injunction. ........................................................................58

CONCLUSION ..............................................................................................59

CERTIFICATE OF COMPLIANCE................................................................61

CERTIFICATE OF SERVICE .........................................................................62

ADDENDUM ................................................................................................63

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Wash. Metro. Area Transit Auth.*,
   826 F.3d 544 (D.C. Cir. 2016)................................................................18

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988)...........................................................................36

*Am. Soc'y for Testing & Materials v. Public.Resource.Org., Inc.,*
   No. 13-cv-1215 (TSC), 2022 WL 971735
   (D.D.C. Mar. 31, 2022)...........................................21, 35, 42, 48, 58

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
   896 F.3d 437 (D.C. Cir. 2018)............... 12, 13, 14, 15, 37, 42, 43, 44, 46, 54

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
   No. 13-cv-1215, 2017 WL 473822 (D.D.C. Feb. 2, 2017) ...............12

*American Educational Research Association, Inc. et al. v.
   Public.Resource.Org, Inc.*,
   No. 1:14-V-00857-TSC (D.D.C. Oct. 14, 2020) ..............................14

*Antioch Co. v. Scrapbook Borders, Inc.*,
   291 F. Supp. 2d 980 (D. Minn. 2003)...............................................57

*Appalachian Power Co. v. Train*,
   566 F.2d 451 (4th Cir. 1977) ............................................................34

*Apple, Inc. v. Samsung Elecs. Co.*,
   678 F.3d 1314 (Fed. Cir. 2012) ........................................................56

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) .............................................................45

*Banks v. Manchester*,
   128 U.S. 244 (1888).........................................................................26

*Bellwether Props., LLC, v. Duke Energy Indiana, Inc.*,
   87 N.E.3d 462 (Ind. 2017) ...............................................8, 9, 16, 54

*Berry v. Dillon*,
   291 F. App'x 792 (9th Cir. 2008) ......................................................57

*Boisson v. Banian Ltd.*,
   280 F. Supp. 2d 10 (E.D.N.Y. 2003) ................................................57

*Building Officials & Code Administration. v. Code Technologies, Inc.*,
   628 F.2d 730 (1st Cir. 1980).......................................................23, 27

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014) ..........................................................52

*Campbell v. Acuff-Rose Music*,
510 U.S. 569 (1994)...........................................................................49

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
44 F.3d 61 (2d Cir. 1994) ...........................................................23, 24, 33

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
843 F.2d 600 (1st Cir. 1988)...............................................................28

*Crocker v. Piedmont Aviation, Inc.*,
49 F.3d 735 (D.C. Cir. 1995)..............................................................18

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006).................................................................55, 56, 57

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)...........................................................................27

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
499 U.S. 340 (1991)...........................................................................45

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978).................................................................24, 38, 56

*Fox Broad. Co. v. Dish Network L.L.C.*,
747 F.3d 1060 (9th Cir. 2013) ........................................................49, 50

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) ...............................................58

*Georgia v. Public.Resource.Org*,
140 S.Ct. 1498 (2020)................................... 16, 19, 20, 26, 30, 42

*Getty Petroleum Mktg. v. Capital Terminal Co.*,
291 F.3d 312 (1st Cir. 2004) (Lipez, J., concurring).....................7, 9, 10, 35, 38

*Globe Newspaper Co. v. Superior Court for Norfolk Cty.*,
457 U.S. 596 (1982)...........................................................................24

*Golan v. Holder*,
565 U.S. 302 (2012)...........................................................................27

*Google LLC v. Oracle Am., Inc.*,
141 S.Ct. 1183 (2021)................................... 30, 31, 42, 45, 48, 51, 54

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)...........................................................................25

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
   774 F.3d 192 (3d Cir. 2014) ...................................................58

*Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
   920 F.3d 1 (D.C. Cir. 2019) ...................................................55

*Higgins v. Detroit Educ. Television Found.*,
   4 F. Supp. 2d 701 (E.D. Mich. 1998) ....................................49

*Howell v. Miller*,
   91 F. 129 (6th Cir. 1898) (Harlan, J.) ...................................26

*Liberty Lobby, Inc. v. Rees*,
   852 F.2d 595 (D.C. Cir. 1988) ..............................................18

*Milice v. Consumer Product Safety Comm'n*,
   2 F.4th 994 (D.C. Cir. 2021) ...................................................7

*Morgan Drexen Inc. v. CFPB*,
   785 F.3d 684, 694 (D.C. Cir. 2015) .......................................56

*Nichia Corp. v. Everlight Ams. Inc.*,
   855 F.3d 1328 (Fed. Cir. 2017) .............................................55

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
   121 F.3d 516 (9th Cir. 1997) .................................................24

*Princeton Univ. Press v. Mich. Doc. Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996) .................................................49

*Public.Resource.Org Inc. v. Cal. Office of Administrative Law*,
   No. 34-2021-80003612, Judgment at 11 (Cal. Sup. Ct., Apr. 11, 2022)......22, 42

*Silvers v. Sony Pictures Entm't, Inc.*,
   402 F.3d 881 (9th Cir. 2005) ............................................16, 48

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)..........................................41, 45, 48, 49

*Swatch Group Management Services v. Bloomberg LP.*,
   756 F.3d 73 (2d. Cir. 2014) .............................................32, 46

*TD Bank N.A. v. Hill*,
   928 F.3d 259 (3d Cir. 2019) ..................................................58

*Thomas Jefferson University v. Shalala*,
   512 U.S. 504 (1994).............................................................33

*United States v. Myers*,
   553 F.3d 328 (4th Cir. 2009) .............................................7, 20

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Univ. of Houston Sys. v. Jim Olive Photography,*
  580 S.W.3d 360 (Tex. App. 2019), *aff'd,* 624 S.W.3d 764 (Tex. 2021)...........29

*Valancourt Books, LLC v. Perlmutter,*
  554 F. Supp. 3d 26 (D.D.C. 2021) ....................................................................29

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.,*
  293 F.3d 791 (5th Cir. 2002) .................................... 21, 22, 23, 24, 28, 45, 52, 53

*Wheaton v. Peters,*
  33 U.S. (8 Pet.) 591 (1834) .............................................................................26

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................................55

**STATUTES**

5 U.S.C. § 552(a) ....................................................................................................5, 33

17 U.S.C. § 102(b) .......................................................................................................27

17 U.S.C. § 105 .........................................................................................................4, 28

17 U.S.C. § 106 .........................................................................................................29, 31

17 U.S.C. § 107 ............................................................................................................29

17 U.S.C. § 121 ............................................................................................................41

1976 Copyright Act......................................................................................................27, 41

California Building Standards Law ...........................................................................5

California Code of Regulations Title 24, Part 3 ..................................................6, 22

Jodi L. Short, *The Political Turn in American Administrative Law: Power,
  Rationality, and Reasons*, 61 Duke L.J. 1811, 1821 (2012)..............................25

Minn. Admin. Rule 4761.2460 .................................................................................5

Pub. L. No. 74-220, ch. 417, 49 Stat. 500-503 (July 26, 1935)...............................25

**FEDERAL AND STATE REGULATIONS**

1 C.F.R. § 51.1 ...........................................................................................................33

1 C.F.R. §§ 51.1-51.11................................................................................................5

1 C.F.R. § 51.6(a) (1973) ...........................................................................................33

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

1 C.F.R. § 51.7(a) (1973) ............................................................33

1 C.F.R. § 51.9(a)-(b)..................................................................33

24 C.F.R. § 3280.4(aa)(4) (2019) ..................................................6

34 C.F.R. § 668.146 .....................................................................9

40 C.F.R. § 136.3 (2014) ............................................................43

49 C.F.R. § 192.7 (2009) ..............................................................6

Cal. Code of Regs., Title 24, Part 3 ..............................................5

H.R. Rep. No. 94–1476 (1976), 1976 U.S.C.C.A.N. 5659....................41

*The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989) ..........25

### AMENDMENTS

First Amendment.................................................................18, 24

Second Amendment ....................................................................36

Fifth Amendment ........................................................................25

Fourteenth Amendment ..........................................................17, 25

### OTHER AUTHORITIES

Erwin N. Griswold, *Governance in Ignorance of the Law—A Plea for Better Publication of Executive Legislation*, 48 Harv. L. Rev. 198 (1934) .................26

*Incorporation by Reference*, 37 Fed. Reg. 23602 (Nov. 4, 1972) (codified at 1 C.F.R. 51), JA09250(Dkt-215-5).....................................34

K. Kindy, *In Trump era, lobbyists boldly take credit for writing a bill to protect their industry*, Washington Post (July 31, 2017)......................21

L. Ray Patterson & Craig Joyce, *Monopolizing the Law: the Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L. Rev. 719, 777 (1999) ............................................28

Merriam Webster Ninth New Collegiate Dictionary (1989) ...................28

Nina A Mendelson, *Private Control over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 771 (2014) ..............................................35

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Office of the Federal Register, *Document Drafting Handbook*, Aug. 2018 ed.
(Rev. 1.1, dated Aug. 9, 2019), Chapter 1.5 ......................................................33

*Oil Suit Dismissed in Supreme Court*, N.Y. Times, Oct. 2, 1934 ...........................25

Oxford English Dictionary.....................................................................................27

Postsecondary Education for Students with Disabilities 43-44 (Dec. 6,
2011), http://www2.ed.gov/about/ bdscomm/list/aim/meeting/aim-
report.pdf.............................................................................................................41

Victoria F. Nourse & Jane S. Schachter, *The Politics of Legislative Drafting:
a Congressional Case Study,* 77 N.Y.U. L. Rev. 575, 583 (2002)......................20

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ASHRAE | American Society of Heating, Refrigerating and Air-Conditioning Engineers (the acronym appears in the title of the organization's documents) |
| ASTM | ASTM International is a trading name of Plaintiff American Society for Testing and Materials (the acronym also appears in the title of the organization's documents) |
| C.F.R. | Code of Federal Regulations |
| EDGAR | Electronic Data Gathering and Retrieval (a database of the Securities and Exchange Commission) |
| EPA | Environmental Protection Agency |
| HTML | Hypertext Markup Language |
| IBR | Incorporation by reference |
| MML | Mathematics Markup Language |
| NESC | National Electrical Safety Code |
| NFPA | National Fire Protection Association (the acronym appears in the title of the organization's documents) |
| OCR | Optical character recognition |
| OFR | Office of the Federal Register |

## STATEMENT OF ISSUES

1.    Whether the district court correctly held that Public Resource's posting of the law does not infringe copyright.

2.    Whether the district court correctly refused to permanently enjoin Public Resource from posting certain standards, after finding that Plaintiffs would not suffer irreparable harm and recognizing that those standards could become law through incorporation.

## STATEMENT OF THE CASE

### I.    BACKGROUND

#### A.    The Parties

##### 1.    Carl Malamud and Public Resource

Carl Malamud, president and founder of Public.Resource.Org ("Public Resource"), has dedicated his career to making government and legal materials available online. In 1994 he used a National Science Foundation grant to purchase all electronic filings that corporations submitted to the Securities and Exchange Commission, and he made the Electronic Data Gathering and Retrieval ("EDGAR") database freely available online. JA07201(Dkt-204-4 ¶7). In 1995, he lent computers and donated software to help the Commission take the service over. *Id*. He also purchased feeds of all U.S. patents and made them available for free online. He later convinced the U.S. Patent and Trademark Office to provide that service to the public. *Id*. ¶12.

1

In 2007, Mr. Malamud founded Public Resource, a charitable organization that provides online access to many kinds of government materials, from judicial opinions to video recordings of congressional hearings. JA07159(Dkt-203-2 ¶68).

To aid its mission, Public Resource operates a website providing public access to the law, including public safety and other standards that federal and state governments have incorporated into law by reference or reprinting. *Id*. Public Resource relies on contributions and grants for its funding. *Id*. It does not limit, or charge for, that access. JA07160-7161(Dkt-203-2 ¶72). It does not display, or derive any revenue, from advertising. JA01018(Dkt-120-3 ¶7). Nor does it log or track visitors to its site. JA01266(Dkt-121-5 ¶24).

Public Resource makes these materials not just available but more accessible. For example, by reformatting documents, Public Resource allows persons with visual disabilities to enlarge the text or use text-to-speech software to hear the text of a document. JA07160-7161(Dkt-203-2 ¶¶70, 73). Similarly, Public Resource translates images into scalable vector graphics for better visibility. *Id.* To make documents word-searchable, allowing researchers to analyze them efficiently, it uses optical character recognition, painstakingly retypes documents into Hypertext Markup Language ("HTML"), and converts formulas to Mathematics Markup Language ("MML"). *Id.*

## 2. Plaintiffs and the Volunteers They Convene to Draft Standards

Plaintiffs are standards development organizations that convene volunteers to draft and update standards for various industries. The volunteers include government officials, industry representatives, academics, and other technical experts. JA07179-7180(Dkt-203-2 ¶¶184-187). Those volunteers and their employers contribute their time to proposing, evaluating, specifying, and approving codes and standards. They suggest and vote on language, weighing and implementing proposals from government employees, academics, and others. *Id*. They debate the scope, structure, and wording of standards, forming a consensus reflecting minimally acceptable or best practices using the most precise, scientific terms possible. JA07171(Dkt-203-2 ¶¶126-127)

Plaintiffs do not compensate the volunteers. JA07179-7183(Dkt-203-2 ¶¶184-93). Instead, the volunteers serve the public and their profession, and may gain professional recognition and have their participation paid for by their employers. JA07183(Dkt-203-2 ¶¶194-5).

Plaintiffs help organize the drafting process, keep minutes of meetings, and furnish templates for volunteers to use in drafting the standards. Plaintiffs lobby to have some of those standards incorporated into law, and they sell copies of the standards as well as ancillary materials. JA07155-7158(Dkt-203-2 ¶¶49-64). JA07155-7156(Dkt-203-2 ¶¶50, 54). Plaintiffs benefit when their standards become

law. JA01083(Dkt-120-6 at 12); JA01551-1552(Dkt-122-1 at 281-82); JA02136-2151(Dkt-122-4 at 30-45) (ASHRAE referring to its "EPAct advantage"). For example, Plaintiff NFPA advertises its National Electrical Code handbook saying, "Be confident your work complies with California law." JA02953-2954(Dkt-124-5). Plaintiff ASTM advertises that "[k]nowledge of ASTM standards is important for complying with U.S. regulations and procurement requirements." JA01961(Dkt-122-3 at 24).

### 3.    Plaintiffs' Shifting Claims of Copyright Ownership

Plaintiffs applied for copyright registrations of the standards at issue in this case as "works made for hire." JA07183-7184(Dkt-203-2 ¶196). But that status applies to work of employees but does not apply to work of volunteers unless the volunteers executed valid work-made-for-hire agreements and the works are eligible. When pressed on that issue, Plaintiffs later claimed they owned the copyrights by assignments. JA07184(Dkt-203-2 ¶199). Facing defects in documentation, Plaintiffs then said that convening volunteers and shepherding the process made the Plaintiffs "joint authors" of the standards with standing to bring this lawsuit. Plaintiffs have never addressed the participation of federal government employees in authoring their standards. JA07184-7190(Dkt-203-2 ¶¶199-224). If standards are joint works with the United States Government, they have no copyright protection. *See* 17 U.S.C. § 105.

**B.     Public Resource's Archive and the Incorporation Process**

**1.     The Process of Incorporation**

Incorporation by reference is an alternative to express inclusion of language into a government's published laws or regulations. *See* 5 U.S.C. § 552(a)(1); 1 C.F.R. §§ 51.1-51.11. The federal government began incorporating materials by reference, instead of reproducing them, to limit the bulk of the Code of Federal Regulations (C.F.R.). JA07145 (Dkt-203-2 ¶3). States and municipalities also turn standards into law through incorporation by reference as well as by reprinting entire standards in the texts of laws. *See, e.g.*, Minn. Admin. Rule 4761.2460, Subp. 2(C); Cal. Code of Regs., Title 24, Part 3.

Incorporation processes are careful and rigorous. Federally, an agency responsible for a regulation provides notice in the Federal Register and seeks comments concerning its intent to incorporate. JA07147-7148(Dkt-203-2 ¶¶10, 18). If the agency decides to incorporate and the Director of the Federal Register approves, the standard is incorporated and becomes federal law. 5 U.S.C. § 552(a).

State adoptions, by reference or reprinting, are equally meticulous. For example, California follows a triennial cycle, with a 45-day public-comment period, a six-month publication requirement, and a three-month delay for implementation. The California Building Standards Law precisely defines this process. JA07147-7148(Dkt-203-2 ¶15). That incorporation process includes the National Electrical

5

Code, reprinted in the California Electrical Code. *See* Cal. Code of Regs., Title 24, Part 3. JA07193-7194(Dkt-203-2 ¶¶236-7).

> **2.    Governments Define the Scope of Incorporation and Typically Incorporate Entire Documents.**

The Incorporation by Reference Handbook of the Office of the Federal Register specifies that, if material is necessary to understand or comply with the regulation, the agency must incorporate the material by reference. JA09512(Dkt-204-64 p. 2 (citing 5 U.S.C. § 552(a))). To be eligible, the material must be *published* and "impossible or impractical" to print in the C.F.R. JA09516(*id*. at 6).

According to the Director of Legal Affairs and Policy at the Office of the Federal Register, if an agency identifies a *document* in its incorporation language and does not specify a section of that document, incorporation extends to the *entire document*. JA07213(Dkt-204-4 ¶40), JA07226(Dkt-204-40). An agency explicitly specifies provisions for incorporation when it intends to incorporate only parts of a document. For example, 24 C.F.R. § 3280.4(aa)(4) (2019) states that only specific portions of the 2005 edition of the National Electrical Code, NFPA 70, are incorporated into that chapter of the regulations. In contrast, 49 C.F.R. § 192.7 (2009) incorporated the full 2005 edition of the National Electrical Code, NFPA 70.

> **3.    Agencies That Incorporate Standards by Reference Express Those Standards as Government Policy with Governmental**

**Authority, and Incorporated Documents Have the Force and Effect of Law.**

Material incorporated by reference, "like any other properly issued rule, has the force and effect of law." JA07145 (Dkt-203-2 ¶2); *cf. United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009). The same rule applies to material incorporated in state and municipal regulations. *See Getty Petroleum Mktg. v. Capital Terminal Co*., 291 F.3d 312, 327 (1st Cir. 2004) (Lipez, J., concurring).

Accordingly, incorporated standards have the same effects as other laws and regulations, including civil and criminal penalties for violations. *See Milice v. Consumer Product Safety Comm'n*, 2 F.4th 994, 1000 (D.C. Cir. 2021).

**4.    Every Standard as to Which the District Court Found Fair Use Has Been Incorporated by Reference into Law But Is Otherwise Superseded.**

The federal government has incorporated into law every entire standard at issue as to which the district court found fair use. *See* JA07223-7224(Dkt-204-5 ¶¶56-58), JA08534-8666(Dkts-204-95, -96, and -97)(tables listing all standards at issue with locations of incorporation). State governments also have incorporated many of the standards, by reference or reprinting. *Id.*; JA07193-7194(Dkt-203-2 ¶¶236-7). When Plaintiffs sued, all but one of the standards at issue were outdated *as standards*—they had been superseded or withdrawn—but were still in force *as law*. Today, all are either superseded or withdrawn *as standards*. JA07223-7224(Dkt-204-5 ¶¶ 56-58), JA08534-8666(Dkts-204-95, -96, and -97).

### C.    Standards Incorporated by Reference into Law Can Be Hard to Find or Use.

Although standards that have become law implement government decisions, express government policies, and govern a wide range of activities, the public's practical ability to read, analyze, and communicate them is sharply limited.

Courts and litigants have been frustrated by the inability to access the laws that affect their cases. In 2017, for example, the Indiana Supreme Court was unable to obtain a safety code at the heart of a dispute before it because of publisher-imposed limitations on access to the code. The court ultimately found the standard *on the Internet Archive—thanks to Public Resource.* The court discussed at length the problem of public access to the law caused by restrictions on material incorporated by reference. *See Bellwether Props., LLC, v. Duke Energy Indiana, Inc.,* 87 N.E.3d 462, 467-69 (Ind. 2017).

A similar dilemma arose in a dispute that turned on application of the 1987 edition of a standard (promulgated by Plaintiff NFPA) that had been incorporated into the Rhode Island Building Code. The complaining party asked the trial court to take judicial notice of the state building code. The court required the complaining party to introduce the standard into evidence, for use as the basis of a jury instruction, but counsel were unable to locate the correct edition of the standard (they could only find the 2000 edition). The trial court could not find it either. The court granted judgment as a matter of law against the complaining party for failure to prove the

8

content of the relevant regulation. The First Circuit affirmed, ruling the district court was not obliged to take judicial notice of a regulation it could not review. *Getty Petroleum,* 391 F.3d at 312.

Even where incorporated standards *can* be found, they are often difficult to access and use. The National Archives offers appointments to read a paper version of a federally incorporated standard. *See, e.g.*, 34 C.F.R. § 668.146. These versions are inaccessible to persons with visual disabilities, who wish to conduct computer-aided analysis, or who cannot travel to Washington, D.C. JA07152(Dkt-203-2 ¶31).

Sometimes one can buy copies. But because relevant versions are often currently effective *as law* but superseded *as standards,* those older versions may not be available for purchase. *Id.*

One can theoretically search libraries for standards, but their availability is unpredictable at best. *See, e.g., Bellwether*, 87 N.E.3d at 468; *Getty Petroleum*, 391 F.3d at 321 (NFPA 30 not "readily available"); *id.* at 328 (Lipez, J., concurring).

Finally, one can access some standards through Plaintiffs' online "reading rooms" that, with one exception (NFPA's), were established only after Public Resource highlighted the lack of public access. JA07152-7153(Dkt-203-2 ¶33).

████████ created its ████████████████ reading room in 2013 as an ███

████████████████████████████████████████████████████████████

████████████ JA07153-7154(Dkt-203-2 ¶39). To use ASTM or NFPA's reading

rooms, one must first register by providing one's name and email address, agree to terms of use that include unfavorable forum selection clauses, and consent to jurisdiction in a potentially distant court. ASTM also requires a residence address and phone number, and an agreement that that the organization owns copyright over the standards. JA07153-7154(Dkt-203-2 ¶¶37-40). Plaintiffs view their reading rooms as opportunities to sell additional products to visitors who come seeking to read the law. *Id.*, Plaintiffs-Appellants' Br. 43; JA00108-109(Dkt-117-2 ¶¶86-87).

Plaintiff's "reading room" format sharply limits reading and use. The visitor must view standards in a small screen box, sometimes with degraded text and a small font. Usually just a portion of each page is visible; with magnification a single line cannot be viewed without scrolling. Plaintiffs' reading rooms inhibit search and computer-aided analysis of the standards; they do not include copy/paste, print, or save options. JA07154(Dkt-203-2 ¶44). Contrary to Plaintiffs' assertions, some incorporated standards are not available in the reading rooms at all, and Plaintiffs can remove standards at will. *Id.* ¶43; *cf.* Plaintiffs-Appellants' Br. 32.

## D. Public Resource's Archive Has Not Harmed Sales of Plaintiffs' Standards.

Public Resource first posted NFPA standards in 2008; ASTM and ASHRAE standards followed soon afterwards. Plaintiffs have no concrete example of resulting harm, and their records show the opposite.

MATERIAL UNDER SEAL DELETED

ASTM admitted ████████████████████████████████████████████

████████ JA07172(Dkt-203-2 ¶137). ASTM has no evidence of lost sales. In fact,

ASTM's sales have increased despite (and perhaps because of) Public Resource's

activities. JA07174(Dkt-203-2 ¶153).

ASHRAE stated it had not attempted to determine what, if any, losses were

attributable to Public Resource's activities, and it was unable to identify any

evidence of harm in response to a recent interrogatory. JA07174(Dkt-203-2 ¶¶150,

154).

NFPA asserts that "revenue is somewhat cyclical with publications, but in

recent years, NFPA's revenue from the sale of standards has been declining [and]

NFPA attributes this decline, at least in part, to PRO's making copies of NFPA's

standards . . . ." JA07167(Dkt-203-2 ¶100). NFPA's only support for this assertion

is the statement of its chief executive officer. JA04995-4996(Dkt-198-50 ¶38).

NFPA's internal sales reports and analyses show ██████████████████████████

██████████████████████████████████████████ JA07150 (Dkt-

203-27. The "cyclical" nature of publication revenue reflects the fact that, once

standards become outdated, revenue plummets, whether posted by Public Resource

or not. JA07174(Dkt-203-2 ¶155).

Plaintiffs' purported expert, John Jarosz, asserted in 2015 that Public

Resource's activities "would" threaten the market for their products. Years later,

there is no evidence that speculation has become a reality. JA07165(Dkt-203-2 ¶91).

There is no evidence that any person who might have viewed a standard via Public

Resource would otherwise have purchased it.

## II.    PROCEDURAL HISTORY

### A.    The District Court's First Summary Judgment Order

Plaintiffs sued Public Resource for copyright and trademark infringement of

hundreds of standards. The parties filed cross-motions for summary judgment;

Plaintiffs sought summary judgment on nine standards. The district court granted

summary judgment to Plaintiffs and enjoined Public Resource from unauthorized

use of those standards and Plaintiffs' trademarks. *Am. Soc'y for Testing & Materials*

*v. Public.Resource.Org, Inc.*, No. 13-cv-1215, 2017 WL 473822 (D.D.C. Feb. 2,

2017). Public Resource appealed.

### B.    This Court Vacated the Injunction, Reserving the Question of Copyright Enforceability of Standards Incorporated into Law.

This Court vacated the district court's injunction and reversed the summary

judgment order. *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,

896 F.3d 437 (D.C. Cir. 2018) ("*ASTM II*"). The Court stated that Public Resource

presented "a serious constitutional concern with permitting private ownership of

standards essential to understanding legal obligations," but focused solely on the

question of fair use so as "to avoid 'pass[ing] on questions of

constitutionality…unless such adjudication is unavoidable.'" *Id.* at 447 (quoting

12

*Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)) (alteration in original). This Court also opined that if Public Resource's postings were not found to be fair use, such a result would "again rais[e] the question of whether the authors of such works can maintain their copyright at all." *ASTM II*, 896 F.3d at 447.

This Court ruled that the district court had misapplied the fair use standard and remanded the case for further proceedings and factual development, stating:

> though there is reason to believe "as a matter of law" that PRO's reproduction of certain standards "qualif[ies] as a fair use of the copyrighted work," *id.* (internal quotations and citations omitted), we ultimately think the better course is to remand the case for the district court to further develop the factual record and weigh the factors as applied to PRO's use of each standard in the first instance.

*Id.* at 448–49 (alterations in original). This Court directed the parties not to "treat[] the standards interchangeably" and offered additional guidance regarding fair-use factors and the possibility of grouping similar materials together. *Id.* at 449.

Concurring, Judge Katsas was more explicit: "The Court's fair-use analysis faithfully recites the governing four-factor balancing test, yet, in conducting the balancing, it puts a heavy thumb on the scale in favor of an unrestrained ability to say what the law is." *Id.* at 459. He continued:

> [W]here a particular standard is incorporated as a binding legal obligation, and where the defendant has done nothing more than disseminate it, the Court leaves little doubt that the dissemination amounts to fair use.

*Id.* Judge Katsas joined the Court's opinion, understanding that, "in the unlikely event that disseminating 'the law' might be held not to be fair use," the Court would revisit the question of copyrightability. *Id.*

### C.  On Remand, the District Court Found Fair Use as to 185 Standards and Declined to Enter a Permanent Injunction.

On remand, the parties further developed the factual record and filed new cross-motions for summary judgment.[1] They provided detailed information and materials for individualized fair-use analyses for each standard at issue, including copies of each standard, copies of Public Resource's republished versions, and the text and location of the incorporating regulation. *See* JA09286-9287(Dkt-239 at 22–23). Public Resource's briefing focused primarily on fair use but expressly reserved its prior arguments that Plaintiffs had not established ownership and that standards that have been incorporated into law are government edicts. (Dkt-202-2 at 19 n.6); JA07179-7190(Dkt-203-2 ¶¶184-224).

As to 184 of the standards, and a portion of one other, the court found no copyright infringement on the basis of fair use. JA09300(Dkt-239 at 36). As to the remaining 32 standards, the district court found that the standards posted by Public

---

[1] In the separate action that had been consolidated with this case in the first appeal, *American Educational Research Association, Inc. et al. v. Public.Resource.Org, Inc.*, the plaintiffs dismissed their case with prejudice after briefing their second motion for summary judgment. No. 1:14-cv-00857-TSC, Dkt. 149 (D.D.C. Oct. 14, 2020).

