No. 22-7063

IN THE

# UNITED STATES COURT OF APPEALS

### FOR THE

# DISTRICT OF COLUMBIA CIRCUIT

_____

**American Society for Testing and Materials, et al.,**

*Appellants,*

**vs.**

**Public.Resource.Org, Inc.,**

*Appellee.*

_____

**On Appeal from**
**U.S. District Court for the District of Columbia**
**Honorable Tanya S. Chutkan**
**Case No. 1:13-cv-1215-TSC**

_____

**BRIEF OF *AMICI CURIAE* AMERICAN MEDICAL ASSOCIATION,**
**AMERICAN DENTAL ASSOCIATION,**
**AND AMERICAN HOSPITAL ASSOCIATION**
**IN SUPPORT OF APPELLANTS**

_____

Jack R. Bierig
ArentFox Schiff LLP
233 S. Wacker Drive
Suite 7100
Chicago, IL 60606
(312) 258-5500
Jack.Bierig@afslaw.com
*Counsel for Amici Curiae*

October 28, 2022

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**(A) Parties and Amici.** Except for the following, all parties, interveners, and *amici* appearing before the district court and in this Court are listed in the Appellants' Brief filed on September 16, 2022:

American Medical Association

American Dental Association

American Hospital Association

**(B) Rulings Under Review.** References to the rulings at issue appear in the Appellants' Brief filed on September 16, 2022.

**(C)   Related Cases.** This case was previously before this Court in No. 17-7035, *American Society for Testing and Materials, et al. v. Public.Resource.Org, Inc.* Counsel are not aware of any other related cases before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, *Amici Curiae* state that the American Medical Association, American Dental Association, and American Hospital Association have no parent corporations and no publicly held company has a 10% or greater ownership interest in them. The Associations are not-for-profit associations whose membership includes physicians, dentists, hospitals, and hospital administrators.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................. i

CORPORATE DISCLOSURE STATEMENT ..................................... ii

INTEREST OF AMICI CURIAE ..................................................... 1

SUMMARY OF ARGUMENT ......................................................... 5

ARGUMENT ................................................................................. 8

I.     Background: The federal government has long relied on— and benefited from—authorship of copyrighted works by private entities. ................................................................... 8

II.    Privately authored works do not lose copyright protection when the government requires their use ............................. 15

       A.    Federal legislation and regulations have consistently provided that required use does not divest copyright. ........................................................................ 15

       B.    Courts have confirmed that government use does not invalidate copyrights. ........................................... 22

III.   The "fair use" provision of the Copyright Act should not be broadly construed to undermine the enforceability of copyrights in privately created works whose use is required by government ......................................................... 24

CONCLUSION ............................................................................ 32

CERTIFICATE OF COMPLIANCE ............................................... 34

CERTIFICATE OF SERVICE ....................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Dental Ass'n v. Delta Dental Plans Ass'n,*
   126 F.3d 977 (7th Cir. 1997) ............................. 3, 11, 24, 28, 32

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith,*
   11 F.4th 26 (2d Cir. 2021), *cert. granted*, 142 S. Ct.
   1412 (2022) ........................................................ 26, 27

*Banks v. Manchester,*
   128 U.S. 244 (1888) ................................................ 22

*CCC Info. Servs. v. Maclean Hunter Mkt. Reports, Inc.,*
   44 F.3d 61 (2d Cir. 1994) ........................................ 22

*Cty. of Suffolk, N.Y. v. First Am. Real Estate Sols.,*
   261 F.3d 179 (2d Cir. 2001) .................................... 22

*Dr. Seuss Enters., L.P. v. ComicMix LLC,*
   983 F.3d 443 (9th Cir. 2020), *cert. denied*, 141 S. Ct.
   2803 (2021) .......................................................... 26

*Georgia v. Public.Resource.Org, Inc.,*
   140 S. Ct. 1498 (2020) ........................................ 6, 18, 22, 23

*Google LLC v. Oracle Am., Inc.,*
   141 S. Ct. 1183 (2021) ........................................ 25, 26

*Int'l Code Council, Inc. v. UpCodes, Inc.,*
   No. 17 CIV. 6261, 2020 WL 2750636 (S.D.N.Y. May
   27, 2020)............................................................... 27

*Mazer v. Stein,*
   347 U.S. 201 (1954) ................................................ 31

*Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.,*
   No. CV 21-5262, 2021 WL 4913276 (C.D. Cal. Aug. 9,
   2021) .................................................................... 27

iv

*Neotonus, Inc. v. Am. Med. Ass'n,*
  554 F. Supp. 2d 1368 (N.D. Ga. 2007), *aff'd*, 270 F.
  App'x 813 (11th Cir. 2008) ........................................... 10, 11, 28

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,*
  121 F.3d 516 (9th Cir. 1997), *amended,* 133 F.3d 1140
  (9th Cir. 1998).................................................... 2, 6, 13, 22, 30

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) ................................................................ 31

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.,*
  293 F.3d 791 (5th Cir. 2002) (*en banc*) ............................... 23, 24

*Wheaton v. Peters,*
  33 U.S. 591 (1834) ................................................................ 22

