No. 22-7063

In the

# United States Court of Appeals
# for the District of Columbia Circuit

———————

AMERICAN SOCIETY FOR TESTING AND MATERIALS;
NATIONAL FIRE PROTECTION ASSOCIATION, INC.; AND
AMERICAN SOCIETY OF HEATING, REFRIGERATING,
AND AIR-CONDITIONING ENGINEERS, INC.,

*Plaintiffs-Appellants,*

v.

PUBLIC.RESOURCE.ORG, INC.,

*Defendant-Appellee.*

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA, TANYA S. CHUTKAN, J.

———————

**BRIEF OF FORMER GOVERNMENT PUBLISHING OFFICIALS
RAYMOND A. MOSLEY AND ROBERT C. TAPELLA
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE**

———————

CHARLES DUAN
    *Counsel of Record*
2701 Calvert Street NW, Apt. 623
Washington, DC 20008
(202) 713-5799
notices.ecf@cduan.com

*Counsel for amici curiae*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), *amici curiae* certify as follows.

**(A)   Parties and Amici.**  Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Defendant-Appellee:

Raymond A. Mosley and Robert C. Tapella

The *amici* are former government officials, filing this brief in their personal capacities. No statement under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1(a) is required because the *amici* are not a corporation, association, joint venture, partnership, syndicate, or other similar entity.

**(B)   Rulings Under Review.**  References to the rulings at issue appear in the Brief for Defendant-Appellee.

**(C)   Related Cases.**  To the knowledge of counsel, other than any cases listed in the Brief for Defendant-Appellee, the case on review was not previously before this Court or any other court, and there are no other related cases currently pending in this Court or in any other court.

Dated: December 7, 2022        */s/ Charles Duan*
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
\
Charles Duan
*Counsel for amici curiae*

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), counsel certifies that the present separate brief is necessary because of the specific and distinct interests represented by *amici curiae*. As former government officials responsible for promulgation of federal regulations and other legal texts, *amici curiae* have unique knowledge, experience, and perspectives on the role of publication of regulatory material that are informative to the issues in the present case and that would not be adequately presented by the parties or other *amici*. Counsel is unaware of any other *amicus* party that would reflect the views expressed in the present brief.

Dated: December 7, 2022        */s/ Charles Duan*
                                                       _____
                                                       Charles Duan
                                                       *Counsel for amici curiae*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES . . . . . .   i

CERTIFICATE REGARDING SEPARATE BRIEFING   . . . . . . . . . . . . .   ii

TABLE OF AUTHORITIES   . . . . . . . . . . . . . . . . . . . . . . . .   iv

INTEREST OF *AMICI CURIAE*   . . . . . . . . . . . . . . . . . . . . .   1

SUMMARY OF ARGUMENT   . . . . . . . . . . . . . . . . . . . . . . . .   2

ARGUMENT   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

I.   Creation of the Federal Register   . . . . . . . . . . . . . . . . .   4

   A.   Leading Jurists Condemn Unpublished Regulations   . . . . . . .   4

   B.   Private Industry Interests Oppose Publication   . . . . . . . . .   7

   C.   The Federal Register Sets the Stage for Modern Administrative Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

II.   Electronic Distribution   . . . . . . . . . . . . . . . . . . . . . .   10

   A.   Government Privatization Stymies an Online Federal Register   . . .   11

   B.   Access Proponents Force a Reversal   . . . . . . . . . . . . . . .   14

   C.   An Online Federal Register Prompts New Innovation   . . . . . . .   17

III.   History Informs the Disposition of This Case   . . . . . . . . . . . .   20

   A.   Unfettered Access to Binding Law Underpins Democratic Self-Governance   . . . . . . . . . . . . . . . . . . . . . . . . . .   20

   B.   Private-Incentives Arguments Justifying Copyright Protection Equally Justify Not Publishing the Federal Register at All   . . . . . .   23

   C.   Access Enables Legal and Technological Innovation That Enhances Public Participation in Lawmaking   . . . . . . . . . . . . . .   24

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

CERTIFICATE OF COMPLIANCE   . . . . . . . . . . . . . . . . . . . .   27

# TABLE OF AUTHORITIES

## CASES

*American Society for Testing & Materials v. Public.Resource.Org*,
    896 F.3d 437 (D.C. Cir. 2018) . . . . . . . . . . . . . . . . . . . 20, 22–23

*Legi-Tech, Inc. v. Keiper*,
    766 F.2d 728 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . 15

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) . . . . . . . . . . . . . . . . . . . . . . . 6–7, 9, 20

## STATUTES

Act of June 19, 1937, ch. 369, 50 Stat. 304 . . . . . . . . . . . . . . . . . 10

Administrative Procedure Act, ch. 324, 60 Stat. 237 (1946) . . . . . . . . . . 10

E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 . . . . . . . . 18

Federal Register Act, ch. 417, 49 Stat. 500 (1935) . . . . . . . . . . . . . 7, 9, 21

Government Printing Office Electronic Information Access Enhancement
    Act of 1993, Pub. L. No. 103-40, 107 Stat. 112 . . . . . . . . . . . . . . 17

Paperwork Reduction Act of 1980, Pub. L. No. 96-511, 94 Stat. 2812 . . . 11–12

## FEDERAL REGISTER NOTICES

Advance Notice of Further Policy Development on Dissemination of
    Information, 54 Fed. Reg. 214 (Office of Mgmt. & Budget Jan. 4, 1989),
    https://archives.federalregister.gov/issue_slice/1989/1/4/212-220.pdf#
    page=3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12–13, 15

Development of an OMB Policy Circular on Federal Information
    Management, 48 Fed. Reg. 40964 (Office of Mgmt. & Budget Sept.
    12, 1983), https://archives.federalregister.gov/issue_slice/1983/9/12/
    40963-40968.pdf#page=2 . . . . . . . . . . . . . . . . . . . . . . 12–13

Management of Federal Information Resources, 50 Fed. Reg. 10734 (Office
of Mgmt. & Budget Mar. 15, 1985) (proposed policy), https://archives.
federalregister.gov/issue_slice/1985/3/15/10708-10747.pdf#page=
27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12–13

Management of Federal Information Resources, 50 Fed. Reg. 52730 (Office
of Mgmt. & Budget Dec. 24, 1985) (final policy), https://archives.
federalregister.gov/issue_slice/1985/12/24/52707-52735.pdf#page=
8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12–14

