**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 22-7063

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

American Society for Testing and Materials; National Fire Protection Association, Inc; American Society of Heating, Refrigerating, and Air-Conditioning Engineers, Inc.

*Appellants*,

v.

Public.Resource.Org, Inc.,

*Appellee.*

---

Appeal from the United States District Court for the
District of Columbia
Hon. Tanya S. Chutkan, Case No. 1:13-cv-1215-TSC

---

## AMICUS BRIEF OF PRIME ACCESS CONSULTING, INC. IN SUPPORT OF APPELLEE PUBLIC.RESOURCE.ORG, INC.

---

Blake E. Reid
SAMUELSON-GLUSHKO
TECHNOLOGY LAW & POLICY
CLINIC AT COLORADO LAW
Counsel for Amicus Curiae
Prime Access Consulting, Inc.
404 UCB
Boulder, CO 80309-0404
303-492-0548
blake.reid@colorado.edu

December 9, 2022

## Certificate as to Parties, Rulings Under Review, and Related Cases

### A. Parties and Amici

Except for amici Prime Access Consulting, Inc., Raymond A. Mosley and Robert C. Tapella, and American Federation of State, County and Municipal Employees, and any amici that have yet to appear before this Court, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellee Public.Resource.Org, Inc.

Pursuant to D.C. Cir. R. 26.1 and 28(a)(1)(A) and Fed. R. App. Pr. 29.1(a)(4)(A), amicus Prime Access Consulting, Inc. states that it has no parent corporations and that no publicly held corporation or other publicly held entity owns ten percent (10%) or more of amicus.

### B. Rulings Under Review.

References to the rulings at issue appear in the Brief for Appellee Public.Resource.Org, Inc.

### C. Related Cases

This case was previously before this Court in No. 17-7035, American Society for Testing, *et. al.*, v. Public.Resource.Org, Inc. Counsel is not aware of any other related cases before this Court.

# Table of Contents

**Certificate as to Parties, Rulings Under Review, and Related Cases** ...................................................................... ii

**Table of Authorities** .......................................................... v

**Statutes and Regulations** .............................................. viii

**Statement of Identity, Interest in Case, and Source of Authority to File** ................................................................... 1

**Statement of Authorship and Financial Contributions** ............... 2

**Argument** .......................................................................... 2

I.   The reading rooms that the standard setting organizations rely on are inaccessible to users with print disabilities. ......................... 5

    A.   The American National Standards Institute portal prevents users from accessing reading rooms. ........................... 6

    B.   The standards are not available in accessible formats. .............. 9

    C.   The reading rooms rely on inaccessible applications and tools. 12

II.  The reading rooms' inaccessibility is sufficiently severe that it likely violates federal disability laws. ............................. 15

    A.   The reading rooms likely are subject to Section 504 of the Rehabilitation Act. ................................................. 16

    B.   The reading rooms likely are subject to Section 508 of the Rehab Act. ............................................................. 19

    C.   The reading rooms likely are subject to Title III of the Americans with Disabilities Act. .............................. 20

    D.   The reading rooms likely violate federal disability laws. .......... 22

**Conclusion** ..................................................................... **29**

**Certificate of Compliance**.....................................................**31**

**Certificate of Service**.........................................................**32**

# Table of Authorities

## Cases

*Authors Guild v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ........................ 3

*Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12 (1st Cir. 1994) ..........................................21

*Clark v. Vilsack*, No. CV 19-394 (JEB), 2021 WL 2156500 (D.D.C. May 27, 2021) ..................................................................................19

*D'Amore v. Small Business Administration*, No. 21-CV-01505 (CRC), 21 WL 6753481 (D.D.C. Set. 16, 2021) ............................................19

*Del-Orden v. Bonobos*, No. 17 CIV. 2744 (PAE), 2017 WL 6547902 (S.D.N.Y. Dec. 20, 2017)..................................................................24

*Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999) ................21

*Fernandez v. Mattress Xperts Broward, Inc.*, No. 21-80573-CIV, 2021 WL 3931243 (S.D. Fla. Sept. 2, 2021) ............................................23

*Haynes v. Dunkin' Donuts*, 741 F. App'x 752 (11th Cir. 2018)..........21, 24

*Morgan v. Joint Admin. Bd.*, 268 F.3d 456 (7th Cir. 2001) ...................21

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196 (D. Mass. 2012) ..................................................................................20, 21

*Nat'l Fed'n of the Blind v. Target*, 452 F. Supp. 2d 946 (N.D. Cal. 2006). ....................................................................................22

*Robles v. Domino's Pizza*, 913 F.3d 898 (9th Cir. 2019)....................21, 22

*Tavarez v. Moo Organic Chocolates,* No. 21-CV-9816 (VEC), 2022 WL 3701508 (S.D.N.Y. Aug. 26, 2022) ............................................21

*Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000). ....................................................................................22

## Statutes

29 U.S.C. § 794.................................................................17

29 U.S.C. § 794d...............................................................19

42 U.S.C. § 12182.............................................................20

## Legislative Materials

124 Cong. Rec. 13,901 (1978)..............................................17

*Casey, Scott, Durbin, Duckworth Announce Department of Justice
    Commitment to Conduct Web Accessibility Report* (Nov. 21,
    2022), https://www.aging.senate.gov/press-releases/casey-scott-
    durbin-duckworth-announce-department-of-justice-
    commitment-to-conduct-web-accessibility-report ...........................24

