No. 22-7063

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

American Society for Testing and Materials; National Fire Protection Association, Inc.; American Society of Heating, Refrigerating, and Air-Conditioning Engineers, Inc.

*Appellants*,

v.

Public.Resource.Org, Inc.,

*Appellee.*

_____

Appeal from the United States District Court for the District of Columbia
Hon. Tanya S. Chutkan, Case No. 1:13-cv-1215-TSC

_____

**BRIEF OF *AMICI CURIAE* LIBRARY FUTURES INSTITUTE, EVERYLIBRARY INSTITUTE, AUTHORS' ALLIANCE, AND PUBLIC KNOWLEDGE IN SUPPORT OF APPELLEE**

Harold Feld
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC 20036
(202) 861-0020
hfeld@publicknowledge.org
*Counsel for Amici Curiae*

December 11, 2022

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amici curiae* certify as following:

A.     **Parties and Amici.** In addition to the parties, intervenors, and *amici* appearing before the district court and in this Court that are listed in the Brief for Plaintiffs-Appellants, filed September 23, 2022, and any amicus briefs filed prior to this one, the following *amici curiae* appear via this brief: Library Futures Institute, EveryLibrary Institute, Authors' Alliance, Public Knowledge.

B.     **Rulings Under Review.**  References to the rulings at issue appear in the Brief for Plaintiffs-Appellants filed September 23, 2022.

C.     **Related Cases**. This case was previously before this Court in No. 17-7035. To the knowledge of counsel, other than any cases listed in the Brief for Plaintiffs-Appellants filed September 23, 2022, there are no other related cases currently pending in this Court or in any other court.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Circuit Rule 26.1, *amici curiae* state that they do not have parent corporations and no publicly-held corporation owns a 10% or greater ownership interest in *amici curiae*. *Amici* are non-profit organizations and their general purpose is to represent librarians, authors, researchers, and the public interest.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………..…………………………….iv

INTERESTS OF *AMICI CURIAE*……………..……………………………...1

SUMMARY OF ARGUMENT ……………………..…………………………..4

ARGUMENT…………………………………..…………………………………...6

  I.   Principles of Due Process and the Rule of Law Require Meaningful Public Access To Official Versions of "The Law"…..…………………………….6

  II.  The Expansive Control That Copyright Owners Wield Is Incompatible With the Due Process Interests of the Public in Unrestricted Access To and Use of the Law………………………………………….……………….……….9

  III.  Granting Exclusive Rights in the Standards Incorporated by Law Does Not Serve the Purposes of Copyright...……………………...……..……….....14

CONCLUSION…………………………………….…………………………..18

CERTIFICATE OF COMPLIANCE…………………….…………………….19

CERTIFICATE OF SERVICE……..……………………….……………………20

## TABLE OF AUTHORITIES

**Cases**

*Banks v. Manchester*, 128 U.S. 244 (1888)……………………..……………15, 16

*Bldg. Officials & Code Adm. v. Code Tech., Inc*.,
628 F.2d 730 (1st Cir. 1980)……………………………..……………………6, 13

*Callaghan v. Myers*, 128 U.S. 617 (1888)………………..………………………15

*CompuServe, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir. 1996)..………………….10

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975)…………..……………………7

*Davidson v. Wheelock*, 27 F. 61 (C.C.D. Minn. 1866) …………….………..……15

*Georgia v. Public.Resource.Org*, 140 S. Ct. 1498, 1507 (2020)……..…………....1

*Fox Film Corp. v. Doyal,* 286 U.S. 123 (1932) …………………………………..10

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985)………………………………………………………....9, 14

*Hill v. Gateway 2000, Inc.,* 105 F.3d 1147 (7th Cir. 1997) ………………………10

*Howell v. Miller*, 91 F. 129 (6th Cir. 1898) …………………….……………..15

*Nash v. Lathrop*, 6 N.E. 559 (Mass. 1886)………………………..……………6, 15

*Stewart v. Abend*, 495 U.S. 207 (1990) …………………………..………………9

*Texaco, Inc. v. Short*, 454 U.S. 516 (1982)…………………….………………..8

*Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834)..…………………………………15

**Statutes**

U.S. Const. art. I, § 8, cl. 8……………………..…………………………………...14

17 U.S.C. §101 (2019)………………….…………………………………………..15

17 U.S.C. § 106 (2019)…………………..…………………………………………..9

17 U.S.C. §105 (2019) ………………………...…………………………………..15

Mass. Gen. Laws, ch. 78 § 7……………………………………………………12

N.C. Gen. Stat § 125-19 (2022) …………………………………………………..12

Miss. Code Ann. § 39-3-365………………………………………...……………...12

**Other Authorities**

Anne Klinefelter, *Reader Privacy in Digital Library Collaborations: Signs of Commitment, Opportunities for Improvement*, 13 I/S: A Journal of Law and Policy for the Information Society 199 (2016) ……………..……….…13

