NOT YET SCHEDULED FOR ORAL ARGUMENT

**Appeal No. 22-7063**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

American Society for Testing and Materials; National Fire Protection
Association, Inc.; American Society of Heating, Refrigerating, and Air-
Conditioning Engineers, Inc.,

*Appellants*,

---v.---

Public.Resource.Org, Inc.,

*Appellee.*

---

Appeal from the United States District Court for the District of Columbia
Hon. Tanya S. Chutkan, Case No. 1:13-cv-1215-TSC

---

**BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND 11 MEDIA ORGANIZATIONS IN
SUPPORT OF APPELLEE SEEKING AFFIRMANCE**

---

*Counsel listed on the following page*

Gabriel Rottman
Lin Weeks*
Ian Kalish*
UNIVERSITY OF VIRGINIA SCHOOL
    OF LAW FIRST AMENDMENT
    CLINIC
580 Massie Road
Charlottesville, VA 22903
(202) 795-9316
*Of counsel

Bruce D. Brown
    *Counsel of Record*
Katie Townsend
Shannon A. Jankowski*
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
bruce.brown@rcfp.org
*Of counsel

Gautam Hans*
CORNELL LAW SCHOOL FIRST
AMENDMENT CLINIC
243 Hughes Hall
Ithaca, NY 14853
(607) 254-5994
gshans@cornell.edu
*Of counsel

*Counsel for Amici Curiae*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>
## <u>PURSUANT TO CIRCUIT RULE 28(a)(1)</u>

Pursuant to Circuit Rule 28(a)(1), amici curiae certify as following:

    A.    <u>Parties and Amici</u>.

In addition to the parties, intervenors, and amici appearing before the district court and in this court that are listed in the Appellee's brief, and any amicus briefs filed prior to this one, the following amici curiae appear via this brief:

The Reporters Committee for Freedom of the Press

American Society of Magazine Editors

The Atlantic Monthly Group LLC

Freedom of the Press Foundation

Investigative Reporting Workshop at American University

The Media Institute

National Press Photographers Association

The News Leaders Association

Pro Publica, Inc.

Radio Television Digital News Association

Society of Environmental Journalists

Tully Center for Free Speech

    B.    <u>Rulings</u>.

References to the rulings at issue appear in the Appellee's brief.

i

C.    <u>Related Cases</u>.

This case was previously before this Court in No. 17-7035.  To the knowledge of counsel there are no other related cases currently pending in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, amici certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The American Society of Magazine Editors is a trade association with no parent corporation and no stock.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc.  No publicly held corporation owns 10% or more of its stock.

Freedom of the Press Foundation does not have a parent corporation, and no publicly held corporation owns 10% or more of the stock of the organization.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization based at the American University School of Communication in Washington. It issues no stock.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The News Leaders Association has no parent corporation and does not issue any stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

## RULE 29(a)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than amici, its members, or counsel—contributed money that was intended to fund preparing or submitting the brief.

## CERTIFICATE REGARDING SEPARATE BRIEFING

Pursuant to Circuit Rule 29(d), amici certify that this brief is necessary to provide the perspective of media organizations and journalists. Amici have a strong interest in ensuring that the press is able to access materials relevant to its reporting—including the full text of standards that carry the weight of law.

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................................... iii

RULE 29(a)(4)(E) CERTIFICATION .................................................... v

CERTIFICATE REGARDING SEPARATE BRIEFING ....................................... v

TABLE OF CONTENTS ........................................................................ vi

TABLE OF AUTHORITIES ................................................................. viii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE ......... 1

SUMMARY OF ARGUMENT .............................................................. 3

ARGUMENT ...................................................................................... 5

I.      By compiling and publishing incorporated standards free of charge,
        Public Resource has empowered the press and the public to fulfill the
        important function of scrutinizing and disseminating the law. ..................... 5

II.     A decision that deprives the press and public the opportunity to freely
        access and review incorporated standards will harm the public interest
        and is inconsistent with the other legal protections for robust access to
        similar materials. ....................................................................... 11

        A.      The First Amendment establishes a right of access by the press
                and public to a wide variety of governmental activities, and the
                incorporated text of privately drafted standards should be freely
                accessible for similar reasons................................................12

        B.      Allowing members of the press and public to freely access
                standards incorporated by reference fulfills the legislative goal
                of transparency embodied in the Administrative Procedure Act. .......17

        C.      The rationale underpinning the government edicts doctrine
                likewise applies to the materials at issue in this case.........................20

CONCLUSION ............................................................................ 22

APPENDIX A ............................................................................. 24

CERTIFICATE OF COMPLIANCE ..................................................... 29

CERTIFICATE OF SERVICE ............................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
  896 F.3d 437 (D.C. Cir. 2018)..................................................... 21

*Appalachian Power Co. v. Train*,
  566 F.2d 451 (4th Cir. 1977) ................................................ 17, 18

*Banks v. Manchester*,
  128 U.S. 244 (1888) ................................................................. 21