Resource differed from the versions incorporated into law and on that basis granted summary judgment to the Plaintiffs. *Id*. It declined to permanently enjoin Public Resource from posting those standards, however, given the "meager evidence of irreparable harm" and "the possibility that these standards will be incorporated into law at a later date." JA09311(Dkt-239 at 47).[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Public Resource has a simple, powerful mission: to make all government information easily and freely available online. Not long ago, that would have seemed impossible; today, it is not just possible but critically important to promoting the rule of law. Thanks in part to Public Resource's work, the public can access judicial opinions, state and federal statutes, and the Federal Register, online, for free, without needing to waive any rights or surrender personal information, and with the full ability to study and share what they learn. The glaring exception, if Plaintiffs succeed here, would be a set of laws that in many cases most directly affects our everyday lives: the codes that ensure our homes, workplaces, devices, and many other products, are safe and fit for purpose.

Access to these codes is not a theoretical problem—just ask the Indiana Supreme Court. In 2017, that court considered a statute of limitations question that turned upon Indiana's incorporation by reference of the 2002 version of a standard.

---

[2] The district court's trademark ruling is not at issue in this appeal.

*See Bellwether,* 87 N.E.3d at 468–69. The parties had not submitted the incorporated standard, and the court needed to know what the law said. A court employee asked the relevant government agency for a copy and was told they had to make an appointment to inspect the document but could not borrow or print it because of purported copyright restrictions. *Id.* at 468. Indiana's highest court, seeking to learn *its own state's law*, was able to do so only because it found the document on the Internet Archive. *Id.* at 469. Who put it there? Public Resource. JA07163(Dkt-203-2 ¶80).

A nation governed by the rule of law cannot tolerate private control of that law, no matter who initially drafts it. Copyright, while authorized by the Constitution, is still nothing more or less than a bundle of statutory incentives. It cannot trump fundamental constitutional rights. *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 883–84 (9th Cir. 2005). The district court's opinion respects that principle, in accord with centuries of precedent establishing that "no one can own the law" and "all should have free access to its contents." *Georgia v. Public.Resource.Org*, 140 S.Ct. 1498, 1507 (2020).

This Court should affirm the summary judgment on either of two separate grounds.

First, the standards are government edicts free from copyright, following the Supreme Court's guidance in *Georgia*, which treated all materials promulgated by

officials who are empowered to speak with the force of law as constructively authored by the people. Affirmance on this ground would also accord with decisions of other circuits regarding standards incorporated by reference, and it would protect First, Fifth, and Fourteenth Amendment rights of the people to read, communicate, and analyze the law.

In the alternative, the Court should affirm that Public Resource's posting of standards incorporated into law is a fair use. Its archive of incorporated standards is noncommercial, transformative, and highly factual; it reproduces no more than necessary to enable access to the complete set of documents that govern our conduct. Plaintiffs propose a crabbed approach that deprives laws of their context and nuance by isolating only portions of fully incorporated documents. This Court did not require that; nor does fair use. Public Resource's efforts have not harmed the markets for any standards at issue and will not in the future.

Finally, the Court should affirm the denial of a permanent injunction as to the 32 standards that the district court determined not to be incorporated, as the district court's sound exercise of judicial discretion in the absence of any irreparable harm. The denial supports the public interest by allowing Public Resource to add new versions of standards to its archive as incorporations continue.

## ARGUMENT

## I.   THE GOVERNMENT EDICTS DOCTRINE FORBIDS COPYRIGHT RESTRICTIONS ON DOCUMENTS INCORPORATED BY REFERENCE INTO LAW

Two separate legal canons protect Public Resource's conduct here: the fair use doctrine and the government edicts doctrine. While the district court ruled on fair use, this Court may affirm on either basis because doing so would not require modification of the judgment, regardless of whether the district court reached, or even rejected, the alternative reasoning. *Alexander v. Wash. Metro. Area Transit Auth.,* 826 F.3d 544, 550–51 (D.C. Cir. 2016); *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 741 (D.C. Cir. 1995).

Here, affirmance based on the government edicts doctrine would lead to the same result as the district court's order: summary judgment in Public Resource's favor as to 185 standards expressly incorporated into law, and a denial of an injunction against posting the 32 standards that are not currently law. Where, as here, a judgment implicates the First Amendment, courts must "conduct an independent examination of the whole record to ensure that the judgment does not constitute a forbidden intrusion on First Amendment rights." *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C. Cir. 1988) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

Affirmance on this basis would provide certainty for future users, rather than requiring them to "roll the dice with a potential fair use defense" that will cause the "less bold to think twice before using official legal works…." *Georgia,* 140 S.Ct. at 1513.

At a minimum, if this Court finds that Public Resource's posting of any standard incorporated by reference is not a fair use, it should take the step it avoided in the first appeal and reach the issue of copyrightability as to that standard.

### A.    The Supreme Court's *Georgia* Holding Naturally Extends to Laws Incorporated by Reference.

After this Court's first ruling in this case, the Supreme Court revisited the copyrightability of law in *Georgia v. Public.Resource.Org*. 140 S.Ct. at 1501. Holding that annotations to Georgia's official statutory code, as government edicts, were free from copyright, the Court explained that officials who "speak with the force of law" cannot claim copyright in the works they create in the course of their official duties. *Id.* at 1503.[3] The central basis for this ruling was the principle that "no one can own the law" and that "all should have free access to its contents." *Id* at 1507.

The same reasoning applies here. Regulatory agencies express government policy, speaking with the force of law, when they incorporate a standard by

---

[3] The parties provided supplemental briefing to the district court on this issue. Dkts. 225-228.

19

reference. Incorporation of materials by reference has the same effect as though the government had pasted them word-for-word into a regulation. *See* JA02903(Dkt-122-9 at 86); *Myers*, 553 F.3d at 331.

Moreover, regulators and Plaintiffs often work closely together in creating standards. Federal employees participate extensively in the standards drafting processes that Plaintiffs convene. JA01093(Dkt-120-9 at 2)("Over 1,400 individuals from federal agencies [were] actively engaged in 90 percent of [ASTM] standards writing technical committees."); JA01949(Dkt-122-3 at 12)("1000 units of U.S. Government participation in ASTM"). Agency officials then select some of the output of those processes and declare it to be the law, just like a legislature enacting a bill written by a lobbyist. In both instances, the government edicts doctrine prevents the "instant and automatic" application of copyright to legal texts. That, in turn, saves the public from "hav[ing] to think twice before using official legal works that illuminate the law we are all presumed to know and understand." *Georgia*, 140 S.Ct. at 1512-13.

It is common for edicts of government to originate with private parties. The words of our statutes and regulations are frequently composed by constituents, lobbyists, industry associations, law professors, other state and foreign officials, uniform law commissions, and groups like the American Legislative Exchange Council. *See* Victoria F. Nourse & Jane S. Schachter, *The Politics of Legislative*

*Drafting: a Congressional Case Study,* 77 N.Y.U. L. Rev. 575, 583 (2002); K. Kindy, *In Trump era, lobbyists boldly take credit for writing a bill to protect their industry*, Washington Post (July 31, 2017).[4]

When a legislature or a regulator adopts these words in its official capacity, in a process designed to give them the force of law, those works are government edicts and are not copyrightable. If copyright enforceability for standards incorporated into law were accepted, "there would be 'no outer limit on claims of copyright prerogatives by nongovernmental persons who contribute to writing 'the law' such as lobbyists or law professors. An individual who drafted a statute or amendment later adopted by Congress could claim copyright in the text.'" Brief of the United States as Amicus Curiae on Petition for Certiorari at 15, *S. Bldg. Code Cong. Int'l, Inc.* v. *Veeck* (quoting *Veeck*, 293 F.3d 791, 799 (5th Cir. 2002)).[5]

In this respect, the district court erred. It reasoned that the government edicts doctrine only applies to text "independently created" by a rulemaking authority or its contractor. JA09284 (Dkt-239 at 20) ("*ASTM III*"). The Supreme Court's observation that "works created by government officials (or private parties) who lack the authority to make or interpret the law" can be subject to copyright describes the

---

[4] Available at https://www.washingtonpost.com/powerpost/in-trump-era-lobbyists-boldly-take-credit-for-writing-a-bill-to-protect-their-industry/2017/07/31/eb299a7c-5c34-11e7-9fc6-c7ef4bc58d13_story.html.

[5] Available at https://www.justice.gov/sites/default/files/osg/briefs/2002/01/01/2002-0355.pet.ami.inv.pdf.

more general case of materials that are not adopted by a government authority as official pronouncements. Here, governments officially pronounce standards as binding government edicts. If the district court's reasoning were correct, a lobbyist who drafts a proposed regulation that is later enacted by a legislature or agency could claim exclusive rights to the text of that regulation.

This danger is not hypothetical: Plaintiff NFPA currently claims to hold copyright in the express text of Title 24, Part 3 of the California Code of Regulations, and has asked the state to restrict public access to it. JA07193-7196 (Dkt-203-2 ¶¶236-242); *Public.Resource.Org Inc. v. Cal. Office of Administrative Law*, No. 24-2021-80003612, Judgment at 11 (Apr. 11, 2022).

## B. Multiple Circuits Have Concluded that Standards Incorporated by Reference into Law Are Not Copyrightable.

Extension of *Georgia's* reasoning to the standards also brings this Court in line with its sister circuits.

The Fifth Circuit addressed a virtually identical question in *Veeck*, 293 F.3d at 796. Peter Veeck posted online model building codes that two Texas towns had adopted by reference. *Id.* at 793. The organization that developed the codes sued for copyright infringement. Sitting *en banc*, the Fifth Circuit rejected the claim, using language that presaged the Supreme Court's construction of authorship in *Georgia*:

> The very process of lawmaking demands and incorporates contributions by "the people," in an infinite variety of individual and organizational capacities. Even when a governmental body

> consciously decides to enact proposed model building codes, it does so based on various legislative considerations, the sum of which produce its version of "the law." In performing their function, the lawmakers represent the public will, and the public are the final "authors" of the law.… .

*Id.* at 799.

The Fifth Circuit's analysis echoed that of the First Circuit in *Building Officials & Code Administration. v. Code Technologies, Inc.*, 628 F.2d 730, 734, 736 (1st Cir. 1980). In that case, the First Circuit vacated a preliminary injunction for the creator of a model building code that Massachusetts had adopted. *Id.* at 731. The court remanded, explicitly recognizing the due process implications of allowing a single entity to control access to the law.

> [I]t is hard to see how the public's essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder.…

*Id.* at 734, 736.

To be clear, "copyrighted works do not 'become law' merely because a statute refers to them." *See Veeck*, 293 F.3d at 805 (citing 1 Goldstein on Copyright § 2.49 n.45.2). But this case does not involve *citations to* reference works. It concerns documents that governments have *expressly incorporated into law*.

Accordingly, applying the government edicts doctrine here accommodates the holdings of *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61,

74 (2d Cir. 1994), and *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir. 1997), both of which involved "compilations of data that had received governmental approval, not content that had been enacted into positive law." *Veeck*, 293 F.3d at 805. *CCC* involved a book of automobile valuations that an insurance regulation "approved for use" but did not expressly incorporate. 44 F.3d at 74, citing N.J. Admin. Code § 11:3-10.4 (1988). *Practice Management* addressed a regulation that required Medicaid reimbursement applications to refer to privately authored medical codes but did not incorporate the codes into law. 121 F.3d at 518. Because the external works in those cases were referred to but not adopted as law, the government edicts doctrine did not apply.

> **C.    The First, Fifth and Fourteenth Amendments Protect Public Resource's Right to Provide the Public with Means to Access, Analyze, and Criticize the Law.**

Recognizing standards incorporated into law as government edicts also protects the public's First Amendment rights to "discussion, debate, and the dissemination of information and ideas." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 781-83 (1978). As the Supreme Court has noted, "'a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.' [This] serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v.*

*Superior Court for Norfolk Cty.*, 457 U.S. 596, 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

The ability to communicate the law is particularly crucial when that law incorporates a standard by reference. The public cannot blindly rely on government agencies to ensure that incorporated standards serve the public interest rather than the private parties that influence them. The public has an acute need to access and share that law so it can hold regulators accountable for their decisions. *See* Jodi L. Short, *The Political Turn in American Administrative Law: Power, Rationality, and Reasons*, 61 Duke L.J. 1811, 1821 (2012).

Moreover, due process under the Fifth and Fourteenth Amendments independently requires public access to law, including components that have been incorporated by reference. As Justice Scalia wrote, "[r]udimentary justice requires that those subject to the law must have the means of knowing what it prescribes." *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989). That "basic principle of due process" is designed to protect citizens' autonomous choice "to steer between lawful and unlawful conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). Not coincidentally, one of the events leading to the Federal Register Act (Pub. L. No. 74-220, ch. 417, 49 Stat. 500-503 (July 26, 1935)) was government enforcement of an administrative oil quota rule that, it turned out, did not exist. *Oil Suit Dismissed in Supreme Court*, N.Y. Times, Oct. 2, 1934, at 6; *see*

*also* Erwin N. Griswold, *Governance in Ignorance of the Law—A Plea for Better Publication of Executive Legislation*, 48 Harv. L. Rev. 198 (1934).

### D.    A Long History of Precedent Forbids Copyright Restrictions on Dissemination of the Law.

The Supreme Court recognized that its holding in *Georgia* reflected an unbroken line of case law dating to the Court's first copyright decision, *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834). *Georgia*, 140 S.Ct. at 1506. In that case, one of the Court's official reporters claimed copyright in his annotated collection of the Court's opinions. The Court declared it was "unanimously of opinion that no reporter has or can have any copyright in the written opinions delivered by this Court." *Id.* at 668.

Fifty years later, in *Banks v. Manchester*, 128 U.S. 244 (1888), the Court rejected a similar copyright claim by a court reporter of the Ohio Supreme Court. "The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute." *Id.* at 253.

In 1898, the Sixth Circuit observed that "any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book, whether such book be the property of the state or the property of an individual." *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) (Harlan, J.).

As these decisions explain, exclusion of law from copyright does not depend on who requested or funded creation of the law. Instead, it depends on its true author. Or, as the First Circuit later put it, anticipating *Georgia*: "The citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process." *Bldg. Officials*, 628 F.2d at 734.

### E.     The Plain Text of the Copyright Act Also Excludes Standards Incorporated into Law.

The 1976 Copyright Act independently excludes standards incorporated into law. As the Supreme Court recognized in *Eldred v. Ashcroft*, 537 U.S. 186 (2003), the exclusion of ideas and facts from copyright protection is essential to balancing copyright and free speech protections. *Id. at* 219; *see also Golan v. Holder*, 565 U.S. 302, 326-329 (2012). Copyright does not apply to "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

Law, including components incorporated by reference, falls easily within this category. It is a "*system* of rules that a particular country or community recognizes as regulating the actions of its members and may enforce by the imposition of penalties." *See* "Law," Oxford English Dictionary, *available at* https://www.oxforddictionaries.com (emphasis added). It embodies a "*principle*"

*i.e.,* "a comprehensive and fundamental law, doctrine, or assumption; 1b(1): a rule of code of conduct.…" Merriam Webster Ninth New Collegiate Dictionary (1989). *See generally* L. Ray Patterson & Craig Joyce, *Monopolizing the Law: the Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L. Rev. 719, 777 (1999).[6]

Further, once adopted into law, "codes are 'facts' under copyright law. They are the unique, unalterable expression of the 'idea' that constitutes local law." *Veeck*, 293 F.3d at 801. In other words, by virtue of government action, the idea and its expression have merged. And "[w]hen there is essentially only one way to express an idea, the idea and its expression are inseparable, and copyright is no bar to copying that expression." *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc*., 843 F.2d 600, 606 (1st Cir. 1988).

## F.   The "Takings" Argument of Amici Is a Red Herring

Affirming the judgment on copyrightability grounds would not require the Court to address a purported "taking." *Contra* Corrected Brief of American National Standards Institute and Six Standards Organizations as Amici Curiae Supporting

---

[6] Section 105 of the Copyright Act, 17 U.S.C. § 105, denies copyright for any work of the U.S. Government and reflects a related principle. Section 105 applies to all U.S. Government documents beyond laws, such as NASA photographs or FTC consumer guides.

Appellants at 17.[7] If a decision that standards incorporated into law are not copyrightable leads standards organizations to view such incorporations as improper takings, they may make a claim against the government. Of course, that would be as absurd as any other lobbyist's suit that government adoption of a proposed legislative text "takes" the lobbyist's copyright.

In any event, in a takings lawsuit by Plaintiffs, another court could consider questions such as ownership; copyrightability of the standards as standards; whether copyrights constitute property for takings purposes, *see Univ. of Houston Sys. v. Jim Olive Photography*, 580 S.W.3d 360, 377 (Tex. App. 2019), *aff'd,* 624 S.W.3d 764 (Tex. 2021); whether Plaintiffs voluntarily forfeited copyright by lobbying for incorporation, *see* JA07155-7158(Dkt-203-2 ¶¶49–64), *see Valancourt Books, LLC v. Perlmutter*, 554 F. Supp. 3d 26, 33–35 (D.D.C. 2021); whether due process occurred through regulatory or legislative proceedings; and whether the adoption itself constituted just compensation; *see* JA07155-7156(Dkt-203-2 ¶¶50, 54).

This Court need not speculate on those answers in a hypothetical case, and they need not affect this case.

---

[7] In any event, a fair use ruling *respects* the scope of copyright and takes nothing away from it: copyrights are "subject to" the limitation of fair use in section 107, 17 U.S.C. § 106 (preamble), and a fair use is "not an infringement." § 107 (preamble).

## II.    PUBLIC RESOURCE'S ARCHIVE OF LAWS BY INCORPORATION IS ALSO A LAWFUL FAIR USE.

If incorporated standards are subject to copyright, providing an accessible public archive of those standards is nonetheless a lawful fair use, as the district court found. All four fair-use factors support Public Resource's effort to bridge the divide the Supreme Court rejected in *Georgia*, between "economy class" readers who can view only what portions of law Plaintiffs choose to provide—at their discretion and with restrictions—and "first-class" readers who merit an all-access pass. *Georgia*, 140 S.Ct. at 1512.

### A.    The District Court Correctly Held That the Purpose and Character of Public Resource's Archive Favor Fair Use.

The first fair-use factor is the purpose of the use, including whether it is noncommercial and transformative. Public Resource's use is both.

#### 1.    Public Resource's Noncommercial Purpose Favors Fair Use.

In its nonprofit mission, Public Resource buys standards and puts them online, for free, to facilitate public access to and understanding of the law. Plaintiffs do not dispute that this use is noncommercial. Plaintiffs-Appellants' Brief at 19 n.5. "[T]there is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google LLC v. Oracle Am., Inc.*, 141 S.Ct. 1183, 1204 (2021).

## 2.    Public Resource's Transformative Purpose—Creating and Posting a Comprehensive Archive of Standards Incorporated Into Law—Favors Fair Use.

A transformative use "adds something new and important." *Google*, 141 S.Ct. at 1203. Public Resource presents laws and regulations fully as a public archive for paradigmatic fair-use purposes as "criticism, comment, news reporting, teaching…scholarship, and research." 17 U.S.C. § 107. The best way to teach the law is to *provide the public with the law*. Paraphrases, summaries, and descriptions cannot capture the precision necessary to understand legal obligations that governments impose and enforce. Public Resource's archive is indispensable for those who cannot travel to a library, who are print-disabled, and those who wish to engage in computer-aided analysis.

Public Resource's goal is also distinct. Plaintiffs' missions are to "advance the arts and sciences of heating, ventilation, air conditioning and refrigeration," "eliminat[e] death, injury, property and economic loss due to fire, electrical and related hazards," and "promote public health and safety, support the protection and sustainability of the environment, and the overall quality of life." JA07168-7169(Dkt-203-2 ¶114-16).

Public Resource's mission is equally laudable but very different: to provide the public a free, comprehensive repository of *the law*, including the law that exists in private standards that are obscure to much of the public (and even to some courts)

and often superseded as industry standards. JA07212(Dkt-204-4 ¶38). Plaintiffs'
message is: "these are current best practices for the design and operation of buildings
and products." Public Resource's message is: "this is the law." JA07210-7211(Dkt-
204-4 ¶35). This new context reflects and reinforces a distinct purpose. *See Swatch*
*Group Management Services v. Bloomberg LP.*, 756 F.3d 73, 85 (2d. Cir. 2014)
("Bloomberg's message—'This is what they said'—is a very different message from
Swatch Group's—'This is what you should believe.'").

Plaintiffs attempt to deflect the Court's attention from these undisputed facts
by insisting that (1) the district court should have conducted a sentence-by-sentence
analysis to determine whether Public Resource posted more than strictly necessary
to understand a specific legal duty, rather than relying on a regulator's own
determinations; and (2) Plaintiffs' reading rooms are equivalent to Public Resource's
archive. Both claims are incorrect.

### a.    The incorporation by reference process precisely identifies what is and is not the law.

Plaintiffs claim that an exhaustive analysis of standards and regulations is
necessary to determine what portions of incorporated material are "essential to
complying with the law." Plaintiffs-Appellants' Br. 19. That approach is neither
required by this Court's instructions nor workable as a practical matter. It also
ignores clear guidance from the relevant federal government agencies and from the
office that administers the incorporation-by-reference process.

The Federal Register's Document Drafting Handbook is clear: what is expressly incorporated becomes law. If an agency regulation includes a "reference [that] is *required to comply with the regulations*, [the agency] *must* follow the incorporation by reference requirements in the IBR Handbook." Office of the Federal Register, *Document Drafting Handbook*, Aug. 2018 ed. (Rev. 1.1, dated Aug. 9, 2019), Chapter 1.5 (emphasis added) (JA09023(Dkt-215-4)).[8] Mere informational references, by contrast, need not meet that standard. *Id*. A regulator may cite an external document as being "approved for use" without making it part of the citing regulation. *See, e.g.*, *CCC Info. Servs., Inc.* at 74.

Further, "the language incorporating material by reference shall be *as precise and complete as possible.*" 1 C.F.R. § 51.6(a) (1973) (emphasis added); *see also* 1 C.F.R. § 51.7(a) (1973) ("Each incorporation by reference shall include an identification and subject description of the matter incorporated, in terms as precise and useful as practicable within the limits of reasonable brevity.") 1 C.F.R. § 51.9(a)-(b) (emphasis added) ("the language *incorporating a publication* by reference must be precise, complete, and clearly state that the incorporation by reference is

---

[8] The OFR Director oversees the federal incorporation by reference process and must "interpret and apply" its language. 1 C.F.R. § 51.1, 5 U.S.C. 552(a). Accordingly, OFR's interpretation deserves substantial deference. *See Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994).

intended" and that agencies "inform[] the user that the *incorporated publication* is a requirement.") (emphasis added).[9]

When regulators mean to incorporate complete documents, they do so; when they mean to incorporate only specific sections, they know how to do that too. *See, e.g.*, JA07150(Dkt-203-2 ¶27).

If agencies fail to specify the scope of incorporation, their regulations can be held invalid. In *Appalachian Power Co. v. Train*, for example, the Fourth Circuit invalidated an Environmental Protection Agency regulation where the EPA failed to obtain the approval of the Director of the OFR and the regulations had failed to state precisely what was to be incorporated. 566 F.2d 451, 457 (4th Cir. 1977). The court concluded that "an incorporation by reference must give one affected enough knowledge so that he may easily and certainly ascertain the conditions by which he is to be bound." *Id*. at 457. If, as Plaintiffs suggest, the regulations are so vague as to make sentence-by-sentence comparison necessary, that vagueness would render many of the regulations invalid. Presumably neither the Plaintiffs nor the agencies with which they work would desire that outcome. Moreover, agency and Federal Register officials have independently affirmed that "[o]nly the agency would know" precisely what it intended to incorporate by reference into law, and "it would be

---

[9] *See Incorporation by Reference*, 37 Fed. Reg. 23602 (Nov. 4, 1972) (codified at 1 C.F.R. 51), JA09250(Dkt-215-5).

irresponsible" for others to make assumptions about that intent. JA07365-7368(Dkt-204-43 at 191:03-203:12); JA08325-8326(Dkt-204-66).

Where an agency has followed the rigorous process of incorporating a document by reference into law, it has decided that the document is not a mere extrinsic reference. There is no need or benefit to second-guessing that regulatory choice. Given that incorporation by reference already requires multiple rulemaking entities to determine what is and is not the law, the correct question is whether Public Resource has accurately posted the result. The district court followed that sensible approach, as set forth in detail in its opinion and the appendix thereto. *ASTM III*, 2022 WL 971735 at \*\*23-24; JA09312-9498(Dkt-239-1).

Moreover, regulatory beneficiaries of all sorts have a strong and direct interest in access to the content of regulatory standards—including incorporated-by-reference material—because it directly affects their interests and can potentially affect their conduct. *See* Nina A Mendelson, *Private Control over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 771 (2014). Regulatory text that offers alternative means of complying with a rule, or that adds meaning to other rules, affects conduct without creating duties. A party might have a contractual right to hold its opponent responsible for complying with a law by incorporation, as in *Getty Petroleum*. A community might

want to know whether a refinery has been built in accordance with applicable safety standards, even "optional" ones.

As the Supreme Court has noted, many industry standards become law through lobbying, and industry participants have motives to skew the standard-making to suit their commercial interests; it also observed that "[t]he dividing line between restraints resulting from governmental action and those resulting from private action may not always be obvious." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500-02 (1988)(ruling against Noerr-Pennington immunity for NFPA member). In this context, it is especially important that the public have free, unfettered access to the law that emanates from those processes to scrutinize them for improper influence. The limited notice-and-comment opportunity is insufficient without widespread access to the material. *See* Mendelson at 781-82.

Likewise, so-called "extraneous" text can be crucial to understanding the law. Consider, for example, the legal debate over the meaning and effect of the preamble to the Second Amendment. This is one reason regulators incorporate entire documents—to ensure that the required procedures can be understood in context.

### b. Plaintiffs misread this Court's opinion to narrowly circumscribe transformativeness.

Contrary to Plaintiffs' implication, this Court did not hold that transformativeness here turns exclusively on a false dichotomy between incorporated documents (or portions of documents) that are "essential to complying

with any legal duty" and those that are not. *ASTM II,* 896 F.3d at 449–451. Instead, this Court suggested the documents occupy a "spectrum" that a court could consider in determining whether factor one favors fair use. *Id.* at 442-43 ("At one end of this spectrum lie incorporated standards that define one's legal obligations just as much as, say, a local building code…. At the other end of the spectrum lie standards that serve as mere references but have no direct legal effect on any private party's conduct.").

Thus, while the Court suggested that posting incorporated standards at the "reference" end of the spectrum may be *less* transformative, it did not find that such a use was *not* transformative, much less excluded from fair use. *Id*. at 450. Instead, it suggested that "[w]here an incorporated standard provides information essential to comprehending one's legal duties, *for example*, [the first fair use] factor would weigh heavily in favor of permitting a nonprofit seeking to inform the public about the law to reproduce in full the relevant portions of that particular standard." *ASTM II*, 896 F.3d at 450 (emphasis added). And as explained above, Public Resource's comprehensive archive has multiple transformative uses, including but not limited to facilitating broad access to, and research on, the many standards that have been incorporated into law. *Supra* Part II.A.2.a. For example, Public Resource's archive makes it easier to compare rules and regulations across codes. For example, a search

for "fire exits" will unearth multiple references in different codes, making it easier to compare and understand how exits are regulated in different contexts.[10]

### c. Small discrepancies and updates do not change the analysis of fair use.

In their first motion for summary judgment, Dkt. 118-1 at 9, Plaintiffs acknowledged that "[e]ach standard at issue here has been incorporated by reference by at least one governmental entity." In their second motion and on appeal, Plaintiffs try to avoid that admission by raising two technical complaints that are both untimely and unavailing.

*First*, Plaintiffs complain that some of the incorporating regulations have been updated to refer to more recent editions of the standards, and current regulations no longer incorporate the older versions posted before this lawsuit. JA05069-5083 (Dkt-199-2 at 8-22). This is correct, and it is the natural result of Plaintiffs' efforts to persuade regulators to incorporate those newer editions. JA07155-7158 (Dkt-203-2 ¶¶49-64). But courts still must adjudicate cases applying the older regulations. *See, e.g.*, *Getty Petroleum*, 391 F.3d at 316 n.5 (First Circuit panel was unable to find 1987 edition of NFPA 30; noting that, even after repeal of the incorporating regulation, "to properly address [the legal question at issue] we refer to Rhode Island law as it existed at the time of [the dispute], that is, the provisions in effect in 2000").

---

[10] https://archive.org/details/publicsafetycode?query=%22fire+exit%22&sin
=TXT&and%5B%5D=subject%3A%222022+California+Building+Codes%22

Earlier incorporated standards are also relevant for research into historical government actions and development of the law.

*Second*, Plaintiffs state that, in some instances, Public Resource posted editions of ASTM standards that are not the precise editions incorporated into law. JA05069-5083 (Dkt-199-2 8-22)

Given the nature of the documents, minor imprecision is inevitable, despite Public Resource's best efforts. One of Plaintiffs' representatives had difficulty identifying which edition of their own standards had been incorporated. JA07163 (Dkt-203-2 ¶83). ASTM itself spent more than a page of its summary judgment filing explaining how to parse its citations. JA05069-5070 (Dkt-199-2 ¶¶33-35). But the overwhelming majority of Public Resource's postings are correct—including many instances of which ASTM complains. JA07163 (Dkt-203-2 ¶82).