**Statutes**

15 U.S.C. § 272 ........................................................................ 20

17 U.S.C. § 7 ................................................................. 17, 18, 19

17 U.S.C. § 101 ........................................................................ 18

17 U.S.C. § 105 .................................................................. 18, 19

17 U.S.C. § 107 .............................................. 5, 6, 7, 24, 25, 29

17 U.S.C. § 108 ............................................................. 7, 30, 31

42 U.S.C. § 1320d-3 ................................................................. 3

42 U.S.C. § 1395w-4(c)(5) ........................................................ 9

Health Insurance Portability and Accountability Act of
  1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996).............. 3, 4, 9

National Technology Transfer and Advancement Act of
  1995, § 12(d), Pub. L. No. 104-113, 110 Stat. 775
  (1996)...................................................................................... 20

## Other Authorities

42 C.F.R. § 424.32(b) ............................................................. 4, 10

42 C.F.R. § 433.112(b)(2)......................................................... 4, 9

45 C.F.R. § 171.303 ............................................................. 22, 29

Aaron B. Caughey, *Prepregnancy Obesity & Severe
    Maternal Morbidity: What Can Be Done?,* 318 JAMA
    1765 (Nov. 14, 2017) ................................................. 14

Ana Neumann, et al., *Evaluating Quality of Dental Care
    Among Patients with Diabetes*, 148 J. Am. Dent. Assn.
    634 (Sept. 2017)......................................................... 14

CMS, License for Use of Current Procedural Terminology ............. 21

CMS, Medicare Claims Processing Manual ................................. 21

Dep't of HHS, Pub. 100-04, Transmittal 1104 (Nov. 3,
    2006) .................................................................. 4, 10

Dep't of HHS, Pub. 100-04, Transmittal 43 (Dec. 19,
    2003) .................................................................... 4

Fed. R. App. P. 26.1 ....................................................... ii

Fed. R. App. P. 29(a)....................................................... 1

Fed. R. App. P. 29(d)....................................................... 1

Indian Health Serv., Indian Health Manual ................................ 10

Nat'l Research Council, *Standards, Conformity
    Assessment, & Trade: Into the 21st Century* (1995) .................... 8

TRICARE Operations Manual (Apr. 1, 2015 ed., updated
    Aug. 31, 2022)......................................................... 10

U.S. Const., Art. I, § 8 ................................................... 31

U.S. Dep't of Agric., *Rules & Specifications for the Grading of Lumber Adopted by the Various Lumber Manufacturing Associations of the United States* (1906) ............. 17

## INTEREST OF *AMICI CURIAE*[1]

This case concerns unauthorized publication of standards created by private standard-setting organizations that were subsequently incorporated into law. *Amici* associations have authored copyrighted coding works and related forms (including instructions and guidelines) used by physicians, dentists, and hospitals to digitally record the services they have performed for patients. These copyrighted works ("Coding Works" or "Works") are used, *inter alia*, by insurers in determining payment for those services.

Government agencies have required that claims submitted to those agencies for payment for those services must use these Coding Works, but these Works are in no sense "the law." Submitting a claim that does not use these Works is not unlawful. It will simply result in denial of the claim.

---

[1] This brief is submitted under Fed. R. App. P. 29(a) with the consent of all parties. Undersigned counsel for *Amici* certify that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *Amici* and their counsel have contributed money for this brief. Under Circuit Rule 29(d), *Amici* state that a separate amicus brief is necessary because the interests of the three *Amici,* as owners of copyrights in coding works whose use is required by government, are unique to these *Amici.*

Nevertheless, the decision in this appeal may affect *Amici*'s ability to enforce their copyrights in their Works—as well as any standards they have developed that have been adopted by government. More specifically, a ruling against Appellants may undermine *Amici*'s ability to devote the resources necessary to maintain and improve the usefulness of their Works (as medicine, dentistry, and hospital services constantly evolve), and to safeguard the uniformity of those Works in the interests of efficient coding of services and promoting interoperability of medical and dental records systems. Thus, such a ruling would subvert the public-private relationship that has well served our government and our society for over a century.

The *American Medical Association* ("*AMA*") is the largest professional association of physicians, residents, and medical students in the United States. It holds the copyright in a work entitled "Current Procedural Terminology" ("CPT")—the most widely accepted nomenclature for reporting physician procedures and services. *See Practice Mgmt. Info. Corp. v. AMA*, 121 F.3d 516, 517 (9th Cir. 1997), *amended,* 133 F.3d 1140 (9th Cir. 1998) ("*PMIC*"). Since at least 1983, the federal government has required use of CPT for a physician

to obtain reimbursement under the Medicare and Medicaid programs. *See* 48 Fed. Reg. 16750, 16753 (Apr. 19, 1983). In 2000, Health and Human Services ("HHS") designated CPT as a standard code set under Section 1173 of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) ("HIPAA"), codified at 42 U.S.C. § 1320d-3. Because health care providers must "comply with [any] standard or specification" designated by HHS, HIPAA § 1175(b)(1)(A), use of CPT is required to report physician services for all financial and administrative health care transactions sent electronically. *See also* 65 Fed. Reg. 50312, 50323-30 (Aug. 17, 2000).

The *American Dental Association* ("*ADA*") is the nation's largest dental association, representing more than 161,000 dentist members across the country. It holds the copyright in the "Code on Dental Procedures and Nomenclature" ("CDT"). *See ADA v. Delta Dental Plans Ass'n*, 126 F.3d 977 (7th Cir. 1997). In 2000, HHS designated CDT as a HIPAA-compliant code set. 65 Fed. Reg. at 50323-30. Health care providers must use CDT to report dental services for all financial and administrative health care transactions sent electronically.