Management of Federal Information Resources, 57 Fed. Reg. 18296 (Office
of Mgmt. & Budget Apr. 29, 1992), https://archives.federalregister.gov/
issue_slice/1992/4/29/18234-18306.pdf#page=63 . . . . . . . . . . . . . . 16

Second Advance Notice of Further Policy Development on Dissemination
of Information, 54 Fed. Reg. 25554 (Office of Mgmt. & Budget June
15, 1989), https://archives.federalregister.gov/issue_slice/1989/6/15/
25546-25559.pdf#page=9 . . . . . . . . . . . . . . . . . . . . . . 14, 16, 21

## OTHER SOURCES

*A Mighty Maze*, N.Y. Times, Dec. 17, 1934, at 18 . . . . . . . . . . . . . . . . . 7

Ass'n of Research Libraries, *Technology & U.S. Government Information
Policies: Catalysts for New Partnerships*, 5 Gov't Info. Q. 267 (1988) . . . . 14

Brief of *Amici Curiae* 66 Library Ass'ns et al., *Am. Soc'y for Testing
& Materials v. Pub.Res.Org*, 896 F.3d 437 (D.C. Cir. Sept. 25, 2017)
(No. 17-7035, -7039) . . . . . . . . . . . . . . . . . . . . . . . 20, 23, 25

Brief of *Amicus Curiae* Sina Bahram, *Am. Soc'y for Testing & Materials v.
Pub.Res.Org*, 896 F.3d 437 (D.C. Cir. Sept. 25, 2017) (No. 17-7035, -7039) . 22

Charles Duan, *Copyright in the Texts of the Law: Historical Perspectives*, 9
N.Y.U. J. Intell. Prop. & Ent. L. 191 (2020), https://jipel.law.nyu.edu/
copyright-in-the-texts-of-the-law-historical-perspectives/ . . . . . . . . 20

——, *Mandatory Infringement*, 75 Fla. L. Rev. (forthcoming 2023), https://
papers.ssrn.com/sol3/papers.cfm?abstract_id=4193947 . . . . . . . . . . 23

*Electronic Collection and Dissemination of Information by Federal Agencies: A Policy Overview*, House Report No. 99-560 (1986) . . . . . . . . . . . . 15

John A. Fairlie, *Administrative Legislation*, 18 Mich. L. Rev. 181 (1920) . . . . 5

Lotte E. Feinberg, *Mr. Justice Brandeis and the Creation of the Federal Register*, 61 Pub. Admin. Rev. 359 (2001) . . . . . . . . . . . . . . . . . . 4–6

David Ferriero, *Federal Register 2.0*, White House Blog (July 26, 2010), https://obamawhitehouse.archives.gov/blog/2010/07/26/federal-register-20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Government Printing Office Electronic Information Access Enhancement Act of 1993*, Senate Report No. 103-27 (1993) . . . . . . . . . . . . . . . . . . 21

Erwin N. Griswold, *Government in Ignorance of the Law—A Plea for Better Publication of Executive Legislation*, 48 Harv. L. Rev. 198 (1934) . . . . . . 5

*Harvard and U.S. Government Swap: University Gets Griswold in Return for Sayre*, Boston Globe, Mar. 29, 1934, at 16 . . . . . . . . . . . . . . . . . . 5

H.R. 10932, 74th Cong. (1936), *reprinted in To Amend the Federal Register Act: Hearing on H.R. 10932 & 11337 Before the Subcomm. No. II of the H. Comm. on the Judiciary*, 74th Cong. 1 (Feb. 21, 1936), https://catalog.hathitrust.org/Record/100666765 . . . . . . . . . . . . . . . . . . . . . 7

James P. Love, *A Window on the Politics of the Government Printing Office Electronic Information Access Enhancement Act of 1993*, 21 J. Gov't Info. 3 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Luigi Montanez, *How Can Software Engineers Help Make Government Better?*, XRDS (Ass'n for Computing Mach.), Winter 2011, at 23, https://dl.acm.org/doi/10.1145/2043236.2043247 . . . . . . . . . . . . . 19

Ray Mosley, *Federal Register 2.0: Opening a Window onto the Inner Workings of Government*, White House Blog (Oct. 5, 2009), https://obamawhitehouse.archives.gov/blog/2009/10/05/federal-register-20-opening-a-window-inner-workings-government . . . . . . . . . . . . . 18

Karlo Mustonen et al., Gov't Info. Tech. Comm., Am. Library Ass'n, *Government Information Technology and Information Dissemination: A Discussion Paper*, 16 Documents to People 13 (1988) . . . . . . . . . . . 14

Nat'l Archives, *Third Annual Report of the Archivist of the United States for the Fiscal Year Ending 1937* (1938), https://www.archives.gov/files/about/history/sources/reports/1937-annual-report.pdf . . . . . . . . . . . 9

Nat'l Archives & Records Serv., *The National Archives & Records Service in 1980* (1981), https://www.archives.gov/files/about/history/sources/reports/1980-annual-report.pdf . . . . . . . . . . . . . . . . . . . . 11

Office of Mgmt. & Budget, *Report on Eliminations, Consolidations, and Cost Reductions of Government Publications* (1983), https://catalog.hathitrust.org/Record/011428158 . . . . . . . . . . . . . . . . . . . . . 12

Office of Tech. Assessment, *OTA-CIT-396*, *Informing the Nation: Federal Information Dissemination in an Electronic Age* (Oct. 1988), https://www.govinfo.gov/app/details/GOVPUB-GP3-7f6155b4e8bf6aa111c7072600f0eb18 . . . . . . . . . . . . . . . . 15

Peter Orszag, *The Ingenuity of the American People*, Off. Mgmt. & Budget (Sept. 9, 2009), https://obamawhitehouse.archives.gov/node/14893 . . . 19

Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288 (2021) . . . . . . . . . . 4

Drew Pearson & Robert S. Allen, *Justice Brandeis Helps Movement to Obtain "Official Gazette" of U.S.*, Daily Wash. Merry-Go-Round, Jan. 1, 1935, http://hdl.handle.net/1961/2041-16765 . . . . . . . . . . . . . . . 7

Alon Peled, *Re-Designing Open Data 2.0*, 5 E-J. E-Democracy & Open Gov't 187 (2013), https://jedem.org/index.php/jedem/article/download/219/180 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Press Release, *National Archives Office of the Federal Register and GPO Share Open Government Success Story Re: Polar Bears* (Jan. 6, 2013), https://www.archives.gov/press/press-releases/2012-83 . . . . . . . . . 18