Websites and Software Applications Accessibility Act, S. 4998, H.R.
    9021 § 2(b)(1), 117th Cong. (2022)....................................21

## Administrative Materials

Consumer Product Safety Commission, *Safety Standard for Crib
    Mattresses*, 87 Fed. Reg. 41,059 (July 11, 2022)...............................18

Consumer Product Safety Commission, *Safety Standard for Crib
    Mattresses*, 87 Fed. Reg. 8640 (Feb. 15, 2022) ...........................18, 22

Department of Justice, Section 508 Report to the President and
    Congress: Accessibility of Federal Electronic and Information
    Technology (September, 2012),
    https://archive.ada.gov/508/508_Report.htm...................................24

Federal Communications Commission, *Amend. of Part 1 of the
    Commission's Rules to Implement Section 504 of the Rehab. Act
    of 1973,* 2 FCC Rcd. 2199 (1987) .......................................17

Office of Management and Budget, Circular A-119 (revised Jan. 27, 2016), https://www.whitehouse.gov/wp-content/uploads/2020/07/revised_circular_a-119_as_of_1_22.pdf ....18

United States Access Board, Information and Communication Technology Guidelines: Revised 508 Standards and 255 Guidelines §§ E205.4 & 702.10.1 (Jan. 22, 2018), https://www.access-board.gov/ict/#E205-content............................23

## Other Materials

American Foundation for the Blind, *Screen Readers*, https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers................ 7

American National Standards Institute, *Incorporated by Reference Standards Portal*, https://ibr.ansi.org ............................................... 7

Ashley Johnson & Daniel Castro, Improving Accessibility of Federal Government Websites, Information Technology & Innovation Foundation (Jun. 3, 2021), https://itif.org/publications/2021/06/03/improving-accessibility-federal-government-websites/ ...................................................23, 27

Google, *Using reCAPTCHA V2: Accessibility*, https://support.google.com/recaptcha/answer/6175971?hl=en .......... 9

Jonathan Lazar, J. Bern Jordan, and Brian Wentz, *Incorporating Tools and Technical Guidelines into The Web Accessibility Legal Framework for ADA Title III Public Accommodations*, 68 Loy. L. Rev. 305 (2022)..................................................................................16

World Wide Web Consortium, *Web Content Accessibility Guidelines 2 Overview*, https://www.w3.org/WAI/standards-guidelines/wcag/.................................................................................. 4

## Glossary of Abbreviations

Pursuant to D.C. Cir. Handbook of Practice and Procedures

§ IX.A.8(d), amicus has avoided the use of any abbreviations other than

those that are part of common usage.

## Statutes and Regulations

Except for the provisions of the Rehabilitation Act of 1973 and the

Americans with Disabilities Act of 1990 contained in the addendum to

this brief, all applicable statutes and regulations are contained in the

addendum to the Brief for Appellee Public.Resource.Org.

### Statement of Identity, Interest in Case, and
### Source of Authority to File

Amicus Prime Access Consulting, Inc. is an organization dedicated to promulgating inclusive design and accessibility in technology, especially as it pertains to accessible websites and web content. Amicus works on fundamental problems facing disabled people, especially those who have no or low vision or any other print disability. As part of its mission, amicus aspires to safeguard the civil rights of people with disabilities under federal law. Sina Bahram, amicus's founder and previously amicus in this case before the district court and this Court, is a recognized expert in computer science and accessibility and is blind.

More specifically, amicus aims to ensure that people with print disabilities can access government laws, including standards that are incorporated by reference. Currently, standards provided via many of American National Standards Institute's virtual "reading rooms" and associated portal and documents pose substantial barriers to users with disabilities that often completely block access to the standards. Appellant standards setting organizations' arguments about the use of reading rooms as a means for broadly ensuring public access to law, if

given credence by this Court, would dangerously undermine the rights of people with print disabilities to access the law on equitable terms.

All parties have consented to the filing of this brief. Pursuant to D.C. Cir. Rule 29(d), counsel to amicus has coordinated with other amici supporting Appellee and sought to ensure that the arguments presented in the brief are novel and that a separate brief is necessary.[1]

## Statement of Authorship and Financial Contributions

No counsel for a party authored this brief in whole or in part. No party, counsel to any party, or any person other than amici curiae contributed money to fund preparation or submission of this brief.

## Argument

The Court should rule in favor of appellee Public.Resource.Org. Appellant standards setting organizations claim that they make their incorporated-by-reference standards widely available to the public.[2] However, a technical review by amicus of many of the reading rooms for

---

[1] We understand that the Brief of Amici Members of Congress will speak generally to Congress's interest in access as a constituency policy issue.