Craig Joyce, *A Curious Chapter in the History of Judicature: Wheaton v. Peters and the Rest of the Story (of Copyright in the New Republic)*, 42 Hous. L. Rev. 325, 351 (2005)…………………………………...……………..…16

Craig A. Joyce, *The Rise of the Supreme Court Reporter: An Institutional Perspective on Marshall Court Ascendency*, 83 Mich. L. Rev. 1291, 1364-1385 (1985)…………………………………………...………………15

*Create Account,* ASTM Int'l, https://www.astm.org/customer/account/create (last visited Dec. 11, 2022)...………………………………………………11

*How We Collect and Use Personal Data*, ASTM Int'l, https://www.astm.org/privacy-policy#collecting-personal-data (last visited Dec. 11, 2022)……………………………………………...………...11

*Law Libraries and Access to Justice*, American Association of Law Libraries (July 2014), https://www.aallnet.org/wp-

content/uploads/2018/01/AccessToJusticeSpecialCommittee2014LawLibrari
esAndAccessToJustice.pdf………...…………………………………......4, 8

*Letter from James Madison to W.T. Barry*, 9 Writings of James Madison*,* 103
(Aug. 4, 1822), (G. Hunt ed. 1910) ……………………………………………5

*Privacy*, Am. Libr. Ass'n,
https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/privacy#
(last modified Apr. 2017)……………………………………………………9

*Privacy Policy*, ASTM Int'l, https://www.astm.org/privacy-policy (last visited
Dec. 11, 2022)…………….…………………………………………………..8

*Reading Room*, ASTM Int'l, https://www.astm.org/products-services/reading-
room.html (last visited Dec. 11, 2022) …………..………………………8

Roscoe Pound, *Theories of the Law*, 22 Yale L.J. 114, 117 (1912) …….………..4

Ryan Metheny, *Improving Lives by Building Social Capital: A New Way to Frame
the Work of Law Libraries*, 109 Law Libr. J. 631 (2017)..............................2

## INTERESTS OF *AMICI CURIAE*

Pursuant to Federal Rule of Appellate Procedure 29(a), *amici curiae* respectfully submit this brief in support of appellees Public.Resource.Org. This brief is submitted with consent by the parties.[1]

*Amici curiae* are organizations that represent librarians, researchers and the public. These *amici* share a common view that open, equitable, and effective access to legal information is a fundamental right, superior to copyright. We also share the lived experience of knowing that access to official published law can be rendered meaningless if it is secured in private ownership via copyright, thereby limiting access and use of the work from the public. We ask the Court to affirm the District Court, in accord with centuries of precedent establishing that "no one can own the law" and "all should have free access to its contents." *Georgia v. Public.Resource.Org*, 140 S. Ct. 1498, 1507 (2020).

The EveryLibrary Institute ("ELI") is a public policy and tax policy research and training organization focusing on issues affecting the future of public, academic, and school libraries and the profession of librarianship in the United States and abroad. Its areas of interest include funding, copyright, ownership, the structure and governance of libraries, and the impact of library work on society.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no counsel for any party authored this brief in whole or in part, and no party or counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief.

Library Futures Institute ("LFI") is a grassroots non-profit organization representing a growing coalition of stakeholders, united behind our mission to empower libraries, archives, and other cultural institutions to engage with and stand up for their digital rights.

Authors Alliance is a nonprofit organization with a mission to advance the interests of authors who want to serve the public good by sharing their creations broadly. Authors Alliance has more than 2,300 members, including researchers, investigative journalists, historians, and legal scholars. Many of our members are independent authors with no formal university affiliation or funding source through which they can obtain expensive, licensed legal resources. These authors rely heavily on libraries and archives to access the law for the purposes of research that results in articles, books and other materials that will aid in the public's understanding of law and policy.

Public Knowledge is a non-profit public interest organization that defends the rights of internet users, as well as libraries, archives, and cultural institutions, including their ability to freely access the law and other public materials. Public Knowledge promotes balanced intellectual property policies that promote the public interest by ensuring that the rights granted to authors and other creators are balanced with the public's need to access information.