*Detroit Free Press v. Ashcroft*,
  303 F.3d 681 (6th Cir. 2002) ................................................... 15

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) ................................................................... 12

*Georgia v. Public.Resource.Org, Inc.*,
  140 S. Ct. 1498 (2020) ..................................... 3, 6, 7, 11, 17, 20, 21

*Harper & Row Publishers v. Nation Enterprises*,
  471 U.S. 539 (1985) ................................................................. 11

*In re Continental Ill. Secs. Litig.*,
  732 F.2d 1302 (7th Cir. 1984) ................................................. 14

*In re Iowa Freedom of Info. Council*,
  724 F.2d 658 (8th Cir.1983) .................................................... 14

*Mills v. Alabama*,
  384 U.S. 214 (1966) ................................................................... 5

*N.Y.C.L.U. v. N.Y. City Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012) .................................................... 14

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) ................................................................. 15

*Newman v. Graddick*,
  696 F.2d 796 (11th Cir.1983) .................................................. 14

*Press-Enterprise Co. v. Superior Court*,
    464 U.S. 501 (1984) ................................................................... 16

*Press-Enterprise Co. v. Superior Court*,
    478 U.S. 1 (1986) ....................................................................... 16

*Publicker Indus., Inc. v. Cohen*,
    733 F.2d 1059 (3d Cir.1984) ..................................................... 14

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ....................................................... 13, 15, 16

*Rushford v. New Yorker Magazine, Inc.*,
    846 F.2d 249 (4th Cir.1988) ..................................................... 14

*Saxbe v. Wash. Post. Co.*,
    417 U.S. 843 (1974) ............................................................. 5, 13

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ........................................................... 11, 12

*United States v. Grimaud*,
    220 U.S. 506 (1911) ................................................................... 16

*Wheaton v. Peters*,
    33 U.S. 591 (1834) ............................................................. 20, 21

*Whitney v. California*,
    274 U.S. 357 (1927) ................................................................... 12

**Statutes**

17 U.S.C. § 102 .......................................................................... 21

18 U.S.C. § 208 .......................................................................... 20

5 U.S.C. § 522(a)(1)(D) .............................................................. 17

5 U.S.C. § 522(a)(1)(E) .............................................................. 17

5 U.S.C. § 552 ............................................................................ 17

5 U.S.C. § 552(a)(1) ................................................................... 16

5 U.S.C. § 553 ..................................................................................... 18

Ohio Fire Code 1301:7-7-09 ................................................................. 9

**Other Authorities**

1 C.F.R. § 51.7(a)(3) ............................................................................ 18

49 C.F.R. § 192.7(b) ............................................................................ 9

Amy Wang, *Biden Signs Sweeping Bill to Tackle Climate Change, Lower Health-
care Costs*, Wash. Post (Aug. 16, 2022), https://perma.cc/DW5Y-KM36 ......... 6

*ASTM F963-11 Standard Consumer Safety Specification for Toy Safety*, ASTM
Int'l, https://perma.cc/TJZ6-XCL2 ...................................................... 10

Brian Lopez, *Texas Education Agency's New School Library Standards Push for
More Scrutiny and Parental Input*, The Texas Tribune (Apr. 11, 2022),
https://perma.cc/5B9N-DYJ2 ............................................................. 19

Chalmers Rogland, *Greer Factory Where Man Disappeared Fined over $30k by
SC OSHA.  Here Are the 12 Violations*, Herald Journal (Nov. 3, 2022),
https://perma.cc/P494-LM9Y .............................................................. 8

David Shepardson, *Democratic Senators Press U.S. Auto Agency on Safety Rules*,
Reuters (Nov. 15, 2022), https://perma.cc/86FY-S9C6 ..................................... 18

Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36
Harv. J.L. & Pub. Pol'y 131 (2013) ..................................................... 7

Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63 Kan. L. Rev.
279 (2015) ..................................................................................... 7

Jim Mackinnon, *Victim Identified After Timber Top Apartment Units Evacuated for
Carbon Monoxide*, Akron Beacon Journal (Oct. 21, 2022),
https://perma.cc/32JQ-47V2 ............................................................... 9

Nina A. Mendelson, *Private Control Over Access to the Law: The Perplexing
Federal Regulatory Use of Private Standards*,
112 Mich. L. Rev. 737 (2014) .................................. 6, 7, 8, 10, 19, 20

O'Tressmass Tree (@twatts_up), Twitter (Oct. 24, 2022, 8:04 AM),
https://perma.cc/4V3K-XUN7 .............................................................. 9

Peter L. Strauss, *Private Standards Organizations and Public Law*, 22 Wm. &
   Mary Bill of Rts. J. 497 (2013)...................................................................... 9, 10

Ronda Kaysen, *How Do I Know if My Apartment Building is Unprepared for a
   Fire?*, N.Y. Times (Feb 5, 2022), https://perma.cc/TR9W-Z9L4 ....................... 8