As for the rest, the differences are largely immaterial. In a few instances, the edition that Public Resource posted is an *identical reissue* of the incorporated standard—the only difference between what was posted and the document cited in the C.F.R. is that the title adds a "reissue" date. JA07163-7164(Dkt-203-2 ¶84). In others, Public Resource posted an edition of the standard that had a different superscript epsilon designation (i.e. "$\epsilon^1$"), meaning that there was a minor editorial distinction between the incorporated standard and the edition Public Resource posted.

MATERIAL UNDER SEAL DELETED

*Finally*, in the rare circumstance that the edition posted was substantively different from the edition incorporated into law, the district court found that those postings were not fair uses, and Public Resource does not challenge that conclusion here. JA07163(Dkt-203-2 ¶82).

> **d.  Public Resource's archive is very different from Plaintiffs' restrictive and burdensome "reading rooms."**

Plaintiffs' reading rooms are a far cry from Public Resource's comprehensive and accessible collection. Few persons use them (*see* JA05110-5114(Dkt-199-2 ¶¶97-98), for at least one clear reason: Plaintiffs discourage it. ████ created its ████████████████████ reading room in 2013 as an ████████████ ████████████████████████████████████████████ JA07153-7154(Dkt-203-2 ¶¶35-44); *supra* Part I.C.

By contrast, part of Public Resource's mission is to make the law more "user-friendly." It does not limit, or charge for, access to its platform. JA01266(Dkt-121-5 ¶24). It does not display or derive any revenue from advertising. It does not collect its visitors' private information. It simply seeks, as its name suggests, to provide a useful public resource.

Public Resource also makes standards incorporated by reference genuinely accessible. For example, Public Resource's reformatted versions allow people with visual disabilities to enlarge the text or use electronic text-to-speech readers.

JA02434-2446(Dkt-122-6 at 139-151). The drafters of the 1976 Copyright Act considered uses like this to be a favored purpose under the first fair use factor. H.R. Rep. No. 94–1476, at 73 (1976), 1976 U.S.C.C.A.N. 5659, 5686 (calling accessibility a "special instance illustrating the application of the fair use doctrine."). The Supreme Court agrees. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984). The print-disabled community relies on fair use to permit important accessibility measures not explicitly covered by the more specific accessibility exception, 17 U.S.C. § 121.[11]

Similarly, Public Resource often translates images into vector graphics for better enlargement. *Id.* It uses optical character recognition ("OCR"), and often painstakingly retypes documents into Hypertext Markup Language ("HTML") and converts formulas to Mathematics Markup Language ("MML"). *Id.* This makes documents word-searchable and allows researchers to analyze them at large scale with techniques such as machine learning. JA01266-1268(Dkt-121-5 ¶¶25-28).

Finally, not all of the incorporated standards are available on Plaintiffs' reading rooms. For example, ASHRAE still does not make its 1993 Handbook available. Indeed, Plaintiffs have a track record of exercising their claim to a copyright veto power arbitrarily, as when ASTM denied a graduate student's request

---

[11] *See, e.g.,* Report of the Advisory Committee on Accessible Instructional materials in Postsecondary Education for Students with Disabilities 43-44 (Dec. 6, 2011), http://www2.ed.gov/about/ bdscomm/list/aim/meeting/aim-report.pdf.

for permission to use excerpts from a standard in a research paper, while allowing others to excerpt standards at will. JA07167-7168(Dkt-203-2 ¶¶103-11). And NFPA continues to challenge California's right to provide access the National Electrical Code, even though that code was reprinted into California regulations. *See Public.Resource.Org Inc. v. Cal. Office of Administrative Law*, No. 34-2021-80003612, Judgment at 11 (Cal. Sup. Ct., Apr. 11, 2022).

Access to law should not be subject to any private party's whims and complicated rules. Public Resource helps ensure that it is not.

### B.    The "Nature of the Copyrighted Works" Favors Fair Use Wherever Formal Incorporation Occurred.

Factor Two of the fair use analysis examines the nature of the original work, particularly whether it is factual in nature.

#### 1.    Formal Incorporation of Standards and Their Adoption as Law Controls the Second Fair-Use Factor.

Both this Court and the district court rightly treated express incorporation as central to the second fair use factor analysis. *ASTM II*, 896 F.3d at 451; *see ASTM III*, 2022 WL 971735 at **13-14, JA09290-929 (Dkt-239 at 26).

The second factor recognizes that "some works are closer to the core of copyright than others." *Google*, 141 S.Ct. at 1202. If "no one can own the law," *Georgia*, 140 S.Ct. at 1507 (collecting cases), then "the express text of the law falls plainly outside the realm of copyright protection." *ASTM II*, 896 F.3d at 451. As

explained above, when federal or state government incorporate specifically identified documents or portions of documents, that text becomes the express text of the law. When that occurs, there is an "easy substitution" of documents incorporated by reference for express copying of text, *ASTM II*, 896 F.3d at 452, and the second factor weighs "heavily" in favor of fair use. *Id.*

Following this approach, the district court found that 181 of the standards were formally incorporated in their entirety, "without limitation," as if they were copied directly into regulations. JA09313-9398, 09399-9470(Order Appendix ¶¶2-104, 107-121, 123-185). The court correctly concluded that the second factor swung the result "heavily" towards fair use for each. Contrary to Plaintiffs' claim, the "relevance" of these texts to the incorporating regulations is not the right criterion; by fully and explicitly incorporating them, an agency *made* them relevant. *See* Part II.A, *supra*; *cf.* Plaintiffs-Appellants' Br. 35.

When a regulation explicitly incorporates "the full texts of the referenced test procedures" without specifying the precise bounds of the incorporated texts, other parts of the document will likely aid in understanding and interpretation. For example, 40 C.F.R. § 136.3 (2014) incorporates ASTM D3371 (1995) as a required procedure for measuring the amount of acetonitrile (a pollutant) in water. *See* JA09398-9399(Order Appendix ¶105). Although ASTM D3371 includes instructions for measuring several other chemicals, all of the chemicals are measured

43

using the same chromatography test, in which each chemical appears as one peak on a common graph. The entire standard thus provides information about how to distinguish acetonitrile from other chemicals, and the document cannot be divided without excluding vital information.

The district court found that four standards fell into this category, with fair use "harder to justify" but not precluded. JA09312-9313, 09398-9399, 09412(Order Appendix ¶¶1, 105, 106, 122). For these standards, the outcomes rightly varied.[12] The district court permitted Public Resource to use all or part of each of these standards, which is appropriate given that this Court's "fair-use analysis…puts a heavy thumb on the scale in favor of an unrestrained ability to say what the law is." *ASTM II*, 896 F.3d at 459 (Katsas, J., concurring).

## 2. The Standards Are Factual, Even Before They Became Legal Facts.

There is no dispute that the standards are long ago published. It is equally clear that they are highly factual. As this Court noted, "[a]ll of the works at issue here fall at the factual end of the fact-fiction spectrum." *Id.* at 451. Moreover,

---

[12] Plaintiffs misleadingly refer to these as "the four works where the district court held this factor did not favor fair use." Plaintiffs-Appellants' Br. 35. The district court found the second factor to be equivocal. For 32 standards Plaintiffs omit from their appendix, the court found that the second factor did not favor fair use because the version Public Resource posted was not clearly incorporated. JA09471-9498(Order Appendix ¶¶186-217).

incorporation by reference transforms all of the incorporated text into legal facts. After all,

> [i]t should be obvious that for copyright purposes, laws are 'facts': the U.S. Constitution is a fact; the Federal Tax Code and its regulations are facts; the Texas Uniform Commercial Code is a fact. Surely, in principle, the building codes of rural Texas hamlets are no less 'facts' than the products of more august legislative or regulatory bodies.

*Veeck*, 293 F.3d at 801.

Even for the small number of standards that were partially incorporated and not easily parsed, the text that Public Resource posted was "inherently bound together with uncopyrightable ideas"—the decisions of the agencies reflected in their incorporations. *Google*, 141 S.Ct. at 1202.

Finally, the amount of sheer labor and financial resources Plaintiffs expend is irrelevant to the copyright analysis. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 357 (1991) (rejecting "sweat of the brow" theory of copyright). The actual creative work, if any, is performed by volunteers.

### C.     Public Resource Posted What Was Necessary to Achieve Its Transformative Purpose.

The third statutory factor favors fair use where the amount used is "reasonable in relation to the purpose of the copying." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015). Reproduction of entire works is fair use when it reasonably fulfills the user's purpose. *See, e.g., Sony Corp. of Am.*, 464 U.S. at 449–50

(recording of entire television programs for time-shifting); *Swatch*, 756 F.3d at 90 (reproduction and dissemination of entire press-conference recording).

As Public Resource's purpose is to create a thorough and accurate archive of law, it was both reasonable and necessary to post the entire incorporated law. Posting less would thwart Public Resource's goal and could mislead users who expect complete regulations.

This Court held that if Public Resource "limits its copying to only what is required to fairly describe the standard's legal import, this factor would weigh strongly in favor of finding fair use." *ASTM II,* 896 F.3d at 452. The district court correctly found that each of the 184 standards for which it granted Public Resource summary judgment has been completely incorporated into law. JA09293, 09312-9470 (Dkt-239 at 29; Dkt-239-1 at 1–159). Use of the entire standard was necessary to teach the law. For one standard, ASTM D2036, the court found that only two of the four constituent test methods were incorporated and tailored its judgment accordingly. JA09312-9313, 09500(Dkt-239-1 at 1–2; Dkt-240 at 2).

Plaintiffs complain that Public Resource should instead select portions that might be most important to a given audience. But a government agency has incorporated the standards at issue fully. As discussed in Section II.A. above, Plaintiffs' approach would force Public Resource to decide what portions the agency *really* meant when it chose to incorporate a complete document.

Plaintiffs' criticisms of details of the district court's third-factor analysis are also unfounded. First, they complain that the court failed to assess standards individually. Plaintiffs-Appellants' Br. 36–37. But the district court's appendix demonstrates a careful examination of each standard and the incorporating regulatory language. That the same analysis applies repetitively to the vast majority of the standards at issue simply reflects that all of these standards were fully incorporated into law.

Similarly baseless is Plaintiffs' complaint that the district court's analyses of ASTM D2036, ASTM D1688, and ASTM D512 are inconsistent. Plaintiffs-Appellants' Br. 37–38. Although the same regulatory provision incorporated all three standards into law, the district court's appendix made clear why the court treated ASTM D2036 differently: it found that only two of the four testing methods described in that standard had been incorporated. JA09312-9313, 9382-9383, 9412(Opinion Appendix ¶¶1, 85, 122).

### D.    The District Court Correctly Found That Plaintiffs Have Not Suffered Market Harm and Are Unlikely To Do So in the Future.

Under factor four, Plaintiffs argue (1) they need not show any market harm; (2) conclusory assertions of their "expert" and their executives suffice; and (3) speculation about market effects is relevant (even though any effects should have surfaced by now). The district court correctly rejected all these, observing that

> [o]ne can reasonably expect that if over the last four years market harm was occurring, or was likely to occur, Plaintiffs could provide economic data and analysis showing that to be the case…The fact that they do not provide any quantifiable evidence, and instead rely on conclusory assertions and speculation long after Defendant first began [posting incorporated standards], is telling.

*ASTM III*, 2022 WL 971735 at **17, JA09298 (Dkt-239 at 34).

Indeed. Plaintiffs have unrestricted access to their own market data. Burden notwithstanding, if they had any data they would have produced and highlighted it by now.

Moreover, Plaintiffs' theory of market harm sidesteps the Supreme Court's guidance in *Google*, which held that the analysis must "take into account the public benefits the copying will likely produce…. Are they comparatively important, or unimportant, when compared with dollar amounts likely lost." 141 S.Ct. at 1206. Here, those benefits are both obvious and important, particularly with no showing of lost sales.

### 1.    The District Court Correctly Required Plaintiffs to Show Meaningful Likelihood of Harm.

The district court followed Supreme Court guidance in requiring Plaintiffs to demonstrate "*some* meaningful likelihood of future harm" due to PRO's noncommercial use. *Sony Corp. of Am.*, 464 U.S. at 451 (italics in original). In *Sony,* the Court observed that a commercial use carried a rebuttable presumption of market harm. Where use was noncommercial, the Court said, plaintiffs should shoulder the

48

MATERIAL UNDER SEAL DELETED

burden of showing a likelihood of harm. *Id. Campbell v. Acuff-Rose Music* did not

hold otherwise; it left untouched the question of burden regarding noncommercial

uses. 510 U.S. 569, 583-84 (1994).

Since *Campbell*, many courts have applied *Sony's* test. Accordingly "[t]he

burden of proof as to market effect rests with the copyright holder if," as here, "the

challenged use is of a 'noncommercial' nature." *Princeton Univ. Press v. Mich. Doc.

Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996); *see also Higgins v. Detroit Educ.

Television Found.*, 4 F. Supp. 2d 701, 709 & n.8 (E.D. Mich. 1998) (summary

judgment for copyright defendant on fair use based on plaintiff's failure to show

harm, where use had non-profit, teaching purpose); *Fox Broad. Co. v. Dish Network

L.L.C.*, 747 F.3d 1060, 1069 (9th Cir. 2013) (given noncommercial purpose, the

likelihood of future market harm must be demonstrated).

### 2. Plaintiffs Cannot Overcome Their Own Admissions by Speculation.

Public Resource showed a *lack* of harm. Plaintiffs' sales numbers have

generally risen, and their representatives conceded they had no knowledge of any

harm. JA07171-7176(Dkt-203-2 ¶¶133-165). For example, ASTM's President, Jim

Thomas, conceded that ███████████████████████████████████████

███████████████████████████ JA07172(Dkt-203-2 ¶137). ASTM's corporate

representative, Jeffrey Grove, admitted he had no "direct knowledge" of any

"measurable impact" on its finances from Public Resource. *Id.* ASTM had no

49

knowledge of lost sales, lost revenues, or reputational harm caused by Public Resource. JA07172(Dkt-203-2 ¶138). ASHRAE has not tracked any losses due to Public Resource's posting of standards. JA07174(Dkt-203-2 ¶154).

This absence of harm is not surprising. All the standards have been superseded as technical documents by later versions, even though they remain laws. JA02489-2523(Dkt-122-6 at 193-228); JA07172(Dkt-203-2 ¶135). Their commercial value is minimal.

Lacking evidence, Plaintiffs offered speculation from a purported expert who based his analysis entirely on Plaintiffs' self-serving opinions. JA07173(Dkt-203-2 ¶144). That expert could not identify actual losses. JA07173-7174(Dkt-203-2 ¶¶142-9). He did not correlate Public Resource's activities to any change in Plaintiffs' revenues. *Id*. He did not compare profitability of standards posted by Public Resource to that of Plaintiffs' other standards. *Id*. The district court and this Court have nothing more than Plaintiffs' conjecture, which does not impede summary judgment.[13]

### 3.    Answers to This Court's Questions Favor Fair Use.

This Court asked the district court to consider whether (1) the existence of Plaintiffs' reading rooms dispels a claim of market harm; (2) whether any such harm

---

[13] Plaintiffs' claim that a fair use ruling here would encourage others to post standards has no legitimate weight. Other courts can appraise other actors and their activities and contexts.

can exist if standards are only incorporated in part, and Public Resource reproduced only that part; and (3) whether Public Resource's posting harms the market for updates.

On issue (1), Plaintiffs' reading rooms show that making outdated standards available does not destroy sales. Plaintiffs concede that reading rooms help them market other products. Plaintiffs may sell incorporated standards along with other standards and related documents. Publishers of public domain works that are freely available on the Internet, such as legal texts, Shakespeare's works, and the Bible, still sell them for profit.

On (2), as explained above, Public Resource seeks to post only what is incorporated into law.

As for (3), there is no likely harm to the market for new standards. Plaintiffs speculate that because updates may be similar to earlier versions, the public might choose to rely on Public Resource's obsolete versions. Plaintiffs-Appellants' Br. 46. There is no evidence that this occurs.

### 4.    Plaintiffs Do Not Need Copyright Incentives.

"Copyright should not grant anyone more economic power than is necessary to achieve the incentive to create." *Google*, 141 S.Ct. at 1198. Accordingly, courts must focus on market effects that would "frustrate the purposes of copyright by

materially impairing [rightsholders'] incentive to publish the work." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014).

Here, "it is difficult to imagine an area of creative endeavor in which the copyright incentive is needed less." *Veeck*, 293 F.3d at 806.

Plaintiffs benefit when their standards become law. JA01083(Dkt-120-6 at 12); JA01551-1552(Dkt-122-1 at 281-82); JA02137-2151(Dkt-122-4 at 30-45) (ASHRAE referring to its "EPAct advantage"). Each of the SDOs sells supplementary material, and in some cases training programs, touting special insight into laws and regulations that the standards constitute. NFPA's marketing for an ancillary handbook urges "Be confident your work complies with California law" JA02953-2954(Dkt-124-5). Similarly, ASTM, selling training material, states "[k]nowledge of ASTM standards is important for complying with U.S. regulations and procurement requirements." JA01961(Dkt-122-3 at 24). Plaintiffs charge membership dues and conference fees, market training programs and proficiency testing, and obtain government research grants, all of which are current sources of income for Plaintiffs. JA01021(Dkt-120-3 ¶29). Plaintiffs' prediction of the end of privately developed standards is as overstated now as it was decades ago in *Veeck*. Other standards organizations function effectively without enforcing copyright in standards incorporated into law. *Id*.

Moreover, Plaintiffs and the volunteers who draft standards presumably believe their standards are an important contribution, as do the industries to which they apply. Plaintiffs claim to promote public safety, energy efficiency and other public interests. Plaintiffs-Appellants' Br. 5–8. The members who actually develop the standards have the same motives, and those who do the drafting get no royalties. In some cases, they may also be motivated by concern for their own business interests, professional interest in garnering recognition or experience, or their role as government officials and in service of the public interest. JA01021, JA01037-1038(Dkt-120-3 ¶¶28, 136).

Given these incentives, the public policy favoring unrestricted access to the subset of standards incorporated by reference into law does not conflict with the public policy favoring the development of technical standards. Everyone has ample motivation to continue that work.

### 5.    Public Resource's Benefits Outweigh Any Harm.

Public Resource simply helps the public—from judges to journalists to researchers and ordinary citizens—better access and share the rules that govern us and help keep us safe.

This Court recognized that "reproducing the relevant text of a technical standard incorporated by reference for purposes of informing the public about the law obviously has great value." *ASTM II*, 896 F.3d at 451. Were it not for Public

Resource, a California tenant seeking to understand whether her landlord is violating electricity regulations would have limited options: (1) pay $271 for a print copy of the California Electrical Code; (2) find a library with a copy, limiting her ability to highlight relevant sections or refer back to it later; or (3) create an NFPA user account and access it in an online reading room that will not allow her to search for, bookmark, or copy and paste relevant selections. As noted above, courts have experienced the value of Public Resource firsthand. *Bellwether*, 87 N.E.3d at 467-69 (Ind. 2017).

Public Resource's contributions go beyond making incorporated standards available; it also makes them more *usable* for researchers, journalists, and ordinary citizens, especially those who are print disabled. Supra Part II.A.2.d.

The public benefits of Public Resource's project are "comparatively important" when compared with the absence of meaningful market harm to Plaintiffs. *Google,* 141 S.Ct. at 1206. And Plaintiffs' desire to suppress availability of laws by incorporation is not a traditional or reasonable market interest. As Former Archivist of the United States David Ferriero wrote, "Our Founding Fathers believed that an informed and involved citizenry was key to our democracy and Public Resource helps us make[] this true." JA07206(Dkt-204-4 ¶22).

All four factors favor fair use.

54

## III.   THE DISTRICT COURT CORRECTLY DECLINED TO ENJOIN POSTING OF THE REMANING STANDARDS.

The district court's denial of injunctive relief is reviewed for abuse of discretion. *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives,* 920 F.3d 1, 10 (D.C. Cir. 2019). Factual findings underlying the denial are reviewed for clear error. *Id.; Nichia Corp. v. Everlight Ams*., Inc., 855 F.3d 1328, 1344 (Fed. Cir. 2017).

The district court correctly denied a permanent injunction as to the 32 standards that the district court found not clearly incorporated.[14]

In exercising its discretion, a court must apply "traditional equitable considerations," and may not presume "that an injunction automatically follows" a finding of infringement. *eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 392–93 (2006). Moreover, it must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, (2008) (citation omitted). A plaintiff's failure to satisfy *any* of the four injunction factors is grounds for denial. *Morgan Drexen Inc. v. CFPB,* 785 F.3d 684, 694 (D.C. Cir. 2015). Plaintiffs did not meet this test.

---

[14] *See* Plaintiffs-Appellants' Br. 1 (second issue on appeal relates to 32 of the works at issue).

## A.    Plaintiffs Have Not Proved Ownership.

It is Plaintiffs' burden to prove copyright ownership. Plaintiffs ever-evolving theory on this point—asserting "work made for hire" authorship, then ownership by assignments, then finally joint authorship with thousands of volunteers (including federal employees) is difficult to credit. Plaintiffs' migrating justifications and federal government involvement calls their ownership claim into question and weighs against an injunction.

## B.    Irreparable Injury Will Not Occur.

Plaintiffs have not suffered any meaningful injury, let alone an irreparable one. *eBay*, 547 U.S. at 391.

*First*, the record over years of litigation demonstrates that Public Resource's activities have not caused any measurable economic harm. JA07171-7176(Dkt-203-2 ¶¶133-165). Plaintiffs continue to sell copies of the 32 standards at issue, as well as hundreds of non-incorporated standards and ancillary products and services. JA07165, JA07183 (Dkt-203-2 ¶¶94, 195). The district court acted within its discretion to discount Plaintiffs' speculation that the lack of an injunction could force them to change their business model. Plaintiffs-Appellants' Br. 49-50; *see Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324-25 (Fed. Cir. 2012).

*Second*, Plaintiffs have not shown they face any meaningful risk of future economic harm relating to the 32 standards. Plaintiffs repeatedly condition their

argument for future harm on Public Resource's "conduct go[ing] unchecked." Plaintiffs-Appellants' Br. 50, 51. But, as the district court found, "the updated record reflects [Public Resource's] intention to only post documents that have been incorporated into law." Mem. Op. at 45. That is why Public Resource voluntarily took down the 32 standards.[15] Where a plaintiff "failed to show any threat of continuing violations," there is no irreparable harm. *Berry v. Dillon*, 291 F. App'x 792, 795 (9th Cir. 2008); *Antioch Co. v. Scrapbook Borders, Inc.*, 291 F. Supp. 2d 980, 997–98 (D. Minn. 2003) (collecting cases). Voluntary compliance with the court's decision also weighs against an injunction, as the district court found. *See Boisson v. Banian Ltd.*, 280 F. Supp. 2d 10, 19 (E.D.N.Y. 2003).

*Third*, Plaintiffs' claim of "harm to the exclusivity of their rights" is irrelevant under *eBay*, which reversed a holding that the "statutory right to exclude alone justifies [a] general rule in favor of permanent injunctive relief." 547 U.S. at 392; *see also TD Bank N.A. v. Hill*, 928 F.3d 259, 280 (3d Cir. 2019) ("[T]he right to not use the copyright" does not justify a presumption of irreparable harm.).

---

[15] Plaintiffs' assertion that Public Resource "has indicated that it has no intention of stopping its conduct absent intervention from a court" is misleading, because their citations to the record refer only to Public Resource's posting of standards incorporated by reference. *See* JA05117(Dkt-199-2 ¶110)(referencing Public Resource's posting of the 2017 National Electrical Code after it was incorporated). It is undisputed that Public Resource has no intention of posting standards that are *not* incorporated by reference.

*Finally*, "reputational injury" is not a copyright interest. *See Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015) (en banc). The single case Plaintiffs cite on this, *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014), was a *trademark* case. Any trademark injury was addressed by the district court's ruling on Plaintiffs' trademark claims. The district court found, as this Court did, that the disclaimers Public Resource included on the cover of every standard "adequately eliminate the possibility a consumer would assume sponsorship or endorsement by ASTM." *ASTM III*, 2022 WL 971735, at **21, JA09307 (Dkt-239 at 43).

## C.    The Balance of Hardships and the Public Interest Weigh Against an Injunction.

The district court's decision serves the public interest. Government agencies regularly incorporate newer versions of standards into their regulations. *See, e.g.*, JA07240(Dkt-204-42, at 13) (describing process for updating California Electrical Code). If Public Resource were permanently enjoined from posting the 32 standards, later incorporation would force Public Resource to seek a modification of the injunction or leave a gap in its archive of legal materials. The district court's order allows Public Resource to continue updating its archive as the agencies do their work.

At the same time, affirming the district court's denial of an injunction regarding the 32 standards will not harm Plaintiffs' ability to promote additional

standards, as described above. The district court's fair use analysis takes into account the public's interest in maintaining the copyright incentive and Plaintiffs' partnerships with government.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment.

Dated:        February 3, 2023          Respectfully submitted,

                                                        FENWICK & WEST LLP

                                           By:*/s/ Andrew P. Bridges*
                                             Andrew P. Bridges
                                             abridges@fenwick.com
                                             Matthew B. Becker
                                           mbecker@fenwick.com
                                           FENWICK & WEST LLP
                                           801 California Street
                                           Mountain View, CA 94041
                                           Telephone:    (415) 875-2300
                                           Facsimile:    (415) 281-1350

                                           Corynne McSherry
                                           corynne@eff.org
                                         Mitchell L. Stoltz
                                         mitch@eff.org
                                         ELECTRONIC FRONTIER
                                         FOUNDATION
                                         815 Eddy Street
                                         San Francisco, CA 94109
                                         Telephone: (415) 436-9333
                                         Facsimile: (415) 436-9993

David Halperin (D.C. Bar No. 426078)
davidhalperindc@gmail.com
1805 9th Street NW
Washington, DC 20005
Telephone: (202) 905-3434

*Attorneys for Appellee*
*Public.Resource.Org, Inc.*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,985 words, according to the word-processing program used to prepare it.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses proportionally spaced 14-point Times New Roman typeface.

Dated:  February 3, 2023            FENWICK & WEST LLP


By: */s/ Andrew P. Bridges*
Andrew P. Bridges (admitted)
abridges@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone:    (415) 875-2300
Facsimile:    (415) 281-1350

*Attorneys for Appellee*
*Public.Resource.Org, Inc.*

## CERTIFICATE OF SERVICE

I certify that on February 3, 2023, I electronically filed the foregoing FINAL

BRIEF OF APPELLEE PUBLIC.RESOURCE.ORG, INC. with the United States

Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF

system, which will serve all counsel who are registered CM/ECF users. I certify that

all counsel in this case are registered CM/ECF users.

Dated:  February 3, 2023                FENWICK & WEST LLP


By: */s/ Andrew P. Bridges*
        Andrew P. Bridges (admitted)
        abridges@fenwick.com
        FENWICK & WEST LLP
        801 California Street
        Mountain View, CA 94041
        Telephone:    (415) 875-2300
        Facsimile:     (415) 281-1350

        *Attorneys for Appellee*
        *Public.Resource.Org, Inc.*

62

# ADDENDUM

# TABLE OF CONTENTS

1 C.F.R. §51.1 (2022…………………………….……………..ADD-001

1 C.F.R. §51.3 (2015)……………………………..…………..ADD-003

1 C.F.R. §51.5 (2015)…………………………………………ADD-005

1 C.F.R. § 51.6 (1982)…………………………………………ADD-007

1 C.F.R. § 51.7 (2015)…………………………………………ADD-011

1 C.F.R. § 51.9 (2015)…………………………………………ADD-013

1 C.F.R. § 51.11 (1982)………………………………………..ADD-015

17 U.S.C. §102……………………………………………….ADD-016

17 U.S.C. §105……………………………………………….ADD-018

17 U.S.C. §106……………………………………..………..ADD-021

17 U.S.C. §107……………………………………………….ADD-023

17 U.S.C. §121……………………………………………….ADD-025

24 C.F.R. § 3280.4 (2021)……………………………………...ADD-028

34 C.F.R. § 668.146 (2011)…………….....…………………..ADD-053

40 C.F.R. § 136.3 (2012)…………….....…………………….ADD-057

49 C.F.R. § 192.7 (2021)………………………………………ADD-059

5 U.S.C. §552 (2016) (excerpts)………………………………..ADD-068

H.R. Rep. No. 94–1476 (1976) (excerpts)…………………………ADD-070

Minn. Admin. Rule 4761.2460 (2022)……………………………ADD-072


## ADDENDUM OF UNPUBLISHED CASES

*Public.Resource.Org, Inc. v. Cal. Office of Admin. Law.,* No. 34-2021-80003612, (Cal. Sup. Ct., Apr. 11, 2022)……………………………………………….………ADD-071

C KeyCite citing references available

| Code of Federal Regulations |
| Title 1. General Provisions |
| Chapter II. Office of the Federal Register |
| Part 51. Incorporation by Reference. (Refs & Annos) |

1 C.F.R. § 51.1

## § 51.1 Policy.

Currentness

(a) Section 552(a) of title 5, United States Code, provides, in part, that "matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register."