- 3 -

HIPAA § 1175(b)(1)(A). As with CPT, HHS requires use of CDT in sub-mitting claims for reimbursement. *See* Dep't of HHS, [Pub. 100-04, Transmittal 43](#) (Dec. 19, 2003); 42 C.F.R. § 433.112(b)(2). The ADA also holds copyrights in standards it has developed for dental prod-ucts and informatics.

The *American Hospital Association* ("*AHA*") represents more than 5,000 hospitals, health care systems, and other health care or-ganizations. It has more than 42,000 individual members. AHA owns the copyright in the *Official UB-04 Data Specifications Manual*, a uni-form billing form that institutional health care providers must use to submit claims to the government and third-party payers. As with CPT and CDT, the federal government mandates the use of UB-04 when submitting claims to Medicare and Medicaid. *See* 42 C.F.R. § 424.32(b); *see also* Dep't of HHS, [Pub. 100-04, Transmittal 1104](#) (Nov. 3, 2006) (requiring UB-04 for billing the Centers for Medicare & Medicaid Services ("CMS")).

It is essential for *Amici* to maintain their ability to enforce their copyrights in their Coding Works for at least two reasons. First, ab-sent this ability, *Amici* would lack the resources to support continu-ous updating of those Works. Second, *Amici* would be unable to

maintain the uniformity of coding critical to efficient coding and promoting the interoperability of electronic health records.

## SUMMARY OF ARGUMENT

This case involves a system of public-private cooperation that has existed for over a hundred years. This system has allowed the federal government to use, and require use of, privately developed works of authorship that have enabled the government to avoid the substantial administrative and financial burdens associated with creating, maintaining, and updating complex works that can most effectively be authored and kept current by private entities having the most knowledge about their respective fields.

*Amici* begin by explaining the importance of maintaining the ability to enforce copyrights in their Works. We then address two legal issues: (1) whether a governmental requirement to use a privately authored work deprives the work's author of its copyright; and (2) whether copying substantial portions of the copyrighted work constitutes "fair use" under Section 107 of the Copyright Act, where the copy does not transform the work and the work is readily available.

Government-required use of a copyrighted work should not in

any way divest the copyright holder of its copyright in that work. In-deed, the federal agency that implements Medicare and Medicaid has stated that its decision to require use of privately created code sets is not intended to divest the copyright holder of the copyright. 65 Fed. Reg. 50312, 50324 ("[N]othing in this final rule, including the Secre-tary's designation of standards, implementation specifications, or code sets is intended to divest any copyright holders of their copy-rights in any work referenced in this final rule"). And courts have held that required use of copyrighted works by the government does not divest the copyright. *See, e.g., PMIC*, 121 F.3d at 518-19.

To be sure, statutory language and judicial opinions are not copyrightable. But this rule has been limited to government-authored works such as statutes, judicial opinions, and government-commis-sioned works-for-hire. *See Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1508 (2020). It does not extend to copyrights in privately created works whose use is required by the government—particularly where those works have additional uses.

Nor should copying and reproducing copyrighted works be con-sidered "fair use" on the facts of this case. The expansive reading of Section 107's fair use provisions advocated by PRO and adopted by

the district court would undermine the principle—recognized by Congress, federal agencies, and federal courts—that required use of privately created works like *Amici*'s Coding Works does not divest the copyright in those works. A conclusion that any substantial, unlicensed copying of these works for the purposes for which they were created constitutes "fair use" where those works are readily available would leave the copyright technically intact, but effectively prevent enforcement of that copyright and thus render it largely meaningless. Indeed, Section 108 of the Copyright Act—which allows libraries or archives to make one non-commercial copy of a work—further evidences that Section 107's fair use provision was not intended to permit the copying by PRO or any substantial copying of *Amici*'s Coding Works.

In short, this Court should not find fair use where, as here, the use is not transformative, the copying is substantial, and the copyrighted work is not only available for free viewing as authorized by the copyright holder, but readily available in full for a reasonable royalty.

**ARGUMENT**

## I.   Background: The federal government has long relied on— and benefited from—authorship of copyrighted works by private entities.

The federal government has long recognized the benefits of re-lying on the private sector to satisfy its need for certain kinds of works, including standards and Coding Works. Private organizations are able to create such works more quickly and efficiently than the government. Moreover, practical difficulties may hamper the government's ability to create such works on its own. Nat'l Research Council, *Standards, Conformity Assessment, & Trade: Into the 21st Century*, at 56 (1995).

Federal agencies often lack the time, resources, or expertise to create and update these types of works. Relying on privately authored works "eliminates the costs to the Government of developing its own standards," while furthering the "policy of reliance upon the private sector to supply government needs for goods and services." OMB, Circular No. A-119, 58 Fed. Reg. 57643, 57645 (Oct. 26, 1993). In-deed, OMB's guidance evinces "a strong preference for using volun-tary consensus standards over government-unique standards in Fed-eral regulation and procurement." *Id.*

*Amici*'s Coding Works perfectly exemplify the benefits of government reliance on privately created works. In 1977, Congress directed the Health Care Financing Administration to establish uniform codes for coding physician services. *See* 42 U.S.C. § 1395w-4(c)(5). Instead of creating new codes from scratch, the government incorporated CPT into the Healthcare Common Procedure Coding System ("HCPCS"). *See* [48 Fed. Reg. 16750](), 16753 (Apr. 19, 1983); [50 Fed. Reg. 40895-04](), 40898 (Oct. 7, 1985). In the early 1980s, AHA created the predecessor to UB-04, which was adopted as the official billing form for government programs like Medicare and Medicaid. *See* 42 C.F.R. § 433.112(b)(2).