Press Release, Gary Somerset, U.S. Gov't Printing Office, *The White House, National Archives and Government Printing Office Achieve Open Government Milestone* (Oct. 5, 2009), https://www.gpo.gov/docs/default-source/news-content-pdf-files/2009/09news40.pdf . . . . . . . . 18

*Publication of Governmental Rules and Regulations*, House Report No. 74-280 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

J.C. Ruddy & B.S. Simmons, *The Federal Register—Forum of the Government and the People*, 32 Geo. L.J. 248 (1944) . . . . . . . . . . . . . . . . . . 21

Frances Seghers, *Computerizing Uncle Sam's Data: Oh, How the Public Is Paying*, Bus. Wk., Dec. 15, 1986, at 102 . . . . . . . . . . . . . . . . . . 14

*To Amend the Federal Register Act: Hearing on H.R. 10932 & 11337 Before the Subcomm. No. II of the H. Comm. on the Judiciary*, 74th Cong. (Feb. 21, 1936), https://catalog.hathitrust.org/Record/100666765 . . . . 7–9, 22, 24

U.S. Gen. Accounting Office, *GGD-93-5*, *Federal Register: Better Electronic Technology Planning Could Improve Production and Dissemination* (Nov. 1992), https://www.gao.gov/assets/ggd-93-5.pdf . . . . . . . . . . . . . . 13

U.S. Gov't Printing Office, *Annual Report of the Public Printer, Fiscal Year 1975* (1976), https://www.govinfo.gov/app/details/GOVPUB-GP-87aa242a22a1c9d1edc9c77ed2209bc4 . . . . . . . . . . . . . . . . . . 11

——, *Annual Report of the Public Printer, Fiscal Year 1978* (1979), https://www.govinfo.gov/app/details/GOVPUB-GP-3677bb1bb9a1aadf7e794f482d785082 . . . . . . . . . . . . . . . . . 11

——, *Biennial Report to Congress on the Status of GPO Access* (1995), https://www.govinfo.gov/app/details/GOVPUB-GP-563d429404add2944c76d5c5a16cba8c . . . . . . . . . . . . . . . . . . 17–18

——, *Biennial Report to Congress on the Status of GPO Access* (2001), https://www.govinfo.gov/app/details/GOVPUB-GP-43435bd07972a52361b20497220f5ecf . . . . . . . . . . . . . . . . . . 17

——, *GPO/2001: Vision for a New Millennium* (Dec. 1991), https://www.govinfo.gov/app/details/GOVPUB-GP3-b6524860bff4f2fd24680d7d831fa51e . . . . . . . . . . . . . . . . . . 17

Franklyn Waltman, Jr., *NRA Orders Are Attacked in High Court*, Wash. Post, Dec. 11, 1934, at 1 . . . . . . . . . . . . . . . . . . . . . . . . . 6

Michael White, *FederalRegister.gov Wins Award for Innovation & Best Practices*, Reader Aids (Office of the Fed. Register Dec. 15, 2011), https://www.federalregister.gov/reader-aids/office-of-the-federal-register-blog/2011/12/federalregister-gov-wins-award-for-innovation-best-practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Works of Jeremy Bentham* (John Bowring ed., 1843), https://catalog. hathitrust.org/Record/001383956 . . . . . . . . . . . . . . . . . . . . . 5

## INTEREST OF *AMICI CURIAE*

*Amici curiae*[1] are former federal officials, who were responsible for the publication and promulgation of legal information including the Federal Register.

Raymond A. Mosley was the Director of the Office of the Federal Register between 1996 and 2011. He previously worked as a senior manager within the National Archives and Records Administration. During his tenure as Director, Mr. Mosley oversaw key technological improvements to the availability of the Federal Register, including development of the advanced Federal Register 2.0 website.

Robert C. Tapella was the 25th Public Printer of the United States between 2007 and 2010. Prior to then, he was chief of staff at the Government Printing Office. As Public Printer, Mr. Tapella was responsible for modernizing the government's digital publishing, including the launch of the Federal Digital System, or FDsys, in 2009.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), all parties received appropriate notice of and consented to the filing of this brief. Pursuant to Rule 29(c)(5), no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of the brief. No person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

Imagine the Federal Register is not free. For-profit corporations are the sole avenue of access to proposed and final rules, much like how the mandatory technical standards in the present case are controlled by copyright-holding standards organizations. Only a privileged few with the right Washington connections or the funds to pay monopoly prices can bargain to read the publication. Other citizens, researchers, lawyers, and perhaps judges have limited—perhaps no—access to the federal regulations that govern lives and law.

This thought of a privately controlled Federal Register is instructive because it is not hypothetical. It is history. Access to federal regulations, taken for granted today, was historically limited and surprisingly even opposed. The disputes over publishing the Federal Register, as anachronistic as they sound now, carry real-world lessons on commercial control and copyright law in the present case.

Two episodes from the history of the Federal Register's publication stand out: the initial congressional authorization to print the Federal Register, and the shift to online publication. The lessons are threefold. First, this history demonstrates a strong, consistent, widespread view that unfettered access to binding law is of paramount importance. Lawmakers, courts, scholars, librarians, and citizen advocates have highlighted the government's duty to promulgate the law, to press for greater access to regulations through the Federal Register.

Second, the historical debates over the Federal Register rebut the purported need for copyright protection over mandatory technical standards. The Appellant standards organizations contend that copyright-based monopoly control offers necessary private profit incentives. Yet the same incentives-based arguments have been proffered as reasons against publishing the Federal Register online or in print. The copyright arguments in this case are no more plausible than the failed historical arguments against making the Federal Register accessible.

Third, making the Federal Register more accessible has historically led to unexpectedly beneficial innovation. Publishing the Federal Register opened the door to such ideas as regulatory codification, online commenting on regulatory proposals, and even the Administrative Procedure Act. These and other advances in legal technology and institutions, made possible by unfettered access to regulations, have enhanced the public's understanding of government and ability to participate in the regulatory process.

The same innovation benefits should be expected here. Ensuring that copyright law does not impede full access to mandatory technical standards will spawn new services, technologies, and ideas that will further the American experiment of democratic self-governance. That a case seemingly about private intellectual property implicates fundamental public values is perhaps the most valuable lesson that the history of the Federal Register holds.

## ARGUMENT

### I. CREATION OF THE FEDERAL REGISTER

Since at least 1798, administrative agencies have been issuing binding rules with the force of law.[2] Yet publication of and access to those rules has not been a foregone conclusion.[3] It took almost a century and a half of time, several great American jurists, and a surprising degree of controversy to bring the Federal Register into existence.