[2] As of the date the organizations filed their brief, September 16, 2022, they claimed "that there is no evidence in the record that anyone has ever been unable to access one of the standards at issue in this litigation to comply with a government regulation." Appellants' Brief at 8.

standards incorporated by reference used by the organizations—as well as the portal leading to those rooms and many of the documents they contain—revealed that they are inaccessible to users with print disabilities. *See generally* Addendum at REV-1 (providing a full technical review of the reading rooms and associated portal and documents). As this brief explains, users with print disabilities often are outright blocked from accessing the standards. *See id.*

The inaccessibility of the reading rooms and associated portal and documents has significant consequences for this Court's resolution of the fair use issues in this case—to say nothing of the broader implications of access to the law by people with disabilities. The standards setting organizations assert that the provision of standards to the public via the American National Standards Institute's portal and associated reading rooms renders Public.Resource.Org's use of the standards non-transformative and thus tilts the first fair use factor against fairness. *See* Appellants' Brief at 31–32.[3] Additionally, the organizations' expert asserted that "parties that are interested in or

---

[3] Uses that address accessibility shortcomings can tilt the first factor toward fair use regardless of whether they are transformative. *See Authors Guild v. HathiTrust*, 755 F.3d 87, 102 (2d Cir. 2014).

affected by" the organizations' standards "but who do not necessarily need a digital or hardcopy of the standards are already well-served" by the reading rooms, thereby tilting the fourth factor against fair use. Appellants' Brief at 42–43. But contrary to the standards setting organizations' claims, the reading rooms and associated portal and documents prevent people with print disabilities—a substantial portion of the public with an interest in incorporated-by-reference standards with the force of law—from accessing them.

As this brief explains, the reading rooms and associated portal and documents pose more than minor inconveniences to users seeking to view standards. The reading rooms violate basic web accessibility standards, such as the Web Content Accessibility Guidelines,[4] and consequently block the significant population of people with print disabilities from engaging fully with the law. These accessibility failures are so severe that they likely violate federal disability laws, including the Americans with Disabilities Act and Rehabilitation Act.

---

[4] The Web Content Accessibility Guidelines are part of a series of web accessibility guidelines published by the Web Accessibility Initiative of the World Wide Web Consortium. *Web Content Accessibility Guidelines 2 Overview*, https://www.w3.org/WAI/standards-guidelines/wcag/.

## I.   The reading rooms that the standard setting organizations rely on are inaccessible to users with print disabilities.

Appellant standards setting organizations contend that the reading rooms they rely on to provide access to incorporated-by-reference standards are "freely accessible." Appellants' Brief at 10. Closer examination proves otherwise.

The technical review performed by amicus, provided in full in the addendum to this brief, demonstrates that the configuration of the reading rooms and associated portal and documents severely hinders—and in some cases entirely blocks—users with print disabilities from accessing the incorporated standards. *See generally* Addendum at REV-1. This review, which amicus estimates captures only approximately 10 to 15 percent of the issues in the reading rooms, highlights that many of the hindrances that users with print disabilities attempting to review a standard typically encounter are severe.[5] Collectively, these problems

---

[5] The review categorizes issues according to a 3-level severity scale:

Severity 1: Issues that either will prevent a user from carrying out a task or can drastically decrease the effectiveness with which they are able to do so. These issues can be characterized as near-complete blocks to accessibility.

Severity 2: Issues which are likely to cause significant frustration or confusion, but in a non-blocking fashion given enough time,

with the reading rooms and associated portal and documents effectively prevent users with print disabilities from accessing incorporated-by-reference standards.

### A. The American National Standards Institute portal prevents users from accessing reading rooms.

At every step that it takes to access the standards of a given agency, there is an obstacle that either slows down users with print disabilities in both efficiency and effectiveness, or outright blocks them from meaningfully accessing the standards. Entering the American National Standards Institute portal, finding the reading room, downloading the standards and other documents, and finally reading and scrolling through the document reveals a design that is effectively unnavigable—and thus inaccessible—to a significant number of users with print disabilities.

---

experimentation, or assistance. These issues can be characterized as blocks to accessibility that may be overcome by a "power user."

Severity 3: Issues which are demonstrably problematic but will have the least noticeable impact. These issues can be characterized as general irritations and annoyances. However, an excessive presence of Severity 3 items can substantially degrade a user's experience making the circumstances similar to Severity 1.

The review details 39 items, 34 of which are Severity 1 issues and 5 of which are Severity 2 issues. The review focuses on the most egregious and persistent issues and does not detail Severity 3 issues.

Before a user can utilize a specific reading room, they must go
through the portal on the American National Standards Institute
homepage to find the relevant room for the standard they wish to
access.[6] The portal deters and discourages users with print disabilities,
particularly those who are blind or who have low-vision, from trying to
access information on the website and reach reading rooms. Addendum
at REV-2–3.

More specifically, the portal is riddled with incomplete semantic
markup, meaning that distinct sections of the portal are not marked up
in a programmatic way that would convey the information intelligibly to
a user who accesses the portal with a screen reader. *Id.*[7] As a result,
users cannot effectively scroll to important information and navigate to
the reading rooms where the standards themselves are hosted.

---

[6] American National Standards Institute, *Incorporated by Reference
Standards Portal*, https://ibr.ansi.org.
[7] A screen reader is a "software progra[m] that allow[s] blind or [low-
vision] users to read the text that is displayed on the computer screen
with a speech synthesizer or braille display" and functions as the
"interface between the computer's operating system, its applications,
and the user." American Foundation for the Blind, *Screen Readers*,
https://www.afb.org/blindness-and-low-vision/using-
technology/assistive-technology-products/screen-readers.