Based on *amici*'s broad knowledge and expertise in the library world, *amici* are able to provide information that is important to the Court's consideration of how this litigation will affect the ability of libraries to continue to provide open, non-discriminatory access to books and reading materials for their readers. *Amici* rely on unrestricted access to the text of the official law to give effect to our collective missions of facilitating equal and equitable access to legal information, serving legal professionals as well as the general public, who both govern and are governed through the law. *See* Ryan Metheny, *Improving Lives by Building Social Capital: A New Way to Frame the Work of Law Libraries*, 109 Law Libr. J. 631 (2017). For this mission, we rely on full access and reuse of official legal texts for purposes such as conducting and supporting legal research and scholarship, teaching legal research, preserving critical legal materials, providing access to the public, and preserving legal materials for future study.

While legal professionals and the public rely on unrestricted access to the law in order to fulfill their legal obligations and participate in democratic self-rule, the library *amici* on this brief have a special and vital need for open, unencumbered access to the official copies of the law in order to fulfill their mission. Claims of copyright asserted over legal information inhibits our ability to bridge the gap for many who need meaningful access to the law by imposing artificial cost and use restrictions. Copyright can be wielded to control basic library services such as

reproducing copies for users, or public distribution or public display of official copies of the law online for remote access. In the face of such restrictions, notwithstanding the best efforts of libraries and other cultural institutions, our ability to meet the needs of the public is compromised.

As part of our mandate, the library *amici* also note that the number of *pro se* patrons interacting with the legal system continues to grow rapidly. For many of these *pro se* litigants, who generally do not have any legal aid available to them, any additional financial restriction is extremely burdensome, including fees to view official law publications levied by commercial publishers. For example, law libraries around the United States are reporting that the number of these *pro se* litigants requiring access to legal texts is increasing. *See Law Libraries and Access to Justice*, American Association of Law Libraries (July 2014), https://www.aallnet.org/wp-content/uploads/2018/01/AccessToJusticeSpecialCommittee2014LawLibrariesAnd AccessToJustice.pdf. Those *pro se* patrons do not have an organization to represent them before the court, but given their heavy reliance on law libraries for access to the law, we present views that we believe are also representative of their needs.

## SUMMARY OF ARGUMENT

Due process and the rule of law require that the public has meaningful access to "the law." Every major modern society since the Greeks has recognized the importance of this principle. Roscoe Pound, *Theories of the Law*, 22 Yale L.J. 114,

117 (1912). This access is not limited to particular publications, but depends on the official legal status imbued on particular texts by law-making authorities. The method through which a law-making body makes such a designation–whether by crafting the text itself, reproducing the text of the law from other sources for republication in an official code book, or incorporating by reference pre-existing standards into the law–makes no difference for the public who are bound by the law. Adopting a rule that provides for significantly less access to certain parts of the law merely because of the method of enactment would trivialize the due process rights of the public, and would severely inhibit the rights of libraries and the researchers who rely on them to access and understand the law.

The main objective of this brief is to argue that when a law-making body incorporates a standard by reference into legally-binding rule or regulation, the contents of the whole of that publication must be freely and fully accessible by the public. A private organization should not be permitted to assert the broad and powerful coercive rights granted by copyright to prevent the free reuse of that standard. Granting copyright protection over these legal materials would harm librarians and by extension researchers and the public. Further, there is little evidence that affording such protection furthers the purposes of copyright or that standard-making is enhanced by the incentive structure that copyright law provides.

Accordingly, this Court should affirm the decision of the district court in its finding of fair use in favor of the appellee.

## ARGUMENT

### I.   Principles of Due Process and the Rule of Law Require Meaningful Public Access to Official Versions of "The Law"

The U.S. Constitution demands that the public have notice of and access to the law.  "Every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes or the decisions and opinions of the justices." *Nash v. Lathrop*, 6 N.E. 559, 560 (Mass. 1886). Despite it needing "no argument," courts have expounded on this principle as a basic requirement of due process in numerous cases.

Due process requires people to have notice of what the law requires of them so that they may obey it and avoid its sanctions. So long as the law is generally available for the public to examine, then everyone may be considered to have constructive notice of it; any failure to gain actual notice results from simple lack of diligence. But if access to the law is limited, then the people will or may be unable to learn of its requirements and may be thereby deprived of the notice to which due process entitles them. *Bldg. Officials & Code Adm. v. Code Tech., Inc*., 628 F.2d 730, 734 (1st Cir. 1980).