Sarah Lynch, *Oath Keepers Founder Guilty of Sedition in U.S. Capitol Attack Plot*,
   Reuters (Nov. 29, 2022), https://perma.cc/K3XB-JGQM .................................. 14

*Standards Incorporated by Reference (SIBR) Database*, Standards.gov,
   https://sibr.nist.gov/ ................................................................................. 7

*The Roots of Access Rights*, Reporters Comm. for Freedom of the Press (last
   visited Nov. 27, 2022), https://perma.cc/UC2E-XGJR ...................................... 14

### STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

Amici curiae are the Reporters Committee for Freedom of the Press, American Society of Magazine Editors, The Atlantic Monthly Group LLC, Freedom of the Press Foundation, Investigative Reporting Workshop at American University, The Media Institute, National Press Photographers Association, The News Leaders Association, Pro Publica, Inc., Radio Television Digital News Association, Society of Environmental Journalists, and Tully Center for Free Speech (collectively, "amici"). Appellee, Appellant American Society for Testing and Materials, and Appellant American Society of Heating, Refrigerating, and Air-Conditioning Engineers, have all consented to the filing of this brief, and Appellant National Fire Protection Association does not oppose. *See* Fed. R. App. P. 29(a)(2); Circuit Rule 29(b).

Lead amicus, the Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment Freedoms and the newsgathering rights of journalists. A supplemental statement of interest of all amici is included below as Appendix A.

As representatives of the news media, amici have a powerful interest in ensuring the public availability of government documents, especially those that hold the force of law.  This interest extends to materials that were initially drafted by private entities and subsequently incorporated by reference into statutes and regulations.  Incorporated standards have been widely adopted by all levels of government and impose various obligations on product manufacturers, landlords, employers, and many other groups.  Journalists frequently provide news coverage related to these standards, and access is essential to informing their work, and in turn to educating members of the public about laws that govern their lives.  Amici therefore have an interest in ensuring that copyright law is not interpreted to limit public access to these materials.

## SUMMARY OF ARGUMENT

Two years ago, in *Georgia v. Public.Resource.Org, Inc.*, the Supreme Court proclaimed that "no one can own the law."  140 S. Ct. 1498, 1507 (2020).  While this principle appears to be a bright line rule at first blush, its application has been contentious.  This Court is asked to determine when law is not *the law* for the purpose of copyright analysis.  This confusion stems from the reality of this country's regulatory system—private actors have taken on the responsibility of drafting significant portions of federal, state, and local regulations.  But these actors are not hired to work at the direction of agencies; if so, *Georgia* would squarely foreclose the possibility of copyright protection.  Instead, they draft private standards that regulators subsequently incorporate by reference.  The text of the incorporated standards is not required to be reproduced in any governmental media, but the words still carry the force of law.

The press has a significant interest in reporting on what these standards say, and this interest would be undermined if copyright law is interpreted to prevent Public.Resource.Org ("Public Resource") from compiling and sharing the text of incorporated standards.  As incorporated standards impose wide ranging legal obligations—setting various safety requirements that bind product manufacturers, real estate developers, landlords, employers, among many other classes of individuals and entities—the press is needed to inform the public as to what these

standards require and when they may have been violated.  This type of reporting is highly valuable as it relates to government affairs and allows the public to carry out its democratic duty.  Indeed, the role the press plays in facilitating public understanding of the law and the operations of government is heightened here, as individual citizens would be unable to reasonably access every standard on their own.  By compiling and sharing incorporated standards in one place, providing search functionality, and allowing users to download the standards, organizations like Public Resource empower the press to carry out this valuable reporting.

Any individual copyright interest held in an incorporated standard should not outweigh the press and public's critical interest in freely accessing, commenting on, and sharing the specific language that operates as binding law. Indeed, the access provided by Public Resource serves the same broad transparency purposes that other areas of the law advance as well.  The First Amendment requires public access to trials and other governmental functions to preserve the ability of the press and public to oversee government action.  The Administrative Procedure Act contains notice requirements for enacted regulations and sets out notice and comment procedures to preserve the ability of the public to oversee and participate in the regulatory process.  And the government edicts doctrine has recognized that similar legislative materials, including statutory annotations drafted by private entities, are per se uncopyrightable.  By articulating

a clear rule that the sharing of incorporated standards constitutes fair use—or that

the government edicts doctrine reaches these materials—this Court would

harmonize copyright law with these other doctrines and preserve valuable rights of

public access to the law.

## **ARGUMENT**

I.     **By compiling and publishing incorporated standards free of charge, Public Resource has empowered the press and the public to fulfill the important function of scrutinizing and disseminating the law.**

The press conveys information about the workings of government to the

public in many forms—from routine updates on policy changes to larger exposés

on government misconduct.  Collectively, this has a profound effect:  "An

informed public depends on accurate and effective reporting by the news media . . .