(b) The Director will interpret and apply the language of section 552(a) together with other requirements which govern publication in the Federal Register and the Code of Federal Regulations. Those requirements which govern publication include—

(1) The Federal Register Act (44 U.S.C. 1501 et seq.)

(2) The Administrative Procedure Act (5 U.S.C. 551 et seq.);

(3) The regulations of the Administrative Committee of the Federal Register under the Federal Register Act (1 CFR Ch. I); and

(4) The acts which require publication in the Federal Register (See CFR volume entitled "CFR Index and Finding Aids.")

(c) The Director will assume in carrying out the responsibilities for incorporation by reference that incorporation by reference—

(1) Is intended to benefit both the Federal Government and the members of the class affected; and

**ADD-001**

§ 51.1 Policy., 1 C.F.R. § 51.1

(2) Is not intended to detract from the legal or practical attributes of the system established by the Federal Register Act, the Administrative Procedure Act, the regulations of the Administrative Committee of the Federal Register, and the acts which require publication in the Federal Register.

(d) The Director will carry out the responsibilities by applying the standards of part 51 fairly and uniformly.

(e) Publication in the Federal Register of a document containing an incorporation by reference does not of itself constitute an approval of the incorporation by reference by the Director.

(f) Incorporation by reference of a publication is limited to the edition of the publication that is approved. Future amendments or revisions of the publication are not included.

SOURCE: 47 FR 34108, Aug. 6, 1982, unless otherwise noted.

AUTHORITY: 5 U.S.C. 552(a).

Notes of Decisions (2)

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-002**

Code of Federal Regulations
  Title 1. General Provisions
    Chapter II. Office of the Federal Register
      Part 51. Incorporation by Reference. (Refs & Annos)

1 C.F.R. § 51.3

§ 51.3 When will the Director approve a publication?

Effective: January 6, 2015
Currentness

(a)(1) The Director will informally approve the proposed incorporation by reference of a publication when the preamble of a proposed rule meets the requirements of this part (See § 51.5(a)).

(2) If the preamble of a proposed rule does not meet the requirements of this part, the Director will return the document to the agency (See 1 CFR 2.4).

(b) The Director will formally approve the incorporation by reference of a publication in a final rule when the following requirements are met:

(1) The publication is eligible for incorporation by reference (See § 51.7).

(2) The preamble meets the requirements of this part (See § 51.5(b)(2)).

(3) The language of incorporation meets the requirements of this part (See § 51.9).

(4) The publication is on file with the Office of the Federal Register.

(5) The Director has received a written request from the agency to approve the incorporation by reference of the publication.

(c) The Director will notify the agency of the approval or disapproval of an incorporation by reference in a final rule within 20 working days after the agency has met all the requirements for requesting approvals (See § 51.5).

**Credits**
[79 FR 66278, Nov. 7, 2014]

SOURCE: 47 FR 34108, Aug. 6, 1982, unless otherwise noted.

ADD-003

AUTHORITY: 5 U.S.C. 552(a).

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

ADD-004

Code of Federal Regulations
  Title 1. General Provisions
    Chapter II. Office of the Federal Register
      Part 51. Incorporation by Reference. (Refs & Annos)

1 C.F.R. § 51.5

§ 51.5 How does an agency request approval?

Effective: January 6, 2015
Currentness

(a) For a proposed rule, the agency does not request formal approval but must:

(1) Discuss, in the preamble of the proposed rule, the ways that the materials it proposes to incorporate by reference are reasonably available to interested parties or how it worked to make those materials reasonably available to interested parties; and

(2) Summarize, in the preamble of the proposed rule, the material it proposes to incorporate by reference.

(b) For a final rule, the agency must request formal approval. The formal request package must:

(1) Send a letter that contains a written request for approval at least 20 working days before the agency intends to submit the final rule document for publication;

(2) Discuss, in the preamble of the final rule, the ways that the materials it incorporates by reference are reasonably available to interested parties and how interested parties can obtain the materials;

(3) Summarize, in the preamble of the final rule, the material it incorporates by reference;

(4) Send a copy of the final rule document that uses the proper language of incorporation with the written request (See § 51.9); and

(5) Ensure that a copy of the incorporated material is on file at the Office of the Federal Register.

(c) Agencies may consult with the Office of the Federal Register at any time with respect to the requirements of this part.

**Credits**
[79 FR 66278, Nov. 7, 2014]

USCA Case #22-7063    Document #1984604    Filed: 02/03/2023    Page 87 of 174

SOURCE: 47 FR 34108, Aug. 6, 1982, unless otherwise noted.

AUTHORITY: 5 U.S.C. 552(a).

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

ADD-006

B   767,162

GS 4.108:1,2/98 2                    572-B

JK
416
.A5
1949
Title 1-2
1982

# code of federal regulations

## General Provisions

**1**

Revised as of January 1, 1982

**2**

(RESERVED)

UNIVERSITY OF MICHIGAN
LIBRARIES

APR 6 1982

DEPOSITED BY THE
UNITED STATES OF AMERICA

THE NATIONAL ARCHIVES OF THE UNITED STATES * 1934 *

ADD-007

Digitized by Google

# CHAPTER II—OFFICE OF THE FEDERAL REGISTER

———————————————————————

| Part | | Page |
|---|---|---|
| 51 | Incorporation by reference .............................................. | 30 |

**ADD-008**

Digitized by Google

# PART 51—INCORPORATION BY REFERENCE

### GENERAL

Sec.
51.1   Policy.
51.2   Matter eligible.
51.3   Distinctions.
51.4   Elements on which approval may be based.
51.5   Filing.

#### DRAFTING STANDARDS

51.6   Language of incorporation.
51.7   Identification and description.
51.8   Statement of availability.

#### PUBLICATION PROCEDURES

51.10   Advance consultation.
51.11   Letter transmitting final document.
51.12   Stamp of approval.
51.13   Procedures for approval and maintenance of incorporation by reference.

AUTHORITY: 5 U.S.C. 552(a).

SOURCE: 37 FR 23614, Nov. 4, 1972, unless otherwise noted.

### GENERAL

§ 51.1   Policy.

(a) Section 552(a) of Title 5, United States Code, provides, in part, that "matter reasonably available to the class of persons affected thereby is deemed published in the FEDERAL REGISTER when incorporated by reference therein with the approval of the Director of the Federal Register."

(b) The Director will strictly interpret the language quoted in paragraph (a) of this section to provided fairness and uniformity in administrative proceedings involving publication in the FEDERAL REGISTER.

(c) The Director will interpret and apply the language quoted in paragraph (a) of this section with full regard to the significance of related instruments governing publication in the FEDERAL REGISTER and the Code of Federal Regulations. Related instruments include—

(1) Subchapter II of Chapter 5 of Title 5, United States Code;

(2) Chapter 15 of Title 44, United States Code;

(3) Chapter I of this title; and

(4) Special statutory provisions listed in Appendix B to Chapter I [1] of this title that require publication in the FEDERAL REGISTER.

(d) The Director will assume that the language quoted in paragraph (a) of this section is—

(1) Designed to cover the limited purposes of section 552(a) of Title 5, United States Code;

(2) Intended to benefit both the Federal Government and the members of the classes affected by reducing the volume of matter printed in the FEDERAL REGISTER; and

(3) Not intended to detract from the legal or practical attributes of the system established under the basic instruments listed in paragraph (c) of this section.

(e) While the requirements of 5 U.S.C. 552(a) and of this part apply to a final rule making document, issuing agencies are encouraged to consult the Office of the Federal Register with respect to the requirements of this part before submitting for publication a notice of proposed rule making document that contains an incorporation by reference.

§ 51.2   Matter eligible.

To be eligible for incorporation by reference, under section 552(a) of Title 5, United States Code, in a document to be published in the FEDERAL REGISTER, material must conform to the policy stated in § 51.1 and be in the nature of published data, criteria, standards, specifications, techniques, illustrations, or other published information reasonably available to the members of the class that would be affected by the publication.

§ 51.3   Distinctions.

(a) *Ordinary references.* For the purposes of this part, informational references and cross references that do not purport to incorporate outside matter within a FEDERAL REGISTER document are not considered to be legal incorporations by reference under section 552(a) of Title 5, United States Code.

---

[1] For material contained in former Appendix B please consult the CFR volume entitled "CFR Index and Finding Aids".

ADD-009

Digitized by Google

(b) *Regulations governing availability of agency issuances.* Regulations governing the availability of agency issuances are not considered to be legal incorporation by reference under section 552(a) of Title 5, United States Code.

§ 51.4  **Elements on which approval may be based.**

The Director of the Federal Register will approve an incorporation by reference only when the following considerations are favorable and reasonably stable:

(a) The matter is eligible.

(b) Incorporation will substantially reduce the volume of material published in the FEDERAL REGISTER.

(c) The matter incorporated is in fact available to the extent necessary to afford fairness and uniformity in the administrative process.

(d) The incorporating document is drafted and submitted for publication in accordance with this part.

§ 51.5  **Filing.**

Copies of material approved for incorporation by reference including copies of all amendments or revisions to that material, shall be filed with the Office of the Federal Register.

DRAFTING STANDARDS

§ 51.6  **Language of incorporation.**

(a) The language incorporating material by reference shall be as precise and complete as possible.

(b) The words expressing the incorporation shall make it clear that the incorporation by reference is intended and completed by the document in which it appears.

§ 51.7  **Identification and description.**

(a) Each incorporation by reference shall include an identification and subject description of the matter incorporated, in terms as precise and useful as practicable within the limits of reasonable brevity.

(b) Titles, dates, editions, numbers, authors, and publishers shall be stated whenever they would contribute to clear identification.

(c) A brief subject description shall be included to inform the user of his potential need to obtain the matter incorporated.

§ 51.8  **Statement of availability.**

(a) *Information.* Each incorporation by reference shall include a statement covering the availability of the material incorporated, including current information as to where and how copies of it may be examined and be readily obtained with maximum convenience to the user.

(b) *Official showing.* Inclusion of the statement required by paragraph (a) of this section constitutes an official showing by the issuing agency that the material incorporated is, in fact, reasonably available to the class of persons affected.

(c) *Future amendments or revisions.* In any case in which incorporated material will be subject to change, the statement required by paragraph (a) of this section shall set forth that information. However, the incorporation of material in a FEDERAL REGISTER document by reference is limited to the material as it exists on the effective date of the document. Future amendments or revisions of material incorporated by reference are not included. They may be added as they become available, or at any later time, by the issuance of an amendatory document. Separate approval of the Director of the incorporation of each amendment whose original incorporation was approved need not be obtained if all other requirements of this part are met.

PUBLICATION PROCEDURES

§ 51.10  **Advance consultation.**

(a) To avoid delay, each issuing agency shall consult in advance with the Director of the Federal Register regarding the approval of any specific incorporation by reference. The consultation should take place at least 10 working days before the proposed date of submission of the document.

(b) After completion of the consultation, the Director will notify the agency of his decision, at least 5 working days before the pro... ... submission of the doc...

(c) Publication in t... TER of a document

31

Digitized by Google

KeyCite citing references available

| Code of Federal Regulations |
| Title 1. General Provisions |
| Chapter II. Office of the Federal Register |
| Part 51. Incorporation by Reference. (Refs & Annos) |

1 C.F.R. § 51.7

§ 51.7 What publications are eligible?

Effective: January 6, 2015

Currentness

(a) A publication is eligible for incorporation by reference under 5 U.S.C. 552(a) if it—

(1) Conforms to the policy stated in § 51.1;

(2)(i) Is published data, criteria, standards, specifications, techniques, illustrations, or similar material; and

(ii) Does not detract from the usefulness of the Federal Register publication system; and

(3) Is reasonably available to and usable by the class of persons affected. In determining whether a publication is usable, the Director will consider—

(i) The completeness and ease of handling of the publication; and

(ii) Whether it is bound, numbered, and organized, as applicable.

(b) The Director will assume that a publication produced by the same agency that is seeking its approval is inappropriate for incorporation by reference. A publication produced by the agency may be approved, if, in the judgment of the Director, it meets the requirements of paragraph (a) and possesses other unique or highly unusual qualities. A publication may be approved if it cannot be printed using the Federal Register/Code of Federal Regulations printing system.

ADD-011

§ 51.7 What publications are eligible?, 1 C.F.R. § 51.7

(c) The following materials are not appropriate for incorporation by reference:

(1) Material published previously in the Federal Register.

(2) Material published in the United States Code.

**Credits**

[79 FR 66278, Nov. 7, 2014]

SOURCE: 47 FR 34108, Aug. 6, 1982, unless otherwise noted.

AUTHORITY: 5 U.S.C. 552(a).

Notes of Decisions (4)

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

                                           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-012**

C KeyCite citing references available

| Code of Federal Regulations |
| Title 1. General Provisions |
| Chapter II. Office of the Federal Register |
| Part 51. Incorporation by Reference. (Refs & Annos) |

1 C.F.R. § 51.9

## § 51.9 What is the proper language of incorporation?

Effective: January 6, 2015

Currentness

(a) The language incorporating a publication by reference must be precise, complete, and clearly state that the incorporation by reference is intended and completed by the final rule document in which it appears.

(b) The language incorporating a publication by reference is precise and complete if it—

(1) Uses the words "incorporated by reference;"

(2) States the title, date, edition, author, publisher, and identification number of the publication;

(3) Informs the user that the incorporated publication is a requirement;

(4) Makes an official showing that the publication is in fact available by stating where and how copies may be examined and readily obtained with maximum convenience to the user; and

(5) Refers to 5 U.S.C. 552(a).

(c) If the Director approves a publication for incorporation by reference in a final rule, the agency must include—

(1) The following language under the DATES caption of the preamble to the final rule document (See 1 CFR 18.12

Preamble requirements):

The incorporation by reference of certain publications listed in the regulations is approved by the Director of the Federal Register as of _____.

(2) The preamble requirements set out in 51.5(b).

(3) The term "incorporation by reference" in the list of index terms (See 1 CFR 18.20 Identification of subjects in agency regulations).

**Credits**

[79 FR 66278, Nov. 7, 2014]

SOURCE: 47 FR 34108, Aug. 6, 1982, unless otherwise noted.

AUTHORITY: 5 U.S.C. 552(a).

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

**End of Document**                                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 1. General Provisions
Chapter II. Office of the Federal Register
Part 51. Incorporation by Reference. (Refs & Annos)

1 C.F.R. § 51.11

§ 51.11 How does an agency change or remove an approved incorporation?

Currentness

(a) An agency that seeks approval for a change to a publication that is approved for incorporation by reference must—

(1) Publish notice of the change in the Federal Register and amend the Code of Federal Regulations;

(2) Ensure that a copy of the amendment or revision is on file at the Office of the Federal Register; and

(3) Notify the Director of the Federal Register in writing that the change is being made.

(b) If a regulation containing an incorporation by reference fails to become effective or is removed from the Code of Federal Regulations, the agency must notify the Director of the Federal Register in writing of that fact within 5 working days of the occurrence.

SOURCE: 47 FR 34108, Aug. 6, 1982, unless otherwise noted.

AUTHORITY: 5 U.S.C. 552(a).

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-015**

United States Code Annotated
  Title 17. Copyrights (Refs & Annos)
    Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)

17 U.S.C.A. § 102

§ 102. Subject matter of copyright: In general

Currentness

**(a)** Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

**(1)** literary works;

**(2)** musical works, including any accompanying words;

**(3)** dramatic works, including any accompanying music;

**(4)** pantomimes and choreographic works;

**(5)** pictorial, graphic, and sculptural works;

**(6)** motion pictures and other audiovisual works;

**(7)** sound recordings; and

**(8)** architectural works.

**(b)** In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

**CREDIT(S)**

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2544; Pub.L. 101-650, Title VII, § 703, Dec. 1, 1990, 104 Stat. 5133.)

17 U.S.C.A. § 102, 17 USCA § 102
Current through P.L. 117-214. Some statute sections may be more current, see credits for details.

ADD-016

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

**ADD-017**

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

| United States Code Annotated |
| Title 17. Copyrights (Refs & Annos) |
| Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos) |

17 U.S.C.A. § 105

## § 105. Subject matter of copyright: United States Government works

Effective: December 20, 2019

Currentness

**(a) In general.**--Copyright protection under this title is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest, or otherwise.

**(b) Copyright protection of certain of[1] works.**--Subject to subsection (c),[2] the covered author of a covered work owns the copyright to that covered work.

**(c)[2] Use by Federal Government.**--The Secretary of Defense may direct the covered author of a covered work to provide the Federal Government with an irrevocable, royalty-free, world-wide, nonexclusive license to reproduce, distribute, perform, or display such covered work for purposes of the United States Government.

**(c)[2] Definitions.**--In this section:

**(1)** The term "covered author" means a civilian member of the faculty of a covered institution.

**(2)** The term "covered institution" means the following:

**(A)** National Defense University.

**(B)** United States Military Academy.

**ADD-018**

**(C)** Army War College.

**(D)** United States Army Command and General Staff College.

**(E)** United States Naval Academy.

**(F)** Naval War College.

**(G)** Naval Post Graduate School.

**(H)** Marine Corps University.

**(I)** United States Air Force Academy.

**(J)** Air University.

**(K)** Defense Language Institute.

**(L)** United States Coast Guard Academy.

**(3)** The term "covered work" means a literary work produced by a covered author in the course of employment at a covered institution for publication by a scholarly press or journal.

### CREDIT(S)

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 116-92, Div. A, Title V, § 544, Dec. 20, 2019, 133 Stat. 1376.)

Notes of Decisions (11)

**ADD-019**

§ 105. Subject matter of copyright: United States Government works, 17 USCA § 105

Footnotes

1

So in original.

2

So in original. Two subsecs. (c) were enacted.

17 U.S.C.A. § 105, 17 USCA § 105
Current through P.L. 117-214. Some statute sections may be more current, see credits for details.

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    3

**ADD-020**

USCA Case #22-7063    Document #1984604        Filed: 02/03/2023    Page 102 of 174

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>   Title 17. Copyrights (Refs & Annos)
>     Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)

17 U.S.C.A. § 106

§ 106. Exclusive rights in copyrighted works

Effective: November 2, 2002
Currentness

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

**(1)** to reproduce the copyrighted work in copies or phonorecords;

**(2)** to prepare derivative works based upon the copyrighted work;

**(3)** to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

**(4)** in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

**(5)** in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

**(6)** in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

### CREDIT(S)

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 101-318, § 3(d), July 3, 1990, 104 Stat. 288; Pub.L. 101-650, Title VII, § 704(b)(2), Dec. 1, 1990, 104 Stat. 5134; Pub.L. 104-39, § 2, Nov. 1, 1995, 109 Stat. 336; Pub.L. 106-44, § 1(g)(2), Aug. 5, 1999, 113 Stat. 222; Pub.L. 107-273, Div. C, Title III, § 13210(4)(A), Nov. 2, 2002, 116 Stat. 1909.)

17 U.S.C.A. § 106, 17 USCA § 106
Current through P.L. 117-214. Some statute sections may be more current, see credits for details.

ADD-021

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-022**

KeyCite citing references available

| United States Code Annotated |
| Title 17. Copyrights (Refs & Annos) |
| Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos) |

17 U.S.C.A. § 107

# § 107. Limitations on exclusive rights: Fair use

Currentness

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--

**(1)** the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

**(2)** the nature of the copyrighted work;

**(3)** the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

**(4)** the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

**CREDIT(S)**

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 101-650, Title VI, § 607, Dec. 1, 1990, 104 Stat. 5132; Pub.L. 102-492, Oct. 24, 1992, 106 Stat. 3145.)

Notes of Decisions (926)

**ADD-023**

§ 107. Limitations on exclusive rights: Fair use, 17 USCA § 107

17 U.S.C.A. § 107, 17 USCA § 107
Current through P.L. 117-214. Some statute sections may be more current, see credits for details.

**End of Document**                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

ADD-024

KeyCite citing references available

United States Code Annotated
Title 17. Copyrights (Refs & Annos)
Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)
17 U.S.C.A. § 121

## § 121. Limitations on exclusive rights: Reproduction for blind or other people with disabilities

Effective: October 9, 2018

Currentness

**(a)** Notwithstanding the provisions of section 106, it is not an infringement of copyright for an authorized entity to reproduce or to distribute in the United States copies or phonorecords of a previously published literary work or of a previously published musical work that has been fixed in the form of text or notation if such copies or phonorecords are reproduced or distributed in accessible formats exclusively for use by eligible persons.

**(b)(1)** Copies or phonorecords to which this section applies shall--

**(A)** not be reproduced or distributed in the United States in a format other than an accessible format exclusively for use by eligible persons;

**(B)** bear a notice that any further reproduction or distribution in a format other than an accessible format is an infringement; and

**(C)** include a copyright notice identifying the copyright owner and the date of the original publication.

**(2)** The provisions of this subsection shall not apply to standardized, secure, or norm-referenced tests and related testing material, or to computer programs, except the portions thereof that are in conventional human language (including descriptions of pictorial works) and displayed to users in the ordinary course of using the computer programs.

**(c)** Notwithstanding the provisions of section 106, it is not an infringement of copyright for a publisher of print instructional materials for use in elementary or secondary schools to create and distribute to the National Instructional Materials Access Center copies of the electronic files described in sections 612(a)(23)(C), 613(a)(6), and section 674(e) of the Individuals with

**ADD-025**

§ 121. Limitations on exclusive rights: Reproduction for blind or..., 17 USCA § 121

Disabilities Education Act that contain the contents of print instructional materials using the National Instructional Material Accessibility Standard (as defined in section 674(e)(3) of that Act), if--

**(1)** the inclusion of the contents of such print instructional materials is required by any State educational agency or local educational agency;

**(2)** the publisher had the right to publish such print instructional materials in print formats; and

**(3)** such copies are used solely for reproduction or distribution of the contents of such print instructional materials in accessible formats.

**(d)** For purposes of this section, the term--

**(1)** "accessible format" means an alternative manner or form that gives an eligible person access to the work when the copy or phonorecord in the accessible format is used exclusively by the eligible person to permit him or her to have access as feasibly and comfortably as a person without such disability as described in paragraph (3);

**(2)** "authorized entity" means a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities;

**(3)** "eligible person" means an individual who, regardless of any other disability--

**(A)** is blind;

**(B)** has a visual impairment or perceptual or reading disability that cannot be improved to give visual function substantially equivalent to that of a person who has no such impairment or disability and so is unable to read printed works to substantially the same degree as a person without an impairment or disability; or

**(C)** is otherwise unable, through physical disability, to hold or manipulate a book or to focus or move the eyes to the extent that would be normally acceptable for reading; and

**(4)** "print instructional materials" has the meaning given under section 674(e)(3)(C) of the Individuals with Disabilities Education Act.

ADD-026

§ 121. Limitations on exclusive rights: Reproduction for blind or..., 17 USCA § 121

### CREDIT(S)

(Added Pub.L. 104-197, Title III, § 316(a), Sept. 16, 1996, 110 Stat. 2416; amended Pub.L. 106-379, § 3(b), Oct. 27, 2000, 114 Stat. 1445; Pub.L. 107-273, Div. C, Title III, § 13210(3)(A), Nov. 2, 2002, 116 Stat. 1909; Pub.L. 108-446, Title III, § 306, Dec. 3, 2004, 118 Stat. 2807; Pub.L. 115-261, § 2(a)(1), Oct. 9, 2018, 132 Stat. 3667.)

Notes of Decisions (1)

17 U.S.C.A. § 121, 17 USCA § 121
Current through P.L. 117-214. Some statute sections may be more current, see credits for details.

**End of Document**                             © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-027**



KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

| Code of Federal Regulations |
| Title 24. Housing and Urban Development |
| Subtitle B. Regulations Relating to Housing and Urban Development |
| Chapter XX. Office of Assistant Secretary for Housing—Federal Housing Commissioner, Department of Housing and Urban Development |
| Part 3280. Manufactured Home Construction and Safety Standards (Refs & Annos) |
| Subpart A. General |

24 C.F.R. § 3280.4

§ 3280.4 Incorporation by reference.

Effective: July 12, 2021

Currentness

(a) The specifications, standards, and codes of the following organizations are incorporated by reference in 24 CFR part 3280 (this Standard) pursuant to 5 U.S.C. 552(a) and 1 CFR part 51 as though set forth in full. The incorporation by reference of these standards has been approved by the Director of the Federal Register. If a later edition is to be enforced, the Department will publish a notification of change in the Federal Register. These incorporated standards are available for purchase from the organization that developed the standard at the corresponding addresses noted below. Incorporated standards are available for inspection at the Office of Manufactured Housing Program, Manufactured Housing and Construction Standards Division, U.S. Department of Housing and Urban Development, 451 Seventh Street SW, Room B–133, Washington, DC 20410, email mhs@hud.gov. Copies of incorporated standards that are not available from their producer organizations may be obtained from the Office of Manufactured Housing Programs. These standards are also available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, email fedreg.legal@nara.gov or go to www.archives.gov/federal-register/cfr/ibr-locations.html.

(b) Air Conditioning & Refrigeration Institute (ARI), 4100 North Fairfax Drive, Suite 200, Arlington, VA 22203, telephone number 703–524–8800, fax number 703–528–3816, Web site: http://www.lightindustries.com/ARI/.

(1) ANSI/ARI Standard 210/240–89, Unitary Air–Conditioning and Air–Source Heat Pump Equipment, IBR approved for §§ 3280.511(b), 3280.703, and 3280.714(a),

(2) [Reserved]

(c) Aluminum Association (AA), 1525 Wilson Blvd., Suite 600, Arlington, VA 22209; telephone number 703–358–2960, fax number 703–358–3921; Web site: http://www.aluminum.org.

ADD-028

(1) Aluminum Design Manual, Specifications and Guidelines for Aluminum Structures, Part 1–A, Sixth Edition, October 1994, IBR approved for § 3280.304(b).

(2) Aluminum Design Manual, Specifications and Guidelines for Aluminum Structures, Part 1–B, First Edition, October 1994, IBR approved for § 3280.304(b).

(d) American Architectural Manufacturers Association (AAMA), 1827 Walden Office Square, Suite 550, Schaumburg, IL 60173, telephone number 847–303–5664, fax number 847–303–5774, Web site: http://www.aamanet.org.

(1) AAMA 1503.1–88, Voluntary Test Method for Thermal Transmittance and Condensation Resistance of Windows, Doors, and Glazed Wall Sections, IBR approved for § 3280.508(e).

(2) AAMA 1600/I.S.7–00, Voluntary Specification for Skylights, 2003 IBR approved for § 3280.305(c).

(3) AAMA 1701.2–95, Voluntary Standard Primary Window and Sliding Glass Door for Utilization in Manufactured Housing, IBR approved for §§ 3280.403(e) and 3280.404(b).

(4) AAMA 1702.2–95, Voluntary Standard Swinging Exterior Passage Door for Utilization in Manufactured Housing, IBR approved for § 3280.405(b) and (e).

(5) AAMA Standard 1704–1985, Voluntary Standard Egress Window Systems for Utilization in Manufactured Housing, IBR approved for § 3280.404(b).

(6) AAMA/WDMA/CSA/101/I.S.2/A440–08 North American Fenestration Standard/Specification for Windows, Doors and Skylights, January 2008, IBR approved for § 3280.403(b) and (e).

(7) ANSI/AAMA/NWWDA 101/I.S.2–97,Voluntary Specifications for Aluminum, Vinyl (PVC) and Wood Windows and Glass Doors, IBR approved for § 3280.304(b).

(e) American Forest and Paper Association (AFPA), 1111 Nineteenth Street, Suite 800, Washington, DC 20036 (previously named National Forest Products Association (NFPA), telephone number 1–800–878–8878, Web site: http://www.afandpa.org.

(1) AFPA, Design Values for Joists and Rafters 1992, IBR approved for § 3280.304(b).

(2) AFPA PS–20–70, Span Tables for Joists and Rafters, 1993, IBR approved for § 3280.304(b).

(3) ANSI/AFPA NDS–2001, National Design Specifications for Wood Construction, 2001 Edition, with Supplement, Design Values for Wood Construction, November 30, 2001, IBR approved for § 3280.304(b).

(4) AFPA, Wood Structural Design Data, 1986 Edition with 1992 Revisions, IBR approved for § 3280.304(b).

(f) American Gas Association (AGA), 400 North Capitol Street NW., Washington, DC 20001, telephone number 202–824–7000, Web site: http://www.aga.org/Pages/default.aspx.

(1) AGA No. 3–87, Requirements for Gas Connectors for Connection of Fixed Appliances for Outdoor Installation, Park Trailers, and Manufactured (Mobile) Homes to the Gas Supply, IBR approved for § 3280.703.