The government—and the broader health care community—have increasingly relied on *Amici*'s copyrighted Coding Works. Since the early 1980s, the government has required use of CPT in reporting medical procedures and obtaining reimbursement under the Medicare and Medicaid programs, and subsequently required use of CDT and AHA's uniform billing forms. *See id.*; Nat'l Uniform Billing Comm., *[About the NUBC]()*.

In response to the enactment of HIPAA, Pub. L. No. 104-191, 110 Stat. 1936 (1996), HHS mandated the use of CPT and CDT—for

physician and dental services, respectively—in all financial and administrative health care transactions sent electronically. *See* 65 Fed. Reg. 50312, 50323-30 (Aug. 17, 2000). The government likewise requires use of UB-04 when submitting reimbursement claims to government programs. *See* 42 C.F.R. § 424.32(b); Dep't of HHS, Pub. 100-04, Transmittal 1104 (Nov. 3, 2006) (requiring UB-04 for billing CMS). The government also requires use of *Amici's* Coding Works for reporting and reimbursement in the TRICARE, Children's Health Insurance Program, and Indian Health Services programs.[2]

Creating and maintaining these Works require significant resources and expertise. The AMA has spent millions of dollars maintaining more than 10,000 CPT codes and descriptors. Through its CPT Editorial Panel, it constantly revises, updates, and modifies CPT to account for medical advances and changes in medical practice. *See Neotonus, Inc. v. AMA*, 554 F. Supp. 2d 1368, 1371-72 (N.D. Ga. 2007) (explaining the process for adding, deleting, and modifying

---

[2] *See, e.g.,* TRICARE Operations Manual 6010.59-M, Chapter 8, Section 1 and Chapter 19, Section 2 (Apr. 1, 2015 ed., updated Aug. 31, 2022) (requiring use of code sets); Indian Health Serv., Indian Health Manual, Part 5, Ch. 1, §§ 5-1.3F, 5-1.3G (designating CPT and CDT as required code sets, and UB-04 as a required form).

codes), *aff'd*, 270 F. App'x 813 (11th Cir. 2008). The CPT Editorial Panel has twenty-one members (the Panel chair and vice chair, twelve members appointed by national medical specialty societies, two members from the CPT Health Care Professionals Advisory Committee, and five representatives from organizations that could include payers), plus two non-voting liaisons from CMS. AMA, *The CPT® Code Process*. The Editorial Panel meets three times a year to consider changes to CPT submitted by a broad range of stakeholders, including medical specialty societies, individual physicians, hospitals, and third-party payers. *Id.*

During its meetings, the panel addresses nearly 350 major topics, typically involving more than 3,000 votes on individual items. *Id.* Facilitating the Editorial Panel's work requires dozens of dedicated support staff and substantial time commitments from panel members and the 100+ volunteer physicians and health care professionals on the CPT Advisory Committee. *Neotonus*, 554 F. Supp. 2d at 1371.

The ADA similarly spends tremendous resources to maintain and update CDT. *See ADA v. Delta Dental*, 126 F.3d at 979. The ADA's Council on Dental Benefit Programs is responsible for maintaining

the CDT Code in accordance with ADA Bylaws and policy, and applicable federal regulations. The Council established the Code Maintenance Committee to help maintain CDT and ensure that all stakeholders (e.g., ADA members, dental specialty organizations, and payers) have an active role in evaluating and voting on CDT Code changes. This Committee holds public meetings annually to consider and vote on changes to CDT. At these annual meetings, dozens of proposed code changes are discussed, debated, and voted on to ensure that CDT reflects changes in dental knowledge and technology and advances in dental care. The government and dental care delivery system reap tremendous benefits by relying on CDT and the ADA's continuing efforts to maintain and improve CDT.

The same is true for the AHA's Official UB-04 Data Specifications Manual and form. The manual and form include codes representing important information about claims for medical services provided to patients, such as the type of facility where treatment was provided, the patient's condition, the patient's discharge status, the diagnosis and procedures performed, and ancillary service or billing arrangements. The AHA has continuously maintained and updated

the uniform billing data set since its inception, relieving the government of the burden and expense of maintaining and updating the UB-04 data set.

*Amici* ensure that their Coding Works remain accessible to the public. *See, e.g., PMIC*, 121 F.3d at 517. For example, CMS makes CPT available free of charge to the public as part of the Level One component of HCPCS, under a royalty-free license. The public can also purchase the current print edition of CPT for $134.95. The AMA also allows members of the public to search for certain CPT codes online at no cost through its website. *See* AMA, *[Need Coding Resources?](#)*

By supplying uniform and creative nomenclatures for medical procedures and method for reporting billing data, CPT, CDT, and UB-04 have become essential tools not only for efficiently processing claims to the two largest medical payers in the country, Medicare and Medicaid, but also for medical research and promoting interoperability of record-keeping systems. CPT and CDT codes allow medical and dental specialty societies to develop clinical guidelines; payers to track utilization of medical procedures and develop alternative pay-

ment models; and researchers and educators to develop new performance measures, identify patients with certain medical or dental conditions, study the incidence of those conditions, and analyze the costs and effectiveness of treatment options.[3]