### A. LEADING JURISTS CONDEMN UNPUBLISHED REGULATIONS

At the beginning of 1934, Erwin N. Griswold was a young attorney in the Solicitor General's office.[4] Regularly frustrated with the difficulty of finding regulations he was tasked with analyzing, Griswold helped to spur an executive branch initiative for regular publication of federal regulations.[5] The proposed publication, which he and colleagues titled the "Federal Register," quickly gained interest

---

[2]*See* Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288, 1302 (2021) (identifying rulemaking authority of boards of federal tax commissioners).

[3]*See id.* at 1306–07 (noting lack of records of rules of the federal boards).

[4]*See* Lotte E. Feinberg, *Mr. Justice Brandeis and the Creation of the Federal Register*, 61 Pub. Admin. Rev. 359, 361 (2001).

[5]*See id.* at 363.

within the administration.[6]  Having accepted a faculty position at Harvard Law

School, though, Griswold could not see the project to completion.[7]

Griswold would go on to be dean of the law school and Solicitor General of

the United States, but as a newly minted professor, his first order of business

was to publish.  In December 1934, his article *Government in Ignorance of the

Law* appeared in the *Harvard Law Review*.[8]  Quoting Bentham on the cruelty of

tyrants who "punish men for disobedience to laws or orders which he had kept

them from the knowledge of," Griswold's article excoriated the executive branch

for "chaos" in publication of binding administrative rules and executive orders.[9]

Griswold deemed the United States the only "nation of importance" without an

official regulatory gazette, and proposed a "systematic and uniform publication

of the rules and regulations."[10]

Though not the first to criticize the federal deficiency in regulation publish-

ing,[11] Griswold's article was particularly impactful because of a Supreme Court

---

[6] *See id.*

[7] *See Harvard and U.S. Government Swap: University Gets Griswold in Return for Sayre*, Boston Globe, Mar. 29, 1934, at 16.

[8] Erwin N. Griswold, *Government in Ignorance of the Law—A Plea for Better Publication of Executive Legislation*, 48 Harv. L. Rev. 198 (1934).

[9] *Id.* at 198 (quoting 5 *Works of Jeremy Bentham* 547 (John Bowring ed., 1843), https://catalog.hathitrust.org/Record/001383956); *id.* at 204.

[10] *Id.* at 207–08.

[11] *See* John A. Fairlie, *Administrative Legislation*, 18 Mich. L. Rev. 181, 199 (1920), *quoted in* Griswold, *supra* note 8, at 204.

case coincidentally bubbling up at the same time.[12]  In *Panama Refining Co. v. Ryan*, commonly called the "Hot Oil" case, oil refineries challenged the constitutionality of regulatory quotas on oil production that President Roosevelt had adopted by executive order.[13] It was only after the circuit court appeal, however, that a Justice Department attorney realized that the regulatory provision under question, section 4 of the Petroleum Code, had been accidentally deleted from the printed executive order and was not actually in force.[14]

The oral argument was scathing.  The *Washington Post* described how the justices "virtually catechized" the government's attorney Harold M. Stephens, who "spent an apparently embarrassing time" explaining why the United States was prosecuting—indeed, jailing—oil refiners based on a nonexistent section 4.[15] Justice Brandeis in particular questioned Stephens on the existence of "any official or general publication" of executive orders, which Stephens was forced to answer in the negative.[16]  When the Court issued its opinion in the case a month later,

---

[12]The timing may not have been coincidental: Based on review of historical correspondence, Professor Feinberg finds that Justice Brandeis may have used his relationship with another Harvard professor, Felix Frankfurter, to indirectly provoke Griswold into writing his article in time for the Supreme Court's arguments. *See* Feinberg, *supra* note 4, at 364–65.

[13]*See Pan. Ref. Co. v. Ryan*, 293 U.S. 388, 408–11 (1935).

[14]*See* Feinberg, *supra* note 4, at 360.

[15]Franklyn Waltman, Jr., *NRA Orders Are Attacked in High Court*, Wash. Post, Dec. 11, 1934, at 1.

[16]*Id.*; *see* Feinberg, *supra* note 4, at 360.

it quickly disposed of all questions based on the "false assumption" that section 4 was in effect; no case or controversy could be present, said the Court, "upon a provision which did not exist."[17]

Justice Brandeis's comments, in conjunction with Professor Griswold's well-timed article, created a wave of momentum for government publication of administrative regulations.[18] The Federal Register Act was signed into law in July of 1935, making it "the duty of the Public Printer" to publish a daily journal of regulations, executive orders, and other promulgated documents.[19]

## B.  PRIVATE INDUSTRY INTERESTS OPPOSE PUBLICATION

Yet that enactment was not free of controversy. Before the first Federal Register issue had even appeared in print, Representative John J. Cochran introduced a bill to repeal the as-yet unimplemented Federal Register Act.[20]

---

[17] *Pan. Ref.*, 293 U.S. at 412.

[18] *See, e.g.,* Drew Pearson & Robert S. Allen, *Justice Brandeis Helps Movement to Obtain "Official Gazette" of U.S.*, Daily Wash. Merry-Go-Round, Jan. 1, 1935, at 1, http://hdl.handle.net/1961/2041-16765; *A Mighty Maze*, N.Y. Times, Dec. 17, 1934, at 18; *Publication of Governmental Rules and Regulations*, H.R. Rep. No. 74-280 (1935).

[19] *See* Federal Register Act, ch. 417, secs. 3–4, 49 Stat. 500, 501 (1935).

[20] *See* H.R. 10932, 74th Cong. (1936), *reprinted in To Amend the Federal Register Act: Hearing on H.R. 10932 & 11337 Before the Subcomm. No. II of the H. Comm. on the Judiciary*, 74th Cong. 1 (Feb. 21, 1936), https://catalog.hathitrust.org/Record/100666765.