Missing text alternatives for logo links on the portal under the "Hosted by [the American National Standards Institute]" tab exacerbate the navigation issues. Addendum at REV-3–4. This missing information both confuses users and impedes them from acting efficiently because they are unaware that they can activate the logo links to be immediately directed to agency-specific websites and reading rooms.

Even when alternative text is provided, it often is inaccurate and irrelevant, again impeding and confusing users. For example, when a screen reader reads the alternative text for the American Institute of Steel Construction logo, it is announced as the unrelated word "publications." *Id*.

If a user somehow manages to arduously navigate from the portal to the reading room webpage where the actual standards are hosted, they must create an account to be able to enter the reading room. Addendum at REV-51. However, the registration forms required to create an account often are also inaccessible. *Id*. Some of the accessibility barriers in these forms include faulty input fields that prevent users from entering in important account information; a lack of user feedback, such as the presence of loading or refreshing animation or disclaimer text

8

when the user checks that they have "read and accept[ed]" privacy

policies; and the use of inaccessible technologies for human verification

tests (also known as Completely Automated Public Turing tests to tell

Computers and Humans Apart).[8] More specifically, users with limited

mobility who rely on assistive technology to activate links and select

content must race against the two-minute timer of the test, while users

with low and no vision either have difficulty or cannot identify the

images on the test. Addendum at REV-48.

### B.  The standards are not available in accessible formats.

If users somehow are able to navigate through the inaccessible

American National Standards Institute portal and arrive at their

reading room of interest, they are faced with several accessibility

---

[8] Accessible human verification tests have been developed and deployed
by major technology vendors to provide users with disabilities with the
opportunity to complete the test. For example, Google's version 2
human verification test is a potential accessible alternative, and the
technology and code can be utilized by anyone. Google, *Using
reCAPTCHA V2: Accessibility*,
https://support.google.com/recaptcha/answer/6175971?hl=en. The
review discovered that the reading rooms had not deployed any of these
accessible human verification tests.

9

barriers that hinder reading and interacting with the standards hosted

there. Some of the issues are the same ones occurring at the portal.[9]

Some reading rooms improperly use an element known as an

"iframe," which can impose serious accessibility barriers when not

appropriately labeled and utilized. An iframe is essentially a webpage

embedded inside another webpage. When an iframe is incorrectly

labeled, then a screen reader will not be able to identify it correctly to

the user and can utter a long, nonsensical name consisting of dozens—

sometimes hundreds—of alphanumeric characters. As a result of this

issue, along with other incorrect markup, users relying on a screen

reader to read the standards on the American Society for Testing

Materials reading room will be read back nothing at all. Addendum at

REV-20.

Even if an iframe is labeled properly, there can be additional

accessibility problems on the embedded page. On the American Society

for Testing Materials reading room, some links are mislabeled and as a

result, instead of announcing a description of the links, the screen

---

[9] See discussion *supra*, Part I.A (discussing semantic markup and
alternative text issues).

reader will instead read back the names of the previous toolbar that was used. *Id*. In other cases, the links or content within embedded iframes are simply read as "blank," robbing the reader of important information and directions about the standards. *Id*.

Many of the reading rooms have insufficient color contrast, making it difficult for users with low vision or color blindness to see and click on the numerous links in the standards documents. Addendum at REV-22. For example, the links in the Heating and Air Conditioning Association reading room are displayed with a 2.6:1 ratio that falls below the minimum 4.5:1 contrast required by the Web Content Accessibility Guidelines. *Id*. Color contrast issues also render controls and icons inaccessible in some reading rooms, such as the Air-Conditioning, Heating and Refrigeration Institute room. *Id* at REV-29.

Even when a user can identify visual or textual content, they may face barriers interacting with that content. In the case of the American Plywood Association's reading room, there is inaccessible on-hover content, meaning that additional content becomes available only when a mouse hovers over it and cannot be accessed through keyboard focus or shortcuts. Addendum at REV-43–44. Consequently, users that rely on

keyboards or speech input to navigate through a document are barred from accessing that content. *Id*.

### C. The reading rooms rely on inaccessible applications and tools.

Many of the reading rooms examined in the technical review report utilize Portable Document Format files to present important information or directions to users about standards. However, the Portable Document Format files pose several accessibility issues that hinder or block users from interacting with, using, and viewing the standards. Addendum at REV-6.

For example, to access the read-only copy of many of the standards, users must download the FileOpen plug-in and the Adobe Portable Document Format file reader. Addendum at REV-5–6. However, there are no clear instructions on how to open the standards files once downloaded. *Id*. Moreover, the downloaded standards are encumbered with digital rights management controls that prevent users with print disabilities from copying the standards from a laptop or desktop computer to a Braille notetaker or refreshable Braille device. *See id*. The controls also preclude users from using custom Portable Document Format file readers that are more accessible than Adobe Acrobat to read

the standards and from transforming the standards into more accessible formats, such as Microsoft Word or Hypertext Markup Language. *See id.*

Users with disabilities also encounter problems when attempting to open certain Portable Document Format files through the Chrome browser. Addendum at REV-6. Using Chrome sometimes results in an "Error Failed to Load PDF document" message, with no additional information on how to access the file. *Id*. This is not only extremely frustrating for users with disabilities, but also a deterrent; users that are not familiar with device settings are likely to believe that the Portable Document Format files are broken and inaccessible and may abandon trying to open the files. *Id*.