The U.S. Supreme Court has also held in a number of cases, particularly with regard to judicial proceedings, but also in other contexts, that the public has certain rights to access and use other legal documents and related government publications as well. *See Georgia v. Public.Resource.Org, Inc.,* 140 S. Ct. 1498, 1507 (2020). If it is true that such public rights extend to other such *non-binding* pronouncements, it should certainly be true for the public's right to use legally-binding standards that law-making bodies have incorporated by reference into the law.

This tradition has a long history rooted in the idea of democratic government. *See Letter from James Madison to W.T. Barry*, 9 Writings of James Madison, 103 (Aug. 4, 1822), (G. Hunt ed. 1910) ("A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both."). The basic principle of access is driven by the idea that citizens have a right to interact freely with the output of their government in order to properly govern themselves. For example, "[t]he freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government, the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." C*ox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975).

7

While records such as court documents and other non-binding legal materials must be freely publishable and accessible without threat of liability, the need is even stronger for the public to access legal publications that are made official by their incorporation by reference into law. For libraries, for example, copyright over these official publications raises the prospect of liability for everything from everyday uses such as providing individual copies for building inspectors, fire chiefs, and lawyers, to emerging uses such as digital access through online library portals that allow libraries to bring the text of the law to many more users who are homebound, disabled, or without resources to travel to a physical library. While public libraries, law libraries, and other specialized libraries have long served a variety of constituencies, their mission has recently emphasized a focus on those historically excluded from access to justice. *Law Libraries and Access to Justice*, American Association of Law Libraries (July 2014), https://www.aallnet.org/wp-content/uploads/2018/01/AccessToJusticeSpecialCommittee2014LawLibrariesAnd AccessToJustice.pdf.

In this case, appellant seeks to impose copyright restrictions on documents incorporated by reference into law. The constitutional bar for adequate access to the law is not high—legislatures must do "nothing more than enact and publish the law," *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)—and so towns, cities, states, and the federal government are free to adopt a variety of ways to communicate the law's

requirements. Indeed, many towns, cities, and states differ significantly in their approach to legal publications, codifications, and the weight and authority they vest with different types of materials. However, when towns, cities, states make a choice to imbue a particular publication with special "official" status by incorporating a standard into law, it should not also be permitted to allow private organizations to threaten its citizens and other members of the public with serious legal liability when they freely reuse that publication.

## II. The Expansive Control that Copyright Owners Wield Is Incompatible With the Due Process Interests of the Public in Unrestricted Access to and Use of the Law.

The Copyright Act grants holders of rights broad, exclusive rights to control reuse of their works. 17 U.S.C. § 106 (2019). Sometimes referred to as a "limited monopoly," *Stewart v. Abend*, 495 U.S. 207, 229 (1990), those rights include the right of copyright owners to control how and when the works they own are made available to the world. Copyright owners, for example, have the exclusive right to determine when or even if to publish a work. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ("The right of first publication encompasses not only the choice whether to publish at all, but also the choices of when, where, and in what form first to publish a work"). Further, this Court has stated, "[t]he owner of the copyright, if he pleases, may refrain from vending or

9

licensing the content himself with simply exercising the right to exclude others from using his property." *Fox Film Corp. v. Doyal,* 286 U.S. 123, 127 (1932).

Copyright owners may also leverage their exclusive rights to impose significant restrictions on who may have access, when, for how much, and under what circumstances through licensing restrictions. Courts have held, for example, that owners of copyrightable websites or software may impose terms on access such as mandatory arbitration, *Hill v. Gateway 2000, Inc.,* 105 F.3d 1147 (7th Cir. 1997), and choice of forum, *CompuServe, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir. 1996).

ASTM and other appellants are quick to highlight that members of the public have free access to the standards via their online reading rooms, which they suggest obviates the need for alternative, unrestricted access, such as through Public Resource or others. But ASTM's reading room access is far from free for users, and actually illustrates the ways in which it is inconsistent with due process to grant ASTM such strong exclusive rights which would allow ASTM to dictate significant restrictions on users. For example, ASTM's reading room requires users to register, disclosing their name and private email address. *Reading Room*, ASTM Int'l, https://www.astm.org/products-services/reading-room.html (last visited Dec. 11, 2022). ASTM also requires users to agree to a nearly 1000-word contract in order obtain access, including terms under which users must agree to indemnify ASTM, must agree to not reproduce the text of the standards, including prohibiting simple

10

"cut and paste" activity, as well as prohibiting "transmit[ting] the content of the ASTM Document in any form." *Create Account,* ASTM Int'l, https://www.astm.org/customer/account/create (last visited Dec. 11, 2022). Users must also consent to resolve any disputes with ASTM in Pennsylvania–a distant forum for many users–and resolve any disputes subject to the laws of Pennsylvania. *Id*.