[because the press] is the means by which the people receive that free flow of

information and ideas essential to intelligent self-government."  *Saxbe v. Wash.*

*Post. Co.*, 417 U.S. 843, 863 (1974) (Powell, J., dissenting).  Reporting on

government action—and the political discussion this reporting informs—is core to

First Amendment protections, as "there is practically universal agreement that a

major purpose of that Amendment [is] to protect the free discussion of

governmental affairs."  *Mills v. Alabama*, 384 U.S. 214, 218 (1966).  Journalistic

oversight thus promotes debate on matters of public importance and allows citizens

to engage in self-governance in an informed manner.

5

One way in which the press provides this oversight is by routinely publishing information regarding laws and regulations enacted by all levels of government, ensuring that citizens are informed of their rights and obligations. *See e.g.*, Amy Wang, *Biden Signs Sweeping Bill to Tackle Climate Change, Lower Health-care Costs*, Wash. Post (Aug. 16, 2022), https://perma.cc/DW5Y-KM36. Historically, the government directly relied on the press to distribute laws to the broader public, and "[p]rior to 1795, at least three newspapers in each state were responsible for printing authentic copies of laws and regulations." Nina A. Mendelson, *Private Control Over Access to the Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 764 (2014)*.* Recognizing the important role the press fulfilled, Congress even "provided for newspapers to be carried in the mail at rates far lower than for letters, specifically for 'the diffusion of knowledge,' including public information" through the 1792 Post Office Act. *Id.* The Supreme Court has also recognized that judicial opinions and certain legislative materials like legislative annotations—even if drafted by private entities—do not qualify for copyright protection, allowing the news media and the wider public to freely access and publish commentary on the substance of the law. *See Georgia*, 140 S. Ct. at 1512 (explaining that "non-binding" statutory annotations can indicate if certain provisions in the official code may have been

held unconstitutional, and access to this material is necessary for a citizen to "learn[] his legal rights and duties").

Today, lawmakers and agencies increasingly rely on incorporation by reference to give privately drafted rules and safety standards the force of law. Incorporation by reference is a common practice in which government agencies "codif[y] material published elsewhere by simply referring to it in the text of a regulation." Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J.L. & Pub. Pol'y 131, 133 (2013). Technical and safety standards developed by private sector entities, like those at issue in this case, are frequently incorporated. There have been over 24,900 instances of standards incorporated by reference in the Code of Federal Regulations ("CFR"). *See Standards Incorporated by Reference (SIBR) Database*, Standards.gov, https://sibr.nist.gov/ (last visited Dec. 11, 2022). Many of these standards are owned by private standards developing organizations and "may be available to the public only by purchase from a private organization." Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63 Kan. L. Rev. 279, 286 (2015). The price of access to these standards can vary widely, and at times be prohibitively expensive. *See* Mendelson, *supra*, at 743-44 ("Prices that [standards developing organizations] charge for a variety of [incorporated] standards range from fifty to several thousand dollars for the prescription drug compendia incorporated in

Medicare rules.").  Thus, obtaining and reviewing many of these standards would be impossible for most citizens.

Despite these hurdles to public access, incorporated standards still impose potentially wide-ranging legal obligations upon the public.  Accordingly, the press frequently reports stories involving safety standards with provisions incorporated by reference.  These stories may expose workplace safety issues when incorporated standards are violated.  *See, e.g.*, Chalmers Rogland, *Greer Factory Where Man Disappeared Fined over $30k by SC OSHA.  Here Are the 12 Violations*, Herald Journal (Nov. 3, 2022), https://perma.cc/P494-LM9Y.  And press reports have examined whether residential landlords are adhering to fire codes.  *See, e.g.*, Ronda Kaysen, *How Do I Know if My Apartment Building is Unprepared for a Fire?*, N.Y. Times (Feb 5, 2022), https://perma.cc/TR9W-Z9L4 (explaining that a fire in an apartment building that claimed the lives of seventeen people was "exacerbated by malfunctioning fire doors," and "exposed the risks of poor building maintenance.").  This reporting informs members of the public about regulatory standards that directly impact their lives.

Such concerns are not abstract or speculative.  Less than two months ago, a woman died, and others were hospitalized, after a carbon monoxide leak occurred in an apartment building; the landlord reportedly had not installed carbon monoxide detectors in the building.  Jim Mackinnon, *Victim Identified After*

*Timber Top Apartment Units Evacuated for Carbon Monoxide*, Akron Beacon

Journal (Oct. 21, 2022), https://perma.cc/32JQ-47V2.  A Twitter user observed that

by failing to install detectors the landlord had potentially violated the law and

appended a screenshot of Ohio's Fire Code,[1]  a regulation which designates and

incorporates substantial portions of the International Code Council Fire Code, as

well as other privately created standards.  Ohio Fire Code 1301:7-7-09 (providing

in a notice of copyright claim information that the International Code Council

"asserts a copyright of [the incorporated] portions").