(2) [Reserved]

(g) American Hardboard Association (AHA), 1210 West NW Highway, Palatine, IL 60067, Web site: http://hardboard.org.

(1) ANSI/AHA A135.4–1995, Basic Hardboard, IBR approved for § 3280.304(b).

(2) ANSI/AHA A135.5–1995, Prefinished Hardboard Paneling, IBR approved for § 3280.304(b).

(3) ANSI/AHA A135.6–1998, Hardboard Siding, IBR approved for § 3280.304(b).

(h) American Institute of Steel Construction (AISC), One East Wacker Drive, Chicago, IL 60601, telephone number 312–670–2400, fax number 312–670–5403, Web site: http://www.aisc.org/.

(1) AISC–S335, 1989. Specification for Structural Steel Buildings—Allowable Stress Design and Plastic Design (except for the following parts of this standard which are not incorporated by reference: 1.3.3, 1.3.4, 1.3.5, 1.3.6, 1.4.6, 1.5.1.5,

1.5.5, 1.6, 1.7, 1.8, 1.9, 1.10.4 through 1.10.7, 1.10.9, 1.11, 1.13, 1.14.5, 1.17.7 through 1.17.9, 1.19.1, 1.19.3, 1.20, 1.21, 1.23.7, 1.24, 1.25.1 through 1.25.5, 1.26.4, 2.3, 2.4, 2.8 through 2.10), June 1, 1989, IBR approved for §§ 3280.304(b) and 3280.305(j).

(2) [Reserved]

(i) American Iron and Steel Institute (AISI), 25 Massachusetts Ave., NW., Suite 800, Washington, DC 20001, telephone number 202–452–7100, Web site: http://www.steel.org.

(1) AISI, Specification for the Design of Cold–Formed Steel Structural Members, 1996, IBR approved for §§ 3280.304(b) and 3280.305(j).

(2) [Reserved]

(j) American National Standards Institute (ANSI), 25 West 43rd Street, 4th floor, New York, NY 10018, telephone number 212–642–4900, fax number 212–398–0023, Web site: http://www.ansi.org.

(1) ANSI A112.14.1–1975, Backflow Valves, IBR approved for § 3280.604(b).

(2) ANSI A112.19.5–1979, Trim for Water Closet, Bowls, Tanks, and Urinals, IBR approved for § 3280.604(b).

(3) ANSI/AITC A190.1–1992, For wood products—Structural Glued Laminated Timber, IBR approved for § 3280.304(b).

(4) ANSI A208.1–1999, Particleboard, IBR approved for § 3280.304(b).

(5) ANSI A208.2–2002, Medium Density Fiberboard (MDF) For Interior Applications, approved May 13, 2002, IBR approved for § 3280.304(b).

(6) ANSI B16.18–1984, Cast Copper Alloy Solder–Joint Pressure Fittings, IBR approved for § 3280.604(b).

(7) ANSI C72.1–1972, section 4.3.1, Household Automatic Electric Storage Type Water Heaters, IBR approved for §

3280.707(d).

(8) ANSI/IAS LC 1–1997, Fuel Gas Piping Systems Using Corrugated Stainless Steel Tubing (CSST), approved October 28, 1996, IBR approved for § 3280.705(b).

(9) ANSI Z21.1–2000, Household Cooking Gas Appliances, IBR approved for § 3280.703.

(10) ANSI Z21.5.1–1999, Gas Clothes Dryers Volume 1, Type 1 Clothes Dryers, with Addendum Z21.5.1a–1999, IBR approved for § 3280.703.

(11) ANSI Z21.10.1–1998, Gas Water Heaters—Volume 1, Storage Water Heaters with Input Ratings of 75,000 BTU per hour or Less, with Addendum Z21.10.1a–2000, IBR approved for §§ 3280.703 and 3280.707(d).

(12) ANSI Z21.15–1997, Manually Operated Gas Valves for Appliances, Appliance Connector Valves and Hose End Valves, IBR approved for §§ 3280.703 and 3280.705(c).

(13) ANSI Z21.19–1990, with Addendum ANSI Z21.19a–1992 and Z21.19b–1995, Refrigerators Using Gas Fuel, IBR approved for § 3280.703.

(14) ANSI Z21.20 with Addendum Z21.20a–2000, Automatic Gas Ignition Systems and Components, IBR approved for § 3280.703.

(15) ANSI Z21.21–2000, Automatic Valves for Gas Appliances, IBR approved for § 3280.703.

(16) ANSI Z21.22–1999, Relief Valves for Hot Water Supply Systems, IBR approved for §§ 3280.604(b) and 3280.703.

(17) ANSI Z21.23–1993, Gas Appliance Thermostats, approved August 10, 1993, IBR approved for § 3280.703.

(18) ANSI Z21.24–1997/CGA 6.10–M97, Connectors for Gas Appliances, IBR approved for § 3280.703.

(19) ANSI Z21.40.1–1996/CGA 2.91–M96, Gas–Fired, Heat Activated Air Conditioning and Heat Pump Appliances, IBR approved for §§ 3280.703 and 3280.714(a).

ADD-032

(20) ANSI Z21.47–1990 with Addendum Z21.47a–1990 and Z21.47b–1992, Gas–Fired Central Furnaces (Except Direct Vent System Central Furnaces), IBR approved for § 3280.703.

(21) ANSI Z34.1–1993, Third–Party Certification Programs for Products, Processes, and Services, IBR approved for §§ 3280.403(e) and 3280.405(e).

(22) ANSI Z97.1–2004, Standard for Safety Glazing Materials used in Buildings—Safety Performance Specifications and Methods of Test, copyright 2004, IBR approved for §§ 3280.113(c), 3280.304(b), 3280.403(d)(1), 3280.604(b), and 3280.607(b).

(23) ANSI Z124.1–1987, Plastic Bathtub Units with Addendum Z124.1a–1990 and Z124.1b–1991, IBR approved for § 3280.604(b).

(24) ANSI Z124.2–1987, Plastic Shower Receptors and Shower Stalls with Addendum Z124.2a–1990, IBR approved for § 3280.604(b).

(25) ANSI Z124.3–1986, Plastic Lavatories with Addendum Z124.3a–1990, IBR approved for § 3280.604(b).

(26) ANSI Z124.4–1986, Plastic Water Closets, Bowls, and Tanks with Addenda Z124.4a–1990, IBR approved for § 3280.604(b).

(27) ANSI Z124.5–1997, Plastic Toilet (Water Closets) Seats, IBR approved for § 3280.604(b).

(28) ANSI Z124.7–1997, Prefabricated Plastic Spa Shells, IBR approved for § 3280.604(b).

(29) ANSI Z–124.9–1994, Plastic Urinal Fixtures, IBR approved for § 3280.604(b).

(k) The Engineered Wood Association (APA) (formerly the American Plywood Association), 7011 South 19th Street, Tacoma, WA 98411, telephone number 253–565–6600, fax number 253–565–7265, Web site: http://www.apawood.org.

(1) APA D410A–2004, Panel Design Specification, IBR approved for § 3280.304(b).

ADD-033

(2) APA E30P–1996, APA Design/Construction Guide, Residential and Commercial Structures, IBR approved for § 3280.304(b).

(3) APA E30R, Engineered Wood Construction Guide, revised January 2001, IBR approved for § 3280.304(b).

(4) APA H815E–1995 (PDS Supplement #5), Design and Fabrication of All–Plywood Beams, IBR approved for § 3280.304(b).

(5) APA S 811M–1990 (PDS Supplement 1), Design and Fabrication of Plywood Curved Panels, IBR approved for § 3280.304(b).

(6) APA S 812R, Design and Fabrication of Glued Plywood–Lumber Beams, revised November 1998, Supplement #2, July 1992 IBR approved for § 3280.304.

(7) APA U 813L, Design and Fabrication of Plywood Stressed–Skin Panels, revised April 1996, Supplement # 3, August 1992, IBR approved for § 3280.304(b).

(8) APA U 814H, Design and Fabrication of Plywood, Sandwiched Panels, revised September 1993, Supplement #4, March 1990, IBR approved for § 3280.304(b).

(l) American Society of Civil Engineers (ASCE), 1801 Alexander Bell Drive, Reston, VA 20191, telephone number 800–548–2723, Web site: http://www.asce.org.

(1) ANSI/ASCE 7–88, Minimum Design Loads for Buildings and Other Structures, IBR approved for §§ 3280.5(f), 3280.304(b), and 3280.305(c).

(2) SEI/ASCE 8–02, Specification for the Design of Cold–Formed Stainless Steel Structural Members, 2002, IBR approved for §§ 3280.304(b) and 3280.305(j).

(3) ASCE 19–96, Structural Applications of Steel Cables for Buildings, IBR approved for § 3280.304(b).

**ADD-034**

(m) American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE), 1791 Tullie Circle NE., Atlanta, GA 30329, telephone number 404–636–8400, fax number 404–321–5478, Web site: https://www.ashrae.org/home/.

(1) 1997 ASHRAE Handbook of Fundamentals, Inch–Pound Edition (1997), chapters 22 through 27, (except for the following parts of this standard that are not incorporated by reference: 23.1 Steel Frame Construction; 23.2 Masonry Construction; 23.3 Foundations and Floor Systems; 23.15 Pipes; 23.17 Tanks, Vessels, and Equipment; 23.18 Refrigerated Rooms and Buildings; 24.18 Mechanical and Industrial Systems; 25.19 Commercial Building Envelope Leakage; 27.9 Calculation of Heat Loss from Crawl Spaces). IBR approved for §§ 3280.508(a), 3280.508(e), and 3280.511(a).

(2) ANSI/ASHRAE 62.2–2010, Ventilation and Acceptable Indoor Air Quality in Low–Rise Residential Buildings, copyright 2010 IBR approved for § 3280.103(d).

(n) ASME (formally the American Society of Mechanical Engineers), Two Park Avenue, New York, NY 10016–5990, telephone number 800–843–2763, Web site: http://www.asme.org/.

(1) ASME A112.1.2–1991, Air Gaps in Plumbing Systems, IBR approved for § 3280.604(b).

(2) ANSI/ASME A112.4.1–1993, Water Heater Relief Valve Drain Tubes, IBR approved for § 3280.604(b).

(3) ANSI/ASME A112.4.3–1999, Plastic Fittings for Connecting Water Closets to the Sanitary Drainage System, IBR approved for § 3280.604(b).

(4) ASME/ANSI A112.18.1M–1989, Plumbing Fixture Fittings, IBR approved for § 3280.604(b).

(5) ASME A112.18.3M–1996, Performance Requirements for Backflow Protection Devices and Systems in Plumbing Fixture Fittings, IBR approved for § 3280.604(b).

(6) ASME A112.18.6–1999, Flexible Water Connectors, IBR approved for § 3280.604(b).

(7) ASME A112.18.7–1999, Deck Mounted Bath/Shower Transfer Valves with Integral Backflow Protection, IBR approved for § 3280.604(b).

(8) ANSI/ASME A112.19.1M–1987, Enameled Cast Iron Plumbing Fixtures, IBR approved for § 3280.604(b).

**ADD-035**

(9) ANSI/ASME A112.19.2(M)–1990, Vitreous China Plumbing Fixtures, IBR approved for § 3280.604(b).

(10) ANSI/ASME A112.19.3M–1987, Stainless Steel Plumbing Fixtures (Designed for Residential Use), IBR approved for § 3280.604(b).

(11) ANSI/ASME A112.19.4(M)–1984, Porcelain Enameled Formed Steel Plumbing Fixtures, IBR approved for § 3280.604(b).

(12) ASME A112.19.6–1995, Hydraulic Performance Requirements for Water Closets and Urinals, IBR approved for § 3280.604(b).

(13) ASME/ANSI A112.19.7M–1987, Whirlpool Bathtub Appliances, IBR approved for § 3280.604(b).

(14) ASME/ANSI A112.19.8M–1989, Suction Fittings for Use in Swimming Pools, Wading Pools, Spas, Hot Tubs, and Whirlpool Bathtub Appliances, IBR approved for § 3280.604(b).

(15) ASME A112.19.9M–1991, Non–Vitreous Ceramic Plumbing Fixtures, IBR approved for § 3280.604(b).

(16) ASME A112.19.10–1994, Dual Flush Devices for Water Closets, IBR approved for § 3280.604(b).

(17) ANSI/ASME A112.21.3M–1985, Hydrants for Utility and Maintenance Use, IBR approved for § 3280.604(b).

(18) ANSI/ASME B1.20.1–1983, Pipe Threads, General Purpose (Inch), IBR approved for §§ 3280.604(b), 3280.703, 3280.705(e), and 3280.706(d).

(19) ANSI/ASME B16.3–1992, Malleable Iron Threaded Fittings, IBR approved for § 3280.604(b).

(20) ANSI/ASME B16.4–1992, Gray Iron Threaded Fittings, IBR approved for § 3280.604(b).

**ADD-036**

(21) ANSI/ASME B16.15–1985, Cast Bronze Threaded Fittings, Classes 125 and 250, IBR approved for § 3280.604(b).

(22) ASME/ANSI B16.22–1989, Wrought–Copper and Copper Alloy Solder–Joint Pressure Fitting, IBR approved for § 3280.604(b).

(23) ASME B16.23–1992, Cast Copper Alloy Solder–Joint Drainage Fittings–DWV, IBR approved for § 3280.604(b).

(24) ASME/ANSI B16.26–1988, Cast Copper Alloy Fittings for Flared Copper Tubes, IBR approved for § 3280.604(b).

(25) ASME/ANSI B16.29–1986, Wrought Copper and Wrought Copper Alloy Solder–Joint Drainage Fittings–DWV, IBR approved for § 3280.604(b).

(26) ANSI/ASME B36.10–1979, Welding and Seamless Wrought Steel Pipe, IBR approved for §§ 3280.604(b), 3280.703, 3280.705(b), and 3280.706(b).

(o) American Society of Sanitary Engineering (ASSE), 901 Canterbury, Suite A, Westlake, OH 44145, phone number 440–835–3040, fax number 440–835–3488, Web site: http://www.asse-plumbing.org.

(1) ASSE 1001 (ANSI Approved 1990), Performance Requirements for Pipe Applied Atmospheric Type Vacuum Breakers, IBR approved for § 3280.604(b).

(2) ASSE 1002 Revision 5–1986 (ANSI/ASSE–1979), Performance Requirements for Water Closet Flush Tank Fill Valves (Ballcocks), IBR approved for § 3280.604(b).

(3) ASSE 1006 (ASSE/ANSI–1986), Plumbing Requirements for Residential Use (Household) Dishwashers, IBR approved for § 3280.604(b).

(4) ASSE 1007–1986, Performance Requirements for Home Laundry Equipment, IBR approved for § 3280.604(b).

(5) ASSE 1008–1986, Performance Requirements for Household Food Waste Disposer Units, IBR approved for § 3280.604(b).

**ADD-037**

(6) ASSE 1011–1981 (ANSI–1982), Performance Requirements for Hose Connection Vacuum Breakers, IBR approved for § 3280.604(b).

(7) ASSE 1014–1989 (ANSI–1990), Performance Requirements for Hand-held Showers, IBR approved for § 3280.604(b).

(8) ASSE 1016–2005, Performance Requirements for Automatic Compensating Values for Individual Shower and Tub/Shower Combinations, approved January 2005, IBR approved for §§ 3280.604(b) and 3280.607(b).

(9) ASSE 1017–1986, Performance Requirements for Temperature Activated Mixing Valves for Primary Domestic Use, IBR approved for § 3280.604(b).

(10) ANSI/ASSE 1019–1978, Performance Requirements for Wall Hydrants, Frost Proof Automatic Draining, Anti–Backflow Types, IBR approved for § 3280.604(b).

(11) ASSE 1023 (ANSI/ASSE–1979), Performance Requirements for Hot Water Dispensers, Household Storage Type Electrical, IBR approved for § 3280.604(b).

(12) ASSE 1025 (ANSI/ASSE–1978), Performance Requirements for Diverters for Plumbing Faucets with Hose Spray, Anti–Siphon Type, Residential Applications, IBR approved for § 3280.604(b).

(13) ASSE 1037–1990 (ANSI–1990), Performance Requirements for Pressurized Flushing Devices (Flushometers) for Plumbing Fixtures, IBR approved for § 3280.604(b).

(14) ASSE 1051 Revised 1996 (ANSI 1998), Performance Requirements for Air Admittance Valves for Plumbing Drainage Systems—Fixture and Branch Devices, IBR approved for § 3280.604(b).

(15) ASSE 1070–2004, Performance Requirements for Water Temperature Limiting Devices, IBR approved for §§ 3280.604(b) and 3280.607(b).

(p) ASTM, International, 100 Barr Harbor Drive, West Conshohocken, PA 19428, (610) 832–9500, fax number 610–832–9555, Web site: http://www.astm.org.

(1) ASTM A53–93. Standard Specification for Pipe, Steel, Black and Hot–Dipped, Zinc–Coated, Welded and Seamless,

IBR approved for §§ 3280.604(b) and 3280.703.

(2) ASTM A74–92, Standard Specification for Cast Iron Soil Pipe and Fittings, IBR approved for § 3280.604(b).

(3) ASTM A539–99, Standard Specification for Electric–Resistance–Welded Coiled Steel Tubing for Gas and Fuel Oil Lines, IBR approved for §§ 3280.703, 3280.705(b), and § 3280.706(b).

(4) ASTM B42–93, Standard Specification for Seamless Copper Pipe, Standard Sizes, IBR approved for §§ 3280.604 and 3280.703.

(5) ASTM B43–91, Standard Specification for Seamless Red Brass Pipe, Standard Sizes, IBR approved for §§ 3280.604(b) and 3280.705(b).

(6) ASTM B88–93, Standard Specification for Seamless Copper Water Tube, IBR approved for §§ 3280.604, 3280.703, 3280.705(b), and 3280.706(b).

(7) ASTM B251–93, Standard Specification for General Requirements for Wrought Seamless Copper and Copper–Alloy Tube, IBR approved for §§ 3280.604 and 3280.703.

(8) ASTM B280–95a, Standard Specification for Seamless Copper Tube for Air Conditioning and Refrigeration Field Service, IBR approved for §§ 3280.703, 3280.705(b), and 3280.706(b).

(9) ASTM B306–92, Standard Specification for Copper Drainage Tube (DWV), IBR approved for § 3280.604(b).

(10) ASTM C 36/C 36M–99, Standard Specification for Gypsum Wallboard, 1999, IBR approved for § 3280.304.

(11) ASTM C564–97, Standard Specification for Rubber Gaskets for Case Iron Soil Pipe and Fittings, approved December 10, 1997, IBR approved for §§ 3280.604(b) and 3280.611(d).

(12) ASTM C920–02, Standard Specification for Elastomeric Joint Sealants, approved January 10, 2002, IBR approved for § 3280.611(d).

**ADD-039**

(13) ASTM D781–68 (Reapproved 1973), Standard Test Methods for Puncture and Stiffness of Paperboard, and Corrugated and Solid Fiberboard, IBR approved for §§ 3280.304(b), and 3280.305(g).

(14) ASTM D2235–88, Standard Specification for Solvent Cement for Acrylonitrile–Butadiene–Styrene (ABS) Plastic Pipe and Fittings, IBR approved for § 3280.604(b).

(15) ASTM D2564–91a, Standard Specification for Solvent Cements for Poly (Vinyl Chloride) (PVC) Plastic Piping Systems, IBR approved for § 3280.604(b).

(16) ASTM D2661–91, Standard Specification for Acrylonitrile–Butadiene–Styrene (ABS) Schedule 40 Plastic Drain, Waste, and Vent Pipe and Fittings, IBR approved for § 3280.604(b).

(17) ASTM D2665–91b, Standard Specification for Poly (Vinyl Chloride) (PVC) Plastic Drain, Waste, and Vent Pipe and Fittings, IBR approved for § 3280.604(b).

(18) ASTM D2846–92, Standard Specification for Chlorinated Poly (Vinyl Chloride) (CPVC) Plastic Hot- and Cold–Water Distribution Systems, IBR approved for § 3280.604(b).

(19) ASTM D3309–92a, Standard Specification for Polybutylene (PB) Plastic Hot- and Cold–Water Distribution Systems, IBR approved for § 3280.604(b).

(20) ASTM D3311–92, Standard Specification for Drain, Waste, and Vent (DWV) Plastic Fittings Patterns, IBR approved for § 3280.604(b).

(21) ASTM D3953–97, Standard Specification for Strapping, Flat Steel, and Seals, approved April 10, 1997, IBR approved for §§ 3280.306(b) and 3280.306(g).

(22) ASTM D4442–92 (Reapproved 1997), Standard Test Methods for Direct Moisture Content Measurement of Wood and Wood–Base Materials, IBR approved for § 3280.304(b).

(23) ASTM D4444–92, Standard Test Methods for Use and Calibration of Hand–Held Moisture Meters, IBR approved for § 3280.304(b).

(24) ASTM D4635–01, Standard Specification for Polyethylene Films Made from Low–Density Polyethylene for

**ADD-040**

General Use and Packaging Applications, approved June 10, 2001, IBR approved for § 3280.611(d).

(25) ASTM D6007–14, Standard Test Method for Determining Formaldehyde Concentrations in Air from Wood Products Using a Small Air Chamber, approved October 1, 2014; IBR approved for § 3280.406(b).

(26) ASTM E84–01, Standard Test Method for Surface Burning Characteristics of Building Materials, 2001, IBR approved for § 3280.203(a).

(27) ASTM E 119–05, Standard Test Methods for Fire Tests of Building Construction and Materials, approved September 15, 2005, IBR approved for § 3280.1003(a).

(28) ASTM E 96–95 Standard Test Methods for Water Vapor Transmission of Materials, IBR approved for § 3280.504(a).

(29) ASTM E 162–94, Standard Test Method for Surface Flammability of Materials Using a Radiant Heat Energy Source, IBR approved for § 3280.203(a).

(30) ASTM E 773–97, Standard Test Methods for Accelerated Weathering of Sealed Insulating Glass Units, IBR approved for § 3280.403(d).

(31) ASTM E 774–97, Standard Specification for the Classification of the Durability of Sealed Insulating Glass Units, IBR approved for § 3280.403(d).

(32) ASTM E1333–14, Standard Test Method for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products Using a Large Air Chamber, approved October 1, 2014; IBR approved for § 3280.406(b).

(33) ASTM F628–91, Standard Specification for Acrylonitrile–Butadiene–Styrene (ABS) Schedule 40, Plastic Drain, Waste, and Vent Pipe with a Cellular Core, IBR approved for § 3280.604(b).

(34) ASTM F876–10, Standard Specification for Crosslinked Polyethylene (PEX) Tubing, approved February 10, 2010, IBR approved for § 3280.604(b).

(35) ASTM F877–07, Standard Specification for Crosslinked Polyethylene (PEX) Plastic Hot- and Cold–Water Distribution Systems, approved February 1, 2007, IBR approved for § 3280.604(b).

**ADD-041**

(q) Cast Iron Soil Pipe Institute (CISPI), 1064 Delaware Avenue SE, Atlanta, GA 30316, telephone number 404–622–0073, fax number 404–973–2845, Web site: http://www.cispi.org/.

(1) CISPI–301–90, Standard Specification for Hubless Cast Iron Soil Pipe and Fittings for Sanitary and Storm Drain, Waste, and Vent Piping Applications, IBR approved for § 3280.604(b).

(2) CISPI–HSN–85, Specification for Neoprene Rubber Gaskets for HUB and Spigot Cast Iron Soil Pipe and Fittings, IBR approved for §§ 3280.604, 3280.611(d).

(r) FS—Federal Specifications, General Services Administration, Specifications Branch, Room 6039, GSA Building, 7th and D Streets, SW., Washington, DC 20407.

(1) FS WW–P–541E/GEN–1980, Plumbing Fixtures (General Specifications), IBR approved for § 3280.604(b).

(2) FS ZZ–R–765B–1970, Silicone Rubber, (with 1971 Amendment), IBR approved for § 3280.611(d).

(s) HPVA (previously HPMA)—Hardwood Plywood and Veneer Association (HPVA) (previously named Hardwood Plywood Manufacturers Association (HPMA), 1825 Michael Faraday Drive, Reston, VA 22090, telephone number 703–435–2900, fax number 703–435–2537, Web site: http://www.hpva.org/.

(1) ANSI/HPVA HP–1–1994 (Approved 1995), American National Standard for Hardwood and Decorative Plywood, IBR approved for § 3280.304(b).

(2) HP–SG–96, Structural Design Guide for Hardwood Plywood Wall Panels, revised 1996, IBR approved for § 3280.304(b).

(t) HUD User, 11491 Sunset Hills Road, Reston, VA 20190–5254.

(1) HUD User No. 0005945, Overall U–values and Heating/Cooling Loads—Manufactured Homes, February 1992. IBR approved for § 3280.508(b).

ADD-042

(2) [Reserved]

(u) IIT Research Institute (IITRI), 10 West 35th Street, Chicago, IL 60616, telephone number 312–567–4000, Web site: http://www.iitri.org/.

(1) IITRI Fire and Safety Research Project J–6461 "Development of Mobile Home Fire Test Methods to Judge the Fire–Safe Performance of Foam Plastic Sheathing and Cavity Insulation", 1979, IBR approved for § 3280.207(a).

(2) [Reserved]

(v) International Association of Plumbing and Mechanical Officials (IAPMO), 4755 East Philadelphia Street, Ontario, CA 91716, telephone number 909–472–4100, fax number 909–472–4150, Web site: http://www.iapmo.org.

(1) IAPMO PS 2–89, Material and Property Standard for Cast Brass and Tubing P–Traps, IBR approved for § 3280.604(b).

(2) IAPMO PS 4–90, Material and Property Standard for Drains for Prefabricated and Precast Showers, IBR approved for § 3280.604(b).

(3) IAPMO PS 5–84, Material and Property Standard for Special Cast Iron Fittings, IBR approved for § 3280.604(b).

(4) IAPMO PS 9–84, Material and Property Standard for Diversion Tees and Twin Waste Elbow, IBR approved for § 3280.604(b).

(5) IAPMO PS 14–89, Material and Property Standard for Flexible Metallic Water Connectors, IBR approved for § 3280.604(b).

(6) IAPMO PS 23–89, Material and Property Standard for Dishwasher Drain Airgaps, IBR approved for § 3280.604(b).

(7) IAPMO PS 31–91, Material and Property Standards for Backflow Prevention Assemblies, IBR approved for § 3280.604(b).

ADD-043

(8) IAPMO TSC 9–97, Standard for Gas Supply Connectors for Manufactured Homes, IBR approved for § 3280.703.

(9) IAPMO TSC 22–85, Standard for Porcelain Enameled Formed Steel Plumbing Fixtures, IBR approved for § 3280.604(b).

(w) Military Specifications and Standards, Naval Publications and Forms Center (MIL), 5801 Tabor Avenue, Philadelphia, PA 19120.

(1) MIL–L–10547E–1975, Liners, Case, and Sheet, Overwrap; Water–Vapor Proof or Waterproof, Flexible, IBR approved for § 3280.611(d).

(2) [Reserved]

(x) National Electrical Manufacturers Association (NEMA), 1300 North 17th Street, Suite 1752, Arlington, VA 22209, telephone number 703–841–3200, fax number 703–841–5900, Web site: http://www.nema.org/Pages/default.aspx.

(1) ANSI/NEMA WD–6–1997 Wiring Devices–Dimensional Specifications, IBR approved for § 3280.803(f).

(2) [Reserved]

(y) International Code Council Evaluation Service (NER), (previously known as National Evaluation Service), 5360 Workman Mill Road, Whittier, CA 90601–0543, telephone number 1–800–423–6587, ext. 66546, fax number 562–695–4694, Web site: http://www.icc-es.org.

(1) NER–272, National Evaluation Report, Power Driven Staples, Nails, and Allied Fasteners for Use in All Types of Building Construction, Reissued September 1, 1997, IBR approved for 3280.304(b).

(2) [Reserved]

(z) National Fenestration Rating Council (NFRC), 6305 Ivy Lane, Suite 140, Greenbelt, MD 20770, telephone number 301–589–1776, fax number 301–589–3884, Web site: http://www.nfrc.org.

**ADD-044**

(1) NFRC 100, Procedure for Determining Fenestration Product U–factors, 1997 Edition, IBR approved for § 3280.508(e).

(2) [Reserved]

(aa) National Fire Protection Association (NFPA), 1 Batterymarch Park, Quincy, MA 02269, phone number 617–770–3000, fax number 617–770–0700, Web site: http://www.nfpa.org.

(1) NFPA 31, Standard for the Installation of Oil Burning Equipment, 2001, IBR approved for §§ 3280.703 and 3280.707(f).

(2) NFPA 54–2002, National Fuel Gas Code, IBR approved for § 3280.703.

(3) NFPA 58, Liquefied Petroleum Gas Code, 2001 Edition, IBR approved for §§ 3280.703 and 3280.704(b).