UB-04 has similarly become critical to timely and accurate analysis of utilization of health care services. For example, whereas it once took five years for the CDC's National Center for Health Statistics ("NCHS"), using surveys, to gather data about 11,000 inpatients diagnosed with traumatic brain injury, UB-04 allows NCHS to gather the same amount of data in just a year. Sonja Williams, et al., Div. of Health Care Statistics, NCHS, *Using Uniform Bill (UB)-04 Admin. Claims Data to Describe Hospital-Based Care*. UB-04 not only enables NCHS to gather this data more efficiently, but it also permits NCHS to include twice as many variables. *Id.* In these ways, CPT, CDT, and UB-04 have facilitated advances in medicine and patient care at no

---

[3] *See, e.g.,* Aaron B. Caughey, *Prepregnancy Obesity & Severe Maternal Morbidity: What Can Be Done?, 318 JAMA 1765* (Nov. 14, 2017) (using CPT codes to analyze the relationship between pre-pregnancy obesity and maternal morbidity); Ana Neumann, et al., *Evaluating Quality of Dental Care Among Patients with Diabetes, 148 J. Am. Dent. Assn. 634* (Sept. 2017) (using CDT codes to analyze quality of diabetic patients' dental care).

cost to the government.

The efficient administration of our health care system, both public and private, depends heavily on the use of *Amici*'s Coding Works. Without these Works, the federal government would have had to commit enormous time and resources to creating its own code sets, and even more resources to updating and maintaining them over the years. The government, however, has realized the benefits of using the best privately created works without bearing any of these costs.

## II.  Privately authored works do not lose copyright protection when the government requires their use.

### A.  Federal legislation and regulations have consistently provided that required use does not divest copyright.

The law has long assured authors that a government require-ment to use their works does not invalidate the copyrights in those works. To the contrary, every branch of government to consider the issue has determined that privately owned copyrights are not di-vested or in any way compromised by required use.

Before the Copyright Act of 1909, copyright owners hesitated to allow the government to use their works out of concern that such use would invalidate their copyrights. H.R. Rep. 28192, 60th Cong., 2d

Sess., at 10 (1909). To alleviate these concerns, Congress passed special legislation declaring that government use did not affect the validity of copyrighted works.[4] One of the earliest examples of this practice involved technical specifications somewhat analogous to those at issue in this case.

Specifically, the U.S. Forest Service wanted to publish a book called "Rules and Specifications for Grading Lumber Adopted by the Various Lumber Manufacturing Associations of the United States." That book included rules adopted and copyrighted by local lumber associations. Pub. Res. No. 59-41, 34 Stat. 836 (1906). In exchange for the associations' consent to use their copyrighted works, Congress passed a special act declaring that the copyrighted matter "shall be as fully protected under the copyright laws as though published by the proprietors themselves." *Id.* The U.S. Department of Agriculture printed the full text of the resolution just after the title page, and noted in the introduction that "[s]everal of the associations have

---

[4] *See* Pub. Res. No. 55-37, 32 Stat. 746 (1902) (providing that "copyrighted matter, wherever it appears in [the government's publication,] shall be plainly marked as copyrighted matter, and shall be as fully protected under the copyright laws as though published by the proprietors themselves").

copyrighted their rules . . . [which] are protected by Public Resolution No. 41."[5]

With the Copyright Act of 1909, Congress eliminated the need to pass a special act each time the government wanted to use privately created works. As the House Report stated, "[i]t was thought best, instead of being obliged to resort every little while to a special act, to have some general legislation on this subject." H.R. Rep. 28192, 60th Cong., 2d Sess., at 10 (1909). The result was a clause in Section 7 of the 1909 Copyright Act providing that "the publication or republication by the Government, either separately or in a public document, of any material in which copyright is subsisting shall not be taken to cause any abridgement or annulment of the copyright or to authorize any use or appropriation of such copyright material without the consent of the copyright proprietor." The Copyright Act of 1909, § 7, Pub. L. No. 60-349, 35 Stat. 1075 (1909).

The Copyright Act of 1976 maintained the 1909 Act's protection for privately created works used by the government. Section 105 of

---

[5] U.S. Dep't of Agric., *Rules & Specifications for the Grading of Lumber Adopted by the Various Lumber Manufacturing Associations of the United States* (1906) (text of resolution at p.4).

the 1976 Act excludes from copyright protection only "work[s] of the United States government," defined as "work prepared by an officer or employee of the United States Government as part of that person's official duties." 17 U.S.C. §§ 101, 105. The limitation to works prepared by government officials as part of their duties is significant. It does not extend to privately created works utilized by the government unless they were government-commissioned "works-for-hire." *See Georgia v. Public.Resource.Org, Inc.,* 140 S. Ct. at1506, 1508-09.

With the language of Sections 101 and 105 of the 1976 Act, Congress intended to preserve the exclusion of Section 7 of the 1909 Act, as the House and Senate Reports on the bill make clear. Section 7's exclusion was necessary in the 1909 Act because the first part of that section said that copyright protection did not extend to "any publication of the United States Government," which (standing alone) might be read as withdrawing copyright protection for privately owned works used by the government. H.R. Rep. 94-1476, 94th Cong., 2d Sess., at 60 (1976). Section 7's proviso resolved any ambiguity by preserving copyright protection for privately created works.