Cochran's objections to the Federal Register are notable because they introduced thematic arguments against public access to the law that would reappear for years to come.  First, he argued that government publication of the regulations was unnecessary because the only potential readers were industry lawyers and professionals, who could get copies of relevant regulations simply by asking legislators or agencies for copies.[21]  "[T]he attorneys in St. Louis and the business houses in St. Louis," Cochran's home district, "who are interested in Government regulations and Executive orders secure them if they need or want them."[22]

Second, Cochran argued that there were already "probably a dozen private firms in this country that supply lawyers and accountants throughout the United States with the regulations just as soon as they are printed."[23]  The government getting into the business of publishing regulations and thus competing with those private firms, in Cochran's view, was "further encroaching upon the rights of private business."[24]

Based on these two arguments—limited interest in access to regulations and preserving private publishers' profits—Cochran declared the Federal Register "a

---

[21]*See To Amend the Federal Register Act*, *supra* note 20, at 2.
[22]*See id.*
[23]*Id.*
[24]*Id.* at 4.

costly instrument to be published at the expense of the taxpayers," and thus "an absolute waste of Government funds."[25]

## C. The Federal Register Sets the Stage for Modern Administrative Law

Cochran's arguments were met with strident opposition from the Federal Register Act's proponent, Representative Emanuel Celler, backed by Griswold and others, who argued that plenty of lawyers and interested citizens "in the far reaches of the country" lacked the sort of easy access to regulations that Cochran imagined.[26] Even Harold Stevens, now sitting on the D.C. Circuit's predecessor court, recounted his "unhappy experience" arguing *Panama Refining* to support the need to publish the Federal Register.[27] The repeal bill did not pass. Within a few years, the Federal Register began to sell prolifically and even elicited letters of thanks from subscribers,[28] putting to bed Cochran's fears that publication of regulations would be a waste of taxpayer money.

Yet publishing regulations had benefits beyond what even Brandeis, Griswold, or Celler imagined. The original Federal Register Act envisioned a simple per-agency compilation of regulatory documents, but experience with publishing the

---

[25] *Id.* at 10, 7.

[26] *Id.* at 7.

[27] *Id.* at 14.

[28] *See* Nat'l Archives, *Third Annual Report of the Archivist of the United States for the Fiscal Year Ending 1937*, at 55–56 (1938), https://www.archives.gov/files/about/history/sources/reports/1937-annual-report.pdf.

Federal Register made clear that a more organized, systematic arrangement of regulations was necessary. Just a few years after the Federal Register's inaugural issue, the Code of Federal Regulations was born.[29]

More significantly, a government publication of *final* regulations created space for publication of *proposed* regulations, giving the public notice of and opportunity to comment on agency actions. The Federal Register thus laid the groundwork for the landmark statute of administrative law, the Administrative Procedure Act.[30] Public access to regulatory law through publication of the Federal Register prompted innovation in the delivery of legal information to American citizens and greater public participation in the democratic process.

## II. Electronic Distribution

As controversial and beneficial as print publication of the Federal Register was, that format is not commonly used today. Instead, people can point a computer web browser to a government website such as FederalRegister.gov, where the entire history of the official publication is available online for free. Yet easy access to regulatory law, taken for granted today, took decades to come to fruition.

---

[29] Act of June 19, 1937, ch. 369, sec. 1(a), 50 Stat. 304, 305.

[30] *See* Administrative Procedure Act, ch. 324, sec. 4(a), 60 Stat. 237, 239 (1946) ("General notice of proposed rule making shall be published in the Federal Register . . . .").

## A. Government Privatization Stymies an Online Federal Register

As early as 1975, there was interest in computerizing the Federal Register, and by 1978 the Government Printing Office had fully converted the Federal Register and Code of Federal Regulations to electronic production processes.[31] Electronic production of regulatory material opened up the possibility of electronic distribution, and as early as 1980 the annual report of the National Archives envisioned "the creation of an on-line current *CFR* database for information retrieval."[32]

Optimism about an online Federal Register, however, ran headlong into contrary administration efforts across the 1980s. The Paperwork Reduction Act of 1980 gave the Office of Management and Budget substantial authority over "agency information management practices," including "advice and guidance on the acquisition and use of automatic data processing" in agencies.[33] Although the Paperwork Reduction Act envisioned automatic data processing as a tool to

---

[31]*See* U.S. Gov't Printing Office, *Annual Report of the Public Printer, Fiscal Year 1975*, at 16 (1976), https://www.govinfo.gov/app/details/GOVPUB-GP-87aa242a22a1c9d1edc9c77ed2209bc4 (describing future plans for "automation of the composition of the Federal Register Program"); U.S. Gov't Printing Office, *Annual Report of the Public Printer, Fiscal Year 1978*, at 9–10 (1979), https://www.govinfo.gov/app/details/GOVPUB-GP-3677bb1bb9a1aadf7e794f482d785082.

[32]Nat'l Archives & Records Serv., *The National Archives & Records Service in 1980*, at 12 (1981), https://www.archives.gov/files/about/history/sources/reports/1980-annual-report.pdf.

[33]Paperwork Reduction Act of 1980, Pub. L. No. 96-511, sec. 2, § 3504(b)(5), (g)(3), 94 Stat. 2812, 2815, 2817.

"improve . . . dissemination of data in the operation of Federal programs,"[34] the

Office moved almost immediately to use its newfound powers to curtail dissemi-

nation, formulating Circular A-130 on federal information policy in 1983 and the

following years.[35]  Consistent with a larger administrative policy of curtailing

government publication of information,[36] Circular A-130 directed agencies "to

set strict conditions upon the dissemination function," including on electronic

publication.[37]

  Although Circular A-130 did not address the Federal Register specifically, the

policy stopped work on making that publication electronically available.  The

Office of the Federal Register was investigating electronic publication through

---

[34]*Id.* sec. 2, § 3504(b)(4), 94 Stat. at 2815.

[35]*See* Development of an OMB Policy Circular on Federal Information Man-
agement, 48 Fed. Reg. 40964 (Office of Mgmt. & Budget Sept. 12, 1983), https://
archives.federalregister.gov/issue_slice/1983/9/12/40963-40968.pdf#page=2.

[36]*See* Office of Mgmt. & Budget, *Report on Eliminations, Consolidations, and
Cost Reductions of Government Publications* (1983), https://catalog.hathitrust.org/
Record/011428158.

[37]Management of Federal Information Resources, 50 Fed. Reg. 10734, 10735
(Office of Mgmt. & Budget Mar. 15, 1985) (proposed policy), https://archives.
federalregister.gov/issue_slice/1985/3/15/10708-10747.pdf#page=27; *see* Manage-
ment of Federal Information Resources, 50 Fed. Reg. 52730, 52748 (Office of Mgmt.
& Budget Dec. 24, 1985) (final policy), https://archives.federalregister.gov/issue_
slice/1985/12/24/52707-52735.pdf#page=8; Advance Notice of Further Policy De-
velopment on Dissemination of Information, 54 Fed. Reg. 214, 216–17 (Office
of Mgmt. & Budget Jan. 4, 1989), https://archives.federalregister.gov/issue_slice/
1989/1/4/212-220.pdf#page=3.