Even if a user can download and open a Portable Document Format file, they still will encounter accessibility issues with the file in the "view only" mode. For users with print disabilities, a screen reader cannot meaningfully decipher the mathematical and visual information presented in Portable Document Format files, nor navigate efficiently through what is often hundreds of pages for a single standard's body. This is because Portable Document Format files often have language in

the body or title that is set and unmovable, do not have mathematical

equations included in a way that can functionally be read by a screen

reader, do not contain text alternatives for diagrams, charts, or graphs,

or do not contain labeled tables and lists or appropriate semantic

markup throughout the document that makes it logical and efficient for

users with print disabilities to read from. Addendum at REV-7.

Consequently, the screen reader output is difficult or impossible to

comprehend.

   Moreover, the loss of semantic markup and labels—or the

mislabeling of elements in the documents—makes it onerous for users

to identify information that the standards setting organizations deem

as "essential" versus information that is "helpful" to understanding and

complying with the standards. *See* Appellants' Brief at 22. The

organizations claim that their standards contain "significant optional or

explanatory material." *Id*. However, the inaccessible distinctions

between information sets a heavy burden on users with print

disabilities to expend more time contextualizing the information that

they are reading, which may be altogether impossible.

Additionally, when users select to read a footnote or endnote, they are taken directly to the citation, with no way of returning to their original position in the document. This ineffective navigation structure embedded in the Portable Document Format files imposes a significant burden on users with print disabilities who are trying to conduct effective research but are repeatedly forced to re-find their place again in a document that could be hundreds of pages long.

Finally, users are precluded from being able to take accessibility into their own hands where the standards setting organizations have failed. Because many of the provisions of the organizations' standards are locked in as Portable Document Format files, mistakes cannot be easily remediated since they are coded into the metadata of the file. To transform the standards to an accessible format, a user would need to engage in significant semantic restoration, which may prove impossible.

## II. The reading rooms' inaccessibility is sufficiently severe that it likely violates federal disability laws.

The reading rooms and associated portal and documents are inaccessible to a degree that they likely violate federal disability laws because their structure discriminates on the basis of disability. From a legal perspective, a website must be "equally usable by people with

disabilities who rely on alternate forms of input or output, such as screen readers, alternate keyboards, captioning, voice recognition, and alternative devices or no pointing devices."[10]

The reading rooms and associated portal and documents likely are subject to Section 504 and Section 508 of the Rehabilitation Act of 1973 (the "Rehab Act") based on the government's reliance on them in rulemaking activities. The reading rooms and associated portal and documents also likely are subject to Title III of the Americans with Disabilities Act as places of public accommodation. In either case, the inaccessibility of the reading rooms and associated portal and documents rises to the level of potential federal disability law violations.

### A. The reading rooms likely are subject to Section 504 of the Rehabilitation Act.

Because the government routinely relies on the reading rooms and associated portal and documents in the course of rulemaking, the reading rooms and associated portal and documents effectively are a

---

[10] *See generally* Jonathan Lazar, J. Bern Jordan, and Brian Wentz, *Incorporating Tools and Technical Guidelines into The Web Accessibility Legal Framework for ADA Title III Public Accommodations*, 68 Loy. L. Rev. 305, 305–306 (2022).

service provided by the government. As such, the reading rooms likely trigger Section 504's anti-discrimination provisions.

Under Section 504, people with disabilities cannot "solely by reason of [their] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). Section 504 applies to both executive and independent agencies.[11]

Here, federal agencies' rulemaking activities rely explicitly on the reading rooms and associated portal and documents, and thus are

---

[11] While Section 504 refers to "program[s] or activit[ies] conducted by any Executive agency," 29 U.S.C. § 794(a), the legislative history of the Rehab Act indicates that "section 504 . . . [includes] *any* function or activity of any department or agency of the Federal Government." 124 Cong. Rec. 13,901 (1978) (remarks of Rep. Jeffords, the sponsor) (emphasis added). Agencies, including the independent Federal Communications Commission, consider Section 504 binding. *E.g.*, *Amend. of Part 1 of the Commission's Rules to Implement Section 504 of the Rehab. Act of 1973,* 2 FCC Rcd. 2199, 2199 & n.4 (1987) ("Congress intended . . . amendments [to Section 504] to apply to all federal agencies, including independent regulatory agencies like the [Federal Communications Commission]").

inextricably linked.[12] More specifically, the federal government points to the reading rooms as a free resource to find standards incorporated by reference in rulemaking activities.[13] This effectively establishes the reading rooms and associated portal and documents as an essential part of a federal government activity. Because agencies bestow on the

---

[12] Indeed, the Office of Management and Budget specifically "directs agencies to use standards developed or adopted by voluntary consensus standards bodies" consistent with federal law and executive orders. Circular A-119 at 14 (revised Jan. 27, 2016), https://www.whitehouse.gov/wp-content/uploads/2020/07/revised_circular_a-119_as_of_1_22.pdf. Where agencies repeatedly engage standards setting organizations in the incorporation-by-reference process and include the organizations' reading rooms in the final rules, the reading rooms and associated portal and documents are subject to federal laws regulating the agencies that rely on them.