By attempting to limit access to its standards only through its website, ASTM also requires users to agree to its voluminous, multi-part privacy policy. *Privacy Policy*, ASTM Int'l, https://www.astm.org/privacy-policy (last visited Dec. 11, 2022). Among other things, users on the ASTM site must agree to ASTM's collection and reuse of detailed information about the user's research—including "the Internet Protocol Address (IP Address) of the machine that accessed our websites; [t]he date of the visit; [t]he time of the visit; [t]he path taken through [ASTM] websites; [t]he browser being used; [a] list of files downloaded or viewed; and [a]ny errors encountered." *How We Collect and Use Personal Data*, ASTM Int'l, https://www.astm.org/privacy-policy#collecting-personal-data (last visited Dec. 11, 2022). ASTM then asserts that it may freely share personal information and usage data with "suppliers and vendors" including for a wide variety of services such as "fulfillment, payment processing, web services, data analytics, and marketing." *Id.*

With the backing of the incredibly strong bundle of exclusive rights that copyright law provides, ASTM is able to impose these restrictions on users with the knowledge that those users have no choice but to agree, given that they have no alternative pathways through Public Resource, or through libraries. ASTM's exercise of these rights and its version of free access stands in stark contrast to the protected and careful means through which libraries provide access to researchers and other users of legal information.

Libraries do not demand disclosure of private information in order to access research materials. Libraries do not insist that users contractually agree to indemnify them, or resolve disputes in a foreign jurisdiction. And most importantly, libraries do not invade their patrons' privacy. In 48 states, those privacy values are backed up with legislation: for example, providing that information about user behavior is specifically excepted from public records laws, Mass. Gen. Laws, ch. 78 § 7 (2022); that any "information, or services, or as otherwise having used the library," are, N.C. Gen. Stat § 125-19 (2022); and providing that even the user's identity be kept confidential, Miss. Code Ann. § 39-3-365 (2022).

The American Library Association, which identifies privacy as a "core value," explains why such rights are core to its Bill of Rights: lack of privacy and confidentiality has a chilling effect on users' selection, access to, and use of library resources.    *Privacy*,    Am.    Libr.    Ass'n,

https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/privacy#   (last modified Apr. 2017). The purpose of these protections is not for the good of the library, but for the good of researchers so that they can exercise their right to read and learn about the law–in all forms, including through standards like those at issue in this case—without fear of retribution or censorship. Unlike most other means of online access to legal publications, which are laden with tools that invade researchers' privacy, libraries have continued their strong commitment to researchers' privacy rights online, particularly when libraries have been able to assemble and share content through their own digital repositories. *See* Anne Klinefelter, *Reader Privacy in Digital Library Collaborations: Signs of Commitment, Opportunities for Improvement*, 13 I/S: A Journal of Law and Policy for the Information Society 199 (2016).

Were ASTM to prevail, libraries would be unable to provide any of these types of privacy protections for researchers. Because copyright grants such strong exclusive rights, the sole remaining means of access would be through a provider such as ASTM that is able to arbitrarily dictate restrictions on when, where, and how such material can be used without regard to public interests.  "We cannot see how this aspect of copyright protection can be squared with the right of the public to know the law to which it is subject." *Bldg. Officials & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 735 (1st Cir. 1980).

### III.     Granting Exclusive Rights in the Standards Incorporated by Law Does Not Serve the Purposes of Copyright

The Copyright Act ultimately aims to achieve the Constitutional goal to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art 1, cl. 8, sec. 8. "The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'" *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 558 (1985) (quoting *Mazer v. Stein*, 347 U.S. 201, 219 (1954)).

But in this case, the incentive structure that the copyright is built on is entirely unnecessary. As a matter of due process, towns, cities, states, and the federal government must publish their laws. No additional incentive is needed because the Constitution demands it. While towns, cities, states, and the federal government are free to choose from a variety of ways to do that, whatever the method chosen, these government organizations must follow through on their obligation.