　　　This incident is just one demonstration of the importance of access to safety

standards.  Journalists, in particular, must be able to obtain and disseminate the text

of the standards to do their jobs.  While hard copies of standards incorporated by

reference in the Code of Federal Regulations are required to be made available for

public inspection in government agency depositories, those facilities are typically

located in or around Washington, D.C.  *See* Peter L. Strauss, *Private Standards*

*Organizations and Public Law*, 22 Wm. & Mary Bill of Rts. J. 497, 507 (2013)

(citing 49 C.F.R. § 192.7(b) (1993)).  Any decision that would prevent services

like Public Resource from compiling and hosting the contents of incorporated

---

[1] O'Tressmass Tree (@twatts_up), Twitter (Oct. 24, 2022, 8:04 AM),
https://perma.cc/4V3K-XUN7.

standards online would severely hamper the ability of journalists—particularly

those located outside of the nation's capital—to engage in this valuable reporting.

Moreover, the cost of obtaining access to individual incorporated standards

can vary greatly, and high costs may constrain reporters operating on a limited

budget.  The cost of a PDF copy of a toy safety standard developed by the

American Society for Testing and Materials ("ASTM") is $103.00 (up from $76.00

in 2015).  *See ASTM F963-11 Standard Consumer Safety Specification for Toy

Safety*, ASTM Int'l, https://perma.cc/TJZ6-XCL2 (last visited Dec. 11, 2022).  It

would cost more than $400 to acquire Underwriters Laboratories' "Standard for

Manual Signaling Boxes for Fire Alarm Systems," a standard incorporated by

reference in numerous municipal codes.  Strauss, *supra*, at 509.[2]

---

[2] While some standards developing organizations such as ASTM have begun to offer online "reading rooms" for material incorporated by reference, they are not user-friendly and still encumber journalistic reporting.  *See* Public Resource Br. at 9-10.  ASTM's virtual reading room, for instance, requires registration with an email address and acceptance of a lengthy licensing agreement.  *Id.* at 10.  The standards provided are not searchable or arranged in a way that easily associates them with the law.  *Id.*  They are not screen reader accessible, and the read-only, non-duplicable nature of the format reduces the standards' usability and ease of handling, particularly for members of the press who may need to excerpt portions for reporting.  *Id*.  Further, these organizations generally "continue to claim a copyright and the entitlement to revoke access at any time," which may create issues following the publication and distribution of a news story.  Mendelson*, supra*, at 753.  By comparison, searchable versions available for offline use in a variety of formats (including by text-to-speech), *see* Public Resource Br. at 2, allow journalists to access and review source materials more quickly and easily—a benefit that is passed along to the wider public by means of improved reporting.

II.    **A decision that deprives the press and public the opportunity to freely access and review incorporated standards will harm the public interest and is inconsistent with the other legal protections for robust access to similar materials.**

Adjudication of fair use defenses against copyright claims "is notoriously fact sensitive and often cannot be resolved without a trial." *Georgia*, 140 S.Ct. at 1513. When copyright disputes involve legislative and administrative materials, this specter of trial could lead "[t]he less bold among us . . . to think twice before using official legal works that illuminate the law we are all presumed to know and understand." *Id*. Potential disputes could delay publications and constrain valuable reporting—"[over]zealous defense of the copyright owner's prerogative will . . . stifle the broad dissemination of ideas and information copyright is intended to nurture." *Harper & Row Publishers v. Nation Enterprises*, 471 U.S. 539, 579 (1985) (Brennan, J., dissenting). To lessen this threat to the free exchange of ideas and information, this Court should recognize a clear rule that the republication of incorporated standards constitutes fair use or is otherwise uncopyrightable pursuant to the government edicts doctrine.

The Supreme Court has acknowledged that a fair use argument may be "buttressed" by a use that "yields societal benefits." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 454 (1984) (noting that "expand[ing] public access to freely broadcast television programs" achieves such a benefit). The Court further recognized that copying done "to help [citizens] make a decision

on how to vote" has clear societal value. *Id.* at 455 n.40. In this case, Public Resource's compilation and publication of standards incorporated by reference provides just such a societal benefit, allowing for the press and public to have reasonable and meaningful access to materials that carry the force of law. As discussed below, this public benefit is analogous to that advanced by rights of access to similar governmental materials and processes.

Similarly, the rationale underpinning the government edicts doctrine cleanly applies to Public Resource's work to compile and share these materials. This doctrine operates to exclude certain materials from copyright protection altogether—rather than tipping the scales of a fair use analysis—and a decision recognizing that incorporated standards constitute government edicts would strongly benefit the public interest.

> **A.    The First Amendment establishes a right of access by the press and public to a wide variety of governmental activities, and the incorporated text of privately drafted standards should be freely accessible for similar reasons.**

"[A] fundamental principle of the American government" is "that public discussion is a political duty." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). This is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). Accordingly, the Supreme Court has recognized that the First Amendment requires a right of access by the press and

public to various governmental functions, as citizens cannot "accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980).