(4) NFPA No. 70–2005, National Electrical Code, IBR approved as follows:

(i) Article 110.22, IBR approved for §§ 3280.803(k) and 3280.804(k).

(ii) Article 210.12(A) and (B), IBR approved for § 3280.801(b).

(iii) Article 220.61, IBR approved for § 3280.811(b).

(iv) Article 230, IBR approved for §§ 3280.803(k) and 3280.804(k).

(v) Article 250.24, IBR approved for §§ 3280.803(k) and 3280.804(k).

(vi) Article 250.26, IBR approved for §§ 3280.803(k) and 3280.804(k).

(vii) Article 250.28, IBR approved for §§ 3280.803(k) and 3280.804(k).

(viii) Article 312.2(A), IBR approved for §§ 3280.803(k) and 3280.804(k).

(x)¹ Table 314.16(A), IBR approved for §§ 3280.808(m) and 3280.808(q).

(ix)¹ Article 314.23(B), IBR approved for §§ 3280.808(m) and 3280.808(q).

(xi) Article 406.3, IBR approved for § 3280.807(d).

(xii) Article 410.4(D), IBR approved for § 3280.805(a).

(xiii) Article 440, IBR approved for § 3280.805(a).

(xiv) Article 440.65, IBR approved for § 3280.801(b).

(xv) Part II of Article 550, IBR approved for §§ 3280.801(a) and 3280.801(b).

(xvi) Article 550.17, IBR approved for § 3280.810(b).

(xvii) Article 550.25(a), IBR approved for § 3280.801(b).

(xviii) Article 680.70, IBR approved for §§ 3280.607(c) and 3280.801(a).

(xix) Article 680.71, IBR approved for §§ 3280.607(c) and 3280.801(a).

(xx) Articles 680.72, IBR approved for §§ 3280.607(c) and 3280.801(a).

(5) NFPA 90B, Warm Air Heating and Air Conditioning Systems, 1996 Edition, IBR approved for § 3280.703.

**ADD-046**

(6) NFPA 220, Standard on Types of Building Construction, Chapter 2: definitions of "limited combustible" and "noncombustible material", 1995 Edition, IBR approved for § 3280.202.

(7) NFPA 253, Standard Method of Test for Critical Radiant Flux of Floor Covering Systems Using a Radiant Heat Energy Source, 2000, IBR approved for § 3280.207(c).

(8) NFPA 255, Standard Method of Test of Surface Burning Characteristics of Building Materials, 1996, IBR approved for §§ 3280.203(a) and 3280.207(a).

(9) NFPA 720, Standard for Installation of Carbon Monoxide (CO) Detection and Warning Equipment, 2015 Edition, Copyright 2014, IBR approved for § 3280.211(b).

(bb) U.S. Department of Commerce, National Institute of Standards and Technology (NIST), Office of Engineering Standards, Room A–166, Technical Building, Washington, DC 20234 and Voluntary Product Division, 100 Bureau Drive, Stop 2100, Gaithersburg, MD 20899–2100, telephone number 301- 975–4000, fax number 301–975–4715, Web site: http://www.nist.gov.

(1) PS 1–95, Construction and Industrial Plywood (With Typical APA Trademarks), IBR approved for § 3280.304(b).

(2) Voluntary Product Standard PS 2–04, Performance Standard for Wood–Based Structural–Use Panels, December 2004, IBR approval for § 3280.304(b).

(cc) National Sanitation Foundation (NSF), 789 North Dixboro Road, Ann Arbor, MI 48105, telephone number 734–769–8010, fax number 734–769–0109, Web site: http://www.nsf.org.

(1) ANSI/NSF 14–1990, Plastic Piping Components and Related Materials, IBR approved for § 3280.604(b).

(2) ANSI/NSF 24–1988, Plumbing System Components for Manufactured Homes and Recreational Vehicles, IBR approved for § 3280.604(b).

(3) ANSI/NSF 61–2001, Drinking Water System Components–Health Effects, IBR approved for § 3280.604(b).

(dd) Resources, Applications, Designs, & Controls (RADCO), 3220 East 59th Street, Long Beach, CA 90805, telephone number 562–272–7231, fax number 562–529–7513, Web site: http://www.radcoinc.com.

ADD-047

(1) RADCO DS–010–91, Decorative Gas Appliances for Installation in Solid Fuel Burning Fireplaces, May 1991, IBR approved for § 3280.703.

(2) [Reserved]

(ee)  Society  of  Automotive  Engineers  (SAE),  400  Commonwealth  Drive,  Warrendale,  PA  15096,  telephone  number 724–776–0790, Web site: http://www.sae.org/.

(1) SAE–J533b–1992, Flares for Tubing, IBR approved for §§ 3280.703 and 3280.705(f).

(2) [Reserved]

(ff)  Steel Joist Institute (SJI), 234 West Cheves Street, Florence, SC 29501, telephone number 843–407–4091, Web site: http://steeljoist.org.

(1) Standard Specifications Load Tables and Weight Tables for Steel Joists and Joist Girders, SJI 1994, Fortieth Edition, IBR approved for § 3280.304(b).

(2) [Reserved]

(gg)  Truss Plate Institute (TPI), 218 North Lee Street, Suite 312, Alexandria, VA 22314, telephone number 703–683–1010, fax number 866–501–4012, Web site: http://www.tpinst.org/index.html.

(1) TPI–85, Design Specifications for Metal Plate and Wood Connected Trusses, IBR approved for § 3280.304(b).

(2) [Reserved]

(hh)  Underwriters' Laboratories, Inc. (UL), 333 Pfingsten Road, Northbrook, IL 60062, telephone number 847–272–8800, fax number 847–509–6257, Web site: http://www.ul.com.

ADD-048

(1) UL 94–1996, with 2001 revisions, Test for Flammability of Plastic Materials for Parts in Devices and Appliances, Fifth Edition, IBR approved for § 3280.715(e).

(2) UL 103–1995, with 1999 revisions, Factory–Built Chimneys for Residential Type and Building Heating Appliances, Ninth Edition, IBR approved for § 3280.703.

(3) UL 109–1997, with 2001 revisions, Tube Fittings for Flammable and Combustible Fluids, Refrigeration Service, and Marine Use, Sixth Edition, IBR approved for § 3280.703.

(4) UL 127–1996, with 1999 revisions, Factory–Built Fireplaces, Seventh Edition, IBR approved for § 3280.703.

(5) UL 174–1996, with 1997 revisions, Household Electric Storage Tank Water Heaters, Tenth Edition, IBR approved for § 3280.703.

(6) UL 181 Factory–Made Air Ducts and Air Connectors, Ninth Edition, April 4, 1996, with revisions through May 15, 2003, IBR approved for §§ 3280.702, 3280.703 and 3280.715(a).

(7) UL 181A, 1994, with 1998 revisions, Standard for Safety Closure Systems for use with Rigid Air Ducts and Air Connectors, Second Edition, IBR approved for §§ 3280.703 and 3280.715(c).

(8) UL 181B, 1995, with 1998 revisions, Standard for Safety Closure Systems for use with Flexible Air Ducts and Air Connectors, First Edition, IBR approved for §§ 3280.703 and 3280.715(c).

(9) UL 217, Single and Multiple Station Smoke Alarms, Fifth Edition, dated January 4, 1999, IBR approved for §§ 3280.208(a) and 3280.211(a).

(10) UL 268, Smoke Detectors for Fire Protective Signaling Systems, Fourth Edition, dated January 4, 1999, IBR approved for § 3280.208(a).

(11) UL 307A–1995, Liquid Fuel–Burning Heating Appliances for Manufactured Homes and Recreational Vehicles, Seventh Edition, with 1997 revisions, IBR approved for §§ 3280.703 and 3280.707(f).

(12) UL 307B–1995, Gas Burning Heating Appliances for Manufactured Homes and Recreational Vehicles, Fourth Edition, with 1998 revisions, IBR approved for § 3280.703.

**ADD-049**

(13) UL 311, 1994, with 1998 revisions, Roof Jacks for Manufactured Homes and Recreational Vehicles, Eighth Edition, IBR approved for § 3280.703.

(14) UL 441, 1996 with 1999 revisions, Gas Vents, Ninth Edition, IBR approved for § 3280.703.

(15) UL 569, 1995 with 2001 revisions, Pigtails and Flexible Hose Connectors for LP–Gas, Seventh Edition, IBR approved for §§ 3280.703 and 3280.705(k).

(16) UL 737, 1996, Fireplace Stoves, Eight Edition, with 2000 revisions, IBR approved for § 3280.703.

(17) UL 923 Microwave Cooking Appliances, Fifth Edition, May 23, 2002, IBR approved for § 3280.204(c).

(18) UL 1042–1994, Electric Baseboard Heating Equipment, Fourth Edition, with 1998 revisions, IBR approved for § 3280.703.

(19) UL 1096, 1986, Electric Central Air Heating Equipment, Fourth Edition with revisions July 16, 1986, and January 30, 1988, IBR approved for § 3280.703.

(20) UL 1482, 1996, with 2000 revisions, Solid–Fuel Type Room Heaters, Fifth Edition, IBR approved for § 3280.703.

(21) UL 1995, 1995, Heating and Cooling Equipment, Second Edition, with 1999 revisions, IBR approved for § 3280.703.

(22) UL 2021–1997. Fixed and Location–Dedicated Electric Room Heaters, Second Edition, with 1998 revisions, IBR approved for § 3280.703.

(23) ANSI/UL 2034–2016, Standard for Single and Multiple Station Carbon Monoxide Alarms, Third Edition, dated February 28, 2008 (including revisions through May 11, 2016), IBR approved for § 3280.211(a).

(ii) Underwriters' Laboratories of Canada (ULC), 7 Underwriters Road, Toronto, Ontario, Canada M1 R 3A9, telephone number 866–937–3852, fax number 416–757–8727, Web site: http://www.ul.com/canada/eng/pages/.

(1) CAN/ULC S102.2–M88, Standard Method of Test for Surface Burning Characteristics of Floor Coverings and Miscellaneous Materials and Assemblies, Fourth Edition, April 1988, IBR approved for § 3280.207(b).

(2) [Reserved]

(jj) Window and Door Manufacturers Association (WDMA) (Previously known as the National Wood Window and Door Association, (NWWDA)), 2025 M Street, NW., Suite 800, Washington, DC 20036–3309, telephone number 202–367–1157, Web site: https://www.wdma.com.

(1) NWWDA I.S.4–81, Water Repellent Preservative Non–Pressure Treatment for Millwork, IBR approved for § 3280.405(b).

(2) [Reserved]

**Credits**

[40 FR 58752, Dec. 18, 1975, as amended at 42 FR 960, Jan. 4, 1977; 47 FR 28092, June 29, 1982; 47 FR 49385, Nov. 1, 1982; 52 FR 4580, Feb. 12, 1987; 52 FR 47553, Dec. 15, 1987; 53 FR 6601, March 2, 1988; 58 FR 55002, Oct. 25, 1993; 59 FR 2469, Jan. 14, 1994; 59 FR 15113, March 31, 1994; 70 FR 72042, Nov. 30, 2005; 78 FR 73976, Dec. 9, 2013; 79 FR 31863, June 3, 2014; 85 FR 5566, Jan. 31, 2020; 86 FR 2516, Jan. 12, 2021; 86 FR 13645, March 10, 2021]

SOURCE: 40 FR 58752, Dec. 18, 1975, unless otherwise noted. Redesignated at 44 FR 20679, Apr. 6, 1979; 58 FR 55002, Oct. 25, 1993; 59 FR 2469, Jan. 14, 1994; 59 FR 15113, March 31, 1994; 61 FR 5216, Feb. 9, 1996; 85 FR 5565, Jan. 31, 2020, unless otherwise noted.

AUTHORITY: 15 U.S.C. 2697, 42 U.S.C. 3535(d), 5403, and 5424.

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

Footnotes

[1]
So in original.

[1]
So in original.

**ADD-051**

§ 3280.4 Incorporation by reference., 24 C.F.R. § 3280.4

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-052**

§ 668.146 Criteria for approving tests., 34 C.F.R. § 668.146

C KeyCite citing references available

| Code of Federal Regulations |
| Title 34. Education |
| Subtitle B. Regulations of the Offices of the Department of Education |
| Chapter VI. Office of Postsecondary Education, Department of Education |
| Part 668. Student Assistance General Provisions (Refs & Annos) |
| Subpart J. Approval of Independently Administered Tests; Specification of Passing Score; Approval of State Process (Refs & Annos) |

34 C.F.R. § 668.146

§ 668.146 Criteria for approving tests.

Effective: July 1, 2011

Currentness

(a) Except as provided in § 668.148, the Secretary approves a test under this subpart if—

(1) The test meets the criteria set forth in paragraph (b) of this section;

(2) The test publisher or the State satisfies the requirements set forth in paragraph (c) of this section; and

(3) The Secretary makes a determination that the information the test publisher or State submitted in accordance with § 668.144(c)(17) or (d)(8), as applicable, provides adequate assurance that the test publisher or State will conduct rigorous test anomaly analyses and take appropriate action if test administrators do not comply with testing procedures.

(b) To be approved under this subpart, a test must—

(1) Assess secondary school level basic verbal and quantitative skills and general learned abilities;

(2) Sample the major content domains of secondary school level verbal and quantitative skills with sufficient numbers of questions to—

(i) Adequately represent each domain; and

ADD-053

§ 668.146 Criteria for approving tests., 34 C.F.R. § 668.146

(ii) Permit meaningful analyses of item-level performance by students who are representative of the contemporary population beyond the age of compulsory school attendance and have earned a high school diploma;

(3) Require appropriate test-taking time to permit adequate sampling of the major content domains described in paragraph (b)(2) of this section;

(4) Have all forms (including short forms) comparable in reliability;

(5) Have, in the case of a test that is revised, new scales, scale values, and scores that are demonstrably comparable to the old scales, scale values, and scores;

(6) Meet all standards for test construction provided in the 1999 edition of the Standards for Educational and Psychological Testing, prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377–4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1–866–272–6272, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ ibr_locations.html. The document also may be obtained from the American Educational Research Association at: http://www.aera.net; and

(7) Have the test publisher's or the State's guidelines for retesting, including time between test-taking, be based on empirical analyses that are part of the studies of test reliability.

(c) In order for a test to be approved under this subpart, a test publisher or a State must—

(1) Include in the test booklet or package—

(i) Clear, specific, and complete instructions for test administration, including information for test takers on the purpose, timing, and scoring of the test; and

(ii) Sample questions representative of the content and average difficulty of the test;

**ADD-054**

(2) Have two or more secure, equated, alternate forms of the test;

(3) Except as provided in §§ 668.148 and 668.149, provide tables of distributions of test scores which clearly indicate the mean score and standard deviation for high school graduates who have taken the test within three years prior to the date that the test is submitted to the Secretary for approval under § 668.144;

(4) Norm the test with—

(i) Groups that are of sufficient size to produce defensible standard errors of the mean and are not disproportionately composed of any race or gender; and

(ii) A contemporary sample that is representative of the population of persons who have earned a high school diploma in the United States; and

(5) If test batteries include sub-tests assessing different verbal and/or quantitative skills, a distribution of test scores as described in paragraph (c)(3) of this section that allows the Secretary to prescribe either—

(i) A passing score for each sub-test; or

(ii) One composite passing score for verbal skills and one composite passing score for quantitative skills.

(Approved by the Office of Management and Budget under control number 1845–0049)

(Authority: 20 U.S.C. 1091(d))

SOURCE: 45 FR 86855, Dec. 31, 1980; 50 FR 26953, June 28, 1985; 51 FR 8948, March 14, 1986; 51 FR 29398, Aug. 15, 1986; 56 FR 61337, Dec. 2, 1991; 59 FR 21866, April 26, 1994; 59 FR 22318, 22418, April 29, 1994; 60 FR 61433, Nov. 29, 1995; 64 FR 57358, Oct. 22, 1999; 64 FR 58617, Oct. 29, 1999; 64 FR 59037, 59066, Nov. 1, 1999; 65 FR 38729, June 22, 2000; 65 FR 65637, 65674, Nov. 1, 2000; 68 FR 66615, Nov. 26, 2003; 73 FR 35492, June 23, 2008; 75 FR 66960, Oct. 29, 2010; 78 FR 48050, Aug. 7, 2013; 80 FR 67193, Oct. 30, 2015; 81 FR 76070, Nov. 1, 2016; 82 FR 31913, July 11, 2017; 84 FR 49909, Sept. 23, 2019; 87 FR 65490, Oct. 28, 2022; 87 FR 66039, Nov. 1, 2022, unless otherwise noted.

AUTHORITY: 20 U.S.C. 1001–1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c–1, and 1231a, unless otherwise noted.; Section 668.14 also issued under 20 U.S.C. 1085, 1088, 1091, 1092, 1094, 1099a–3, 1099c, and 1141.; Section

**ADD-055**

§ 668.146 Criteria for approving tests., 34 C.F.R. § 668.146

668.41 also issued under 20 U.S.C. 1092, 1094, 1099c.; Section 668.91 also issued under 20 U.S.C. 1082, 1094.; Section 668.171 also issued under 20 U.S.C. 1094 and 1099c and section 4 of Pub.L. 94–452, 92 Stat. 1101–1109.; Section 668.172 also issued under 20 U.S.C. 1094 and 1099c and section 4 of Pub.L. 94–452, 92 Stat. 1101–1109.; Section 668.175 also issued under 20 U.S.C. 1094 and 1099c.

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

**End of Document**                            © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-056**

C KeyCite citing references available

| Code of Federal Regulations |
| Title 40. Protection of Environment |
| Chapter I. Environmental Protection Agency (Refs & Annos) |
| Subchapter D. Water Programs |
| Part 136. Guidelines Establishing Test Procedures for the Analysis of Pollutants (Refs & Annos) |

40 C.F.R. § 136.3

§ 136.3, Intro Identification of test procedures.

Effective: June 18, 2012

Currentness

<This section is displayed as separate documents.>

<See 136.3, (a) to Table IA, Part 1>

<See 136.3, Table IB, Part 2.>

<See 136.3, Table IC, Part 3.>

<See 136.3, Table ID, Part 4.>

<See 136.3, Table IE, Part 5.>

<See 136.3, Table IF, Part 6.>

<See 136.3, Table IG, Part 7.>

<See 136.3, Table IH, Part 8.>

<See 136.3, (b) to end, Part 9.>

**Credits**

[38 FR 28758, Oct. 16, 1973, as amended at 41 FR 52781, Dec. 1, 1976, 42 FR 3306, Jan. 18, 1977; 42 FR 37205, July 20,

**ADD-057**

§ 136.3, Intro Identification of test procedures., 40 C.F.R. § 136.3

1977; 49 FR 43251, 43258, 43259, Oct. 26, 1984; 50 FR 691, 692, 695, Jan. 4, 1985; 51 FR 23693, June 30, 1986; 52 FR 33543, Sept. 3, 1987; 55 FR 24534, June 15, 1990; 55 FR 33439, 33440, Aug. 15, 1990; 56 FR 43702, Sept. 4, 1991; 56 FR 50759, Oct. 8, 1991; 57 FR 41833, Sept. 11, 1992; 59 FR 4505, Jan. 31, 1994; 60 FR 17160, April 4, 1995; 60 FR 39588, 39590, Aug. 2, 1995; 60 FR 44672, Aug. 28, 1995; 60 FR 53542, Oct. 16, 1995; 62 FR 13833, March 24, 1997; 62 FR 48403, 48404, Sept. 15, 1997; 63 FR 44146, Aug. 18, 1998; 63 FR 50423, Sept. 21, 1998; 64 FR 4978, Feb. 2, 1999; 64 FR 26326, May 14, 1999; 64 FR 30433, 30434, June 8, 1999; 64 FR 73423, Dec. 30, 1999; 66 FR 3474, Jan. 16, 2001; 66 FR 26795, May 15, 2001; 66 FR 32776, June 18, 2001; 67 FR 65226, Oct. 23, 2002; 67 FR 65886, Oct. 29, 2002; 67 FR 69971, Nov. 19, 2002; 68 FR 43278, July 21, 2003; 68 FR 54934, Sept. 19, 2003; 72 FR 11212, March 12, 2007; 72 FR 14224, March 26, 2007; 82 FR 40846, Aug. 28, 2017; 86 FR 27237, May 19, 2021]

AUTHORITY: Secs. 301, 304(h), 307 and 501(a), Pub.L. 95–217, 91 Stat. 1566, et seq. (33 U.S.C. 1251, et seq.) (the Federal Water Pollution Control Act Amendments of 1972 as amended by the Clean Water Act of 1977).

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-058**

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

| Code of Federal Regulations |
| Title 49. Transportation |
| Subtitle B. Other Regulations Relating to Transportation |
| Chapter I. Pipeline and Hazardous Materials Safety Administration, Department of Transportation (Refs & Annos) |
| Subchapter D. Pipeline Safety |
| Part 192. Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards (Refs & Annos) |
| Subpart A. General |

49 C.F.R. § 192.7

§ 192.7 What documents are incorporated by reference partly or wholly in this part?

Effective: March 21, 2021 to May 23, 2023

Currentness

<Text of section effective until May 24, 2023.>

(a) Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. The materials listed in this section have the full force of law. All approved material is available for inspection at Office of Pipeline Safety, Pipeline and Hazardous Materials Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590, 202–366–4046 https://www.phmsa.dot.gov/pipeline/regs, and is available from the sources listed in the remaining paragraphs of this section. It is also available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, email fedreg.legal@nara.gov or go to www.archives.gov/federal-register/cfr/ibr-locations.html.

(b) American Petroleum Institute (API), 200 Massachusetts Ave. NW, Suite 1100, Washington, DC 20001, and phone: 202–682–8000, website: https://www.api.org/.

(1) API Recommended Practice 5L1, "Recommended Practice for Railroad Transportation of Line Pipe," 7th edition, September 2009, (API RP 5L1), IBR approved for § 192.65(a).

(2) API Recommended Practice 5LT, "Recommended Practice for Truck Transportation of Line Pipe," First edition, March 2012, (API RP 5LT), IBR approved for § 192.65(c).

ADD-059

(3) API Recommended Practice 5LW, "Recommended Practice for Transportation of Line Pipe on Barges and Marine Vessels," 3rd edition, September 2009, (API RP 5LW), IBR approved for § 192.65(b).

(4) API Recommended Practice 80, "Guidelines for the Definition of Onshore Gas Gathering Lines," 1st edition, April 2000, (API RP 80), IBR approved for § 192.8(a).

(5) API Recommended Practice 1162, "Public Awareness Programs for Pipeline Operators," 1st edition, December 2003, (API RP 1162), IBR approved for § 192.616(a), (b), and (c).

(6) API Recommended Practice 1165, "Recommended Practice for Pipeline SCADA Displays," First edition, January 2007, (API RP 1165), IBR approved for § 192.631(c).

(7) API Specification 5L, "Specification for Line Pipe," 45th edition, effective July 1, 2013, (API Spec 5L), IBR approved for §§ 192.55(e); 192.112(a), (b), (d), (e); 192.113; and Item I, Appendix B to Part 192.

(8) ANSI/API Specification 6D, "Specification for Pipeline Valves,"23rd edition, effective October 1, 2008, including Errata 1 (June 2008), Errata2 (/November 2008), Errata 3 (February 2009), Errata 4 (April 2010), Errata 5 (November 2010), Errata 6 (August 2011) Addendum 1 (October 2009), Addendum 2 (August 2011), and Addendum 3 (October 2012), (ANSI/API Spec 6D), IBR approved for § 192.145(a).

(9) API Standard 1104, "Welding of Pipelines and Related Facilities," 20th edition, October 2005, including errata/addendum (July 2007) and errata 2 (2008), (API Std 1104), IBR approved for §§ 192.225(a); 192.227(a); 192.229(b) and (c); 192.241(c); and Item II, Appendix B.

(10) API Recommended Practice 1170, "Design and Operation of Solution-mined Salt Caverns Used for Natural Gas Storage," First edition, July 2015 (API RP 1170), IBR approved for § 192.12.

(11) API Recommended Practice 1171, "Functional Integrity of Natural Gas Storage in Depleted Hydrocarbon Reservoirs and Aquifer Reservoirs," First edition, September 2015, (API RP 1171), IBR approved for § 192.12.

(12) API STANDARD 1163, "In–Line Inspection Systems Qualification," Second edition, April 2013, Reaffirmed August 2018, (API STD 1163), IBR approved for § 192.493.

(c) ASME International (ASME), Three Park Avenue, New York, NY 10016, 800–843–2763 (U.S./Canada), http://www.asme.org/.

(1) ASME/ANSI B16.1–2005, "Gray Iron Pipe Flanges and Flanged Fittings: (Classes 25, 125, and 250)," August 31, 2006, (ASME/ANSI B16.1), IBR approved for § 192.147(c).

(2) ASME/ANSI B16.5–2003, "Pipe Flanges and Flanged Fittings," October 2004, (ASME/ANSI B16.5), IBR approved for §§ 192.147(a), 192.279, and 192.607(f).

(3) ASME B16.40–2008, "Manually Operated Thermoplastic Gas Shutoffs and Valves in Gas Distribution Systems," March 18, 2008, approved by ANSI, (ASME B16.40–2008), IBR approved for Item I, Appendix B to Part 192.

(4) ASME/ANSI B31G–1991 (Reaffirmed 2004), "Manual for Determining the Remaining Strength of Corroded Pipelines," 2004, (ASME/ANSI B31G), IBR approved for §§ 192.485(c), 192.632(a), 192.712(b), and 192.933(a).

(5) ASME/ANSI B31.8–2007, "Gas Transmission and Distribution Piping Systems," November 30, 2007, (ASME/ANSI B31.8), IBR approved for §§ 192.112(b) and 192.619(a).

(6) ASME/ANSI B31.8S–2004, "Supplement to B31.8 on Managing System Integrity of Gas Pipelines," 2004, (ASME/ANSI B31.8S–2004), IBR approved for §§ 192.903 note to Potential impact radius; 192.907 introductory text, (b); 192.911 introductory text, (i), (k), (l), (m); 192.913(a), (b), (c); 192.917 (a), (b), (c), (d), (e); 192.921(a); 192.923(b); 192.925(b); 192.927(b), (c); 192.929(b); 192.933(c), (d); 192.935 (a), (b); 192.937(c); 192.939(a); and 192.945(a).

(7) [Reserved by 86 FR 2237; 86 FR 12834]

(8) ASME Boiler & Pressure Vessel Code, Section VIII, Division 1 "Rules for Construction of Pressure Vessels," 2007 edition, July 1, 2007, (ASME BPVC, Section VIII, Division 1), IBR approved for §§ 192.153(a), (b), (d); and 192.165(b).

(9) ASME Boiler & Pressure Vessel Code, Section VIII, Division 2 "Alternate Rules, Rules for Construction of Pressure Vessels," 2007 edition, July 1, 2007, (ASME BPVC, Section VIII, Division 2), IBR approved for §§ 192.153(b), (d); and 192.165(b).

(10) ASME Boiler & Pressure Vessel Code, Section IX: "Qualification Standard for Welding and Brazing Procedures, Welders, Brazers, and Welding and Brazing Operators," 2007 edition, July 1, 2007, ASME BPVC, Section IX, IBR approved for §§ 192.225(a); 192.227(a); and Item II, Appendix B to Part 192.

(d) American Society for Nondestructive Testing (ASNT), P.O. Box 28518, 1711 Arlingate Lane, Columbus, OH 43228, phone: 800–222–2768, website: https://www.asnt.org/.

    (1) ANSI/ASNT ILI–PQ–2005(2010), "In-line Inspection Personnel Qualification and Certification," Reapproved October 11, 2010, (ANSI/ASNT ILI–PQ), IBR approved for § 192.493.

    (2) [Reserved]

(e) ASTM International (formerly American Society for Testing and Materials), 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428, phone: (610) 832–9585, website: http://astm.org.

    (1) ASTM A53/A53M–10, "Standard Specification for Pipe, Steel, Black and Hot–Dipped, Zinc–Coated, Welded and Seamless," approved October 1, 2010, (ASTM A53/A53M), IBR approved for § 192.113; and Item II, Appendix B to Part 192.

    (2) ASTM A106/A106M–10, "Standard Specification for Seamless Carbon Steel Pipe for High–Temperature Service," approved October 1, 2010, (ASTM A106/A106M), IBR approved for § 192.113; and Item I, Appendix B to Part 192.

    (3) ASTM A333/A333M–11, "Standard Specification for Seamless and Welded Steel Pipe for Low–Temperature Service," approved April 1, 2011, (ASTM A333/A333M), IBR approved for § 192.113; and Item I, Appendix B to Part 192.

    (4) ASTM A372/A372M–10, "Standard Specification for Carbon and Alloy Steel Forgings for Thin–Walled Pressure Vessels," approved October 1, 2010, (ASTM A372/A372M), IBR approved for § 192.177(b).

    (5) ASTM A381–96 (reapproved 2005), "Standard Specification for Metal–Arc Welded Steel Pipe for Use with High–Pressure Transmission Systems," approved October 1, 2005, (ASTM A381), IBR approved for § 192.113; and Item I, Appendix B to Part 192.