The 1976 Act's wording eliminated the need for such a proviso. Section 105's copyright exclusion applies only to "any work of the

United States Government," which is defined "in such a way that privately written works are clearly excluded from the prohibition." *Id.* Given this change in language, Congress saw "no need to restate [the 1909 Act's Section 7 proviso] explicitly in the context of section 105" because "there is nothing in section 105 that would relieve the Government of its obligation to secure permission in order to publish a copyrighted work, and publication or other use by the Government of a private work could not affect its copyright protection in any way." S. Rep. No. 94-473, 94th Cong., 1st Sess., at 57 (1975).[6] Indeed, while amending the Copyright Act several times, Congress never amended the principle that government-required use of privately authored works does not divest their copyright.

Notably, OMB has made it clear that government adoption of voluntary standards and works of nomenclature does not affect the enforceability of copyrights in such works. The 1993 version of OMB Circular A-119 stated that, although the government should adopt

---

[6] *See also* H.R. Rep. 94-1476, 94-1476, 94th Cong., 2d Sess., at 60 (1976) ("The committee here observes: (1) there is nothing in section 105 that would relieve the Government of its obligation to secure permission in order to publish a copyrighted work; and (2) publication or other use by the Government of a private work would not affect its copyright protection in any way.").

voluntary standards, "[s]uch adoption should take into account the requirements of copyright and other similar restrictions." OMB Circular No. A-119(7)(a)(5), 58 Fed. Reg. 57643, 57645 (Oct. 26, 1993). Congress then codified the policies underlying OMB Circular A-119 as binding federal law in the National Technology Transfer and Advancement Act of 1995, § 12(d), Pub. L. No. 104-113, 110 Stat. 775 (1996), codified at 15 U.S.C. § 272.

With this congressional endorsement, OMB revised Circular A-119 again in 1998 to strengthen copyright protection for works used by the government. Whereas the prior version directed agencies to "take into account the requirements of copyright," the 1998 version made it explicit that agencies "must observe and protect the rights of the copyright holder" when using privately owned works. 63 Fed. Reg. 8546, 8555 (Feb. 19, 1998).

The January 2016 revision to OMB Circular A-119 maintained this language, while addressing the free-access problem associated with government use of copyrighted works. The 2016 circular encourages agencies to "promote the availability of [copyrighted] materials" that are incorporated by reference, but only to the extent it is "con-

sistent with applicable law" and "respect[s] the copyright owner's interest in protecting its intellectual property." OMB Circular A-119 (Jan. 27, 2016), at 21 (2016 WL 7664625, *19).

Agencies have heeded this direction. Particularly on point is the regulation that designated CPT and CDT as HIPAA-compliant code sets, which states that "nothing in this final rule, including the Secretary's designation of standards, implementation specifications, or code sets is intended to divest any copyright holders of their copyrights in any work referenced in this final rule." 65 Fed. Reg. at 50324. The Federal Register and other government publications similarly display copyright notices along with new rules that utilize the copyrighted Works of *Amici*.[7] Recently, HHS has reaffirmed that privately authored works such as *Amici*'s Coding Works, promoting interoperability of health records, should not be divested of copyright

---

[7] *See, e.g.*, CMS, License for Use of Current Procedural Terminology; 81 Fed. Reg. 80170, 80172 (Nov. 15, 2016) ("Throughout this final rule, we use CPT codes and descriptions to refer to a variety of descriptions. We note that CPT codes and descriptions are copyright 2015 American Medical Association."); 69 Fed. Reg. 15837, 15840 (Mar. 26, 2004) ("Displaying Material With CDT-4 Code" and displaying "[ADA]'s Copyright Notice"); CMS, Medicare Claims Processing Manual, Chapter 23 (acknowledging that CPT and CDT are copyrighted works).

as long as the royalty charged by the copyright holder is fair and reasonable. *See* 45 C.F.R. § 171.303.

### B. Courts have confirmed that government use does not invalidate copyrights.

Courts have squarely held that copyrights are not invalidated by governmental adoption or mandated use of the work. In *PMIC*, 121 F.3d at 520, the Ninth Circuit held that the AMA's copyright in CPT is valid even though HHS required use of CPT to obtain reimbursement from Medicare and Medicaid. The Second Circuit similarly has held that state statutes requiring the use of a copyrighted compilation of used car values do not destroy the copyright in that work. *CCC Info. Servs. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 73-74 (2d Cir. 1994). It later reaffirmed that holding. *See Cty. of Suffolk, N.Y. v. First Am. Real Estate Sols.*, 261 F.3d 179, 193-94 (2d Cir. 2001).

*Wheaton v. Peters*, 33 U.S. 591 (1834) and *Banks v. Manchester*, 128 U.S. 244 (1888)—which held that opinions and syllabi created by judges are not copyrightable—do not suggest that privately created works incorporated by reference into regulations are uncopyrightable "laws." As discussed in *Georgia v. Public.Resource.Org, Inc.*,

140 S. Ct. 1498 (2020), decided two years after this Court's prior decision in this case, those cases concerned works created by government actors—not by private parties.

The Supreme Court explained that the "limitation on copyright protection for certain government work product" means that "officials empowered to speak with the force of law . . . cannot copyright . . . the works they create in the course of their official duties," but that this limitation "does not apply . . . to works created by private parties . . . who lack the authority to make or interpret the law." *Id.* at 1504, 1507. As the Court summarized, "copyright does not vest in works that are (1) created by judges and legislators (2) in the course of their judicial and legislative duties" (including works-for-hire commissioned by a legislative body). *Id.* at 1508.