1985, but the Circular's policy against electronic dissemination was "part of the reason for not proceeding with the online version."[38]

The Office of Management and Budget's primary argument against government dissemination of electronic publications was "unfair competition" with the private sector.[39] Electronic publications, it contended, were "value-added products" for the private sector, not the government, to offer.[40] Furthermore, agencies' developing software or tools to publish information electronically was "a source of inefficiency" and potentially "would not be cost-justified" in the Office's view.[41] Though it acknowledged "the obligation of the government to inform the citizenry," the Office retorted that reliance on for-profit publishers "does not translate into diminishing or limiting the flow of information from the agency to the public."[42]

---

[38]U.S. Gen. Accounting Office, *GGD-93-5*, *Federal Register: Better Electronic Technology Planning Could Improve Production and Dissemination* 32–33 (Nov. 1992), https://www.gao.gov/assets/ggd-93-5.pdf.

[39]54 Fed. Reg. at 219; *see also* 50 Fed. Reg. at 10735.

[40]54 Fed. Reg. at 217; *see also* 50 Fed. Reg. at 10736 ("[A]gencies should consider dissemination in electronic form to be service of special benefit . . . ."); 48 Fed. Reg. at 40964 ("[I]nformation is not a free good but a resource of substantial economic value . . . .").

[41]50 Fed. Reg. at 10735–36.

[42]50 Fed. Reg. at 52732, 52747; *see also* 54 Fed. Reg. at 215.

B.  **Access Proponents Force a Reversal**

Reaction to these cramped views of agencies' dissemination obligations was swift and strong.  Hundreds of comments (a large number in pre-email days), largely from librarians, academics, and members of the public, called the limitations on electronic dissemination "too negative and restrictive"[43] and "an assault on public policy principles concerning the free flow of information."[44]  A popular magazine article described how "prices have skyrocketed" for access to privatized government information.[45]  Both the Association of Research Libraries and the Government Documents Roundtable of the American Library Association denounced privatization of government information as contrary to "the traditional government information policy of open and equitable access."[46]

Even Congress turned on the policies of Circular A-130.  A House committee report from 1986 criticized government restrictions on electronic data access that

---

[43]50 Fed. Reg. at 52732.

[44]Second Advance Notice of Further Policy Development on Dissemination of Information, 54 Fed. Reg. 25554, 25556 (Office of Mgmt. & Budget June 15, 1989), https://archives.federalregister.gov/issue_slice/1989/6/15/25546-25559.pdf#page=9.

[45]Frances Seghers, *Computerizing Uncle Sam's Data: Oh, How the Public Is Paying*, Bus. Wk., Dec. 15, 1986, at 102, 102.

[46]Karlo Mustonen et al., Gov't Info. Tech. Comm., Am. Library Ass'n, *Government Information Technology and Information Dissemination: A Discussion Paper*, 16 Documents to People 13, 14 (1988); *see also* Ass'n of Research Libraries, *Technology & U.S. Government Information Policies: Catalysts for New Partnerships*, 5 Gov't Info. Q. 267, 269 (1988).

created an effective "monopoly over the dissemination of public information."[47]
Two years later, Congress's Office of Technology Assessment published an extensive study on "Federal Information Dissemination in an Electronic Age."[48] On the
Federal Register in particular, the study found that putting the publication online
"would greatly improve and enhance access," an important goal given that "[i]t
is unreasonable to expect individuals and organizations to comply with the rules
and regulations and government without timely access to the relevant details."[49]

The debate over electronic publication came to a head in early 1989. That
year, the Office of Management and Budget proposed amending Circular A-130,
explicitly requiring agencies to, "absent compelling reasons, avoid disseminating
value-added electronic information products."[50] Indeed, the proposed amendment even defined computer-searchable files to be value-added.[51]

---

[47] *See Electronic Collection and Dissemination of Information by Federal Agencies: A Policy Overview*, H.R. Rep. No. 99-560, at 7 (1986) (quoting *Legi-Tech, Inc. v. Keiper*, 766 F.2d 728, 733 (2d Cir. 1985)).

[48] *See* Office of Tech. Assessment, *OTA-CIT-396*, *Informing the Nation: Federal Information Dissemination in an Electronic Age* (Oct. 1988), https://www.govinfo.gov/app/details/GOVPUB-GP3-7f6155b4e8bf6aa111c7072600f0eb18.

[49] *See id.* at 165 (quoting contractor report).

[50] Advance Notice of Further Policy Development on Dissemination of Information, 54 Fed. Reg. 214, 219 (Office of Mgmt. & Budget Jan. 4, 1989), https://archives.federalregister.gov/issue_slice/1989/1/4/212-220.pdf#page=3.

[51] *Id.*

Overwhelming pressure from public commenters led the Office to reverse course just six months later.[52] In a remarkable expression of contrition, the Office withdrew its prior proposal, agreeing that "government information is a public asset" and that "it is the obligation of government to make such information readily available to the public on equal terms to all citizens."[53] A subsequent proposed revision to Circular A-130, released in 1992, directed agencies to "use electronic media and formats . . . to disseminate information products in order to make government information more easily accessible and useful to the public."[54]

Momentum for electronic government dissemination of legal information, though born out of the Circular A-130 debate, carried far beyond. Beginning in 1990, consumer advocate and library organizations convinced Congress to hold hearings and then to introduce a bill requiring the Government Printing Office to publish government information electronically.[55] The Office itself agreed, anticipating a new role for itself as electronic informer of the public in a visionary 1991

---

[52]*See* Second Advance Notice of Further Policy Development on Dissemination of Information, 54 Fed. Reg. 25554, 25554 (Office of Mgmt. & Budget June 15, 1989), https://archives.federalregister.gov/issue_slice/1989/6/15/25546-25559.pdf#page=9.

[53]*See id.* at 25557.

[54]Management of Federal Information Resources, 57 Fed. Reg. 18296, 18300 (Office of Mgmt. & Budget Apr. 29, 1992), https://archives.federalregister.gov/issue_slice/1992/4/29/18234-18306.pdf#page=63.

[55]*See generally* James P. Love, *A Window on the Politics of the Government Printing Office Electronic Information Access Enhancement Act of 1993*, 21 J. Gov't Info. 3 (1994).

report.[56] The resulting legislation, enacted in 1993, mandated online publication of the Congressional Record and the Federal Register.[57]

## C.  An Online Federal Register Prompts New Innovation

Online Federal Register access naturally helped researchers, libraries, and citizens read the law; it also saved the government substantial paper printing costs.[58] But the benefits went further.  Public access to online regulations created new opportunities, both public and private, to develop new technologies that would even further advance public understanding of and participation in the regulatory process.