[13] By way of recent example, the Consumer Product Safety Commission promulgated a final rule establishing a safety standard for crib mattresses that incorporated by reference standards published by the American Society for Testing and Materials. *Safety Standard for Crib Mattresses*, 87 Fed. Reg. 8640, 8640 (Feb. 15, 2022) (to be codified at 16 C.F.R. pt. 1241). Commission staff "regularly participate[d] in the . . . subcommittee meetings" and "actively participated" in the development of the standard. *Id.* at 8640–41. The Commission specifically addressed several concerns from commenters about concerns over the legally required availability of the standard by pointing to its availability at the Society's reading room. *Id.* at 8665, 8669. When the Society changed the uniform resource locator of the reading room, the Commission published a correction specifically to alert the public of the new location of the reading room. *Safety Standard for Crib Mattresses*, 87 Fed. Reg. 41,059, 41,060 (July 11, 2022) (to be codified at 16 C.F.R. § 1241.2).

18

reading rooms a crucial role in rulemaking, the government's use of the reading rooms is subject to Section 504's requirements.

## B. The reading rooms likely are subject to Section 508 of the Rehab Act.

Because the government relies on the reading rooms and associated portal and documents to provide information and data to the public in the course of rulemaking, the reading rooms and associated portal and documents also likely are subject to Section 508 of the Rehab Act. Section 508 requires any electronic and information technology procured by the government to allow members of the public with disabilities "seeking information or services from a Federal . . . agency to have access to and use of information and data . . . comparable to the access to and use of the information and data by such members of the public who are not individuals with disabilities."[14] 29 U.S.C. § 794d(a)(1)(A)(ii).

---

[14] Section 508 applies to executive agencies and to independent agencies. *See Clark v. Vilsack*, No. CV 19-394 (JEB), 2021 WL 2156500, at \*1 (D.D.C. May 27, 2021) (noting Section 508's application to the United States Department of Agriculture, an executive agency); *D'Amore v. Small Business Administration*, No. 21-CV-01505 (CRC), 21 WL 6753481 (D.D.C. Set. 16, 2021) (applying Section 508 to the Small Business Administration, an independent agency).

Thus, the reading rooms and associated portal and documents must be configured so disabled people and nondisabled people seeking to review an incorporated-by-reference standard have *comparable* use and access. It is not sufficient that a person with a print disability could *theoretically* access a standard.

### C.  The reading rooms likely are subject to Title III of the Americans with Disabilities Act.

Finally, the reading rooms likely are places of public accommodation subject to Title III of the Americans with Disabilities Act. Title III bars constructing a public accommodation in a way that "subjects an individual or class of individuals on the basis of a disability . . . directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity . . . to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).

The reading rooms likely are public accommodations covered by Title III under the theory, followed by some courts, that places of public accommodation need not be connected to a physical space.[15] It is

---

[15] *E.g.*, *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200 (D. Mass. 2012), applying *Carparts Distrib. Ctr., Inc. v. Auto.*

irrelevant that a website has no physical location as long as it offers a good or service to the general public.[16]

The standards setting organizations explicitly rely on the fact that reading rooms provide a service to the public. Appellants' Brief at 24 ("Plaintiffs make their [incorporated by reference] standards widely available to the public, including through free online access."). Where the organizations admit they provide a service to the public, the reading rooms are a public accommodation.

Alternatively, the reading rooms likely are public accommodations covered by Title III under the "nexus" theory followed by other courts.[17] Under the "nexus" theory, Title III covers websites where there exists "some connection between the good or service complained of and an

---

*Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994); *see also Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 459 (7th Cir. 2001)(citing *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 558 (7th Cir. 1999).; *Tavarez v. Moo Organic Chocolates,* No. 21-CV-9816 (VEC), 2022 WL 3701508, at *1 (S.D.N.Y. Aug. 26, 2022).

[16] *Netflix, Inc.*, 869 F. Supp. 2d. at 200.

[17] *E.g.*, *Robles v. Domino's Pizza*, 913 F.3d 898, 905 (9th Cir. 2019); *Haynes v. Dunkin' Donuts*, 741 F. App'x 752, 754 (11th Cir. 2018). Legislation is pending that would affirm Title III's application to websites. *See* Websites and Software Applications Accessibility Act, S. 4998, H.R. 9021 § 2(b)(1), 117th Cong. (2022).

actual physical place."[18] If a website impedes the access of people with disabilities to "the full and equal enjoyment of goods and services" offered in physical locations, the website violates Title III.[19]

Here, the purposes of the standards being available via the online reading rooms and of the standards being available in the National Archives are the same.[20] Thus, the standards setting organizations arguably establish a nexus by making standards available via the reading rooms.