Second, and more specifically to the arguments of Appellants and some of its *amici*, the copyright incentives for publishing law are not nearly as significant as are claimed. A brief review of legal publishing bears this out. Beginning with common law cases in the early nineteenth century, courts began to recognize that applying

copyright protection to primary law was harmful to the public interest. *See, e.g.*, *Callaghan v. Myers*, 128 U.S. 617, 645-47 (1888); *Banks v. Manchester*, 128 U.S. 244, 253-54 (1888); *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 668 (1834); *Howell v. Miller*, 91 F. 129, 138 (6th Cir. 1898); *Davidson v. Wheelock*, 27 F. 61, 62 (C.C.D. Minn. 1866); *Nash v. Lathrop*, 6 N.E. 559, 562-63 (Mass. 1886)). Later, the federal government codified these decisions into the U.S. Code, barring copyright protection for U.S. government works, including any official laws. *See* 17 U.S.C. §101, §105 (2019).

In *Wheaton v. Peters*, 33 U.S. 591 (1834), the Supreme Court resolved a dispute between the first and second official Supreme Court reporters. *See Act of Mar. 3, 1817, ch. 63, 3 Stat. 376* (providing for an official reporter). Henry Wheaton, the first reporter, published reports containing the text of Justices' opinions and, additionally, his own unique annotations, including statements of the cases' facts, procedural histories, and abstracts of the Supreme Court's decisions. *Wheaton*, 33 U.S. at 617. After Wheaton, the second official reporter, Richard Peters, created his own summaries of the Supreme Court's prior decisions. In doing so, Peters used some parts of Wheaton's annotations. *See* Craig A. Joyce, *The Rise of the Supreme Court Reporter: An Institutional Perspective on Marshall Court Ascendency*, 83 Mich. L. Rev. 1291, 1364-1385 (1985). Wheaton sued Peters for copyright infringement. The Court's decision stated that "no reporter has or can have any

copyright in the written opinions delivered by this court." *Wheaton*, 33 U.S. at 668. *See also* Craig Joyce, *A Curious Chapter in the History of Judicature: Wheaton v. Peters and the Rest of the Story (of Copyright in the New Republic)*, 42 Hous. L. Rev. 325, 351 (2005).

Later, *Banks v. Manchester*, 128 U.S. 244 (1888) expanded the holding from *Wheaton*, denying copyright protection for state judicial opinions. The materials at issue in *Banks*, the Ohio court's opinions and its statements of the case and syllabuses, were "exclusively the work of the judges," and were "not… author[ed]" by the court's official reporter. *Id*. at 251. Therefore, applying the "public policy" announced in *Wheaton* (that "no copyright could ... be secured in the products of the labor done by judicial officers in the discharge of their judicial duties") the Court held that the copying of the judge-created materials did not provide grounds for an infringement claim. *See id*. at 253-254. The "work done by the judges . . . is free for publication to all" because it "constitutes the authentic exposition and interpretation of the law, which[] bind[s] every citizen." *Id*. at 253.

In many other states the creation of research aids has proliferated as well in the absence of exclusive control over the official text. For many states, commercial publishers have found the market lucrative enough to publish their own unofficial versions of the code, complete with annotations. *E.g., compare* West's North

Carolina Code Annotated (West) *with* North Carolina General Statutes (the official Lexis publication).

The point of all this is not to say that ASTM must follow a particular business model to support its work, but to highlight that there is a long history of many viable financial models for creating and publishing the law that do not rely on depriving the public access and use of its text. It is unnecessary and the purposes of copyright are not served, nor are the interests of the public, when ASTM's standards are so merged with the law that they are essentially government edicts, but are locked behind ASTM's private platform. In this case, the legally coercive power that copyright grants interferes with the public's interest in reading, communicating, and analyzing the law. By restricting access to standards that have been incorporated into law, researchers and the public are deprived of the opportunity to not only access, but also meaningfully use and share incorporated standards, which is necessary to prompt further innovation—the key purpose of copyright.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Harold Feld

Harold Feld
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC 20036
(202) 861-0020
hfeld@publicknowledge.org
*Counsel for Amici Curiae*

December 12, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word-processing system used to prepare this brief, there are 4,034 words in the brief excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14 point font.

December 12, 2022                                                    /s/ Harold Feld
                                                                              Harold Feld

## CERTIFICATE OF SERVICE

I certify that, on December 12, 2022, this notice was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Harold Feld

Harold Feld
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC 20036
(202) 861-0020
hfeld@publicknowledge.org
*Counsel for Amici Curiae*