In *Richmond Newspapers*, the Supreme Court first recognized this access right with respect to criminal trials. *Id*. at 567-69. The Court relied heavily on the history of open access to trials in coming to this decision, referring often to the origins of English and early American trials. *Id.* Both traditions placed a high value on openness to provide a check on the fairness of courts, and on discouraging "perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Id.* at 569. This access additionally benefited citizens by facilitating understanding of the legal system and its workings in a case, allowing "a strong confidence in judicial remedies [to be] secured which could never be inspired by a system of secrecy." *Id.* at 572 (internal quotation marks omitted).

These benefits are not enjoyed only by those physically present in the court room, as the press often "function[s] as surrogates for the public." *Id*. at 573. "No individual can obtain for himself the information needed for the intelligent discharge of his political responsibilities. . . . [T]he press therefore acts as an agent of the public at large." *Saxbe*, 417 U.S. at 863 (Powell, J., dissenting). People rely on journalists to acquire information about trials, placing an increased emphasis on the importance of the press's access to courts to ensure public awareness. *See, e.g.*,

Sarah Lynch, *Oath Keepers Founder Guilty of Sedition in U.S. Capitol Attack Plot*, Reuters (Nov. 29, 2022), https://perma.cc/K3XB-JGQM (reporting on a prosecution related to the January 6, 2021, assault on the U.S. Capitol).

While the right of access originated with respect to criminal trials, it has been subsequently applied to other court proceedings and governmental operations. Indeed, "[e]very federal court of appeals to have considered whether the First Amendment guarantees a qualified right of access to civil trials and to their related proceedings and records has concluded that it does." *The Roots of Access Rights*, Reporters Comm. for Freedom of the Press (last visited Nov. 27, 2022), https://perma.cc/UC2E-XGJR.[3]

Further, the First Amendment right of access extends beyond the courtroom. For instance, the Second Circuit recognized in *N.Y.C.L.U. v. N.Y. City Transit Authority* that certain administrative functions can be subject to a right of access similar to the constitutional guarantee regarding court hearings. 684 F.3d at 290 ("The public's right of access to an adjudicatory proceeding does not depend on which branch of government houses that proceeding.").  Similarly, the Sixth

---

[3] Citing *N.Y.C.L.U. v. N.Y. City Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253–54 (4th Cir. 1988); *In re Continental Ill. Secs. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984); *In re Iowa Freedom of Info. Council*, 724 F.2d 658, 661 (8th Cir. 1983); *Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983).

Circuit has also read *Richmond Newspapers* broadly, noting that "[t]he *Richmond Newspapers* two-part test has also been applied to particular proceedings outside the criminal judicial context, including administrative proceedings." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695 (6th Cir. 2002) (holding that deportation proceedings were subject to the right of access).

The interests promoted by *Richmond Newspapers* and subsequent cases are directly implicated in the case at bar. "[O]penness ensures that government does its job properly; that it does not make mistakes." *Id*. at 704. Free access to incorporated standards promotes transparency and accountability. It makes incorporated standards—which have the force of law—open to public assessment and more accessible for reporting, and allows the press and public to view, evaluate, and comment on the law.

By the same token, obscuring incorporated standards from public access undermines governmental legitimacy. It directly inhibits the public "from observing" lawmaking institutions and the press from facilitating this observation. *Richmond Newspapers*, 448 U.S. at 572; *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 724 (1971) (Douglas, J., concurring) ("Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors."). Recognizing a robust fair use principle allowing for free and open access to incorporated standards bolsters the legitimacy of the regulatory process and thus serves the same

purpose as the right of access to judicial records and proceedings guaranteed by the First Amendment.

Indeed, failure to extend the logic of the First Amendment right of access to the materials at issue could lead to absurd results. For example, when Congress grants an agency the power to promulgate criminal regulations, that agency may adopt such regulations through incorporation by reference.[4] And the federal government could enforce the regulations in criminal court, where journalists and the public would have a right of access to several components of any proceeding. *See Richmond Newspapers*, 448 U.S. at 575-76 (providing for access to criminal trial); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 511 (1984) (providing for access to jury selection); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10 (1986) (providing access to preliminary hearings). But the press and public's understanding would be severely constrained without free access to the underlying incorporated standard that may have been violated. Even if a member of the press paid for a copy in order to report on the proceeding, they would still "have to think twice" before republishing those standards or else risk a copyright-infringement

---

[4] Under *United States v. Grimaud*, 220 U.S. 506 (1911), executive agencies may adopt regulations that are punishable as crimes. And under the Administrative Procedure Act, agencies may promulgate regulations by incorporating private standards by reference. *See* 5 U.S.C. § 552(a)(1).

suit that would likely require a full trial on the facts to resolve. *See Georgia*, 140 S. Ct. at 1513.