    (6) ASTM A578/A578M–96 (reapproved 2001), "Standard Specification for Straight–Beam Ultrasonic Examination of Plain and Clad Steel Plates for Special Applications," (ASTM A578/A578M), IBR approved for § 192.112(c).

    (7) ASTM A671/A671M–10, "Standard Specification for Electric–Fusion–Welded Steel Pipe for Atmospheric and Lower Temperatures," approved April 1, 2010, (ASTM A671/A671M), IBR approved for § 192.113; and Item I, Appendix B to Part 192.

**ADD-062**

(8) ASTM A672/A672M–09, "Standard Specification for Electric–Fusion–Welded Steel Pipe for High–Pressure Service at Moderate Temperatures," approved October 1, 2009, (ASTM A672/672M), IBR approved for § 192.113 and Item I, Appendix B to Part 192.

(9) ASTM A691/A691M–09, "Standard Specification for Carbon and Alloy Steel Pipe, Electric–Fusion–Welded for High–Pressure Service at High Temperatures," approved October 1, 2009, (ASTM A691/A691M), IBR approved for § 192.113 and Item I, Appendix B to Part 192.

(10) ASTM D638–03, "Standard Test Method for Tensile Properties of Plastics," 2003, (ASTM D638), IBR approved for § 192.283(a) and (b).

(11) ASTM D2513–18a, "Standard Specification for Polyethylene (PE) Gas Pressure Pipe, Tubing, and Fittings," approved August 1, 2018, (ASTM D2513), IBR approved for Item I, Appendix B to Part 192.

(12) ASTM D2517–00, "Standard Specification for Reinforced Epoxy Resin Gas Pressure Pipe and Fittings," (ASTM D 2517), IBR approved for §§ 192.191(a); 192.281(d); 192.283(a); and Item I, Appendix B to Part 192.

(13) ASTM D2564–12, "Standard Specification for Solvent Cements for Poly (Vinyl Chloride) (PVC) Plastic Piping Systems," Aug. 1, 2012, (ASTM D2564–12), IBR approved for § 192.281(b)(2).

(14) ASTM F1055–98 (Reapproved 2006), "Standard Specification for Electrofusion Type Polyethylene Fittings for Outside Diameter Controlled Polyethylene Pipe and Tubing," March 1, 2006, (ASTM F1055–98 (2006)), IBR approved for § 192.283(a), Item I, Appendix B to Part 192.

(15) ASTM F1924–12, "Standard Specification for Plastic Mechanical Fittings for Use on Outside Diameter Controlled Polyethylene Gas Distribution Pipe and Tubing," April 1, 2012, (ASTM F1924–12), IBR approved for Item I, Appendix B to Part 192.

(16) ASTM F1948–12, "Standard Specification for Metallic Mechanical Fittings for Use on Outside Diameter Controlled Thermoplastic Gas Distribution Pipe and Tubing," April 1, 2012, (ASTM F1948–12), IBR approved for Item I, Appendix B to Part 192.

(17) ASTM F1973–13, "Standard Specification for Factory Assembled Anodeless Risers and Transition Fittings in Polyethylene (PE) and Polyamide 11 (PA11) and Polyamide 12 (PA12) Fuel Gas Distribution Systems," May 1, 2013, (ASTM F1973–13), IBR approved for § 192.204(b); and Item I, Appendix B to Part 192.

**ADD-063**

(18) ASTM F2145–13, "Standard Specification for Polyamide 11 (PA 11) and Polyamide 12 (PA12) Mechanical Fittings for Use on Outside Diameter Controlled Polyamide 11 and Polyamide 12 Pipe and Tubing," May 1, 2013, (ASTM F2145–13), IBR approved for Item I, Appendix B to Part 192.

(19) ASTM F 2600–09, "Standard Specification for Electrofusion Type Polyamide–11 Fittings for Outside Diameter Controlled Polyamide–11 Pipe and Tubing," April 1, 2009, (ASTM F 2600–09), IBR approved for Item I, Appendix B to Part 192.

(20) ASTM F2620–19, "Standard Practice for Heat Fusion Joining of Polyethylene Pipe and Fittings," approved February 1, 2019, (ASTM F2620), IBR approved for §§ 192.281(c) and 192.285(b).

(21) ASTM F2767–12, "Specification for Electrofusion Type Polyamide–12 Fittings for Outside Diameter Controlled Polyamide–12 Pipe and Tubing for Gas Distribution," Oct. 15, 2012, (ASTM F2767–12), IBR approved for Item I, Appendix B to Part 192.

(22) ASTM F2785–12, "Standard Specification for Polyamide 12 Gas Pressure Pipe, Tubing, and Fittings," Aug. 1, 2012, (ASTM F2785–12), IBR approved for Item I, Appendix B to Part 192.

(23) ASTM F2817–10, "Standard Specification for Poly (Vinyl Chloride) (PVC) Gas Pressure Pipe and Fittings for Maintenance or Repair," Feb. 1, 2010, (ASTM F2817–10), IBR approved for Item I, Appendix B to Part 192.

(24) ASTM F2945–12a "Standard Specification for Polyamide 11 Gas Pressure Pipe, Tubing, and Fittings," Nov. 27, 2012, (ASTM F2945–12a), IBR approved for Item I, Appendix B to Part 192.

(f) Gas Technology Institute (GTI), formerly the Gas Research Institute (GRI)), 1700 S. Mount Prospect Road, Des Plaines, IL 60018, phone: 847–768–0500, Web site: www.gastechnology.org.

(1) GRI 02/0057 (2002) "Internal Corrosion Direct Assessment of Gas Transmission Pipelines Methodology," (GRI 02/0057), IBR approved for § 192.927(c).

(2) [Reserved]

(g) Manufacturers Standardization Society of the Valve and Fittings Industry, Inc. (MSS), 127 Park St. NE., Vienna, VA 22180, phone: 703–281–6613, Web site: http://www.mss-hq. org/.

**ADD-064**

(1) MSS SP–44–2010, Standard Practice, "Steel Pipeline Flanges," 2010 edition, (including Errata (May 20, 2011)), (MSS SP–44), IBR approved for § 192.147(a).

(2) [Reserved]

(h) NACE International (NACE), 1440 South Creek Drive, Houston, TX 77084: phone: 281–228–6223 or 800–797–6223, Web site: http://www.nace.org/Publications/.

(1) ANSI/NACE SP0502–2010, Standard Practice, "Pipeline External Corrosion Direct Assessment Methodology," revised June 24, 2010, (NACE SP0502), IBR approved for §§ 192.923(b); 192.925(b); 192.931(d); 192.935(b) and 192.939(a).

(2) NACE Standard Practice 0102–2010, "In-Line Inspection of Pipelines," Revised 2010–03–13, (NACE SP0102), IBR approved for §§ 192.150(a) and 192.493.

(i) National Fire Protection Association (NFPA), 1 Batterymarch Park, Quincy, Massachusetts 02169, phone: 1 617 984–7275, Web site: http://www.nfpa.org/.

(1) NFPA–30 (2012), "Flammable and Combustible Liquids Code," 2012 edition, June 20, 2011, including Errata 30–12–1 (September 27, 2011) and Errata 30–12–2 (November 14, 2011), (NFPA–30), IBR approved for § 192.735(b).

(2) NFPA–58 (2004), "Liquefied Petroleum Gas Code (LP–Gas Code)," (NFPA–58), IBR approved for § 192.11(a), (b), and (c).

(3) NFPA–59 (2004), "Utility LP–Gas Plant Code," (NFPA–59), IBR approved for § 192.11(a), (b); and (c).

(4) NFPA–70 (2011), "National Electrical Code," 2011 edition, issued August 5, 2010, (NFPA–70), IBR approved for §§ 192.163(e); and 192.189(c).

(j) Pipeline Research Council International, Inc. (PRCI), c/o Technical Toolboxes, 3801 Kirby Drive, Suite 520, P.O. Box 980550, Houston, TX 77098, phone: 713–630–0505, toll free: 866–866–6766, Web site: http://www.ttoolboxes.com/. (Contract number PR–3–805.)

(1) AGA, Pipeline Research Committee Project, PR–3–805, "A Modified Criterion for Evaluating the Remaining Strength of Corroded Pipe," (December 22, 1989), (PRCI PR–3–805 (R–STRENG)), IBR approved for §§ 192.485(c); 192.632(a); 192.712(b);   192.933(a) and (d).

(2) [Reserved]

(k) Plastics Pipe Institute, Inc. (PPI), 105 Decker Court, Suite 825 Irving TX 75062, phone: 469–499–1044, http://www.plasticpipe.org/.

(1) PPI TR–3/2012, HDB/HDS/PDB/SDB/MRS/CRS, Policies, "Policies and Procedures for Developing Hydrostatic Design Basis (HDB), Hydrostatic Design Stresses (HDS), Pressure Design Basis (PDB), Strength Design Basis (SDB), Minimum Required Strength (MRS) Ratings, and Categorized Required Strength (CRS) for Thermoplastic Piping Materials or Pipe," updated November 2012, (PPI TR–3/2012), IBR approved for § 192.121.

(2) PPI TR–4, HDB/HDS/SDB/MRS, Listed Materials, "PPI Listing of Hydrostatic Design Basis (HDB), Hydrostatic Design Stress (HDS), Strength Design Basis (SDB), Pressure Design Basis (PDB) and Minimum Required Strength (MRS) Rating For Thermoplastic Piping Materials or Pipe," updated March, 2011, (PPI TR–4/2012), IBR approved for § 192.121.

**Credits**

[35 FR 13257, Aug. 19, 1970, as amended by Amdt. 192–37, 46 FR 10159, Feb. 2, 1981; 50 FR 45732, Nov. 1, 1985; 51 FR 15334, April 23, 1986; 58 FR 14521, March 18, 1993; Amdt. 192–78, 61 FR 28783, June 6, 1996; 61 FR 30824, June 18, 1996; Amdt. 192–94, 69 FR 32892, June 14, 2004; 69 FR 54592, Sept. 9, 2004; 70 FR 11139, March 8, 2005; Amdt. 192–100, 70 FR 28842, May 19, 2005; Amdt. 192–102, 71 FR 13301, March 15, 2006; Amdt. 192–103, 71 FR 33406, June 9, 2006; Amdt. 192–103, 72 FR 4656, Feb. 1, 2007; 73 FR 16570, March 28, 2008; 73 FR 62174, Oct. 17, 2008; 74 FR 2894, Jan. 16, 2009; 74 FR 17101, April 14, 2009; 74 FR 30476, June 26, 2009; Amdt. 192–112, 74 FR 63327, Dec. 3, 2009; Amdt. 192–114, 75 FR 48601, Aug. 11, 2010; Amdt. 192–119, 80 FR 178, Jan. 5, 2015; Amdt. 192–122, 81 FR 91872, Dec. 19, 2016; Amdt. 192–124, 83 FR 58715, Nov. 20, 2018; Amdt. 192–125, 84 FR 52243, Oct. 1, 2019; Amdt. 192–126, 85 FR 8126, Feb. 12, 2020; Amdt. 192–128, 86 FR 2237, Jan. 11, 2021; 86 FR 12834, March 5, 2021]

SOURCE: 35 FR 13257, Aug. 19, 1970; 52 FR 32800, Aug. 31, 1987; 53 FR 1635, Jan. 21, 1988; Amdt. 192–73, 60 FR 14650, March 20, 1995; Amdt. 192–3, 60 FR 41828, Aug. 14, 1995; Amdt. 192–75, 61 FR 18516, April 26, 1996; 61 FR 38403, July 24, 1996; 70 FR 8302, Feb. 18, 2005; Amdt. 192–111, 74 FR 62505, Nov. 30, 2009; Amdt. 192–112, 74 FR 63326, Dec. 3, 2009,; Amdt. 192–120, 80 FR 12777, March 11, 2015; Amdt. 192–119, 80 FR 46847, Aug. 6, 2015; Amdt. 192–122, 81 FR 91872, Dec. 19, 2016; Amdt. 192–123, 82 FR 7997, Jan. 23, 2017; Amdt. 192–124, 83 FR 58715, Nov. 20, 2018; Amdt. 192–125, 84 FR 52243, Oct. 1, 2019, unless otherwise noted.

AUTHORITY: 30 U.S.C. 185(w)(3), 49 U.S.C. 5103, 60101 et. seq., and 49 CFR 1.97.

**ADD-066**

**§ 192.7 What documents are incorporated by reference partly or..., 49 C.F.R. § 192.7**

Current through Nov. 10, 2022, 87 FR 67833. Some sections may be more current. See credits for details.

**End of Document**                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-067**

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

| United States Code Annotated |
| Title 5. Government Organization and Employees (Refs & Annos) |
| Part I. The Agencies Generally |
| Chapter 5. Administrative Procedure (Refs & Annos) |
| Subchapter II. Administrative Procedure (Refs & Annos) |

5 U.S.C.A. § 552

§ 552. Public information; agency rules, opinions, orders, records, and proceedings
[Statutory Text & Notes of Decisions subdivisions I, II]

Effective: June 30, 2016

Currentness

<Notes of Decisions for 5 USCA § 552 are displayed in multiple documents.>

**(a)** Each agency shall make available to the public information as follows:

**(1)** Each agency shall separately state and currently publish in the Federal Register for the guidance of the public--

**(A)** descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

**(B)** statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

**(C)** rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

**(D)** substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

ADD-068

**(E)** each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

**(2)** Each agency, in accordance with published rules, shall make available for public inspection in an electronic format--

**(A)** final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

**(B)** those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

**(C)** administrative staff manuals and instructions to staff that affect a member of the public;

**(D)** copies of all records, regardless of form or format--

**(i)** that have been released to any person under paragraph (3); and

**(ii)(I)** that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or

**(II)** that have been requested 3 or more times; and

**(E)** a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless

H.R. REP. 94-1476, H.R. Rep. No. 1476, 94TH Cong., 2ND Sess. 1976, 1976 U.S.C.C.A.N. 5659, 1976 WL 14045
(Leg.Hist.)
**5659 P.L. 94-553, COPYRIGHTS ACT
Senate Report (Judiciary Committee) No. 94-473,
Nov. 20, 1975 (To accompany S. 22)
House Report (Judiciary Committee) No. 94-1476,
Sept. 3, 1976 (To accompany S. 22)
House Conference Report No. 94-1733,
Sept. 29, 1976 (To accompany S. 22)
Cong. Record Vol. 122 (1976)
DATES OF CONSIDERATION AND PASSAGE
Senate February 19, September 30, 1976
House September 22, 30, 1976
The House Report and the House Conference Report are set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE
DOCUMENT ON WESTLAW.)

## HOUSE REPORT NO. 94-1476

Sept. 3, 1976

*1 The Committee on the Judiciary, to whom was referred the bill (S. 22) for the general revision of the copyright law, title
17 of the United States Code, and for other purposes, having considered the **5660 same, report favorably thereon with an
amendment in the nature of a substitute and recommend that the bill as amended do pass.

* * * *

### *47 PURPOSE

The purpose of the proposed legislation, as amended, is to provide for a general revision of the United States Copyright Law,
title 17 of the United States Code.

### STATEMENT

The first copyright law of the United States was enacted by the First Congress in 1790, in exercise of the constitutional power
'To promote the Progress of Science and useful Arts, by securing the limited Times to Authors and Inventors the exclusive
Right to their respective Writings and Discoveries ' (U.S. Constitution, Art. I, sec. 8. Comprehensive revisions were enacted,
at intervals of about 40 years, in 1831, 1870, and 1909. The present copyright law, title 17 of the United States Code, is
basically the same as the act of 1909.

Since that time significant changes in technology have affected the operation of the copyright law. Motion pictures and sound
recordings had just made their appearance in 1909, and radio and television were still in the early stages of their
development. During the past half century a wide range of new techniques for capturing and communicating printed matter,
visual images, and recorded sounds have come into use, and the increasing use of information storage and retrieval devices,
communications satellites, and laser technology promises even greater changes in the near future. The technical advances
have generated new industries and new methods for the reproduction and dissemination of copyrighted works, and the
business relations between authors and users have evolved new patterns.

Between 1924 and 1940 a number of copyright law revision measures were introduced. All these failed of enactment, partly

ADD-070

exploration than has so far been possible of the needs and problems of a number of different interests affected, and of the various legal problems presented. Nothing in section 107 or elsewhere in the bill is intended to change or prejudge the law on the point. On the other hand, the Committee is sensitive to the importance of the problem, and urges the representative of the various interests, if possible under the leadership of the Register of Copyrights, to continue their discussions actively and in a constructive spirit. If it would be helpful to a solution, the Committee is receptive to undertaking further consideration of the problem in a future Congress.

The Committee appreciates and commends the efforts and the co-operative and reasonable spirit of the parties who achieved the agreed guidelines on books and periodicals and on music. Representatives of the American Association of University Professors and of the Association of American Law Schools have written to the Committee strongly criticizing the guidelines, particularly with respect to multiple copying, as being too restrictive with respect to classroom situations at the university and graduate level. However, the Committee notes that the **5686 Ad Hoc group did include representatives of higher education, that the stated 'purpose of the . . . guidelines is to state the minimum and not the maximum standards of educational fair use' and that the agreement acknowledges 'there may be instances in which copying which does not fall within the guidelines . . . may nonetheless be permitted under the criteria of fair use.'

The Committee believes the guidelines are a reasonable interpretation of the minimum standards of fair use. Teachers will know that copying within the guidelines is fair use. Thus, the guidelines serve the purpose of fulfilling the need for greater certainty and protection for teachers. The Committee expresses the hope that if there are areas where standards other than these guidelines may be appropriate, the parties will continue their efforts to provide additional specific guidelines in the same spirit of good will and give and take that has marked the discussion of this subject in recent months.

Reproduction and uses for other purposes

The concentrated attention given the fair use provision in the context of classroom teaching activities should not obscure its application in other areas. It must be emphasized again that the same general standards of fair use are applicable to all kinds of uses of copyrighted material, although the relative weight to be given them will differ from case to case.

The fair use doctrine would be relevant to the use of excerpts from copyrighted works in educational broadcasting activities not exempted under section 110(2) or 112, and not covered by the licensing provisions of section 118. In these cases the factors to be weighed in applying the criteria of this section would include whether the performers, producers, directors, and other responsible for the broadcast were paid, the size and nature of the audience, the size and number of excerpts taken and, in the case of recordings made for broadcast, the number of copies reproduced and the extent of their reuse or exchange. The availability of the fair use doctrine to educational broadcasters would be narrowly circumscribed in the case of motion pictures and other audiovisual works, but under appropriate circumstances **73 it could apply to the nonsequential showing of an individual still or slide, or to the performance of a short excerpt from a motion picture for criticism or comment.

Another special instance illustrating the application of the fair use doctrine pertains to the making of copies or phonorecords of works in the special forms needed for the use of blind persons. These special forms, such as copies in Braille and phonorecords of oral readings (talking books), are not usually made by the publishers for commercial distribution. For the most part, such copies and phonorecords are made by the Library of Congress' Division for the Blind and Physically Handicapped with permission obtained from the copyright owners, and are circulated to blind persons through regional libraries covering the nation. In addition, such copies and phonorecords are made locally by individual volunteers for the use of blind persons in their communities, and the Library of Congress conducts a program for training such volunteers. While the making of multiple copies or phonorecords of a work for general circulation **5687 requires the permission of the copyright owner, a problem addressed in section 710 of the bill, the making of a single copy or phonorecord by an individual as a free service for a blind persons would properly be considered a fair use under section 107.

A problem of particular urgency is that of preserving for posterity prints of motion pictures made before 1942. Aside from the deplorable fact that in a great many cases the only existing copy of a film has been deliberately destroyed, those that remain are in immediate danger of disintegration; they were printed on film stock with a nitrate base that will inevitably decompose in time. The efforts of the Library of Congress, the American Film Institute, and other organizations to rescue and preserve this irreplaceable contribution to our cultural life are to be applauded, and the making of duplicate copies for purposes of archival preservation certainly falls within the scope of 'fair use.'

**ADD-071**

USCA Case #22-7063    Document #1984604       Filed: 02/03/2023    Page 153 of 174

Minnesota Rules

   Department of Health [4600 to 4770]

      Chapter 4761. Residential Lead Abatement

         Training Courses; Examinations

Minnesota Rules, part 4761.2460

4761.2460. INDEPENDENT TESTING ORGANIZATIONS; PERMITS.

Currentness

Subpart 1. **Applicability.** This part applies to a person who seeks a permit to administer examinations that are independent of a training course as required under parts 4761.2260, subpart 3, item B; 4761.2280, subpart 2, item B; and 4761.2300, subpart 3, item B, and that are intended to qualify individuals to be licensed as lead supervisors, lead inspectors, or lead risk assessors.

Subp. 2. **Application.** A permit application must be submitted on a form provided by the commissioner. The application must:

A. be submitted at least 60 days before a scheduled examination;

B. include all of the questions that may be used on the examination with the correct answer indicated for each question and with possible answers for multiple-choice questions. The questions must address the topics listed in part 4761.2440, subpart 3, 4, or 5, as applicable. The application must indicate the proportion of questions that will address each topic;

C. include documentation that the examination meets the validity standards for educational and psychological testing specified in American Psychological Association (APA), Standards for Educational and Psychological Testing (1999). This document is not required for an examination that was developed by or for the EPA. The APA standards are incorporated by reference, are not subject to frequent change, and are available through the Minitex interlibrary loan system through a local library;

D. include an assurance that each examination will consist of at least 75 questions and that a passing score will be at least 70 percent correct answers. An application must include documentation that the examination evaluates an individual's understanding of the topics in part 4761.2440, subpart 3, 4, or 5, as appropriate to each examination; and

E. describe how the security of the examination questions and answers will be maintained.

Subp. 3. **Expiration; transfer.** A permit issued under this part is valid for two years and is not transferable.

Subp. 4. **Renewal application.** A renewal application form, provided by the commissioner, must be completed and submitted to the commissioner.

ADD-072

USCA Case #22-7063    Document #1984604    Filed: 02/03/2023    Page 154 of 174

Subp. 5. **Approval; rejection.** The commissioner shall review and approve an application or notify the applicant of any deficiencies. The commissioner shall reject a deficient application after 60 days unless the applicant corrects the application.

**Credits**
**Statutory Authority:** *MS s 144.9508*

**History:** *29 SR 531*

Current with rules published in the Minnesota State Register Volume 47, Number 16, October 17, 2022.

Minn. R. 4761.2460, MN ADC 4761.2460

---

**End of Document**                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

ADD-073

1    ROB BONTA
     Attorney General of California
2    MICHELLE M. MITCHELL
     Supervising Deputy Attorney General
3    KEITH L. WURSTER
     Deputy Attorney General
4    State Bar No. 198918
     LAURA A. RANDLES-LITTLE
5    Deputy Attorney General
     State Bar No. 232930
6      1300 I Street, Suite 125
       P.O. Box 944255
7      Sacramento, CA 94244-2550
       Telephone: (916) 210-6504
8      Fax:
       E-mail: Laura.RandlesLittle@doj.ca.gov
9    *Attorneys for Respondents*
     *Office of Administrative Law and*
10   *Building Standards Commission*

**FILED / ENDORSED**

APR 1 1 2022

By N. Smith, Deputy Clerk

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                       COUNTY OF SACRAMENTO

13                            CIVIL DIVISION

14

15

16   **PUBLIC.RESOURCE.ORG, INC.,**                    34-2021-80003612

17                                     Petitioner,    [PROPOSED] **JUDGMENT**

18          v.

19   **CALIFORNIA OFFICE OF**
     **ADMINISTRATIVE LAW, and the**
20   **CALIFORNIA BUILDING STANDARDS**
     **COMMISSION,**
21
                                      Respondents.
22

23          Having reviewed the papers submitted by the parties, IT IS ORDERED, ADJUGED AND

24
     DECREED that Petitioner Public.Resrouce.Org, Inc.'s Verified Petition for Writ of Mandate
25
     regarding Respondent California Office of Administrative Law is denied and judgment is entered
26
     in favor of Respondent California Office of Adminsitrative Law for the reasons set forth in the
27

28
                                               1

1    the Court's Tentative Ruling attached and incorporated for reference hereto as Exhibit A.

2    Dated April **11**, 2022

3

4                        THE HONORABLE STEVEN M. GEVERCER

5                        JUDGE OF THE SUPERIOR COURT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# EXHIBIT A

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SACRAMENTO

| DATE/TIME: | March 25, 2022     2:00 p.m. | DEP. NO.: | 27 |
|---|---|---|---|
| JUDGE: | HON. STEVEN M. GEVERCER | CLERK: | N. SMITH |

| | |
|---|---|
| Public.Resource.Org., Inc.,<br>          Petitioner,<br><br>v.<br><br>California Office of Administrative Law, and<br>the California Building Standards<br>Commission,<br>          Respondents. | Case No. 34-2021-80003612 |

| Nature of Proceedings: | Petition for Writ of Mandate |
|---|---|

### I.   TENTATIVE RULING.

The following shall constitute the Court's tentative ruling on the above matter, set for hearing in Department 27, on Friday, March 25, 2022, at 2:00 p.m. The tentative ruling shall become the ruling of the Court, unless a party desiring to be heard so advises the Clerk of Department 27 no later than 4:00 p.m. on the Court day preceding the hearing, and further advises the Clerk that such party has notified the other side of its intention to appear.

The Court strongly encourages parties to appear remotely for the hearing on the tentative ruling through the Court's Zoom Application. But any party wishing to appear in person may do so, provided that party notifies the Court by 4:00 the Court day before the hearing.

The parties may join the Zoom session for hearing on the tentative ruling by audio and/or video through the following link/telephone number:

| https://saccourt.zoom.us/my/dept27a | (888) 475-4499   ID: 553-829-7195 |
|---|---|

Petitioner, Public.Resource.Org, Inc. has filed a petition for writ of mandate (Petition) against Respondents Office of Administrative Law (OAL) and the California Building Standards Commission (BSC), directing Respondents to comply with the Public Records Act (Gov. Code, §§ 6250 *et seq.*) (PRA).  As to Respondent OAL, the Petition is denied.  As to Respondent BSC, the Petition is stayed pending resolution of a final judgment from the District of Columbia District Court in *American Society for Testing and Materials, et al v. Public.Resource.Org* (D.C. Cir. 2018) 896 F.3d 437, 441.

Page - 1 - of 12

## 1. Background.

On December 29, 2020, Petitioner[1] sent a PRA request to OAL for Titles 1-5, 7-23, and 25-28 of the California Code of Regulations (collectively, CCR).[2] (Petition, ¶13, Exh. C.) Petitioner requested that OAL provide the information "in all formats, in your possession, including (but not limited to) structured, machine-readable digital formats, such as XMF or PDF files," pursuant to Government Code section[3] 6250, subdivision (a)(1). (Petition, Exh. C.) Petitioner also informed OAL that it must produce a copy of an electronic record in any format that has been used by it to create copies for its own use or for provision to other agencies, pursuant to Section 6250, subdivision (a)(2). (*Ibid.*)

OAL responded, stating that it could provide a paper copy of the CCR to Petitioner, and offered to scan each page of the print version, to serve as an "electronic" copy. (Petition, Exh. D.) OAL also directed Petitioner to a website that contained the most "up to date" version of the CCR. (*Ibid.*) OAL also offered to provide a CD-ROM with past versions of the CCR, but noted that the contents of the CD-ROM cannot be copied in whole or transferred to another storage device. (*Ibid.*) Petitioner and OAL corresponded further, and Petitioner contended that OAL's response was insufficient, and that the website to which it directed Petitioner was not "publicly available." (Petition, ¶¶14-19.)

Also on December 29, 2020, Petitioner also made a nearly identical, separate PRA request for Title 24 of the CCR (Title 24) to the Office of Public Affairs, which contains the Department of General Services, and BSC. (Petition, Exh. F.) Again, Petitioner requested an electronic copy of Title 24, and sought Title 24 in all formats in BSC's possession, including "structured, machine-readable formats." (*Ibid.*)

BSC also responded that it could not produce the records. BSC stated that a hard copy of Title 24 was available for inspection at BSC's office, and noted that hard copies of Title 24 were available for public viewing and copying at state document depository libraries or at city of county building or planning departments. (Petition, Exh. G.) BSC stated that Title 24 may be viewed online on the BSC's website, but because BSC did not have publishing rights, it could not provide copies to the public. (*Ibid.*) BSC explained that this is because Title 24 is based on and includes model codes produced by standards developing organizations (SDOs), Intervenors National Fire Protection Association (NFPA), International Codes Council (ICC), and the International Association of Plumbing and Mechanical Officials. (*Ibid.*) BSC also responded that

---

[1] Petitioner is a non-profit organization with the mission of providing public access to government records and legal materials. (Petition, ¶5.)