*Amici,* like Appellants here, are private parties with no power to make law. That is not changed when the government incorporates parts of their copyrighted, privately created codes into regulations. *See Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 804-05 (5th Cir. 2002) (*en banc*) ("The copyrighted works do not 'become law' merely because a statute refers to them" when it "requires citizens to consult or use a copyrighted work in the process of fulfilling their

obligations.").[8]

## III. The "fair use" provision of the Copyright Act should not be broadly construed to undermine the enforceability of copyrights in privately created works whose use is required by government.

*Amici*'s Coding Works "are routinely copyrighted, and challenges to the validity of these copyrights are routinely rejected." *ADA v. Delta Dental,* 126 F.3d at 978. But the overbroad construction of the "fair use" provision of Section 107 of the Copyright Act adopted by the district court would, in effect, swallow the copyrights in these Works by substantially limiting their enforcement—or, at a minimum, create enormous transaction costs in vindicating the applicable copyright. Thus, this Court should construe Section 107 in a manner that does not subvert the recognized copyright in privately

---

[8] *Veeck* held that model codes, created for the sole purpose of being adopted as laws, are not copyrightable, but distinguished code sets like *Amici*'s, which are created for independent reasons. *Id.* In the certiorari proceedings in *Veeck,* the Solicitor General reaffirmed that statutory or administrative references to a privately copyrighted work do not mean that the public may copy it freely. Brief of the United States as *Amicus Curiae* at 11, *S. Bldg. Code Cong. Int'l, Inc. v. Veeck*, No. 02-355 (2002). The Office of the Federal Register also reaffirmed this distinction when it rejected PRO's petition to modify the regulations governing incorporation by reference. *See* 78 Fed. Reg. 60784, 60792 (Oct. 2, 2013) ("[W]e agree with commenters who said that when the Federal government references copyrighted works, those works should not lose their copyright.").

- 24 -

created works such as *Amici*'s Coding Works.

Section 107 provides that "fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." It lists four considerations to be taken into account in determining whether a use is "fair":

(1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)    the nature of the copyrighted work;

(3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

First, the "purpose and character" consideration asks "whether the copier's use adds something new, with a further purpose or different character, altering the copyrighted work with new expression, meaning or message." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1202 (2021) (internal quotation marks and citation omitted). If the copier's use "adds something new and important" (such as parody, commentary, or criticism) it is considered "transformative" and more

likely constitutes fair use. *Id.* at 1203.

In *Google*, the Supreme Court held that Google's use of certain lines of Java programming code was transformative. But that decision was made in the context of certain computer code that, "if copyrightable at all," is far removed "from the core of copyright." *Id.* at 1202. These circumstances are vastly different from those presented in this appeal.

In other contexts, courts have interpreted "transformation" narrowly. Simply "taking" is not transformative. For example, in *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 452-55 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021), the Ninth Circuit held that a "mash-up" of Star Trek and Dr. Seuss that did not parody, criticize, comment on, or ridicule the Dr. Seuss book on which it was modeled was not transformative, as it simply lifted its core elements with the purpose of "repackaging" and "evoking" (taking, not transforming) the Dr. Seuss book.

Similarly, in *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 42-43 (2d Cir. 2021), *cert. granted*, 142 S. Ct. 1412 (2022), the Second Circuit held that a Warhol portrait series based on a photograph of Prince was not transformative, because

"the overarching purpose and function of the two works . . . is identical," both broadly as works of visual art and narrowly as portraits of the same person—i.e., "the same work in a different form," "retain[ing] the essential elements . . . without significantly adding to or altering those elements." The Supreme Court has granted certiorari and is expected to clarify the fair use issue in the context of that case.

Regardless of how the *Warhol* Court rules, the use at issue here should not be considered a fair use, as it is simply "taking" and is not transformative. The whole point of PRO's activity is to copy ASTM's standards for the precise purpose for which they were created, and thereby to circumvent the need for others to obtain a license to use ASTM's standards. Likewise, those who copy *Amici*'s Works generally do so for the precise purpose for which the Coding Works were created. They do not transform anything.[9]

---

[9] Two recent district court decisions suggest that publishing privately created standards incorporated by reference into building codes is "transformative," on the theory that it educates the public, but factual issues remained. *See Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc.*, No. CV 21-5262, 2021 WL 4913276, at *4-5 (C.D. Cal. Aug. 9, 2021) (preliminary injunction denied because of uncertainty regarding fair use defense); *Int'l Code Council, Inc. v. UpCodes, Inc.*, No. 17 CIV. 6261, 2020 WL 2750636, at *24-25 (S.D.N.Y. May 27, 2020) (summary judgment denied on the fair use defense because of issues of fact regarding the nature/extent of copying). However, a conclusion

Here, the district court effectively held that if a work is referenced by or incorporated into a law or regulation, then the unauthorized copying and distribution of that work is transformative and therefore a fair use. This erroneous determination undercuts the long-established principle—recognized by Congress, federal agencies, and federal courts—that required use of privately created works like *Amici*'s Coding Works does not divest the copyright in those works.

Second, like ASTM's standards (whose creation requires enormous judgment and back-and-forth on many issues), *Amici*'s Coding Works are highly creative. *See ADA v. Delta Dental*, 126 F.3d at 979 (explaining "[b]lood is shed in the ADA's committees" when creating new CDT codes and descriptions); *Neotonus*, 554 F. Supp. 2d at 1371-72 (explaining that the CPT Editorial Panel "is supported by a large body of advisors . . . [including] more than 100 volunteer physicians and health care professionals").