The initial release of the online Federal Register was searchable, for example, a substantial improvement over the limited indexing of the print version.[59]  By 2001, the Government Printing Office had implemented an email list alert system to notify interested users of the daily Federal Register table of contents.[60]  A year

---

[56]*See* U.S. Gov't Printing Office, *GPO/2001: Vision for a New Millennium* 19–24, 35–39 (Dec. 1991), https://www.govinfo.gov/app/details/GOVPUB-GP3-b6524860bff4f2fd24680d7d831fa51e.

[57]Government Printing Office Electronic Information Access Enhancement Act of 1993, Pub. L. No. 103-40, sec. 2(a), § 4101(a)(2), 107 Stat. 112, 112.

[58]*See* U.S. Gov't Printing Office, *Biennial Report to Congress on the Status of GPO Access* 18 (1995), https://www.govinfo.gov/app/details/GOVPUB-GP-563d429404add2944c76d5c5a16cba8c.

[59]*Id.* at 6.

[60]U.S. Gov't Printing Office, *Biennial Report to Congress on the Status of GPO Access* 13 (2001), https://www.govinfo.gov/app/details/GOVPUB-GP-43435bd07972a52361b20497220f5ecf.

later, Congress called for creation of an electronic rulemaking program to allow citizens to file comments online.[61] Electronic access to the Federal Register made all of these advances possible.

Online publication also led to a push for standardized data formats, which would have perhaps the most recognizable recent impact on public access to regulations. Interest in publication of machine-readable regulation data arose as early as 1995, shortly after the Federal Register went online.[62] In 2009, the Office of the Federal Register began publishing the Federal Register in a machine-readable data format, as part of ongoing open-data efforts within the administration.[63] Critics decried these efforts as wasted expenditures,[64] but the proof of their value was in the pudding.[65]

---

[61] *See* E-Government Act of 2002, Pub. L. No. 107-347, sec. 206(c), 116 Stat. 2899, 2916.

[62] U.S. Gov't Printing Office, *supra* note 58, at 15.

[63] *See* Ray Mosley, *Federal Register 2.0: Opening a Window onto the Inner Workings of Government*, White House Blog (Oct. 5, 2009), https://obamawhitehouse.archives.gov/blog/2009/10/05/federal-register-20-opening-a-window-inner-workings-government; Press Release, Gary Somerset, U.S. Gov't Printing Office, *The White House, National Archives and Government Printing Office Achieve Open Government Milestone* (Oct. 5, 2009), https://www.gpo.gov/docs/default-source/news-content-pdf-files/2009/09news40.pdf.

[64] *See, e.g.,* Alon Peled, *Re-Designing Open Data 2.0*, 5 E-J. E-Democracy & Open Gov't 187, 189–92 (2013), https://jedem.org/index.php/jedem/article/download/219/180.

[65] *See also* Press Release, *National Archives Office of the Federal Register and GPO Share Open Government Success Story Re: Polar Bears* (Jan. 6, 2013), https://www.archives.gov/press/press-releases/2012-83 (noting addition of an application pro-

In 2010, a group of software developers used the Federal Register's machine-readable data to create GovPulse, an online tool that simplified browsing and searching the regulatory publication.[66] GovPulse won an award in the Sunlight Foundation's Apps for America 2 contest.[67] Just months later, it won a greater endorsement: The Office of the Federal Register brought GovPulse's developers on board to develop a new official website for the publication.[68] The resulting Federal Register 2.0 service subsequently won an award from the Administrative Committee of the United States, as a government service that "streamlines and enhances public participation in the regulatory process."[69] Online publication of the Federal Register in 1993 thus set the stage for public and private innovation that ultimately produced the modern, powerful, user-friendly Federal Register website that millions of Americans depend upon to access regulatory law today.

---

gramming interface to the Federal Register website, enabling programmers to build creative tools such as a tracker for regulations affecting polar bears).

[66] *See generally* Luigi Montanez, *How Can Software Engineers Help Make Government Better?*, XRDS (Ass'n for Computing Mach.), Winter 2011, at 23, 24, https://dl.acm.org/doi/10.1145/2043236.2043247.

[67] *See id.*; Peter Orszag, *The Ingenuity of the American People*, Off. Mgmt. & Budget (Sept. 9, 2009), https://obamawhitehouse.archives.gov/node/14893.

[68] *See* David Ferriero, *Federal Register 2.0*, White House Blog (July 26, 2010), https://obamawhitehouse.archives.gov/blog/2010/07/26/federal-register-20.

[69] Michael White, *FederalRegister.gov Wins Award for Innovation & Best Practices*, Reader Aids (Office of the Fed. Register Dec. 15, 2011), https://www.federalregister.gov/reader-aids/office-of-the-federal-register-blog/2011/12/federalregister-gov-wins-award-for-innovation-best-practices.

### III.  HISTORY INFORMS THE DISPOSITION OF THIS CASE

History over millennia has taught the importance of public access to binding law.[70] Lessons from the publication history of the Federal Register fit neatly within this context. These lessons are relevant to the present dispute over copyrights in binding technical standards incorporated into law, and they ought to inform this Court's disposition of the case.[71]

### A.  UNFETTERED ACCESS TO BINDING LAW UNDERPINS DEMOCRATIC SELF-GOVERNANCE

First, publication of the Federal Register highlights the need for citizens to have complete access to binding law. In the case of print publication, the *Panama Refining* case illustrated the basic unfairness of a regulatory agency enforcing an inaccessible, unverifiable regulation. Scholars, bar associations, and judges agreed that the government had an obligation to publish the law officially and

---

[70] *See* Brief of *Amici Curiae* 66 Library Ass'ns et al. at 2–5, *Am. Soc'y for Testing & Materials v. Pub.Res.Org*, 896 F.3d 437 (D.C. Cir. Sept. 25, 2017) (No. 17-7035, -7039) [hereinafter Brief of Library Assn's et al.] (discussing Roman law precedents); *Am. Soc'y for Testing & Materials*, 896 F.3d at 458 (Katsas, J., concurring). *See generally* Charles Duan, *Copyright in the Texts of the Law: Historical Perspectives*, 9 N.Y.U. J. Intell. Prop. & Ent. L. 191, 200–16 (2020), https://jipel.law.nyu.edu/copyright-in-the-texts-of-the-law-historical-perspectives/.