### D. The reading rooms likely violate federal disability laws.

Regardless of which federal disability law is most applicable, the analysis to determine compliance is largely the same. Ultimately, the reading rooms' inaccessibility rises to the level of non-compliance with federal disability laws.

---

[18] *Domino's Pizza*, 913 F.3d at 905, *quoting Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000).

[19] *Nat'l Fed'n of the Blind v. Target*, 452 F. Supp. 2d 946, 956 (N.D. Cal. 2006).

[20] *See, e.g.*, 87 Fed. Reg. at 8640, 8664 (equating the provision of an incorporated-by-reference standard through a reading room with the availability of the standard for physical inspection at the National Archives and a federal agency facility).

Federal disability laws prohibit the kinds of deficiencies that exist in the reading rooms discussed *supra*, including improper color use, failure to use alternative text, and keyboard-only user discrimination.[21] Courts have detailed what constitutes a cognizable Section 504 claim against a website, particularly where websites are incompatible with assistive technology.[22] Section 508 is similarly restrictive,[23] and

---

[21] See discussion *supra*, part I.

[22] For example, a plaintiff's claim that a website violated Section 504 where it was incompatible with screen readers survived a motion to dismiss. *Fernandez v. Mattress Xperts Broward, Inc.,* No. 21-80573-CIV, 2021 WL 3931243, at *2 (S.D. Fla. Sept. 2, 2021). The court considered the possibility this incompatibility posed an unacceptable "intangible barrier" to a physical location. *Id.*

[23] *See e.g.*, United States Access Board, Information and Communication Technology Guidelines: Revised 508 Standards and 255 Guidelines §§ E205.4 & 702.10.1 (Jan. 22, 2018), https://www.access-board.gov/ict/#E205-content (implementing Section 508 standards and specifically incorporating version 2.0 of the Web Content Accessibility Guidelines); *see also* Ashley Johnson & Daniel Castro, Improving Accessibility of Federal Government Websites, Information Technology & Innovation Foundation (Jun. 3, 2021), https://itif.org/publications/2021/06/03/improving-accessibility-federal-government-websites/. (Low-scoring websites included "images and links that are not accurately described in their text alternatives, text alternatives that are repetitive or confusing, and images with no text alternatives," but earned points for "accurate captions on video content, the use of high-contrast colors, and a lack of flashing elements that might impact people with photosensitive seizure disorders").

routinely has been considered in government reports.[24] Title III likewise

has been construed to prohibit the kinds of deficiencies detailed above.[25]

---

[24] A 2012 Department of Justice report details requirements for Section 508 compliance. *Section 508 Report to the President and Congress: Accessibility of Federal Electronic and Information Technology* (September 2012), https://archive.ada.gov/508/508_Report.htm. For low-vision and photosensitive users, the Department of Justice requires appropriate use of color with proper contrast. *Id.* For keyboard-only users, websites using programmatic elements should provide keyboard accessibility and "a well-defined on-screen indication of the current focus that moves with keyboard navigation." *Id.* Requirements for screen reader access are the most extensive. *See id.* Websites must provide alternate text and descriptive narration for multimedia content and use proper headers, both on web pages and tables. *Id.* Additionally, programmatic elements must provide sufficient information to assistive technology. *Id.* The Department of Justice recently indicated they intend to update the report. *Casey, Scott, Durbin, Duckworth Announce Department of Justice Commitment to Conduct Web Accessibility Report* (Nov. 21, 2022), https://www.aging.senate.gov/press-releases/casey-scott-durbin-duckworth-announce-department-of-justice-commitment-to-conduct-web-accessibility-report.

[25] *Del-Orden v. Bonobos* involved a screen reader user and a defendant who ran an online retail store whose website deficiencies included alt-text for images only activated by a cursor and that, when zoomed in, had key programmatic elements not visible onscreen. No. 17 CIV. 2744 (PAE), 2017 WL 6547902, at *12 (S.D.N.Y. Dec. 20, 2017). Unlike where a disabled person could use a website with some or no accommodations, that website denied "full and equal opportunity to enjoy the services defendants provide." *Id.*; *see also Dunkin' Donuts LLC,* 741 F. App'x at 754 (Dunkin' Donuts' website incompatibility with a screen reader was sufficient to survive a motion to dismiss because "[t]he failure to make . . . services accessible to the blind can be said to exclude, deny, or otherwise treat blind people differently . . . because of the absence of auxiliary aids and services.").

Regardless of which disability laws apply, the analysis is largely the same. The reading rooms are deficient to the point of violating federal disability laws because they discriminate against blind and low vision users, keyboard-only users, and other users who require assistive technology. As discussed *supra*, the reading rooms and associated portal and documents contain numerous deficiencies that deprive users with print disabilities the level of access required under federal disability law.[26]

**Color Contrast Failures.** First, the reading rooms' failure to use proper color contrast deprives low-vision and keyboard-only users of free and equal access to the standards.[27] Improper use of color denies disabled users access that is comparable to non-disabled users. When users struggle to discern document links to navigate standards, they are denied a comparable experience to non-disabled users. Color contrast failures additionally deprive those who cannot discern links and differences in text of access to information.

---

[26] See discussion *supra*, Part I.
[27] See discussion *supra*, Part I.B.