   **B.    Allowing members of the press and public to freely access standards incorporated by reference fulfills the legislative goal of transparency embodied in the Administrative Procedure Act.**

   Public access is key to the Administrative Procedure Act ("APA"), which governs the rulemaking processes of all executive agencies of the federal government.  In fact, within the APA, "public information" is discussed in the very first section following the statutory definitions.  *See* 5 U.S.C. § 552.  This section, enacted as part of the Federal Register Act and amended by the Freedom of Information Act ("FOIA"), requires agencies to publish "substantive rules of general applicability adopted as authorized by law" in the Federal Register. 5 U.S.C. § 522(a)(1)(D).  Publication is essential because a regulation cannot be binding on any person unless they have "actual and timely notice" of the terms of that rule.  5 U.S.C. § 522(a)(1)(E).

   These requirements also apply when an agency does not draft the full text of a regulation, but instead adopts an existing standard through incorporation. Incorporated materials are usually not republished in the Federal Register, but may be "deemed published" when the underlying material is "reasonably available to the class of persons affected thereby." *Id*.; *see also, e.g.*, *Appalachian Power Co. v. Train*, 566 F.2d 451, 455 (4th Cir. 1977) (holding that a document that the EPA

intended to incorporate by reference into a regulation was "not a validly issued part of the regulations, because it ha[d] not been published in the Federal Register, nor ha[d] the procedural requisites for incorporation by reference been complied with"). Further, regulations incorporated by reference must also be *usable* by the class of persons affected, which includes "[t]he completeness and ease of handling of the publication." 1 C.F.R. § 51.7(a)(3). Repositories like Public Resource help regulators satisfy the statutory burden of reasonable availability by providing a central location where incorporated standards can be easily accessed by the press and the wider public, ensuring that all affected persons have access to the standards that affect them.

In addition to the specific accessibility requirements codified in the Federal Register Act, allowing the press and public to access materials hosted by Public Resource is consistent with the APA's requirement that an interested person be able to comment on a proposed rule or petition to revise, repeal, or issue a rule. *See* 5 U.S.C. § 553. The press often plays a key role in the agency rule-making process by scrutinizing the text of proposes regulations and notifying the public of potential issues. *See, e.g.*, David Shepardson, *Democratic Senators Press U.S. Auto Agency on Safety Rules*, Reuters (Nov. 15, 2022), https://perma.cc/86FY-S9C6; Brian Lopez, *Texas Education Agency's New School Library Standards*

*Push for More Scrutiny and Parental Input*, The Texas Tribune (Apr. 11, 2022),

https://perma.cc/5B9N-DYJ2.

The opportunity for the press to scrutinize the complete text of privately

drafted standards is particularly significant, as the public is not guaranteed any

input into their creation.  In contrast to the well-established notice and comment

process for federal agency rulemaking, private organizations that issue standards

are not held to any particular procedures for developing standards that will later be

incorporated by reference.  While some standards development organizations (such

as ASTM) have open proceedings and information sharing, they are not bound by

the APA or FOIA, and nothing requires them to follow any sort of rulemaking

procedures.  *See* Mendelson, *supra,* at 780.  Even when organizations "aim,

ambitiously, to provide a balance of viewpoints" when drafting standards,

"[r]ealistically . . . one may have to 'pay to play' in SDO processes."  *Id*.  And

requiring commenters to purchase the draft standard being revised in order to

review and meaningfully contribute "often represents a substantial financial

obstacle to participation."  *Id.* at 780-81.

When public stakeholders are not able to meaningfully engage with the

creation of standards, the standards are more likely to only reflect the viewpoints

of the industries subject to the regulation, not those who the regulation is created to

benefit or protect.  In fact, while some standards development organizations are

composed of experts or professionals, some "may be organized expressly to protect regulated industry interests." *See id.* at 779.  Congress has attempted to limit this kind of industry "capture" in *agency* rulemaking, but these protections do not apply to private entities developing standards.  For instance, a criminal statute prohibits Executive Branch officials from participating in matters that would affect their own financial interests or those of family members or organizations they are members of, even when those financial interests are small.  *See* 18 U.S.C. § 208. Without this type of ethical safeguard, it is even more important that the press and public be able to access privately drafted standards and hold the government accountable for adopting rules that may not truly serve the interests of regulatory beneficiaries.

### C.    The rationale underpinning the government edicts doctrine likewise applies to the materials at issue in this case.

In *Georgia,* the Supreme Court reaffirmed the government edicts doctrine— a per se rule against assertion of copyright over materials that officials empowered to speak with the force of law create in the course of their official duties.  140 S. Ct. at 1504.  The justification behind this doctrine similarly applies to materials drafted by private organizations that are subsequently incorporated by government bodies.