[2] Respondent OAL oversees the publication and distribution of Titles 1-5, 7-23, and 25-28 of the CCR. (Petition, ¶6.) Respondent BSC administers the adoption of, and codifies and publishes the California Building Standards Code as Title 24 of the CCR. (Petition, ¶7.)

[3] Unless otherwise specified, all statutory references shall be to the Government Code.

individual parts or a full set of Title 24 may be purchased from these three publishing entities. (*Ibid.*)

Petitioner then filed a petition for writ of mandate, alleging that OAL and BSC violated the PRA. On August, 27, 2021, the Court granted NFPA's and ICC's motion for leave to intervene in this proceeding.

### 2. Discussion.

#### a. Claims Against OAL.

Petitioner argues that OAL has violated the PRA by refusing to produce the records and insufficiently responding to its request, namely by failing to provide an "electronic" copy of the CCR in a "structured, machine-readable" format. (Opening Brief, 9:4.) Respondent OAL responds that the Legislature, in enacting the pertinent provisions of the Administrative Procedure Act (APA), dictated how the CCR should be made publicly available, and that in any event it, has complied with the PRA in responding to Petitioner.

#### i. PRA Statutes.

Under the PRA, a public agency must make public records promptly available to any person who submits a PRA request that "reasonably describes an identifiable record or records." (Gov. Code, § 6253, subd. (b).) The PRA enables persons to seek "injunctive or declarative relief or writ of mandate" to enforce that person's right to inspect or receive copies of public records. (Gov. Code, §§ 6258, 6259.)

The PRA is construed broadly in favor of access. (*Am. Civil Liberties Union Foundation v. Superior Court* (2017) 3 Cal.5th 1032, 1040.) Exemptions from disclosure must be narrowly construed. (*Id.*) The agency withholding the records bears the burden of proving that an exception from disclosure applies. (*California First. Amend. Coal. v. Superior Court* (*California First*) (1998) 67 Cal.App.4th 159, 167.)

The PRA imposes on agencies an affirmative obligation to make available to the public any public records in their possession, unless the agency can demonstrate that a responsive record is otherwise exempt from disclosure. (Gov. Code, §§ 6253, 6254, 6255.) Public records may be exempted from disclosure if they fall within a particular specific statutory basis for exempting the records. (Gov. Code, § 6254). Additionally, public records may also be exempt from disclosure if the agency can show that "on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." (Gov. Code, § 6255, subd. (a).) If "the requester has alternative, less intrusive means of obtaining the information sought" the public interest in disclosure is minimal, although the "existence of an alternative means does not wholly undermine the public interest in disclosure." (*County of Santa Clara v. Superior Court (Santa Clara)* (2009) 170 Cal.App.4th 1301,

Page - 3 - of 12

1325 [citing *City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1020, 1025].)

Section 6253.9 governs an agency's duty to produce electronic copies of records under the PRA. It provides:

   a) Unless otherwise prohibited by law, any agency that has information that constitutes an identifiable public record not exempt from disclosure...that is in an electronic format shall make that information available in an electronic format when requested by any person and, when applicable, shall comply with the following:

      (1) The agency shall make the information available in any electronic format in which it holds the information.

      (2) Each agency shall provide a copy of an electronic record in the format requested if the requested format is one that has been used by the agency to create copies for its own use or for provision to other agencies. The cost of duplication shall be limited to the direct cost of producing a copy of a record in an electronic format.

   (b) ...the requester shall bear the cost of producing a copy of the record, including the cost to construct a record, and the cost of programming and computer services necessary to produce a copy of the record when either of the following applies:

      (1) In order to comply with the provisions of subdivision (a), the public agency would be required to produce a copy of an electronic record and the record is one that is produced only at otherwise regularly scheduled intervals.

      (2) The request would require data compilation, extraction, or programming to produce the record.

   (c) Nothing in this section shall be construed to require the public agency to reconstruct a record in an electronic format if the agency no longer has the record available in an electronic format.

   (d) If the request is for information in other than electronic format, and the information also is in electronic format, the agency may inform the requester that the information is available in electronic format.

   (e) Nothing in this section shall be construed to permit an agency to make information available only in an electronic format.

**ADD-080**

(f) Nothing in this section shall be construed to require the public agency to release an electronic record in the electronic form in which it is held by the agency if its release would jeopardize or compromise the security or integrity of the original record or of any proprietary software in which it is maintained.

(g) Nothing in this section shall be construed to permit public access to records held by any agency to which access is otherwise restricted by statute.

(Gov. Code, § 6253.9.) Thus, a government agency is required by the PRA to produce non-exempt responsive computer records in the same manner as paper records, and can be required to compile, redact or omit information from an electronic record. (*See Sander v. Superior Court* (2018) 26 Cal.App.5th 651, 669.) Section 6253.9 contemplates that public agencies can be required to gather and segregate disclosable electronic data from nondisclosable exempt information and perform data compilation, extraction or computer programming if "necessary to produce a copy of the record." (*Ibid.* [citing Gov. Code, § 6253.9, subdivision (b)].) However, the PRA does not require an agency to create a *new* record: an agency "cannot be required to create a new record by changing the substantive content of an existing record or replacing existing data with new data." (*Ibid.* [citing *Yeager v. Drug Enforcement Admin.* (D.C. Cir. 1982) 678 F.2d 315, 323 and noting that "Segregating and extracting data is a far cry from requiring public agencies to undertake the extensive 'manipulation or restructuring of the substantive content of a record.'"].) Additionally, agencies need not draft summary or explanatory material, perform calculations on data, or create inventories of data in response to a records request. (*National Lawyers Guild, San Francisco Bay Area Chapter v. City of Hayward* (2020) 9 Cal.5th 488, 502; *Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1075; *see also Sander v. Superior Court, supra*, 26 Cal.App.5th, at p. 669.)

### ii. Pertinent Law Governing the Public Availability of CCR.

The Administrative Procedure Act (APA) (*see* Gov. Code §§ 11340, et. seq.) among other things, establishes the OAL and sets forth specific statutes governing rulemaking, or an agency's promulgation of regulations, which comprise the CCR. Section 11344, requires OAL to make the CCR available online. Section 11344 provides:

(OAL) shall do all of the following:

(a) Provide for the official compilation, printing, and publication of adoption, amendment, or repeal of regulations, which shall be known as the [CCR]. On and after July 1, 1998, [OAL] shall make available on the Internet, free of charge, the full text of the [CCR], and may contract with another state agency or a private entity in order to provide this service.

(b) Make available on its Internet Web site a list of, and a link to the full text of, each regulation filed with the Secretary of State that is pending effectiveness pursuant to Section 11343.4.

(c) Provide for the compilation, printing, and publication of weekly updates of the California Code of Regulations....

....

(Gov. Code, § 11344.) OAL is also required to supply a complete set of the CCR and its Supplement to any county clerk. (*Id.*, at § 11344.2.) Additionally, the CCR "shall be sold at prices which will reimburse the state for all costs incurred for printing, publication, and distribution." (*Id.*, at § 11344.4.)

### iii. The Petition is Denied as to OAL.

Petitioner argues that OAL violated the PRA by not providing the CCR to Petitioner in a "structured, machine-readable" format. Underpinning Petitioner's argument is its belief that OAL possesses a "Master Database" through its contract with Thomson Reuters/West Publishing, and has the ability to access the Master Database and provide Petitioner the CCR to Petitioner in a "structured, machine-readable" format.

OAL contends that Petitioner is demanding OAL provide the CCR in a format that it does not possess, and that it is really trying to compel OAL to create an entirely *new* record, which the PRA does not require.

Petitioner has not shown that OAL violated the PRA. OAL neither possesses the Master Database, nor do the PRA or pertinent statutes impose any duty upon OAL to provide the CCR in the '"structured, machine-readable" format sought by Petitioner.

- **OAL Does Not Possess the Master Database.**

Petitioner argues that OAL constructively possesses the Master Database. OAL disagrees and claims that it does not possess the Master Database, or the data (the updated versions of regulations comprising the CCR) in it.

OAL has the better argument.

OAL declares that the Master Database exists in proprietary software of Thomson Reuters/West Publishing. (Declaration of Kevin Hull (Hull Decl.), ¶5; Declaration of Andrew Martens (Martens Decl.), ¶6.) The language of the contract with Thomson Reuters/West Publishing provides for a "useable electronic data base" in a "portable and easily processed or converted format" upon completion or termination of the contract. (Administrative Record[4], Exh. B [000009] and Exh. J [000052-53].) The above contractual term ensures that OAL can obtain all the data (the regulations comprising the CCR) if needed to provide it to a new contractor. As the contract is not completed or terminated, OAL has not invoked this contractual term. Thus, Thomson Reuters/West Publishing has never given OAL the Master Database or the data in it.

---

[4] Petitioner has furnished a collection of exhibits that it denotes as an "administrative record."

Page - 6 - of 12

(Hull Decl., ¶3; Martens Decl., ¶5.) The data has never been extracted and formatted in the manner requested by Petitioner.

Petitioner argues that OAL, in fact, constructively possesses the Master Database because it has the right to control it. First, this is belied by the OAL's agreement with Thomson Reuters/West Publishing. Second, Petitioner's argument that it is entitled to data from this Master Database (the CCR) in a particular format conflates OAL's right to the data *within* the Master Database with the Master Database itself, which is not a "record," and which OAL does not possess.

Thus, OAL does not possess the data in a structured-machine readable format requested by Petitioner. OAL has not violated the PRA for this reason.

- **The PRA Imposes No Duty Upon OAL To Produce the CCR in the Format Requested by Petitioner.**

Additionally, the PRA itself imposes no duty upon OAL to produce "electronic" records in the "structured, machine-readable format" requested by Petitioner.

In determining whether OAL violated the PRA, the Court must harmonize two sets of pertinent statutes: the PRA, and the APA. (*City of Chula Vista v. Drager* (2020) 49 Cal.App.5th 539, 560 ["If, after an examination of the statutes in context, they 'conflict on a central element, we strive to harmonize them so as to give effect to each. The Court is guided by the following principles of statutory construction.'"].)

"A court's overriding purpose in construing a statute is to ascertain legislative intent. ... [Citation.] In interpreting a statute to determine legislative intent, a court looks first to the words of the statute and gives them their usual and ordinary meaning. [Citation.] Statutes must be given a fair and reasonable interpretation, with due regard to the language used and the purpose sought to be accomplished.' (*Sander v. Superior Court*, *supra*, 26 Cal.App.5th, at 653-654 [internal quotations and citations omitted].)

In PRA cases, the California Constitution requires that '[a] statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access.' (*Sander v. Superior Court*, *supra*, 26 Cal.App.5th, at 653-654. [citing Cal. Const., art I, § 3, subd. (b); *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 617].)

Additionally, a specific statutory provision prevails over a general statute. (*See Rose v. State* (1942) 19 Cal.2d 713, 723-724.) If statutory provisions conflict, statutes that are passed later in time control. (*City of Chula Vista v. Drager*, *supra*, 49 Cal.App.5th, at p. 560 [citing *Collection Bureau of San Jose v. Rumsey* (200) 24 Cal.4th 301].)

The text of Section 6253.9 imposes no duty upon OAL to make records available in a particular format. It requires an agency to produce an "electronic" copy of records, and

contemplates that an agency may need to engage in "data compilation, extraction, or programming" to produce a record. Thus, the Court cannot find that OAL violated Section 6253.9 by failing to produce records in a "structured, machine-readable format."

The Court is mindful that the California Constitution requires that statutes, such as Section 6253.9 be "broadly construed" if it furthers the people's right of access. But the Court's inquiry does not stop here. It must also consider more specific, later-enacted statutes in the APA, and give those statutes a "fair and reasonable" interpretation.

As noted above, the Legislature has enacted more specific statutes, governing OAL's duty to make the CCR available. Pertinent here, Section 11344, provides that OAL must make the CCR publicly available on its website by posting a link to the full text of, each regulation. (Gov. Code, § 11344.) Notably, it imposes no duty upon OAL to make the CCR available in any electronic format requested by a member of the public. Thus, the Court finds that this specific statute directed only to OAL prevails over the more general PRA provisions governing all agencies.

Moreover, Section 11344, which was added in 1983, has been amended many times, most recently in 2012. (Stats. 2012, c. 295 (S.B. 1099), §3.) In contrast, Section 6253.9 was added in 2000, and has not been updated. (Gov. Code, § 6253.9 [Added by Stats. 2000, c. 982, (A.B. 2799) § 2.) Thus, because Section 11344 is a later-amended statute, the Court presumes that the Legislature was aware of the PRA and Section 6253.9, when amending it.

Accordingly, the OAL has complied with Section 11344 and has not violated the PRA by failing to produce records in a "structured, machine-readable" format.

- **Petitioner's Other Arguments Show no Violation of the PRA.**

Petitioner claims that the website that OAL directed it to is not "publicly available" because it is subject to technological and legal restrictions to prevent users from text-searching, copying and pasting, or distributing portions of the CCR. (Opening Brief, p. 6.) Nothing in the PRA requires that discloseable records be searchable or adaptable for copying and pasting. Additionally, for the same reasons articulated above, OAL has not violated the PRA in this regard.

Petitioner also argues that OAL is trying to circumvent its duties to disclose records by outsourcing the publication of to a third party in violation of Section 6720. This statute, enacted in 1995, provides in pertinent part that "no state or local agency shall sell, exchange, furnish, or otherwise provide a public record subject to disclosure pursuant to this chapter to a private entity in a manner that prevents a state or local agency from providing the record directly pursuant to this chapter." (Gov. Code, § 6270 [Added by Stats.1995, c. 108 (A.B.141), § 1.].)

However, the Court must presume that the Legislature, in enacting and amending statutes regarding OAL's duty to publish the CCR, is aware of OAL's arrangement with

ADD-084

Thomson Reuters/West. Again, the Court notes that Section 11344, was amended
several times after the enactment of Section 6270, and was most recently amended in
2012. Thus, OAL has not violated the PRA on this ground.

### b. Claims Against Respondent BSC.

Petitioner argues that BSC has violated the PRA by not disclosing an electronic copy of
Title 24. BSC responds that Section 6254, subdivision (k), exempts Title 24 from
disclosure, as it contains model codes drafted by Intervenors NPFA and ICC, which are
protected by federal copyright law. BSC alternatively argues that Section 6255, the
"catch-all" exemption, exempts Title 24 from disclosure, as the public interest in
nondisclosure clearly outweighs the public interest in disclosure. Intervenors NFPA and
ICC, which are aligned with BSC, note the pendency of two federal actions in which the
similar copyright issues are addressed. Intervenors argue that the records are exempt
from disclosure, but also argue that this proceeding should be stayed, pending
resolution of the federal cases.

### i. Legal Standard.

The PRA contains a lengthy list of statutory exemptions from disclosure. (Gov. Code, §
6254.) Pertinent here, an item is statutorily exempt from disclosure if they are
"exempted or prohibited pursuant to federal or state law." (*Id.*, § 6254, subd. (k).) BSC
and Intervenors claim that Title 24 is protected by federal copyright law, as it
incorporates by reference model codes drafted by Intervenors and other SDOs, and
thus, Title 24 is statutorily exempt from disclosure.

"When an action is brought in a court of this state involving the same parties and the
same subject matter as an action already pending in a court of another jurisdiction, a
stay of the California proceedings is not a matter of right, but within the sound discretion
of the trial court." (*Farmland Irrigation Co. v. Dopplmaier* (1957) 48 Cal. 2d 208, 215.)

"It is black letter law that, when a federal action has been filed covering the same
subject matter as is involved in a California action, the California court has the discretion
but not the obligation to stay the state court action." (*Caiafa Prof. Law Corp. v. State
Farm Fire & Cas. Co.* (*Caiafa*) (1993) 15 Cal.App.4th 800, 804.) *Caiafa* enumerated
various factors that courts should apply when deciding whether to stay a matter pending
in a California court because of pending federal litigation. It provided that courts "should
consider the importance of discouraging multiple litigation designed solely to harass an
adverse party, and of avoiding unseemly conflicts with the courts of other jurisdictions. It
should also consider whether the rights of the parties can best be determined by the
court of the other jurisdiction because of the nature of the subject matter, the availability
of witnesses, or the stage to which the proceedings in the other court have already
advanced." (*Id.*) Courts should also consider whether the federal action is pending in
California. (*Id.*)

Of additional importance is the Court's inherent authority to control its docket. Courts routinely stay matters where circumstances warrant. *(Frieberg v City of Mission Viejo* (1995) 33 Cal.App.4th 1484, 1489 ["Trial courts generally have the inherent power to stay proceedings in the interests of justice and to promote judicial efficiency."].)

### ii. The Petition is Stayed as to Claims against Respondent BSC.

Petitioner argues that BSC violated the PRA by not disclosing Title 24, because it actually possesses it; the online version cited by OAL and BSC is not "publicly available," as the user is subject to end-user restrictions; and no exemption from disclosure applies, particularly Section 6254, subdivision (k).

Petitioner contends that although Title 24 contains model codes drafted by Intervenors that are incorporated by reference, the model codes in Title 24 have now become "the law," and lost their copyright protection. Thus, Petitioner argues, Section 6254, subdivision (k), does not apply.

BSC responds that Title 24 is exempt under section 6254, subdivision (k), or alternatively, Section 6255, and that it complied with the PRA by making records available electronically.

Intervenors argue that a stay is appropriate in light of pending federal litigation.[5]  The Court agrees.

The issue of whether model codes that have been incorporated by reference into law is currently being litigated in federal court. In *American Society for Testing and Materials, et al v. Public.Resource.Org* (ASTM) (D.C. Cir. 2018) 896 F.3d 437, 441. Intervenor NFPA and two other SDOs sued Petitioner for copyright and trademark infringement, after Petitioner purchased copies of incorporated standards, scanned them into digital files, appended coversheets explaining Petitioner's mission and the source of the standards, and posted the documents to a public website. *(Id.*, at p. p. 444.) In some cases, Petitioner modified files so that the text of the standard could be more easily enlarged, searched, and read with text-to-speech software. *(Ibid.)*

In that case, Petitioner made, and is making, the same arguments raised here: that NFPA and the other SDOs lose the benefit of copyright protection for model standards they authored once those model standards are incorporated by reference. In *ASTME*, Petitioner and NFPA and the other plaintiffs filed competing motions for summary judgment. *(Ibid.)* The district court granted NFPA and the SDOs' motion, rejecting Petitioner's arguments. The district court found that NFPA and the SDOs held copyrights in the model standards incorporated by reference, and that Petitioner

---

[5] Petitioner faults Intervenors for raising this issue in the briefs, rather than bringing a separate motion for a stay under Code of Civil Procedure, section 1005. This point is well-taken. However, because Petitioner has been afforded the opportunity to respond to Intervenors' request for a stay, the Court will consider it.

improperly reproduced them, and that Petitioner failed to create a triable issue of fact that its reproduction qualified as "fair use"---a defense to copyright infringement. (*Ibid.*)

PRO appealed that decision to the D.C. Circuit. The D.C. Circuit vacated the district court's decision. In doing so, it found that the district court should have considered Petitioner's affirmative defense of fair use. (*ASTM , supra*, 896 F.3d 437, 440-441.) Accordingly, the D.C. Circuit has remanded the matter to the district court to consider Petitioner's affirmative defense to the motion for summary judgment brought by NFPA and the other SDOs. (*Id*, at p. 458.) In briefing related to that motion, Petitioner does not dispute that it advances the same argument that it advances here: that codes that governments have expressly incorporated into law, lose copyright protection and that standards incorporated by reference are "government edicts" under *Georgia v. Public Resource.Org, Inc. (Georgia)* (2020) 140 S. Ct 1498.

Additionally, Intervenor ICC is involved in pending litigation in the Southern District of New York, where the accused infringer (a company named UpCodes) has raised similar defenses based on incorporation by reference, that Petitioner raises in *ASTM* and this case. (*International Code Council, Inc. v. UpCodes, Inc.* (S.D.N.Y. May 27, 2020, No. 17-cv-6261.)

The Court exercises its discretion to stay the proceedings against BSC. At issue is whether the model codes drafted by Intervenors and incorporated into Title 24 are protected by federal copyright law. The federal proceedings in *ASTM* are addressing this very issue; and as to the same parties: Intervenor NFPA and Petitioner. Additionally, another federal court is addressing these similar issues as to another organization and Intervenor ICC.

First, the nature of the subject matter—federal copyright law—is the exclusive province of federal court. (*Sears Roebuck & Co. v. Stieffel Co.* (1964) 376 U.S, 255, 231, fn.7; *Topolos v. Caldewey* (9th Cir. 1983) 698 F.2d 991, 993-994.) Petitioner cites to *Santa Clara, supra*, 170 Cal.App.4th 1301, for the proposition that "California law" addresses when the work of California agencies may be subject to copyright protection. This argument is unavailing. *Santa Clara* addressed copyright issues that arose after an *agency* claimed copyright protection in a work it authored. That is not the case here. The issue is whether copyright law protects *Intervenors'* works, which is currently under consideration in federal courts. The Court also rejects Petitioner's argument that the nature of the subject matter in this case differs, because the Court is concerned with the applicability of the PRA. This is true, but, if federal copyright law applies and protects model codes incorporated by reference into regulations, then this necessarily resolves whether BSC has violated the PRA. Thus, staying the proceedings also promotes judicial efficiency.

Second, a stay avoids the potential for "unseemly" conflicts with federal copyright issues raised by Petitioner, such as whether the "government edicts" doctrine, as articulated by the Supreme Court in *Georgia*, prevents Intervenors from asserting a copyright interest in the portions of Title 24 that incorporates their model codes by reference.

Third, the *ASTM* case is significantly advanced in the proceedings, weighing in favor of a stay. As noted above, the *ASTM* is on remand from the Court of Appeal where the district court will again consider the motions for summary judgment, including application of the government edicts' doctrine.

These factors all support the Court's decision to stay the proceedings as to BSC.

Petitioner argues upon reply, that BSC may not rely on *any* statutory exemption in Section 6254, because BSC has disclosed some copies of Title 24, and thus, waived its right to assert this exemption under Section 6254.5. Petitioner opposed BSC's nondisclosure based on 'Section 6254 on the merits, and did not at all raise this "waiver" argument in its Opening Brief. Thus, Intervenors and BSC had no opportunity to respond to it. Accordingly, the Court does not consider it.

### 3. Disposition.

The Petition is denied as to Respondent OAL. The Petition is stayed as to Respondent BSC in light of the *ASTM* matter.

Counsel for Respondent OAL shall prepare a formal order and a separate judgment, incorporating this ruling as an exhibit to each, submit them to opposing counsel for approval as to form, and thereafter submit them to the Court for signature and entry of judgment in accordance with California Rules of Court, rule 3.1312.

| From: | O"Hollaren, Ryan T. |
|---|---|
| To: | Laura RandlesLittle; Caplan, Matt; Mornin, Joe |
| Cc: | Keith Wurster |
| Subject: | RE: Case No. 34-2021-80003612-CU-WM-GDS (Public.Resource.Org, Inc. v. OAL, et al)- Proposed order and jugment |
| Date: | Monday, April 4, 2022 9:34:31 AM |

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Good morning – We propose adding a simple sentence capturing the point you just put your finger on: "This proposed Judgment does not apply to Respondent BSC." Such a statement avoids confusion, since it accurately captures the posture of the case.

Ryan O'Hollaren
Cooley LLP
**w** 415.693.2288 · **m** 415.385.2879
rohollaren@cooley.com

**From:** Laura RandlesLittle <Laura.RandlesLittle@doj.ca.gov>
**Sent:** Monday, April 4, 2022 8:08 AM
**To:** O'Hollaren, Ryan T. <rohollaren@cooley.com>; Caplan, Matt <mcaplan@cooley.com>; Mornin, Joe <jmornin@cooley.com>
**Cc:** Keith Wurster <Keith.Wurster@doj.ca.gov>
**Subject:** RE: Case No. 34-2021-80003612-CU-WM-GDS (Public.Resource.Org, Inc. v. OAL, et al)- Proposed order and jugment

**[External]**

Good morning,

While we would be happy to consider alternate language you think might meet your objective, it is our position that additional language that goes beyond how the judgment applies to Respondent OAL will cause confusion. However, please let us know this morning if you have different language you would like us to consider. Please note, if we cannot agree that our draft is amenable, per the California Rules of Court, I will also transmit your concerns to the court when we submit the Proposed Judgment.
Thank you,
Laura

Laura Randles-Little
Deputy Attorney General
Government Law Section | California Department of Justice
1300 I Street, 17th Floor | Sacramento, CA 95814
*tel.* (916) 210-6504

**From:** O'Hollaren, Ryan T. <rohollaren@cooley.com>
**Sent:** Friday, April 1, 2022 4:31 PM
**To:** Laura RandlesLittle <Laura.RandlesLittle@doj.ca.gov>; Caplan, Matt <mcaplan@cooley.com>; Mornin, Joe <jmornin@cooley.com>
**Cc:** Keith Wurster <Keith.Wurster@doj.ca.gov>
**Subject:** RE: Case No. 34-2021-80003612-CU-WM-GDS (Public.Resource.Org, Inc. v. OAL, et al)- Proposed order and judgment

---

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

---

Hi Laura,

We understand that the judgment only applies to OAL; we simply want to clarify that that fact so as to avoid any potential confusion on the point. If our proposed language is not agreeable, we're happy to review an alternative approach.

We agree with the change to refer to the Tentative as an Exhibit. And as to the signature, we removed the line because we don't interpret the local rules to require our signature on the document.

Thanks,

**Ryan O'Hollaren**
Cooley LLP
**w** 415.693.2288 · **m** 415.385.2879
rohollaren@cooley.com

---

**From:** Laura RandlesLittle <Laura.RandlesLittle@doj.ca.gov>
**Sent:** Friday, April 1, 2022 3:50 PM
**To:** O'Hollaren, Ryan T. <rohollaren@cooley.com>; Caplan, Matt <mcaplan@cooley.com>; Mornin, Joe <jmornin@cooley.com>
**Cc:** Keith Wurster <Keith.Wurster@doj.ca.gov>
**Subject:** RE: Case No. 34-2021-80003612-CU-WM-GDS (Public.Resource.Org, Inc. v. OAL, et al)- Proposed order and jugment

**[External]**

Good afternoon,
Thank you for your comments. We believe the judgment only applies to Respondent OAL and do not agree it is appropriate to add language referencing a party to whom the judgment does not apply. Additionally, to avoid confusion now and in the future as to the judgement's potential application to Respondent BSC, the language should be limited to Respondent OAL. Thus, we have not

**ADD-090**

incorporated your recommended edit at this time. Please let us know if you continue to disagree with this approach. Pursuant to the Rule 3.1312 of the California Rules of Court we plan on filing the proposed Order and Judgment on Monday.

Also, please note, we made one minor edit to the Order to consistently reference the Tentative Ruling as an Exhibit. I understand from your email you do not have concerns with the Order. Can you clarify that this means you will not be signing the order as "Approved to Form"?

Thank you,
Laura

**Laura Randles-Little**
**Deputy Attorney General**
**Government Law Section | California Department of Justice**
**1300 I Street, 17th Floor | Sacramento, CA 95814**
*tel.* **(916) 210-6504**

**From:** O'Hollaren, Ryan T. <rohollaren@cooley.com>
**Sent:** Thursday, March 31, 2022 2:40 PM
**To:** Laura RandlesLittle <Laura.RandlesLittle@doj.ca.gov>; Caplan, Matt <mcaplan@cooley.com>; Mornin, Joe <jmornin@cooley.com>
**Cc:** Keith Wurster <Keith.Wurster@doj.ca.gov>
**Subject:** RE: Case No. 34-2021-80003612-CU-WM-GDS (Public.Resource.Org, Inc. v. OAL, et al)-Proposed order and jugment

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Good afternoon,

Attached is the proposed judgment with our edits. We have no edits on the proposed order.

Thanks,

**Ryan O'Hollaren**
Cooley LLP
**w** 415.693.2288 · **m** 415.385.2879
rohollaren@cooley.com

**From:** Laura RandlesLittle <Laura.RandlesLittle@doj.ca.gov>
**Sent:** Wednesday, March 30, 2022 10:57 AM
**To:** Caplan, Matt <mcaplan@cooley.com>; Mornin, Joe <jmornin@cooley.com>; O'Hollaren, Ryan T.

**ADD-091**

<rohollaren@cooley.com>

**Cc:** Keith Wurster <Keith.Wurster@doj.ca.gov>

**Subject:** Case No. 34-2021-80003612-CU-WM-GDS (Public.Resource.Org, Inc. v. OAL, et al)-Proposed order and jugment

**[External]**

---

Good morning,

Attached please find a draft proposed judgment and a draft proposed order as directed by the Court. Please review this and let us know if you have any comments or concerns. If you do not have any concerns, we would appreciate it if you could please sign these as to form and return the signed documents to us.

Thank you,

Laura

Laura Randles-Little
Deputy Attorney General
Government Law Section | California Department of Justice
1300 I Street, 17th Floor | Sacramento, CA 95814
*tel.* (916) 210-6504

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

**ADD-092**

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.