Third, use of the copyrighted works in question is almost al-

───────────────

that that wholesale copying is transformative on an "educating the public" theory is incorrect: By that standard, any unauthorized use would be transformative.

- 28 -

ways substantial. Indeed, in this case PRO has copied all ASTM standards.

Fourth, the effect on *Amici* of allowing unlicensed copying and reproduction of their Coding Works on a fair use theory would be profound. *Amici* and other organizations expend tremendous resources to create, maintain, and update Works like these, which they create for multiple private purposes, independent of the use required by the federal government. *Amici* depend on revenue from the licensing of these copyrighted Works to be able to devote the resources required to produce works of maximum utility reflecting changes in knowledge, technology, and practice.

If the ability to receive copyright royalties were undercut by an expansive interpretation of Section 107, *Amici* and other organizations would lack the resources to create and maintain Works of such high utility as CPT, CDT, and UB-04. Moreover, they would lose the ability to prevent alteration of the Coding Works, which would undermine the important goal of maintaining uniformity of codes. If copiers were free to modify the codes for their own purposes without limitation, on a fair use theory, a crucial benefit of Coding Works would be lost. *See* 45 C.F.R. § 171.303.

In any event, invocation of the fair use defense is not necessary to provide access to *Amici*'s Coding Works. Those Works are already available in full for a reasonable royalty. At most, the fair use defense should be available only if privately created works whose use is required by law are not readily available to the public. *See, e.g., PMIC*, 121 F.3d at 519.

*Amici* did not develop their Coding Works for government use, but instead to meet private needs, with utility independent of the uses mandated by the government. But *Amici* allowed the government to use these Works in reliance on the established law that such use would not divest their copyrights. Treating unlicensed copying as "fair use" (except in very limited situations involving real transformation and minimal copying) would, as a practical matter, divest *Amici*'s copyrights—rights that Congress, regulatory agencies, and courts have sought to preserve. This conclusion is confirmed by Section 108 of the Copyright Act, which permits reproduction of no more than one copy of a work by libraries and archives, and only if the copying is not for commercial advantage. This narrow permission would be unnecessary if wholesale copying were considered fair use. Thus, copying of *Amici*'s Coding Works other than in accordance with

Section 108 should not be deemed fair use.

"[G]ranting authors the exclusive rights to reproduce their works" gives them "an incentive to create," and rewards "author[s] in order to benefit the public." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 477 (1984). This is "the best way to advance public welfare." *Mazer v. Stein*, 347 U.S. 201, 219 (1954). Organizations like *Amici* can create and maintain such useful Works only because the law has protected their copyrights. An expansive view of fair use would contravene the constitutional aim of "promot[ing] the Progress of Science and the useful Arts." U.S. Const., Art. I, § 8.

This Court should not find fair use where, as here, the use is not transformative, the copying is substantial, and the copyrighted Work is not only available for free viewing but readily available in full for a reasonable royalty.

Allowing fair use defenses to erode the enforceability of copyrights in Works such as CPT, CDT, and UB-04 would, in effect, swallow the copyrights in these Works by preventing, or substantially limiting, their enforcement. If *Amici* have to litigate the fair use issue every time a copier claims fair use, the transactional costs would subvert the value of the copyright. Additionally, allowing unrestricted

and unauthorized use of the Works would destroy the uniformity that is essential to these Works' usefulness. *See ADA v. Delta Dental*, 126 F.3d at 981 ("standardization of language promotes interchange among professionals" and "variations salted through a convention impede communication"). If, for example, entities were free to change codes and descriptors in CPT and CDT and to substitute their own preferred classifications or descriptions of medical or dental procedures, inconsistency and confusion would inevitably result—a modern day medical/dental Tower of Babel.

## CONCLUSION

A broad ruling in favor of PRO would undermine the "Progress of Science and the Useful Arts" by depriving organizations such as *Amici* of (a) the resources needed to maintain the Coding Works that are essential to the efficient functioning of our health care system, and (b) the ability to stop third parties from creating works that subvert the goal of promoting uniformity of coding. *Amici* therefore urge the Court to make clear that requiring use of Coding Works for various purposes does not divest the copyright in those Works—and that substantial unlicensed copying of the codes when they are readily available to users is not fair use.

Dated: October 28, 2022          Respectfully submitted,


                                 /s/ Jack R. Bierig
                                 Jack R. Bierig
                                 ARENTFOX SCHIFF LLP
                                 233 S. Wacker Drive
                                 Suite 7100
                                 Chicago, IL 60606
                                 Tel.: (312) 258-5500
                                 jack.bierig@afslaw.com

                                 *Counsel for Amici Curiae*
                                 *American Medical Association,*
                                 *American Dental Association, and*
                                 *American Hospital Association*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B). As measured by the word processing system used to prepare this brief, it contains 6459 words excluding the parts of the brief exempted by Fed. R. App. P. 29(a)(5), Fed. R. App. P. 32(f), and D.C. Cir. R. 32(e)(1) & (3).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Bookman Old Style 14 point font.

## CERTIFICATE OF SERVICE

I certify that on October 28, 2022, a true and correct copy of this Brief of Amici Curiae American Medical Association, American Dental Association, and American Hospital Association in Support of Appellants was filed via the Court's electronic filing system, which will forward a copy to all counsel of record, who are registered CM/ECF users.

Dated: October 28, 2022                    */s/ Jack R. Bierig*
                                                         Jack R. Bierig

CH2:26407385.10

- 34 -