[71] There are, of course, important differences. Publishing the Federal Register required legislation, but that does not mean that opening access to mandatory technical standards requires legislation as well. The Federal Register required legislative authorization to appropriate the funds and resources for publishing it; no such appropriation of resources is needed to make the technical standards at issue available.

dependably.[72] The quick passage of the Federal Register Act thereafter reflected a widespread consensus that the government had a duty to make binding regulatory law available to the public.

The path to electronic Federal Register publication shows that access to the law should not be limited to particular means of access. Library associations and citizen advocacy groups argued that a print-only Federal Register was insufficient dissemination of the law in a coming age of online information. Government agencies responsible for publishing regulatory law agreed, both the Office of the Federal Register and the Government Printing Office. The 1993 legislation to put the Federal Register online reflected a united sense of Congress that electronic publication was of fundamental importance to democratic institutions.[73] Even the Office of Management and Budget found itself compelled to agree, in the end, that "it is the obligation of government" to publish binding regulations "on equal terms to all citizens," and to take "full advantage of all dissemination channels" to do so.[74]

---

[72]*See* J.C. Ruddy & B.S. Simmons, *The Federal Register—Forum of the Government and the People*, 32 Geo. L.J. 248, 250–52 (1944).

[73]*Government Printing Office Electronic Information Access Enhancement Act of 1993*, S. Rep. No. 103-27, at 2 (1993).

[74]Second Advance Notice of Further Policy Development on Dissemination of Information, 54 Fed. Reg. 25554, 25557 (Office of Mgmt. & Budget June 15, 1989), https://archives.federalregister.gov/issue_slice/1989/6/15/25546-25559.pdf#page=9.

Informing the public by "all dissemination channels" contrasts sharply with the Appellant standards organizations' cramped proposals for how the public should access binding standards. They argue (at 9–10) that the public is sufficiently informed of the law by the choice of costly purchase of copyrighted volumes, accessing a feature-limited and possibly privacy-invasive "reading room" website, or distant travel to an office in Washington, D.C. This argument is no different from Rep. Cochran's claim that the Federal Register was unnecessary because one could obtain copies of regulations by writing a letter to the issuing agency—a claim that the government's own lawyers disputed.[75] Limiting the media in which the law is publicly accessible excludes those of less financial means, limited political savvy, or different physical abilities from a basic element of the democratic process.[76] It is comprehensive, unfettered access to binding legal texts, not mere "good-enough" publication, that has been the lodestar of democratic governance throughout history.

---

[75] *See To Amend the Federal Register Act, supra* note 20, at 15 (statement of Harold Stephens).

[76] *See* Brief of *Amicus Curiae* Sina Bahram at 7–10, *Am. Soc'y for Testing & Materials v. Pub.Res.Org*, 896 F.3d 437 (D.C. Cir. Sept. 25, 2017) (No. 17-7035, -7039).

## B.  Private-Incentives Arguments Justifying Copyright Protection Equally Justify Not Publishing the Federal Register at All

In opposition to the democratic importance of unrestricted access to binding regulatory texts are the standards organizations' purported need for the incentive value of copyright monopoly protection.  The Appellants contend (at 5–6) that the profits from the sales of technical standards incorporated into law finance the development of those standards.  Unrestricted access to those mandatory standards, they claim (at 42), would undermine the organizations' copyright-backed monopoly control and diminish those profits.

Putting aside the accuracy of the standards organizations' logic,[77] this copyright-incentives argument is equally an argument against publishing the Federal Register at all.  By the same token, the Office of Management and Budget argued that electronic publication of government information such as the Federal Register would undermine the profits of private-sector information services that, at the time, were charging monopolistic prices for access.  So too did Rep. Cochran contend that government printing of the Federal Register would be

---

[77] *See* Brief of Library Assn's et al., *supra* note 70, at 22–24, *quoted in Am. Soc'y for Testing & Materials*, 896 F.3d at 453; *see also* Charles Duan, *Mandatory Infringement*, 75 Fla. L. Rev. (forthcoming 2023) (manuscript at 38–41), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4193947 (noting distortion of copyright incentives resulting from mandatory incorporation of standards).

"encroaching upon the rights of private business" to profit from sales of federal regulations.[78]

With the benefit of hindsight, it is unthinkable today that the United States should stop making the Federal Register available online or in print, in deference to the profit interests of private publishers. The public value of unrestricted access to binding law has categorically outweighed the private value of monopoly incentives. The standards organizations' appeal to copyright incentives should fare no better.

## C.  Access Enables Legal and Technological Innovation That Enhances Public Participation in Lawmaking

The benefits of enhancing public access to regulations have consistently exceeded expectations. Printing the Federal Register made apparent the need for an organized uniform codification system across agencies, giving rise to the Code of Federal Regulations. Print publication also set the stage for publication of and commenting on proposed rules, opening the door to public participation in the regulatory process under the Administrative Procedure Act. Online publication of the Federal Register invited online commenting on proposed regulations, and set in motion a synergistic cycle of public and private innovation that led to the advanced Federal Register 2.0 website.

---

[78] *To Amend the Federal Register Act, supra* note 20, at 4.

In the same way, the benefits of unrestricted access to mandatory technical standards will likely exceed the obvious. Already there are civic technology efforts and public-minded software developers poised to make legal information like these standards more understandable, accessible, and useful to the public.[79] Should the standards organizations be able to wield copyrights in mandatory legal texts to cut off public access, the resulting loss will be measured not just in individual citizens unable to read the law. The loss will be measured in potential technologies, innovations, and creative solutions that could have enhanced public engagement with the law and the legal system.

By limiting the dominance of commercial interests over the texts of regulations, publication of the Federal Register has made American government more democratic and participatory. Limiting the dominance of copyright monopolies over mandatory technical standards will similarly improve the public welfare.

---

[79]*See* Brief of Library Assn's et al., *supra* note 70, at 8–10.

**CONCLUSION**

For the foregoing reasons, the decision of the district court should be affirmed.

Respectfully submitted,

Dated: December 7, 2022          /s/ Charles Duan

CHARLES DUAN
    Counsel of Record
2701 Calvert Street NW, Apt. 623
Washington, DC 20008
(202) 713-5799
notices.ecf@cduan.com

Counsel for amici curiae

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the Circuit Rules. The document contains **6,101** words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using the *xelatex* typesetting system, in the font Libertinus Serif Regular.

Dated: December 7, 2022          */s/ Charles Duan*
                                  Charles Duan
                                  *Counsel for amici curiae*