In failing to use proper color contrast, the reading rooms and associated portal and documents exclude members of the public—the kind of exclusion Congress designed disability law to prevent. Regardless of the disability laws being applied, improper color usage unlawfully deprives users with disabilities of access. Users with disabilities cannot have full and equal enjoyment of a government service or public accommodation if they cannot actually read the information they are trying to acquire.

**Discrimination Against Keyboard-Only Users.** The reading rooms further discriminate against keyboard-only users with a structure that is functionally impossible to navigate without use of a mouse.[28] By failing to consider the accessibility requirements of all members of the public, and constructing the reading rooms in a way that directly inhibits access by keyboard-only users, the reading rooms run afoul of all three aforementioned federal disability laws.

Moreover, even if some users with print disabilities have the patience and dexterity required to navigate dense reading rooms using only a keyboard with poor focus indication, that does not absolve the

---

[28] See discussion *supra,* Part I.

26

failure of the reading rooms to comply with disability laws. Being able to access the information only with major difficulties not faced by those without disabilities still deprives members of the public of full use and enjoyment of a public service.

**Improper Alternative Text and Headings.** The failure to use alternative text and proper headings in formatting standards is fundamentally incompatible with screen readers and denies screen-reader users access.[29] As discussed *supra*, many reading rooms rely on inaccessible human verification tests with substantial alternative-text problems. Addendum at REV-10.[30] Reading rooms offer no alternatives, despite the existence of functioning alternative tests.[31] It is thus impossible for a screen-reader user to pass the test, make an account, and access the standards. Addendum at REV-10.

Alternative text problems also pervade poorly formatted Portable Document Format files in the reading rooms.[32] Deficient Portable Document Format files are wholly impossible for screen-readers to

---

[29] *See* Improving Information & Technology Foundation Report *supra* at note 23.

[30] See discussion *supra*, Part I.

[31] See discussion *supra*, note 8.

[32] See discussion *supra*, Part I.

read–what appears to be poor formatting means that whole swaths of text and complex equations are unreadable or incomprehensible. *Id*.

Standards setting organizations allege "the undisputed evidence shows that people who rely on standards can obtain them with little difficulty." Appellants' Brief at 9. But reading rooms that do not use appropriate alternative text and screen-reader compatible formatting are impossible to access. A standard cannot be accessible under disability law if some members of the public with disabilities cannot make an account to log in to the reading room, much less attempt to navigate it.

\*    \*    \*

Federal disability laws require the reading rooms and associated portal and documents to provide comparable experiences to disabled and nondisabled people alike. It is impossible to provide a comparable service that complies with federal disability law where users with print disabilities cannot access all the information in a clear, cognizable, and navigable fashion.

28

## Conclusion

In asserting that they make their standards available to "people who rely on [them]," the standards setting organizations effectively imply that they do not believe disabled people rely on their standards. Appellants' Brief at 9. The inaccessibility of the reading rooms and associated portal and documents bar disabled members of the public from accessing incorporated-by-reference standards to a degree that likely runs afoul of federal disability laws. Contrary to the standard setting organizations' contentions, the standards are not available to users with print disabilities who wish to access them online, and the organizations' fair use arguments that rely on these contentions must fail accordingly. Thus, amicus respectfully urges this Court to rule in favor of appellee Public.Resource.Org.

Respectfully submitted,

/s/Blake E. Reid

Blake E. Reid
Samuelson-Glushko Technology Law and
Policy Clinic at Colorado Law[33]

2450 Kittridge Loop Dr.
Wolf Law Building
Robert and Laura Hill Clinical Suite
404 UCB
Boulder, CO 80309–0404
303-492-0548

---

[33] Counsel thanks student attorneys Catherine Ferri, Sanam Analouei, and DaJonna Richardson for their substantial assistance in writing this brief.

## Certificate of Compliance

1.  This document complies with the type-volume limitation of Fed. R.
    App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the
    document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R.
    32(e)(1), this document contains 5,826 words.

2.  This document complies with the typeface requirements of Fed. R.
    App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.
    32(a)(6) because this document has been prepared in a
    proportionally spaced typeface using in Microsoft Word for Mac
    version 16.67 in 14-point Century Schoolbook.

/s/ Blake E. Reid

Blake E. Reid
Samuelson-Glushko Technology Law and
Policy Clinic at Colorado Law

2450 Kittridge Loop Dr.
Wolf Law Building
Robert and Laura Hill Clinical Suite
404 UCB
Boulder, CO 80309–0404
303-492-0548
blake.reid@colorado.edu

Dated: December 9, 2022

31

**Certificate of Service**

I certify that on December 9, 2022, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system. Pursuant to D.C. Cir. R. 32(d)(4), paper copies of this brief also will be filed with the Clerk of this Court via sufficiently expeditious mail within two business days.

/s/ Blake E. Reid

Blake E. Reid
Samuelson-Glushko Technology Law and
Policy Clinic at Colorado Law

2450 Kittridge Loop Dr.
Wolf Law Building
Robert and Laura Hill Clinical Suite
404 UCB
Boulder, CO 80309–0404
303-492-0548
blake.reid@colorado.edu