The Supreme Court first articulated the government edicts doctrine in an opinion rejecting a claim of copyright in judicial opinions, *Wheaton v. Peters*, 33

U.S. 591, 668 (1834), and the Court later explained that the doctrine also bars

assertion of copyright in the headnotes and syllabi that judges create. *Banks v.*

*Manchester*, 128 U.S. 244, 253 (1888).  The principle underlying these rulings is

that "[t]he whole work done by the judges constitutes the authentic exposition and

interpretation of the law, which, binding every citizen, is free for publication to

all." *Id.*  In essence, "*no one can own the law*." *Georgia*, 140 U.S. at 1507

(emphasis added).[5]

This doctrine provides that copyright law cannot be a vehicle for

diminishing the public's ability to access the laws that govern our conduct.  Indeed,

because "[e]very citizen is presumed to know the law, it needs no argument to

show . . . that all should have free access to its contents." *Id.*  That proposition will

be wholly undermined if journalists and public interest organizations such as

Public Resource are not free to compile and share the contents of incorporated

standards that carry the force of law.  Not only does the government edicts doctrine

demonstrate an analogous societal benefit for the purposes of a fair use analysis,

---

[5] The First Amendment undoubtedly informs the doctrine, as nothing in the
Copyright Act itself explicitly limits the authorship requirement in such a way.  17
U.S.C. § 102; *see also Georgia*, 140 S. Ct. at 1512 ("The Court long ago
*interpreted the word "author"* to exclude officials empowered to speak with the
force of law") (emphasis added).  Copyright jurisprudence thus contemplates First
Amendment-grounded rules of per se access to public materials, so this Court need
not constrain itself to the traditional requirement that each "fair use defense must
be decided on its own facts." *Am. Soc'y for Testing & Materials v.*
*Public.Resource.Org, Inc.*, 896 F.3d 437, 448 (D.C. Cir. 2018).

but it also provides an independent justification to reject ASTM's copyright claim—as incorporated standards constitute binding law, they cannot be copyrighted.  Public Resource Br. at 19-22.

## **CONCLUSION**

For the reasons set forth above, the Reporters Committee for Freedom of the Press and 11 Media Organizations respectfully submit that this Court should affirm the district court's decision.

Dated:  December 12, 2022

Respectfully submitted,

/s/ Bruce D. Brown
Bruce D. Brown
*Counsel of Record*
Katie Townsend*
Shannon A. Jankowski*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
bruce.brown@rcfp.org
*Of counsel*

Gabriel Rottman
Lin Weeks*
Ian Kalish*
UNIVERSITY OF VIRGINIA SCHOOL OF
LAW FIRST AMENDMENT CLINIC
580 Massie Road
Charlottesville, VA 22903
(202) 795-9316
*Of counsel*

Gautam Hans*
CORNELL LAW SCHOOL FIRST
AMENDMENT CLINIC
243 Hughes Hall
Ithaca, NY 14853
(607) 254-5994
gshans@cornell.edu
*Of counsel

*Counsel for Amici Curiae*[6]

---

[6] Counsel wish to thank UVA law students Alexander Briggs and Ian Roberson, and Cornell law students Cameron Misner, Steve Mirsen, and Shayla Hinson, for their invaluable contributions to this brief.

## APPENDIX A

## SUPPLEMENTAL STATEMENTS OF INTEREST OF AMICI CURIAE

**The Reporters Committee for Freedom of the Press** (the "Reporters Committee") is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment Freedoms and the newsgathering rights of journalists.

**The American Society of Magazine Editors** is the principal organization in the United States for the editorial leaders of magazines and websites.  Founded in 1963, ASME strives to defend the First Amendment, support the development of journalism and promote the editorial integrity of print and digital publications. ASME sponsors the National Magazine Awards for Print and Digital Media in association with the Columbia Journalism School, conducts training programs for writers and editors and publishes the ASME Guidelines for Editors and Publishers.

**The Atlantic Monthly Group LLC** is the publisher of *The Atlantic* and TheAtlantic.com.  Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, *The Atlantic* continues its

160-year tradition of publishing award-winning journalism that challenges assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

**Freedom of the Press Foundation** ("FPF") is a non-profit organization that supports and defends public-interest journalism in the 21st century. FPF works to preserve and strengthen First and Fourth Amendment rights guaranteed to the press through a variety of avenues, including building privacy-preserving technology, promoting the use of digital security tools, and engaging in public and legal advocacy.

**The Investigative Reporting Workshop**, based at the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

**The Media Institute** is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. Its program agenda encompasses all

sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry.  Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.  The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**The News Leaders Association** was formed via the merger of the American Society of News Editors and the Associated Press Media Editors in September 2019.  It aims to foster and develop the highest standards of trustworthy, truth-seeking journalism; to advocate for open, honest and transparent government; to fight for free speech and an independent press; and to nurture the next generation of news leaders committed to spreading knowledge that informs democracy.

**Pro Publica, Inc.** ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest.  It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019

prize for feature writing, and the 2017 gold medal for public service.  ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact.  ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism.  RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries.  RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**The Society of Environmental Journalists** is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 5,820 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated:  December 12, 2022
   Washington, D.C.    *s/ Bruce D. Brown*

           Bruce D. Brown
           *Counsel for Amicus Curiae*

## **CERTIFICATE OF SERVICE**

I certify that on December 12, 2022, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system.  Appellants and Appellee are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.


*/s/ Bruce D. Brown*

Bruce D. Brown
*Counsel for Amici Curiae*

Dated:  December 12, 2022