ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-7063**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

AMERICAN SOCIETY FOR TESTING AND MATERIALS, et al.,
Appellants

v.

PUBLIC.RESOURCE.ORG, INC.,
Appellee

_____

Appeal from the United States District Court
for the District of Columbia
Hon. Tanya S. Chutkan, No. 1:13-cv-1215-TSC

_____

**APPELLANTS' REPLY BRIEF**

_____

J. Kevin Fee
Jane W. Wise
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
Tel: (202) 799-4000
kevin.fee@us.dlapiper.com

Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 699-2700
stanley.panikowski@us.dlapiper.com

*Counsel for American Society for Testing
and Materials d/b/a/ ASTM International*

Donald B. Verrilli, Jr.
Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500E
Washington, DC 20001
Tel: (202) 220-1100
donald.verrilli@mto.com

Kelly M. Klaus
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000
kelly.klaus@mto.com

*Counsel for National Fire Protection
Association, Inc.*

January 13, 2023
(*additional counsel on inside cover*)

PUBLIC COPY – SEALED MATERIAL DELETED

Jeffrey S. Bucholtz
David P. Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 737-0500
jbucholtz@kslaw.com

Kenneth L. Steinthal
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 318-1200
ksteinthal@kslaw.com

*Counsel for American Society of Heating,
Refrigerating, and Air Conditioning
Engineers, Inc.*

Rose Leda Ehler
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel: (213) 683-9100
rose.ehler@mto.com

*Additional Counsel for National Fire
Protection Association, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellants certify as follows:

**A.     Parties and amici**

Appellants are American Society for Testing and Materials d/b/a ASTM International ("ASTM"), National Fire Protection Association, Inc. ("NFPA"), and American Society of Heating, Refrigerating, and Air Conditioning Engineers, Inc. ("ASHRAE"), which were the Plaintiffs/Counter-Defendants in the district court. Appellee is Public.Resource.Org, which was the Defendant/Counter-Plaintiff in the district court.

The following individuals/entities submitted amicus briefs to the district court:

- Ann Bartow

- American Insurance Association

- American Library Association

- American National Standards Institute, Incorporated

- American Property Casualty Insurance Association

- American Society of Safety Engineers

- Brian L. Frye

- David Ardia

- Elizabeth Townsend Gard

- Institute of Electrical and Electronic Engineers, Incorporated

- International Association of Plumbing & Mechanical Officials

- International Code Council, Inc.

- James Gibson

- Jessica Silbey

- Jennifer Urban

- Jonathan Zittrain

- Knowledge Ecology International

- National Electrical Manufacturers Association

- North American Energy Standards Board

- Pamela Samuelson

- Public Knowledge

- Rebecca Tushnet

- Reporters Committee for Freedom of the Press

- Sina Bahram

- Stacey Dogan

- Stacey M. Lantagne

- Underwriters Laboratories Inc.

The following individuals/entities submitted amicus briefs to this Court:

- Aaron Perzanowski

- American Dental Association

- American Federation of State, County and Municipal Employees

- American Hospital Association

- American Medical Association

- American National Standards Institute, Inc.

- American Society of Civil Engineers

- The American Society of Magazine Editors

- Atlantic Monthly Group LLC

- Authors Alliance

- Christine Farley

- The Copyright Alliance

- County of Sonoma

- EveryLibrary Institute

- Freedom of the Press Foundation

- Institute of Electrical and Electronics Engineers, Inc.

- International Code Council

- Investigative Reporting Workshop

- James Gibson

- Jamie Boyle

- Jessica Silbey

- Joshua Sarnoff

- Julie Cohen

- Lawrence Lessig

- Library Futures Institute

- Mark Lemley

- Matthew Sag

- Media Institute

- Michael A. Carrier

- Michael Carroll

- National Association for the Advancement of Colored People

- National Electrical Manufacturers Association

- National Press Photographers Association

- The News Leaders Association

- North American Energy Standards Board

- Pamela Samuelson

- Peter Jaszi

- Prime Access Consulting, Inc.

- Pro Publica, Inc.

- Public Knowledge

- Radio Television Digital News Association

- Raymond A. Mosley

- Reporters Committee for Freedom of the Press

- Robert C. Tapella

- Society of Environmental Journalists

- Shubha Ghosh

- Tully Center for Free Speech

- ULSE Incorporated

- Victoria Phillips

- Xiyin Tang

- Yvette Joy Liebesman

- Zoe Lofgren

## B.    Rulings under review

References to the rulings under review appear in Appellants' Brief.

## C.    Related cases

A statement of related cases appears in Appellants' Brief.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS....................................................................vi

TABLE OF AUTHORITIES ............................................................. viii

GLOSSARY OF ABBREVIATIONS ..................................................XIII

STATUTES AND REGULATIONS....................................................XIV

SUMMARY OF ARGUMENT ..........................................................1

ARGUMENT ...............................................................................2

I.   PUBLIC.RESOURCE.ORG'S REQUEST FOR A BROAD
     CONSTITUTIONAL RULING IS LEGALLY AND FACTUALLY
     UNSUPPORTED.....................................................................2

     A.   No one has been unable to access the Works........................3

     B.   Eliminating Plaintiffs' copyrights in IBR'd Works would exact
          significant and needless costs from Plaintiffs and the public. ..............5

     C.   Congress balanced the public's entirely compatible interests in
          access to IBR'd standards and allowing copyright to support the
          independent creation of those standards. ...............................8

II.  THE GOVERNMENT EDICTS DOCTRINE IS INAPPLICABLE
     TO PLAINTIFFS' WORKS. .........................................................10

III. PUBLIC.RESOURCE.ORG FAILS TO SATISFY ITS BURDEN TO
     SHOW THAT ITS WHOLESALE APPROPRIATION OF
     PLAINTIFFS' WORKS IS FAIR USE.............................................15

     A.   Factor 1: Public.Resource.Org fails to show that its use of
          Plaintiffs' Works is transformative. ....................................16

          1.   Public.Resource.Org copies portions that are not essential
               to complying with legal duties...................................16

          2.   Public.Resource.Org's purpose overlaps with Plaintiffs'
               and is non-transformative. .......................................22

     B.   Factors 2 and 3: Public.Resource.Org fails to show that the
          nature of Plaintiffs' Works, and the amount and substantiality
          of its copying, favor fair use................................................24

**TABLE OF CONTENTS**
**(continued)**

Page

C.  Factor 4: Public.Resource.Org failed to meet its burden to show a lack of market harm.............................................................25

    1.  The district court erred in shifting to Plaintiffs Public.Resource.Org's affirmative-defense burden.................25

    2.  The uncontroverted evidence shows that Public.Resource.Org's copying causes market harm. .............26

    3.  Public.Resource.Org's truncated responses to this Court's questions further confirm market harm. ...............................29

    4.  At a minimum, there is a disputed fact issue on factor four. ...........................................................................................30

    5.  The claimed "public benefits" from Public.Resource.Org's unrestricted copying are illusory. ........33

IV.  PUBLIC.RESOURCE.ORG'S ARGUMENTS DO NOT CHANGE THE DISTRICT COURT'S ABUSE OF DISCRETION IN REFUSING TO ENJOIN THE INFRINGEMENT IT FOUND..................34

CONCLUSION..................................................................................38

CERTIFICATE OF COMPLIANCE....................................................40

ADDENDUM OF STATUTES AND REGULATIONS ................... A-1

CERTIFICATE OF SERVICE ....................................................COS-1

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

\* *American Society for Testing & Materials v. Public.Resource.Org,
Inc.*,
896 F.3d 437 (D.C. Cir. 2018)..... 1, 6, 7, 9, 11, 15, 16, 17, 20, 21, 22, 24, 29, 32

*Brammer v. Violent Hues Prods., LLC*,
922 F.3d 255 (4th Cir. 2019) ...........................................................23

*Building Officials & Code Administrators v. Code Technology, Inc.*,
628 F.2d 730 (1st Cir. 1980).................................................................7

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014) ........................................................26

\* *Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)...................................................................15, 22

\* *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
44 F.3d 61 (2d Cir. 1994) ..............................................................6, 12

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ...........................................................34

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)..........................................................................9

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) ...........................................36

\* *Georgia v. Public.Resource.Org, Inc.*,
140 S. Ct. 1498 (2020).........................................................1, 9, 10, 15

*Getty Petroleum Marketing, Inc. v. Capital Terminal Co.*,
391 F.3d 312 (1st Cir. 2004)...............................................................3

*Golan v. Holder*,
565 U.S. 302 (2012)..........................................................................9

\* Authorities upon which Plaintiffs principally rely are marked with asterisks.

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021)................................................................33, 34

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985)..........................................................................9

*Jennings v. Stephens*,
  574 U.S. 271 (2015)..........................................................................9

* *Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019)................................................................18, 19

*LaShawn A. v. Barry*,
  87 F. 3d 1389 (D.C. Cir. 1996)........................................................11

*McGucken v. Pub Ocean Limited*,
  42 F.4th 1149 (9th Cir. 2022) ....................................................27, 32

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
  888 F. Supp. 2d 691 (D. Md. 2012), *aff'd*, 722 F.3d 591 (4th Cir.
  2013) ...................................................................................36, 37

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................36

*MidCap Media Finance, LLC v. Pathway Data, Inc.*,
  929 F.3d 310 (5th Cir. 2019) ...........................................................33

*National Lifeline Ass'n v. FCC*,
  983 F.3d 498 (D.C. Cir. 2020)..........................................................18

*Nintendo of Am. Inc. v. Lewis Galoob Toys Inc.*,
  No. 90-15936, 1991 WL 5171 (9th Cir. Jan. 24, 1991) ....................37

*Oracle Am., Inc. v. Google Inc.*,
  750 F.3d 1339 (Fed. Cir. 2014) ........................................................9

* *Practice Mgmt. Info. Corp. v. American Med. Ass'n*,
  121 F.3d 516 (9th Cir. 1997) .............................................................6

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Princeton Univ. Press v. Mich. Doc. Servs., Inc.*,
99 F.3d 1381 (6th Cir. 1996) ...............................................................26

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) .................................................................36

*Seshadri v. Kasraian*,
130 F.3d 798 (7th Cir. 1997) ..............................................................12

*Sessions v. Morales-Santana*,
137 S. Ct. 1678 (2017)....................................................................4, 5

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012)................................................................27

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ............................................................37

*Suntrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1257 (11th Cir. 2001) ..........................................................31

*Swatch Group Management Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014) .............................................................23, 24

*Veeck v. Southern Building Code Congress International, Inc.*,
293 F.3d 791 (5th Cir. 2002) ...............................................................7

STATE CASES

*Bellwether Properties, LLC v. Duke Energy Indiana, Inc.*,
87 N.E.3d 462 (Ind. 2017) ...................................................................3

*Public.Resource.Org Inc. v. Cal. Office of Administrative Law*,
No. 24-2021-80003612 (Cal. Super. Ct. filed Mar. 17, 2021) ............................4

FEDERAL STATUTES

* 5 U.S.C. § 552(a) ....................................................................2, 8, 17

17 U.S.C. § 108.............................................................................22

x

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

\* Copyright Act of 1976 .............................................................7, 9, 13, 35

1995 National Technology Transfer and Advancement Act ...................................13

**FEDERAL REGULATIONS**

1 C.F.R. 51.9(a)...........................................................................17

1 C.F.R. 51.9(b) .....................................................................18, 19

1 C.F.R. 51.3(b) ............................................................................20

79 Fed. Reg. 66,267 (Nov. 7, 2014)...................................................8, 14

**LEGISLATIVE MATERIALS**

H.R. 5305, 115th Cong. (2018)...............................................................8

H.R. Rep. 94-1476 (1976)...................................................................13

H.R. Rep. 113-152 (2013)...................................................................14

**OTHER AUTHORITIES**

*CPSC Br., Milice v. Consumer Product Safety Commission*,
    2 F.4th 994 (D.C. Cir. 2020) (No. 21-1071), 2020 WL 8641276 ...............13, 14

Letter from Raymond Mosley, Director of the Federal Register, to
    Carl Malamud (Aug. 3, 2009),
    https://law.resource.org/pub/us/case/govdocs/gov.nara.fedreg_200
    90803_from.pdf ........................................................................20

*Nat'l Fire Protection Ass'n, Inc. v. UpCodes, Inc.*,
    Case No. 21-5262 (C.D. Cal., filed June 29, 2021)......................................8, 29

National Research Council, *Standards, Conformity Assessment, and*
    *Trade: Into the 21st Century* (1995)..................................................14

*Nimmer on Copyright* § 5.06[C] ...............................................................6

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

3 *Nimmer on Copyright* § 10.03[A][7] ...................................................................13

# GLOSSARY OF ABBREVIATIONS

ASHRAE            American Society of Heating, Refrigerating, and Air
                  Conditioning Engineers

ASTM              American Society for Testing and Materials

IBR               Incorporation by Reference

NFPA              National Fire Protection Association

OFR               Office of Federal Register

SMF               Plaintiffs' Statement of Material Facts in Support of Their
                  Motion for Summary Judgment

Supp. SMF         Plaintiffs' Supplemental Statement of Material Facts in Support
                  of Their Motion for Summary Judgment and in Opposition to
                  Defendant's Motion for Summary Judgment

2d. Supp. SMF     Plaintiffs' Second Supplemental Statement of Material Facts in
                  Support of Their Second Motion for Summary Judgment

* Authorities upon which Plaintiffs principally rely are marked with asterisks.

## STATUTES AND REGULATIONS

Except for the following, all applicable statutes, rules, regulations, etc. are contained in Appellants' Brief or Appellee's Brief.

- Office of Management and Budget Circular A-119 (2016)

- Incorporation by Reference, 79 Fed. Reg. 66,267 (Nov. 7, 2014)

- H.R. Rep. 94-1476 (1976)

- H.R. Rep. 113-152 (2013)

Excerpts of or a complete version of the above-listed sources are set forth in the Addendum to this brief.

## SUMMARY OF ARGUMENT

Public.Resource.Org cannot square the district court's decision with this Court's fair use guidance in *American Society for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437 (D.C. Cir. 2018) ("*ASTM II*"). Public.Resource.Org ignores this Court's direction in favor of cherry-picked quotations from an Office of the Federal Register ("OFR") Handbook and an OFR official's three-line email response to Public.Resource.Org. Although Public.Resource.Org has the burden, Plaintiffs' undisputed expert economic evidence establishes the consequences to Plaintiffs' markets if its conduct were to become widespread. Public.Resource.Org's mass copying and distribution is not fair.

Public.Resource.Org alternatively makes a sweeping and meritless argument that incorporation by reference ("IBR") strips the Works of copyright. Copyright protection is instant and automatic for privately-authored works, like Plaintiffs'. No government official writes any Works verbatim into statute or regulation through IBR, and Plaintiffs' copyrights are not divested by subsequent IBR. To argue otherwise, Public.Resource.Org must contort the Supreme Court's "straightforward rule" for whether a work is a government edict which turns "on the identity of the author." *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1506 (2020). Nor does the Constitution require vitiating Plaintiffs' copyrights. All the Works are

"reasonably available," 5 U.S.C. § 552(a):  Plaintiffs post them online for anyone to read for free.  This Court, like all other appellate courts to consider similar arguments, previously declined the extreme result Public.Resource.Org advocates. It should do so again—such a result lacks legal basis, and would thwart Congress' will and undermine the self-funded process necessary to create independent voluntary-consensus standards.

Finally, Public.Resource.Org's unlawful copying and distribution of non-IBR'd Works warrants a permanent injunction.

The judgment should be vacated and remanded for the proper application of *ASTM II*, and the denial of injunctive relief reversed.

## ARGUMENT

### I.    Public.Resource.Org's Request For A Broad Constitutional Ruling Is Legally and Factually Unsupported.

Swinging for the fences, Public.Resource.Org and its chorus of amici argue that the Constitution commands that Plaintiffs' copyrights be vitiated so "the law" may be set free.  The various incantations of this argument ignore that Plaintiffs' Works are already available on their websites without charge; no one has been deprived of the ability to read, comment on, or criticize them.  Congress and the Executive Branch have balanced the need to incentivize the creation of standards with the public's right to know what they say.  There is no cause to upset that balance when there is no evidence anyone has been unable to access Plaintiffs' Works.

### A.    No one has been unable to access the Works.

Public.Resource.Org and its amici say that allowing the copyrights to stand imperils the public's right to "[a]ccess, [a]nalyze, and [c]riticize the law," Appellee's Br. 24; forces citizens and government enforcers "to pay [Plaintiffs] to find out what [the law] says," Sonoma County Br. 6; and makes "access to the law" turn on one's "resources," AFSCME Br. 10.

This dramatic rhetoric has no support.  No one has to pay a penny to read the Works.  JA ___ (2d. Supp. SMF ¶85).  After a decade of litigation, neither Public.Resource.Org nor its amici cited a *single instance* in which anyone who wanted to access, discuss, or comment on any Work was unable to do so for free. JA ___, ___ (SMF ¶¶168, 275).

Public.Resource.Org's extra-record anecdotes provide no support.  *Bellwether Properties, LLC v. Duke Energy Indiana, Inc.*, 87 N.E.3d 462, 468 (Ind. 2017), Appellee's Br. 8-9, 16, 54, involved a *non*-Plaintiff organization's standard.  *Getty Petroleum Marketing, Inc. v. Capital Terminal Co.*, 391 F.3d 312, 320 (1st Cir. 2004), Appellee's Br. 9, 38, involved a standard also not in issue.[1]

---

[1] Plaintiffs did not move for summary judgment on ASHRAE's "1993 Handbook," Appellee's Br. 41, and that work is not before this Court.  The graduate student who contacted ASTM, *id.* 41-42, did not claim to be unable to access any ASTM standard and was seeking permission to post online two standards, not Works in suit, for non-educational purposes, JA ___ (Dkt. 212-1 ¶106); JA ___ (Dkt. 122-7, Ex. 117).

3

Public.Resource.Org also mischaracterizes *Public.Resource.Org Inc. v. Cal. Office of Administrative Law*, No. 24-2021-80003612 (Cal. Super. Ct. filed Mar. 17, 2021), Appellee's Br. 22.  Public.Resource.Org challenged the denial of its request for an electronic copy of an NFPA Work under the California Public Records Act.  That denial was no different from the numerous federal denials of Public.Resource.Org's similar requests.  JA ___ (SMF ¶¶176-77).  Again, no one has been unable to access the IBR'd standard.  JA ___ (Dkt. 204-42, Marvelli Dep. 179:10-14).

Public.Resource.Org says the access Plaintiffs provide is not free because online users must register or agree to terms of service.  Appellee's Br. 10.  Such terms are ubiquitous and do not show lack of access.  The Internet Archive, where Public.Resource.Org posts Plaintiffs' Works, has terms of service.  *See* Internet Archive's Terms of Use, Privacy Policy, and Copyright Policy, https://archive.org/about/terms.php (Dec. 31, 2014).  PACER requires registration and consent to monitoring.  *See* Registration, https://pacer.psc.uscourts.gov/pscof/registration.jsf (accessed Jan. 13, 2023); Manage My Account, https://pacer.psc.uscourts.gov/pscof/login.xhtml (accessed Jan. 13, 2023).

Public.Resource.Org, moreover, lacks standing to bring a due process claim.  It does not claim to be subject to enforcement arising out of any IBR'd Work and cannot satisfy the exacting requirements for third-party standing.  *See Sessions v.*

4

*Morales-Santana*, 137 S. Ct. 1678, 1689 (2017). Public.Resource.Org's constitutional arguments fail in this case, with these parties, and these Works.

**B.    Eliminating Plaintiffs' copyrights in IBR'd Works would exact significant and needless costs from Plaintiffs and the public.**

Contrary to Public.Resource.Org's misleading characterization that Plaintiffs merely "convene volunteers," Appellee's Br. 3, 45, Plaintiffs develop their Works through a robust voluntary consensus process that requires *millions of dollars* of annual investment from each organization, JA ___, ___-___, ___, ___, ___-___, ___ (SMF ¶¶6-8, 28-37, 43-44, 104-05, 109-19, 135-41, 152). Plaintiffs depend on sales of their Works to self-fund standards development. JA ___, ___-___, ___-___ (SMF ¶¶45-46, 106, 153-54). Without copyright protection, Plaintiffs would lose a crucial funding stream necessary to support their work, JA ___-___, ___-___, ___-___, ___-___ (Jarosz Report ¶¶80-83, 90-91, 97-98, 131-38); JA ___-___ (2d. Supp. SMF ¶¶77-84), and the public would lose the benefits of an important private-public partnership that enhances safety without burdening taxpayers, JA ___-___ (SMF ¶¶265-71; JA ___-___ (Dkt. 118-9 ¶¶11-14); JA ___-___ (Dkt. 118-6 ¶¶22-24). While purporting to express gratitude for the work Plaintiffs do, JA ___-___ (Dkt. 118-12, Ex. 2 (C. Malamud Dep. 306:03-308:04)); Sonoma County Br. 11, Public.Resource.Org and its amici offer no viable solution for how Plaintiffs can continue that work without the protection of their copyrights.

*ASTM II* recognized the importance of Plaintiffs' Works and declined to consider Public.Resource.Org's "bright-line rule" eliminating copyright because of, *inter alia*, "the economic consequences that might result from [Plaintiffs] losing copyright." 896 F.3d at 446-47. The same reasoning applies now. Every other appellate court has declined to accept the sort of all-or-nothing framework Public.Resource.Org presses.

The Second and Ninth Circuits reaffirmed copyright protection for IBR'd standards, rejecting the plea to "vitiate copyright," noting that it could "prove destructive of the copyright interest in encouraging creativity," by depriving private entities of an "economic incentive[]" to develop their work. *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 65, 73-74 n.30 (2d Cir. 1994) (quoting *Nimmer on Copyright* § 5.06[C] at 5-60); *Practice Mgmt. Info. Corp. v. American Med. Ass'n*, 121 F.3d 516, 518 (9th Cir. 1997).

Public.Resource.Org's attempted distinction of *CCC* and *Practice Management,* as involving mere "*citations to* reference works," Appellee's Br. 23, is wrong. In *Practice Management*, a party that wanted to obtain Medicaid reimbursement had to utilize codes the medical association created. 121 F.3d at 518. Under this Court's articulation, the association's work was "legally binding." *ASTM II*, 896 F.3d at 443. In *CCC*, the publisher's car-valuation book had been adopted as one means of complying with a binding legal requirement, 44 F.3d at 73, and thus

told "the regulated entity how it" could satisfy "codified requirements," *ASTM II*, 896 F.3d at 443.

*Veeck v. Southern Building Code Congress International, Inc.*, 293 F.3d 791 (5th Cir. 2002), and *Building Officials & Code Administrators v. Code Technology, Inc.*, 628 F.2d 730 (1st Cir. 1980) ("*BOCA*"), likewise refrained from adopting the uncompromising position Public.Resource.Org advances.  *Veeck*, responding to an amicus brief filed by NFPA and others, said its holding did not apply to "references to extrinsic standards," and so would not result in organizations' copyrights "be[ing] vitiated simply by the common practice of governmental entities' incorporating their standards in laws and regulations."  293 F.3d at 803-04.[2]  *BOCA* declined to "rule finally on the question," recognizing the potential need "to accommodate modern realities" and the "important public function" served by standards development organizations.  628 F.2d at 735-36.  This reasoning is even more true today given Public.Resource.Org's ambition of copying and distributing *all* of Plaintiffs' IBR'd

---

[2] The Solicitor General's brief that Public.Resource.Org cites is not a precedential court decision.  That brief limited its discussion to the particular circumstances of *Veeck* and said mere IBR of a work might not allow the public to "copy it freely."  U.S. Br. 15, 18-19, *Veeck*, No. 02-355 (U.S. May 2003).  This is consistent with the Solicitor General's position in *Practice Management* that "[n]othing in the Copyright Act . . . would permit a termination of copyright protection in these circumstances."  U.S. Br. 7, *Practice Mgmt.*, No. 97-1254 (U.S. Aug. 1998).  Regardless, interpreting *Veeck* to strip copyright from privately-authored works that later become "the law" is inconsistent with the Supreme Court's holding in *Georgia*.  *See infra*, II.

Works, Appellee's Br. 58; the emergence of for-profit companies copying Public.Resource.Org, *Nat'l Fire Protection Ass'n, Inc. v. UpCodes, Inc.*, Case No. 21-5262 (C.D. Cal., filed June 29, 2021); and the political branches' reaffirmation of the importance of respecting copyright in IBR'd standards, *see* Appellants' Br. 6-8; *infra*, I.C., II.

> **C.  Congress balanced the public's entirely compatible interests in access to IBR'd standards and allowing copyright to support the independent creation of those standards.**

Congress addressed Public.Resource.Org's concerns through 5 U.S.C. § 552(a), which requires that any standard to be IBR'd be "reasonably available to the class of persons affected thereby."  Under this provision, agencies "work with the relevant standards developer to promote the availability of [their] materials," while "*respecting the copyright owner's interest in protecting its intellectual property*."  Office of Management and Budget Circular A-119, at 21 (2016) (emphasis added).

Public.Resource.Org and amicus Congresswoman Lofgren have urged Congress and the Executive Branch to reconsider that balance, but were rejected.  In 2012, Public.Resource.Org's founder (and others) petitioned OFR to vitiate copyright and make material IBR'd available for free online; that proposal was rejected.  79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014).  In 2018, Congresswoman Lofgren co-sponsored a bill to end copyright protection for IBR'd standards.  H.R.

5305, 115th Cong. (2018).  That bill did not become law.  Public.Resource.Org and amici may ask Congress to rethink its judgment but provide no cause for this Court to upset it.  *Georgia*, 140 S. Ct. at 1511 ("[I]t is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives.") (quoting *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003)).

Congress also "balance[d] … the First Amendment and the Copyright Act" through the fair use defense.  *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556 (1985); *see also Golan v. Holder*, 565 U.S. 302, 328 (2012) (fair use is a "built-in First Amendment accommodation").[3]  *ASTM II* provides that fair use may permit limited copying of IBR'd material essential to complying with a legal duty, but otherwise protects Plaintiffs' copyrights.  *See infra*, III.  While

---

[3] First Amendment protections are also built into the Copyright Act's distinction between copyrightable expression and uncopyrightable ideas.  *Golan*, 565 U.S. at 328.  Public.Resource.Org argues that Plaintiffs' Works are uncopyrightable.  Appellee's Br. 27-28, 44-45.  Copyrightability is gauged at the time of creation.  *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1361 (Fed. Cir. 2014); U.S. Br. at 14-15, *Google LLC v. Oracle Am., Inc.*, No. 18-956 (Sept. 2019).  At the time Plaintiffs created the Works, they were copyrightable: they had not been IBR'd and were original expressions of ideas that can be expressed in multiple ways (as evidenced by the fact that standards development organizations write standards on similar subjects in different ways).  JA ___ (SMF ¶38).

Separately, by failing to cross-appeal on its copyrightability or constitutional arguments, Public.Resource.Org has waived these arguments to the extent they would expand the judgment below.  *See Jennings v. Stephens*, 574 U.S. 271, 276 (2015).

Plaintiffs disagree that Public.Resource.Org satisfied its burden of proving fair use, the defense exists and fully addresses the claimed First Amendment concerns.

## II.    The Government Edicts Doctrine Is Inapplicable To Plaintiffs' Works.

Public.Resource.Org wrongly argues the *Georgia* decision "[n]aturally [e]xtends" to Plaintiffs' Works.  Appellee's Br. 19.  The district court properly rejected this argument.  JA ___-___ (Memorandum Opinion 19-20).

*Georgia* held the government edicts doctrine imposes a "straightforward rule," which turns "on the identity of the author."  140 S. Ct. at 1506.  If the author is an "official[] empowered to speak with the force of law," they are not a copyright "author" if they "create[d the work] in the course of their official duties."  *Id.* at 1504.  But the doctrine "does not apply" to works authored by "*private parties*[] who lack the authority to make or interpret the law."  *Id.* at 1507 (emphasis added).  Thus:

> Instead of examining whether given material carries "the force of law," we ask only whether the author of the work is a judge or a legislator. If so, then whatever work that judge or legislator produces in the course of his judicial or legislative duties is not copyrightable. That is the framework our precedents long ago established, and we adhere to those precedents today.

*Id.* at 1513.  Following the Supreme Court's "straightforward rule," the government edicts doctrine does not apply to Plaintiffs' *privately* authored Works.  *Id.* at 1506.

Public.Resource.Org's argument that government officials authored the Works because some government employees participate on Plaintiffs' technical committees, Appellee's Br. 20, mischaracterizes the process as government-driven

10

(it is not) and re-litigate the authorship question this Court rejected.  *ASTM II*, 896 F.3d at 446 (claim of government authorship "forfeited" and "meritless").  That ruling is law of the case as to the ten Works previously at issue.  *See LaShawn A. v. Barry*, 87 F. 3d 1389, 1393 (D.C. Cir. 1996).  As to the remaining Works, the district court correctly found that Public.Resource.Org "proffered no evidence" of government authorship.  JA ___ (Memorandum Opinion 19).  Public.Resource.Org, Appellee's Br. 20, does not identify a single word of any Work that a government official supposedly wrote.

Public.Resource.Org's argument for an extension of *Georgia* would stretch the government edicts doctrine beyond recognition.  Public.Resource.Org argues that IBR should be treated *as if* the agency "pasted [the standard] word-for-word into a regulation," *i.e.*, the same as a legislature writing into the statute books words drafted by lobbyists.  *Id.* 20-22.  That is *not* IBR.  The specific text of the regulation or statute authored by the government that effectuates the IBR is a government edict, not the Works themselves.  The Works are *referenced* and never *written* word-for-word into any regulation, statute, or other "law."

Beyond that fundamental and dispositive distinction, Public.Resource.Org's contentions are wrong for multiple additional reasons.

First, IBR'ing a preexisting standard is fundamentally different from the legislature enacting language that a lobbyist created for the sole purpose of inclusion

in a statute. Plaintiffs generally do not "lobby" for their standards to be IBR'd. JA ___ (SMF ¶56). Unlike lobbyists, standards development organizations do not develop standards solely for the purpose of government incorporation; standards have a range of uses, including by industry, insurance companies, and others. JA ___, ___, ___ (SMF ¶¶54, 90, 134); JA ___ (Dkt. 118-11, ¶16); JA ___ (Dkt. 118-4 ¶20); JA ___ (Dkt. 118-8 ¶10); JA ___-___ (Dkt. 118-10 ¶3); JA ___ (Memorandum Opinion 1). Unlike lobbyists, Plaintiffs make their standards available for IBR *subject to* copyright protection.[4] *See, e.g.*, JA ___ (Dkt. 199-27, Ex. P at NFPA-PR0098063) (explaining, as for all NFPA Works, that "[b]y making these documents available for use and adoption by public authorities . . . NFPA does not waive any rights in copyright"); JA ___ (2d. Supp. SMF ¶8) (standards bear copyright notice in favor of Plaintiff); JA ___ (Dkt. 122-8, Ex. 139) (same). And again—unlike lobbyist-drafted legislation—the text of the standards is not copied word-for-word into the statute books or regulations.[5]

---

[4] Public.Resource.Org is wrong to dismiss the constitutional issues under the Takings Clause if IBR were deemed to eviscerate copyright protection. Appellees' Br. 29. The current public-private partnership in IBR turns on copyright being protected and a contrary ruling would raise precisely those concerns. *CCC*, 44 F.3d at 74.

[5] Public.Resource.Org tries to confuse the issue by speculating that someone who drafted a bill for a legislator could try to enforce copyright in an enacted statute. Appellee's Br. 20-21. There is no evidence anyone has ever made such a claim. If someone did, a court could address that without undermining IBR. *See Seshadri v. Kasraian*, 130 F.3d 798, 805 (7th Cir. 1997) ("Authorizing another to publish under

Second, Public.Resource.Org's equating IBR with lobbyist-drafted bills ignores Congress' and the Executive Branch's decades-long treatment of IBR. When Congress enacted the Copyright Act of 1976, IBR was an established practice of federal agencies. *See* Act of June 5, 1967, Pub. L. No. 90-23, § 552, 81 Stat. 54, 54 (specifically authorizing agencies to IBR). Neither Public.Resource.Org, nor others advancing similar arguments, can identify any "provision of the Copyright Act that would terminate existing copyright protection in a work merely because the work was subsequently incorporated by reference." *See* CPSC Br., *Milice v. Consumer Product Safety Commission*, 2 F.4th 994 (D.C. Cir. 2020) (No. 21-1071), 2020 WL 8641276, at *29. The House Report underlying the Copyright Act shows that Congress did not intend IBR to divest copyright. *See* H.R. Rep. 94-1476, at 60 (1976) ("[P]ublication or other use by the Government of a private work would not affect its copyright protection in any way").

Congress expressed a clear preference for federal agencies to use privately-developed standards, whenever possible, in the 1995 National Technology Transfer and Advancement Act. Appellants' Br. 6. That Act was based on a congressionally-authorized study recognizing that organizations "offset expenses and generate income through sales of standards documents, *to which they hold the copyright*."

---

his sole name would amount to a public disclaimer of authorship"); 3 *Nimmer on Copyright* § 10.03[A][7] (implied license).

National Research Council, *Standards, Conformity Assessment, and Trade: Into the 21st Century* 32 (1995) (emphasis added).  It would have been illogical for Congress to direct agencies to IBR standards if doing so would destroy copyright and standards development organizations' ability to fund the creation of standards in the first place.  *See also* H.R. Rep. 113-152, at 3 (2013) (standards development organizations' "business model[s] could be jeopardized" by allowing third parties to provide free internet access to standards).

Likewise, numerous agencies have taken positions demonstrating IBR is intended to and does preserve copyright.  *See* Appellants' Br. 7-8; JA ___ (SMF ¶¶175, 177); JA ___-___ (Dkt. 118-12, Ex. 3 (C. Malamud Dep. 232:14-234:08)); JA ___ (Dkt. 118-12, Ex. 10); *supra*, 8 (Office of Management and Budget Circular).  Public.Resource.Org is wrong that "the bulk of the Code of Federal Regulations" is the reason agencies IBR.  Appellee's Br. 5.  The Consumer Product Safety Commission "chose to utilize [IBR] procedures" given "ASTM's copyright in its voluntary consensus standard," while ensuring there were "means of reasonable access."  CPSC Br., 2020 WL 8641276, at *22-23.  The practice of IBR is reserved for privately-authored works, and agency materials are "inappropriate for IBR."  79 Fed. Reg. at 66,268.

Third, Public.Resource.Org would have judges engage in the vexing exercise of "attempting to catalog the materials that constitute 'the law,'" beyond the more

14

straightforward determination of authorship. *Georgia*, 140 S. Ct. at 1507. Does the purely informational History and Development of the National Electrical Code, which appears in each edition of NFPA 70, become a non-copyrightable government edict because the standard has been IBR'd? JA ___ (Dkt. 199-27, Ex. P at NFPA-PR0098064); JA ___ (2d. Supp. SMF ¶63 (listing similar histories in each NFPA standard)); JA ___ (Dkt. 198-50 ¶28.b). What about the text of non-IBR'd standards or other works that are referenced as requirements within an IBR'd standard, *e.g.*, *Merriam-Webster's Collegiate Dictionary,* 11th edition? JA ___ (Dkt. 199-33, Ex. V at NFPA-PR0020217). What about law review articles that set forth the legal standard later adopted by a court? *E.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (relying on Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990), for "transformative" test of fair use). Although Public.Resource.Org identifies no limiting principle to prevent its government-edicts theory from unsettling the copyright status of an untold number of privately-authored works, the Supreme Court's authorship-based analysis properly answers each of these questions: no.

## III. Public.Resource.Org Fails To Satisfy Its Burden To Show That Its Wholesale Appropriation Of Plaintiffs' Works Is Fair Use.

In *ASTM II*, this Court said that fair use had to be analyzed "standard by standard" and "use by use," according to the guidance this Court set forth for applying each of the four fair use factors. 896 F.3d at 451. Ignoring this instruction,

Public.Resource.Org asserts that whenever a governmental entity IBR's a standard, it is *per se* fair for any party in Public.Resource.Org's position to copy and distribute that standard without restriction. Public.Resource.Org's overbroad conception of fair use sidesteps the careful inquiry this Court mandated and well-established fair use principles. The Court should reject Public.Resource.Org's dramatic restructuring of fair use.

### A. Factor 1: Public.Resource.Org fails to show that its use of Plaintiffs' Works is transformative.

#### 1. Public.Resource.Org copies portions that are not essential to complying with legal duties.

This Court said "distributing copies of the law" to facilitate public access could be a transformative use. But it made clear "the law" is not co-extensive with all parts of an IBR'd standard. *ASTM II*, 896 F.3d at 450. The Court differentiated between portions of Plaintiffs' Works critical to complying with the law (suggesting transformativeness), and portions that are not (cutting against transformativeness).

Plaintiffs' opening brief reviewed substantial evidence showing that large portions of the copied Works are not "essential to understanding one's legal obligations," *id.* at 453. Appellants' Br. 19-23. But Public.Resource.Org barely tries to defend the district court's failure to analyze the standards as this Court directed. Public.Resource.Org claims the district court did not have to do this work, because federal agencies already did the work for it. Under this view, whenever a

16

federal agency IBR's a standard without an express limitation, the agency has decided the entire standard is essential to complying with the law. *See* Appellee's Br. 32-35. In Public.Resource.Org's view, when the Department of Veterans Affairs referred to NFPA 101 without expressly limiting its IBR to the portions of that Work dealing with veterans cemeteries, *everything*—414 pages, cover-to-cover, JA ___-___ (Dkt. 199-31, Ex. T at NFPA-PR0019355-NFPA-PR0019768)—in that Work as a matter of law became essential to comprehending the requirements for such cemeteries, including material designated for "informational purposes only," and sections that relate to one- and two-family dwellings and day-care occupancies.[6]

No authority supports Public.Resource.Org's radical theory. The statute authorizing federal agencies to IBR does not say anything that supports Public.Resource.Org's theory. 5 U.S.C. § 552(a). Nor do OFR's regulations on IBR. Those regulations state agencies should identify standards "precise[ly] [and] complete[ly]," 1 C.F.R. 51.9(a), but they also say language is "precise and complete if it," *inter alia*, "[s]tates the title, date, edition, author, publisher, and identification

---

[6] Public.Resource.Org also refuses the logical consequence of its argument—that when an agency *has* specified particular sections of a standard or a specific edition of a standard *only* those sections impose a legal obligation. *See, e.g.*, Appellants' Br. 28-29. Public.Resource.Org asks the Court to simply excuse as "best efforts" its copying and distributing in full Works where the incorporating regulation identifies particular sections or a different edition. Appellee's Br. 39 (contending that "differences are largely immaterial").

number *of the publication*," and "[i]nforms the user that *the incorporated publication is a requirement*," *id*. § 51.9(b)(2)-(3) (emphases added).  The regulation does *not* state that the agency has to expressly specify by section number or heading the portion of the publication that is incorporated or essential to understanding any legal requirements.

Public.Resource.Org relies instead on what it calls OFR's "clear guidance" and "interpretation" of the regulations, to which this Court supposedly owes "substantial deference."  Appellee's Br. 32-33 & n.8.  But these sources consist only of a Document Drafting Handbook and IBR Handbook, and a hearsay email statement.  *Id*. 6, 33.  Public.Resource.Org fails to cite the controlling authority on deference to an agency's interpretation of its regulations, *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), much less show that such deference applies, which "it often doesn't," *id*. at 2418.

First, the relevant regulation, 1 C.F.R. 51.9(b), is not "genuinely ambiguous." *Kisor*, 139 S. Ct. at 2415.  The regulation requires the agency to state identifying information for "the publication" as a whole and the fact "the publication" establishes a "requirement."  Nothing in the regulation is susceptible to the reading Public.Resource.Org tries to wring out of it.

Second, the sources Public.Resource.Org cite do not meet the requirements for deference.  *Id*. at 2416-18; *National Lifeline Ass'n v. FCC*, 983 F.3d 498, 507

(D.C. Cir. 2020). None of them purports to construe 1 C.F.R. 51.9(b), much less reflects any "fair and considered judgment" of how to construe that regulation. *Kisor*, 139 S. Ct. at 2417 (citation omitted). The cited sources are not "authoritative" or an "official position" on §51.9(b), *Kisor*, 139 S. Ct. at 2416 (citations omitted), because they do not show OFR taking a position on Public.Resource.Org's proffered interpretation. The Handbooks are simply practical guidance manuals to agencies. The email is just an informal response to Public.Resource.Org's founder.

Agency and OFR practice undercuts Public.Resource.Org's construction of §51.9(b). As Plaintiffs demonstrated, numerous IBR'd Works contain sections expressly stating that they are *not* legally-binding requirements. Appellants' Br. 22; *see also, e.g.*, JA ___ (2d. Supp. SMF ¶64); JA ___ (Dkt. 155-6, Ex. A at NFPA-PR0017561); JA ___-___ (2d. Supp. SMF ¶67); JA ___ (Dkt. 199-17, Ex. F at NFPA-PR0014507); JA ___ (2d. Supp. SMF ¶71); JA ___ (Dkt. 199-34, Ex. 1 at 6). Other Works are IBR'd by regulations whose plain language makes clear that the standards are incorporated as reference procedures. Appellants' Br. 21. Still other Works have sections that are obviously not essential to understanding any legal duty—because, for example, those sections address a completely different topic than the regulation, or on their face provide optional or explanatory material. *See id.* 19-23; *see also, e.g.*, JA ___ (Dkt. 213-1 ¶8); JA ___ (Dkt. 199-15); JA ___ (2d. Supp. SMF ¶75); JA ___ (Dkt. 199-34, Ex. 1 at 146-67). In these instances, the agency

19

did not limit its IBR to only mandatory provisions of the Work, yet it could not rationally have determined the entire standard was necessary to comply with legal duties. Despite the agencies not having followed Public.Resource.Org's claimed interpretation of the regulation, OFR approved the IBR, thus demonstrating that OFR does not read the regulation Public.Resource.Org's way. *See* 1 C.F.R. 51.3(b).

Finally, if Public.Resource.Org's citations require deference, then so too do the statements in the IBR Handbook that express OFR's position that agencies must respect organizations' copyrights. Office of the Federal Register, IBR Handbook at 8-9 (July 2018) (recognizing the need to balance copyright interests and that one way of doing so is to "[m]ake the incorporated material publicly available in read-only form on the copyright owner's website"). Indeed, OFR has consistently taken this position. *See* Letter from Raymond Mosley, Director of the Federal Register, to Carl Malamud, at 2 (Aug. 3, 2009), https://law.resource.org/pub/us/case/govdocs/gov.nara.fedreg_20090803_from.pdf (explaining that "some documents incorporated by reference do or may have copyright protection"); *see generally* Mosley and Tapella Br. (declining to endorse Public.Resource.Org's interpretation of regulations).

Public.Resource.Org's backup argument fights this Court's test. It argues that copying IBR'd content that is merely "help[ful]" to understanding legal duties is transformative. *ASTM II*, 896 F.3d at 450; Appellee's Br. 31, 35-36, 39. This Court

said that "where knowing the content of an incorporated standard might help inform one's understanding of the law but is not essential to complying with any legal duty, the nature of PRO's use might be less transformative and its wholesale copying, in turn, less justified." *ASTM II*, 896 F.3d at 450.  A rule that draws the line at "helpful" has no limiting principle, encompassing Plaintiffs' "explanatory material" that might be found in introductions, annexes, notes, trainings, and handbooks.  NAACP Br. 19-20.

Public.Resource.Org misstates Plaintiffs' argument as one that would require "a sentence-by-sentence analysis."  Appellee's Br. 32.  That is *not* Plaintiffs' argument.  Appellants' Br. 30-31.  Following this Court's direction, Plaintiffs proposed different ways of grouping the Works.  *Id*. 31; *see* JA ___ -___ (Dkt. 199-1 at 17-24) (grouping (1) standards not IBR'd by Public.Resource.Org's identified reference; (2) optional standards or reference procedures; (3) standards with no direct legal effect on private party conduct; (4) standards posted wholesale when only a portion was IBR'd; and (5) merely informational portions or background text).  The district court ignored those groupings.  Its analysis of the remanded questions the Court asked it to answer was perfunctory, incomplete, and in many cases demonstrably wrong.  Appellants' Br. 24-30.

In sum, Public.Resource.Org fails to justify the district court's factor one errors.

### 2.     Public.Resource.Org's purpose overlaps with Plaintiffs' and is non-transformative.

Public.Resource.Org has not "add[ed] something new, with a further purpose or different character," beyond what Plaintiffs already do.  *Campbell*, 510 U.S. at 579.  Public.Resource.Org argues that its mission of making "the law" publicly available is different from Plaintiffs' public-service missions, such as promoting health and safety.  But Plaintiffs *share* this purpose.  They put the Works online so members of the public have access to them.  JA ___ , ___, ___ (SMF ¶¶63-67, 100, 161); JA ___ (Supp. SMF ¶¶23-24); JA ___ (2d. Supp. SMF ¶¶85-87).

Public.Resource.Org and its amici also contend that its use is transformative because it makes the Works more "user-friendly" and "genuinely accessible," and provides an "archive."[7]   Appellee's Br. 37-38, 40, 46; Sonoma County Br. 5; NAACP Br. 20.  But this Court already rejected these and similar arguments.  *ASTM II*, 896 F.3d at 450 (rejecting transformative claims based on "converting the works into a format more accessible for the visually impaired or . . . producing a centralized database of all incorporated standards").

---

[7] Public.Resource.Org speculates that its "archive" might be used by others for transformative uses, such as research or machine learning, Appellants' Br. 37, 41, but transformativeness is assessed on a "case by case" basis, *Campbell*, 510 U.S. at 581.  Whether a hypothetical researcher's copying, or amicus the National Association for the Advancement of Colored People's copying, might be fair is legally irrelevant to Public.Resource.Org's fair use defense.  Congress has imposed substantial limitations on archiving that Public.Resource.Org's model would undermine.  *See* 17 U.S.C. § 108.

There is no record evidence that low-income communities or print-disabled users, represented by amici, are unable to access the Works through Plaintiffs' sites. The evidence shows Plaintiffs regularly grant requests to use the Works for limited, non-commercial purposes without charge or at lower cost, and provide accommodations to users with disabilities.  JA ___, ___ (Dkt. 118-7 ¶¶13, 65); JA ___ (Dkt. 118-3 ¶10); JA ___-___ (Dkt. 118-10 ¶¶18-20); JA ___ (Dkt. 118-12, Ex. 8 (Comstock Dep. 106:19-22)); JA ___ (Dkt. 155-7, ¶17); JA ___ (Dkt. 155-6, ¶¶4-7); JA ___-___ (Dkt. 155-5 ¶¶4-6).

"[A] simple assertion of a subjectively different purpose, by itself, does not necessarily create" transformative use; what matters "is how the work in question appears to the reasonable observer."  *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 263 & n.3 (4th Cir. 2019) (citations and quotation marks omitted). Public.Resource.Org provides a substitute for Plaintiffs' Works.  *Swatch Group Management Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014), is inapposite.  The court described Bloomberg's use as "arguably transformative" because it made a company's earning call publicly available while the underlying company intended "to restrict the information" to "a relatively small group of

23

analysts." *Id.* at 85.  Here, Plaintiffs and Public.Resource.Org both do the same thing:  they make the Works accessible for free online.[8]

### B.    Factors 2 and 3: Public.Resource.Org fails to show that the nature of Plaintiffs' Works, and the amount and substantiality of its copying, favor fair use.

Each of these factors "demands an individual appraisal of each standard and its incorporation" and "is ill-suited to wholesale resolution."  *ASTM II*, 896 F.3d at 451-52.  Plaintiffs showed that, despite a lengthy appendix, the district court did not give individual consideration to the vast majority of Works.  Appellants' Br. 34-37.

---

[8] Although Public.Resource.Org is a non-profit, Plaintiffs maintain that its use is commercial because it fundraised by promising to copy and distribute Plaintiffs' Works.  JA ___-___ (SMF ¶¶227-29); *see also $10 million for Project 10^100 winners*, Google Blog (Sept. 24, 2010) https://googleblog.blogspot.com/2010/09/10-million-for-project-10100-winners.html.

Public.Resource.Org's primary response is to repeat its argument that IBR'ing makes the entire standard "essential."[9]  Appellee's Br. 42-43, 46.  As demonstrated, that argument fails.  *See supra*, III.A.1.[10]

### C. Factor 4: Public.Resource.Org failed to meet its burden to show a lack of market harm.

#### 1. The district court erred in shifting to Plaintiffs Public.Resource.Org's affirmative-defense burden.

Public.Resource.Org fails to rebut Plaintiffs' showing that *Campbell* and cases following it place the burden on Public.Resource.Org, the proponent of the affirmative defense of fair use.  Appellants' Br. 40-42.

---

[9] Plaintiffs pointed out that the district court held that the regulation incorporating ASTM D2036 (1998) supported posting only certain test procedures— but that for other Works IBR'd by the same regulatory language (ASTM D1688 (1995) and ASTM D512 1989 (1999)), Public.Resource.Org was not limited to copying test procedures, but could *also* copy background sections and appendices. Appellants' Br. 37-38.  Public.Resource.Org argues that the district court treated ASTM D2036 differently because "it found that only two of the four testing methods described in that standard had been incorporated," while *all* the test procedures in the other standards were IBR'd.  Appellee's Br. 47.  That distinction would explain why Public.Resource.Org could copy half the test procedures in ASTM D2036 and all the test procedures in the other standards.  But it does *not* explain the district court's holding that Public.Resource.Org could copy material *other than test procedures* for ASTM D1688 and ASTM D512.

[10] Public.Resource.Org's assertion that partially incorporated standards are "inherently bound together" with the "uncopyrightable idea" of the agencies' "decisions" to IBR, Appellee's Br. 45 (citation omitted), is specious.  The "fact" or "idea" of any agency IBR'ing all or part of a Work can be expressed in a sentence stating that fact; it does not justify copying it.

*Princeton Univ. Press v. Mich. Doc. Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996), Appellee's Br. 49, does not change this.  The court not only found the defendant's use *was* commercial, but it explained that market harm was obvious because if others "were to start doing what the defendants have been doing here," the plaintiffs' "revenue stream would shrivel and the potential value of the copyrighted works" would drop.  *Princeton*, 99 F.3d at 1387.  The same is true here.

### 2.    The uncontroverted evidence shows that Public.Resource.Org's copying causes market harm.

The pivotal question is "whether Defendants' use—taking into account *the damage that might occur if 'everybody did it'*—would cause substantial economic harm."  *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014) (emphasis added).  The answer is clear:  if everyone could copy and distribute any Work IBR'd anywhere, that would cause Plaintiffs substantial economic harm.  "The threat of market substitution here is great and thus the fourth factor looms large in the overall fair use analysis."  *Id.* at 1275.  Even if *some* copying of limited portions were permissible fair use, Public.Resource.Org's wholesale copying and distribution cannot be justified.

Public.Resource.Org argues there was no harm because witnesses said it was difficult to quantify precisely how many sales Plaintiffs *had* lost because of Public.Resource.Org's conduct.  Appellee's Br. 49-50.  This argument improperly conflates the fact of harm to *potential* markets (which is all that needs to exist) with

the precise quantification of harm. *McGucken v. Pub Ocean Limited*, 42 F.4th 1149, 1163 (9th Cir. 2022) ("an infringing use would destroy a derivative market when the infringing work is of the same type as existing works by licensed users."); *see also Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 64 (1st Cir. 2012) (rejecting argument that plaintiff had "not shown specific lost sales or profits" because "inquiry cannot be reduced to strictly monetary terms"). The cited testimony, Appellee's Br. 49-50, actually explained that Public.Resource.Org's copying and distribution "caused a drag on [ASTM's] revenue," even if the amount was not easily quantified, JA ___ (Dkt. 204-51, Grove Dep. 145:07-12). The evidence further showed that Public.Resource.Org took users who would otherwise have gone to Plaintiffs' free-access sites and may have purchased Plaintiffs' Works, JA ___-___, ___ (2d. Supp. SMF ¶¶97-99, 102); *infra*, 30; and that Plaintiffs' licenses would have less value if licensees could obtain the Works from Public.Resource.Org, JA ___, ___ (2d. Supp. SMF ¶¶82, 101); JA ___ (Dkt. 198-50 ¶36).

The record includes an unrebutted expert economist opining on the fact of economic harm and the consequences of Public.Resource.Org's conduct if unaddressed. That evidence analyzed the specific numbers of views and downloads of the Works through Public.Resource.Org (as of 2014) and estimated that, in light of an NFPA study showing a ten percent decrease in downloads of NFPA 70 due to

27

numerous online postings of NFPA standards, NFPA was experiencing an equal or greater impact after Public.Resource.Org's postings.  JA ___-___ (Jarosz Report ¶133).  It also included the economic consequences if Public.Resource.Org's conduct—which *currently* covers a small fraction of Plaintiffs' standards—were not stopped:  "virtually all of the [] revenues"—████████████████████████ ██████████████—"could be lost."  JA ___-___, ___ (Jarosz Report ¶¶134-35, Tab 5).  And it highlighted that many of Plaintiffs' current most important standards, which are not at issue here, have been IBR'd, meaning that giving Public.Resource.Org free rein to continue would lead to a substantial impact on Plaintiffs' standards.  JA ___-___ (Jarosz Report ¶135)

The record also contains abundant evidence that market harm will only grow if Public.Resource.Org and everyone else can wholesale copy and distribute the Works.  Plaintiffs sell copies of their Works to the industries and professionals that use them in their jobs.  JA ___-___ (2d. Supp. SMF ¶¶77-80); JA ___, ___ (Dkt. 198-50, ¶¶34, 43); JA ___ (Dkt. 118-10, ¶¶17-18); JA ___ (Dkt. 198-49 ¶14).  Public.Resource.Org's copying naturally leads to at least some of those industry professionals using its unlicensed copies *instead* of purchasing Plaintiffs' Works.  JA ___ (2d. Supp. SMF ¶¶94-95); JA ___ (Dkt. 198-50 ¶35); JA ___ (Dkt. 199-34 ¶5); JA ___ (Dkt. 198-49 ¶16); *see also* AFSCME Br. 7.  An engineering firm reached out to Public.Resource.Org asking "How might we access the documents

you offer?" and another engineer asked, after this Court's prior remand, "Does Friday's decision mean you can update the site?" JA ___-___ (2d. Supp. SMF ¶93); JA ___, ___ (Dkt. 198-48, Ex. 173 at PRO_00267293, PRO_00267241).

The fact of "everyone doing" what Public.Resource.Org has done is not theoretical. UpCodes obtained venture-capital funding for its for-profit business, which entices paying subscribers with unrestricted access to NFPA and ASHRAE Works. *See UpCodes, Inc.*, No. 21-5262 (C.D. Cal.). Amicus American Federation of State, County, and Municipal Employees argues that union members *and management* should be able to obtain the Works for free instead of paying for them. AFSCME Br. 3-4.

### 3.    Public.Resource.Org's truncated responses to this Court's questions further confirm market harm.

The Court asked the district court and parties to attend to three market-harm questions on remand. *ASTM II*, 896 F.3d at 453. Public.Resource.Org devotes 12 lines to these questions. Appellee's Br. 51. Public.Resource.Org tries to minimize these questions because the record does not support its fleeting attempt to answer them.

First, Public.Resource.Org says Plaintiffs are like "[p]ublishers of public domain works," *id.*, but that is not true. A public-domain publisher pays distribution, not content-creation, costs. Plaintiffs, in contrast, incur *millions* of dollars annually to develop and update their Works. *See supra* 5.

Second, Plaintiffs' read-only access—as compared to Public.Resource.Org's unauthorized wholesale distribution—brings individuals and professionals to Plaintiffs' websites, where they may buy a copy, subscribe, or purchase a training or other resource.  JA ___-___, ___ (2d. Supp. SMF ¶¶88-90, 94); JA ___-___ (Dkt. 198-50, ¶45); JA ___ (Dkt. 199-34 ¶4); JA ___ (Dkt. 198-49, ¶15). Public.Resource.Org siphons those potential customers away.

Third, Public.Resource.Org says it "seeks" to post only "the law," Appellee's Br. 51, but as demonstrated in Section III.A, it posts more than that.

Fourth, contrary to Public.Resource.Org's unsubstantiated statement that "superseded" versions have "minimal" commercial value, Public.Resource.Org admits that they are often perfect substitutes for later editions.  Appellee's Br. 50; *id.* 39 (admitting "post[ing] . . . an *identical reissue* of the incorporated standard"); JA ___ (2d. Supp. SMF ¶96); JA ___ (Dkt. 198-49 ¶17).

### 4. At a minimum, there is a disputed fact issue on factor four.

Plaintiffs should prevail as a matter of law on factor four, but if not, the question should be remanded.  Drawing all reasonable inferences in favor of Plaintiffs, there is at least a disputed fact question on market harm.  JA ___-___ (Dkt. 212-1 ¶¶133-65).

Echoing the district court's erroneous conclusion, Public.Resource.Org says Plaintiffs failed to show market harm for several years before that court's order.

30

Appellee's Br. 48.  But this ignores that Public.Resource.Org, at the district court's request, stopped posting Plaintiffs' Works from November 2015 until at least July 2018.  JA ___ (SMF ¶¶185-86); JA ___ (2d. Supp. SMF ¶¶11-12).  Courts exclude that time from the calculus.  *See Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1275 n.32 (11th Cir. 2001) (relevant period for assessing harm was after the court "lifted the injunction").  From July 2018 through present, Public.Resource.Org almost entirely refrained from posting the most updated versions of IBR'd Works, further masking the effect of unrestrained infringement.  Starting in January 2019, Public.Resource.Org posted a single more-current standard, the then-most-recent edition (2017) of NFPA's National Electrical Code.  JA ___ (2d. Supp. SMF ¶110); JA ___ (Dkt. 198-50, ¶30); JA ___ (Dkt. 198-48, Ex. 167 at 6).  Discovery was open for only six months after that.  *See* Order, Feb. 26, 2019 (reopening case) and Order May 22, 2019 (fact discovery closed Sept. 9, 2019).[11]

This Court said Plaintiffs "are right to suggest that there may be some adverse impact on the market for the copyrighted works [Public.Resource.Org] reproduced

---

[11] In that time period, NFPA 70 (2017) was accessed through Public.Resource.Org 5,320 times, JA ___ (Dkt. 198-48, Ex. 167 at 6), and NFPA's overall sales, largely driven by sales from its flagship standard, NFPA 70, had also been decreasing, including through this time period.  JA ___ (Dkt. 198-50, ¶38). The most recent access count for NFPA 70 through Public.Resource.Org has now increased *seven times*.  *See* Internet Archives, https://archive.org/details/gov.law.nfpa.nec.2017/gov.law.nfpa.nec.2017/ (accessed Jan. 13, 2023).

on its website," and simply noted that "it remains unclear from this record just how serious that impact is." *ASTM II*, 896 F.3d at 453. The district court previously recognized that "the only logical conclusion" is that "where consumers in the online marketplace are currently presented with the option to purchase a PDF or hard copy version of Plaintiffs' standards directly from them, or may download a PDF of an identical standard for no cost," "this choice negatively impacts the potential market for Plaintiffs' standards." JA ___ (Dkt. 175 at 39); *McGucken*, 42 F.4th at 1164 (potential market harm when infringing work was a "ready market substitute"). At a minimum there is a genuine dispute of fact that if Public.Resource.Org's conduct became unrestricted and widespread, it would adversely impact the market for the Works and the market for derivative works.

In addition to the evidence cited above, judicially-noticeable evidence shows that, since the summary judgment record closed, NFPA's revenue has gone down cycle-over-cycle following the lifting of the district court's injunction. Between 2016 (a year in which a new version of the National Electrical Code was released and *no* version of the Code was available through Public.Resource.Org) and 2019 (the next year in which a new version of the Code was released but Public.Resource.Org *had* posted prior versions of the Code), NFPA's publication

revenue was down *$5.6 million*.[12]  These figures were not available when the district court considered the evidence and show that NFPA's revenue decreased after Public.Resource.Org resumed distribution of NFPA's standards.

### 5.   The claimed "public benefits" from Public.Resource.Org's unrestricted copying are illusory.

Public.Resource.Org argues that *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183 (2021), requires the Court to factor into the fourth factor "the public benefits the copying will likely produce," *id.* at 1206.  Appellee's Br. 48, 53-55.  But *Google* said this was relevant because of the unique context—computer program application programming interfaces—where enforcement of the copyright risked public harm because programmers faced potentially prohibitive switching costs that could deter new creativity.  141 S. Ct. at 1206, 1208.

No similar concerns exist here.  Plaintiffs provide online access to the Works, JA ___ (2d. Supp. SMF ¶85), so anyone who wants to know what they say does not have to buy a copy.  This case involves the "normal[] conflict" between "potential or presumed losses to the copyright owner" and "copyright's basic objective: providing authors with exclusive rights that will spur creative expression." *Google*,

---

[12]  NFPA's tax filings are available at https://projects.propublica.org/ nonprofits/organizations/41653090. Its expenses and revenues are typically in the tens of millions.  Publication revenue was $48 million in 2016 and $42.4 million in 2019, with increased expenses.  *Compare* Form 990s, Part III.4a.  This Court can take judicial notice of information in tax filings.  *See MidCap Media Finance, LLC v. Pathway Data, Inc.*, 929 F.3d 310, 315 (5th Cir. 2019).

141 S. Ct. at 1206; *see also Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 461 (9th Cir. 2020) (same).

Public.Resource.Org claims that even absent copyright protection, Plaintiffs would have incentives to develop standards.  Appellee's Br. 52-53.  But Plaintiffs would not have the means that copyright provides to act on those incentives.  JA ___, ___-___, ___-___, ___-___, ___-___ (Jarosz Report ¶¶80, 82-83, 90-91, 97-98, 131-38); JA ___, ___-___, ___, ___-___(SMF ¶¶45-48, 51-52, 106-108, 152-156); JA ___-___ (2d. Supp. SMF ¶¶77-84)  If copying like Public.Resource.Org's becomes pervasive, the public-private partnership in standards that has served the public well for decades may cease to exist.

## IV.    Public.Resource.Org's Arguments Do Not Change The District Court's Abuse Of Discretion In Refusing To Enjoin The Infringement It Found.

The district court, after rejecting the fair use defense and finding Public.Resource.Org infringed 32 Works, JA ___ (Memorandum Opinion 36), found:

- Plaintiffs suffered at least a threshold amount of irreparable harm.  JA___-___ (Memorandum Opinion 45-47).

- Monetary relief is inadequate, as Public.Resource.Org does not have the financial means to satisfy any judgment.  JA ___ (Memorandum Opinion 46); JA ___-___, ___ (SMF ¶¶241-44, 272-73); JA ___, ___ (2d. Supp. SMF ¶¶92, 111).

34

- The balance of hardships "weighs strongly in favor of an injunction," and an injunction serves the "policy interests that underlie the Copyright Act" by preserving the necessary financial incentives to "ensure continued development of technical standards." JA ___ (Memorandum Opinion 47).

Given these findings, it was an abuse of discretion to allow Public.Resource.Org to continue its infringement unabated. Public.Resource.Org's contrary arguments fail.

First, Public.Resource.Org's argument that Plaintiffs have not proven ownership of the 32 works, Appellee's Br. 56, is specious, *see supra*, II.

Second, Public.Resource.Org is wrong that Plaintiffs suffered no economic harm. Appellee's Br. 56. Plaintiffs demonstrated several forms of harm; their showing was not "meager." JA ___ (Memorandum Opinion 31); *see* Appellants' Br. 50-55; *supra*, III.C.2

Third, Plaintiffs' future harm is not speculative. Following remand, Public.Resource.Org reposted the 32 Works, notwithstanding the lack of IBR. JA___ (Memorandum Opinion 36). Copies of these Works were viewed and downloaded over *42,000 times*. *See* JA ___-___ (2d. Supp. SMF ¶98) (views and downloads of the 32 Works).

Fourth, Public.Resource.Org's track record makes the likelihood of future infringement manifest. Appellants' Br. 54.

35

Fifth, Public.Resource.Org is wrong that "'harm to the exclusivity of [Plaintiffs'] rights' is irrelevant under *eBay [Inc. v. Mercexchange, LLC]*." Appellee's Br. 57.  An invasion of exclusive rights *alone* may not create a presumption of irreparable harm, but it is not *irrelevant*.  *See, e.g.*, *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 712 (D. Md. 2012) (plaintiff "demonstrated that its loss of exclusive control over its copyrighted content is likely to lead to irreparable harm"), *aff'd*, 722 F.3d 591 (4th Cir. 2013).  Injunctive relief is necessary here because everyone who has downloaded (or will download) a copy from Public.Resource.Org can become an entirely new engine of unrestricted distribution.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007) ("virtually unstoppable" threat of future copyright infringement for downloaded works (citation omitted)).

Sixth, Public.Resource.Org is wrong that "reputational injury" is categorically irrelevant to the copyright irreparable harm inquiry.    Appellee's Br. 58.  Public.Resource.Org misreads *Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015) (en banc),[13] which said that "harm must stem from copyright—namely, harm to [the] legal interests *as an author*."  *Id.* (citing *Salinger v. Colting*, 607 F.3d 68, 81

---

[13] In *Garcia*, the Ninth Circuit did not "foreclose" any argument for reputational injury.  786 F.3d at 746.  It found that the particular harm plaintiff sought to prevent, including death threats and reputational injury, were too attenuated.

& n.9 (2d Cir. 2010)).  Public.Resource.Org caused reputational harm here by introducing errors that sometimes significantly alter the meaning of Plaintiffs' Works.  *See, e.g.*, JA ___ (SMF ¶219).  The risk that, notwithstanding the disclaimers, a reader will misattribute these errors to Plaintiffs poses a significant reputational risk derived from Plaintiffs' legal interests as the author of the original works.  *See Nintendo of Am. Inc. v. Lewis Galoob Toys Inc.,* No. 90-15936, 1991 WL 5171 (9th Cir. Jan. 24, 1991) (recognizing irreparable harm based on impairment to plaintiff's reputation); *Metro. Reg'l*, 888 F. Supp. 2d at 712 (finding irreparable harm where defendant's inaccuracies were "likely to affect the credibility and integrity of the content published and disseminated by MRIS, and as a result, MRIS's reputation").

The balance of hardships and public interest favor Plaintiffs.  JA ___ (Memorandum Opinion 47)*.*  Public.Resource.Org essentially admits that it intends to post the entirety of any of the 32 Works if some portion of that work is ever IBR'd. Appellee's Br. 58.  As Public.Resource.Org concedes, if circumstances change that merit modification of an injunction, Public.Resource.Org can seek such modification, *see id.*, and it has admitted it will face no financial harm in the meantime, JA ___, (SMF ¶277).  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (court must weigh "*likely* consequences of the injunction" which cannot be "insubstantial" and "must be supported by evidence").

## CONCLUSION

The Court should vacate and remand the district court's decision in part and reverse in part.

Dated January 13, 2023

Respectfully submitted,

*/s/  J. Kevin Fee*
J. Kevin Fee
Jane W. Wise
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
Tel: (202) 799-4000
kevin.fee@us.dlapiper.com

Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: (619) 699-2700
stanley.panikowski@us.dlapiper.com

*Counsel for American Society for Testing and Materials d/b/a/ ASTM International*

*/s/  Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz
David P. Mattern
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 737-0500
jbucholtz@kslaw.com

Kenneth L. Steinthal
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 318-1200
ksteinthal@kslaw.com

*Counsel for American Society of Heating, Refrigerating, and Air Conditioning Engineers, Inc.*

*/s/  Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Rachel G. Miller-Ziegler
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500E
Washington, DC 20001
Tel: (202) 220-1100
donald.verrilli@mto.com

Kelly M. Klaus
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000
kelly.klaus@mto.com

Rose Leda Ehler
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel: (213) 683-9100
rose.ehler@mto.com

*Counsel for National Fire Protection Association, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B).  As measured by the word-processing system used to prepare this brief, there are 8,499 words in the brief excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14 point font.

Dated:  January 13, 2023                    */s/  J. Kevin Fee*
                                            J. Kevin Fee

## CERTIFICATE OF SERVICE

I certify that on January 13, 2023, a true and correct copy of this Appellants'

Brief was filed via the Court's electronic filing system, which will forward a copy

to all counsel of record.  I certify that all participants in this case are registered

CM/ECF users.

Dated:  January 13, 2023                          */s/  J. Kevin Fee*
                                                  J. Kevin Fee

# ADDENDUM

# TABLE OF CONTENTS

Office of Management and Budget Circular A-119 (2016)................................. A-1

Incorporation by Reference, 79 Fed. Reg. 66,267 (Nov. 7, 2014) .................... A-44

H.R. Rep. 94-1476 (1976) [EXCERPT] ............................................................ A-56

H.R. Rep. 113-152 (2013) [EXCERPT] ............................................................ A-59

EXECUTIVE OFFICE OF THE PRESIDENT
Office of Management and Budget

OMB Circular A-119:  Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities

AGENCY:  Office of Management and Budget, Executive Office of the President

ACTION:  Final Revision of OMB Circular A-119

SUMMARY:  The Office of Management and Budget (OMB) has revised Circular A-119, "Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities" (hereinafter, Circular A-119, or, the Circular) in light of developments in regulation, standards, and conformity assessment since the Circular was last revised in 1998.

DATES:  Effective upon publication

ADDRESSES:  Direct any comments or inquiries to the Office of Information and Regulatory Affairs, Office of Management and Budget at CircularA-119@omb.eop.gov.

 SUPPLEMENTARY INFORMATION:
   I.    Existing OMB Circular A-119
   II.   Discussion and Responses to Significant Comments
   III.  Section-by-Section Discussion

**Existing OMB Circular A-119.**  The vibrancy and effectiveness of the U.S. standards system in enabling innovation depends on continued private sector leadership and engagement.  Our approach—reliance on private sector leadership, supplemented by Federal government contributions to discrete standardization processes as outlined in OMB Circular A-119—remains the primary strategy for government engagement in standards development.

The policies of Circular A-119 are intended to encourage Federal agencies to benefit from the expertise of the private sector, promote Federal agency participation in standards bodies to support the creation of standards that are useable by Federal agencies, and minimize reliance on government-unique standards where an existing standard would meet the Federal government's objective.

The National Technology Transfer and Advancement Act of 1995 (Public Law 104-113; hereinafter known as "the NTTAA") codified pre-existing policies on the development and use of voluntary consensus standards in OMB Circular A-119, established additional reporting requirements for agencies, and authorized the Department of Commerce's National Institute of Standards and Technology (NIST) to coordinate conformity assessment activities.

**Revision of OMB Circular A-119**.  OMB is revising this Circular in light of developments in regulation, standards, and conformity assessment since the Circular was last revised in 1998.  These revisions reflect the experience gained by U.S. agencies in implementing the Circular since 1998, and concluding and implementing U.S. trade agreements, as well as developments in domestic and

1

international regulatory, standards, and conformity assessment policies.

The revised Circular reflects and supports the regulatory policies and principles set out in relevant executive orders. OMB notes, in particular, the requirements of four executive orders, three of which were issued after 1998:

- Executive Order 12866 ("Regulatory Planning and Review") states that regulations must be consistent with law; regulations must identify the nature and significance of the problem; agencies must identify and assess alternatives to address the problem along with the costs and benefits of each alternative; and the approach selected should maximize net benefits to society;

- Executive Order 13563 ("Improving Regulation and Regulatory Review") emphasizes that the U.S. regulatory system "must protect public health, welfare, safety, and [the] environment while promoting economic growth, innovation, competitiveness, and job creation," and stresses the importance of public participation and careful consideration of both benefits and costs;

- Executive Order 13609 ("Promoting International Regulatory Cooperation") directs Federal agencies to better coordinate U.S. priorities and positions with respect to international regulatory cooperation efforts across U.S. Federal agencies. This includes promoting good regulatory practices both in the United States and internationally, as appropriate, and considering reforms that address unnecessary differences in regulatory requirements between the United States and its major trading partners; and

- Executive Order 13610 ("Identifying and Reducing Regulatory Burdens") institutionalizes the retrospective review mechanism set out in Executive Order 13563 and calls on agencies to reduce the cumulative effects, including the cumulative burdens, of regulation.

In addition to the above Executive Orders, on January 17, 2012, OMB's Office of Information and Regulatory Affairs (OIRA), the Office of Science and Technology Policy (OSTP), and the Office of the United States Trade Representative (USTR) released a Memorandum to Federal agencies on "Principles for Federal Engagement in Standards Activities to Address National Priorities" (see http://www.whitehouse.gov/sites/default/files/omb/memoranda/2012/m-12-08).

The revisions to Circular A-119 inform agencies of their statutory obligations in standards-setting activities. Specifically, 19 U.S.C. § 2532 provides that "[n]o Federal agency may engage in any standards-related activity that creates unnecessary obstacles to the foreign commerce of the United States" and specifies four requirements for agencies' standards-related activities:

1. Ensuring that imported products are not treated less favorably than like domestic products or imported products from other countries;
2. Taking into consideration international standards – and basing standards upon them if appropriate;
3. Developing standards based on performance criteria rather than design criteria when appropriate; and
4. Ensuring foreign suppliers have access to conformity assessment procedures on the same

2

basis as other domestic and foreign suppliers of like products.

In order to gather relevant information for this revision, OMB published a Request for Information (RFI) in the Federal Register on March 30, 2012 (77 Fed. Reg. 19357) on "whether and how to supplement Circular A-119."  The notice also announced OMB would be holding a public workshop at NIST on May 15, 2012.

The RFI and public workshop allowed interested stakeholders to provide valuable input to OMB, NIST, Federal regulators, and other relevant agencies on how the Federal government should address regulatory, standards, and conformity assessment issues that have emerged or moved to the forefront since the Circular was last promulgated in 1998.  OMB received approximately 70 comments from a wide range of stakeholders, including companies, trade associations, academics, public interest groups, standards developing bodies, conformity assessment bodies, and private citizens.[1]

In response to those comments from 2012, OMB issued a Request for Comment on a Proposed Revision of OMB Circular A-119, "Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities," on February 11, 2014 (79 Fed. Reg. 8207).  OMB received over 80 comments from a wide range of stakeholders including companies and trade associations, academics, public interest groups, standards development bodies, conformity assessment bodies, and private citizens.[2]

**Discussion and Responses to Significant Comments**

Although some commenters were critical of specific aspects of the proposed revision, the majority of commenters expressed support for the overall revisions to the Circular and the approaches taken. The more substantive comments are summarized below, along with OMB's responses.

While OMB carefully considered the proposals and concerns of all commenters, many comments were not germane, given the scope of the Circular.  The purpose of the Circular is <u>only</u> to provide guidance on agency use of standards at a level that is practical and useable for all agencies.

For example, OMB received particularly detailed or individualized comments regarding conformity assessment requirements (OMB defers to NIST and its anticipated revisions to its Guidance on Federal Conformity Assessment), country-specific standards policy (OMB defers to USTR), and the publishing requirements for guidance and regulations for agencies (OMB defers to the Office of the Federal Register).  The most current version of NIST's conformity assessment guidance is available at http://www.nist.gov/standardsgov/.

Based on OMB's consideration and responses to these public comments, as well as developments in regulatory, standards, conformity assessment, and trade policy described above, the revised Circular A-119:

---

[1] Public comments submitted in response to OMB's RFI can be found at
http://www.regulations.gov/#!documentDetail;D=OMB-2012-0003-0001.
[2] Public comments submitted in response to the Proposed Revisions can be found at
http://www.regulations.gov/#!documentDetail;D=OMB-2014-0001-0001.

3

- provides additional guidance for agency participation in standards development activities, including with respect to serving on standards technical committees as well as the boards of standards developing bodies;

- provides factors for agencies to consider when evaluating whether to use a standard to meet agency needs;

- strengthens the role of agency Standards Executives to encourage better internal coordination and training on standards;

- updates the provisions on how the U.S. Government manages and reports on the development and use of standards;

- sets out factors for agencies to consider when assessing the effectiveness of conformity assessment options and determining the type(s) of conformity assessment program(s) to employ;

- provides guidance to agencies on how they should implement provisions of the Circular in their rulemakings and guidance documents;

- encourages each agency to alert the public through the Federal Register or the agency's webpage when the agency is considering whether to participate in the standards development process of a particular body.  Such notification would give the public notice that the agency may use the resulting standard in support of significant regulatory action, international regulatory cooperation activities or to otherwise address issues of national priority;

- provides guidance to agencies on what factors to consider when  incorporating standards by reference in regulation;

- requires agencies to utilize the retrospective review mechanism set out in Executive Orders 13563 and 13610, to ensure, among other things, that regulations incorporating standards by reference are updated on a timely basis;

- encourages agencies to work together to reference the same version of standards in regulation and procurements and coordinate on conformity assessment requirements, where feasible;

- incorporates references to trade-related statutory obligations on standards-related measures and directs Federal agencies to consult with USTR on how to comply with international obligations with regard to standards, technical regulations, and conformity assessment; and

- maintains a strong preference for using voluntary consensus standards over government-unique standards in Federal regulation and procurement.

The Circular does not preclude the use of standards other than voluntary consensus standards in rulemaking, procurement or other program activities in cases where: voluntary consensus standards do not exist or where use of existing voluntary consensus standards would be inconsistent with law or otherwise impractical, including where use of a voluntary consensus standard would not be as effective at meeting the agency's regulatory, procurement, or program needs. The Circular also recommends that the agency consider allowing the use of other standards as alternative means for complying with agency regulatory, procurement, or program requirements based on voluntary consensus standards where such other standards are also found to be suitable under the agency's analysis.

**Promoting Voluntary Consensus Standards:**  Comments received overwhelmingly supported a continued preference for Federal agencies' use of voluntary consensus standards in lieu of developing their own standards, in line with the existing Circular and the requirements of Section 12(d) of the NTTAA.

There was also significant support among the commenters for providing Federal agencies the flexibility to choose among standards developed in the private sector, particularly standards developed for emerging technologies that may or may not precisely follow the traditional voluntary consensus standards development process.  As such, and in order for agencies to choose the best standards for their mission needs, this policy maintains flexibility for agencies to use standards developed in the private sector that best meet agencies' regulatory, procurement, or program needs, whether or not those standards are developed by voluntary consensus standards bodies.  To assist agencies in deciding which standards to use, the Circular identifies factors to consider including, among others, the effectiveness and suitability of the standard for meeting agency regulatory, procurement, or program needs, the extent to which a standard meets the definition of a "voluntary consensus standard," and whether the standard is reasonably available.

Along these lines, many respondents provided valuable comments regarding the revised definitions in the Circular.  The revised Circular incorporates a number of these suggestions intended to clarify the qualifications for a voluntary consensus standards development process.

Several commenters asked for clarification on how the Circular addresses "leadership standards" (a term used to describe standards that exceed minimum threshold requirements).  The Circular does not view leadership standards as different from other types of standards.  As always, the Circular will indicate a preference for voluntary consensus standards over government-unique standards, and agencies may build on those standards as necessary to fulfill their obligations.

In addition, the Circular does not indicate a preference for one type of conformity assessment procedure (*e.g.*, supplier's declaration of conformity, third-party certification) over others.  Agencies must have flexibility to determine the most appropriate conformity assessment program to meet agency needs, consistent with law (see Section 7 of the Circular).

OMB further notes the Circular serves as a floor—not a ceiling—for when and how an agency should use standards.  Agencies can, and in many cases will, have additional guidance for agency components or programs based on mission needs and other factors.

**Updating Considerations for Conformity Assessment:**  Commenters who addressed this issue

expressed moderate to very strong support for OMB providing guidance to agencies with respect to conformity assessment.  Commenters recommended that the Circular encourage agencies to rely on private sector conformity assessment activities; provide criteria for agencies to utilize when determining how to best meet their needs; and help agencies comply with relevant international obligations regarding conformity assessment.  Since the Circular was last published in 1998, the evolution of an increasingly globalized marketplace has induced growth in the scope and importance of conformity assessment.  Global supply and distribution chains may mean a greater number of variables for agencies to assess and more complex logistics to account for when conducting assessments of conformity.  Accordingly, the revised Circular encourages agencies to consider leveraging existing private sector conformity assessment activities wherever consistent with law and mission.

**Ensuring Compliance with International Obligations:**  Numerous commenters on the RFI and the Proposed Revision support OMB guidance to agencies on how to comply with relevant international obligations, including the WTO Agreement on Technical Barriers to Trade and other trade agreements.  Accordingly, OMB in coordination with USTR, which has statutory authority in this area pursuant to 19 U.S.C. § § 2171 & 2541, has updated the Circular to reflect this need.

The Circular directs Federal agencies to consult with USTR on how to comply with international trade obligations relating to standards, technical regulations and conformity assessment, including those codified at 19 U.S.C. § 2531.  In addition, the revisions direct Federal agencies to consult with the State Department, to the extent international obligations other than trade obligations may be implicated.  With respect to the Federal government's formulation of international policies on standards and conformity assessment, regulation, and trade, the revisions would encourage, consistent with Executive Order 13609, greater coordination between the Interagency Committee on Standards Policy, the Regulatory Working Group, the Trade Policy Staff Committee and its subcommittees, and any other relevant interagency groups or committees.

Several commenters to the Proposed Revision voiced concerns over specific issues regarding reciprocity of standards use or recognition by other countries or trade unions.  Since these comments fall outside the Circular's scope of providing guidance to agencies about the Federal government's use of standards, OMB encourages parties to address such concerns directly with USTR.

**Agency Considerations for Incorporation By Reference:**  A wide variety of commenters representing public interest groups, individuals, citizens, standards development organizations (SDOs), and companies provided comment on the question of incorporation by reference.  Some comments advocated for the maintenance of current law and policy, noting many SDOs already freely publish their standards online in read-only formats, while others urged all standards incorporated by reference be made freely available on the Internet.

The majority of these comments turned on particular interpretations of the "reasonably available" requirement in the Freedom of Information Act (FOIA), which requires that standards incorporated into regulation by reference be made reasonably available to the "class of persons affected."  As noted in the Draft Revision, it is not within the purview of the Circular to define reasonable availability.  Rather, it is by statute the responsibility of the Office of the Federal Register (OFR) to

address this issue.[3]  OFR revised its regulations on incorporation by reference in a final rule published November 7, 2014 at 79 Fed. Reg 66267.  In that rule, OFR balanced its statutory obligations regarding reasonable availability of the standards with: (1) U.S. copyright law, (2) U.S. international trade obligations, and (3) agencies' ability to substantively regulate under their authorizing statutes.  To address all of these obligations, the OFR rule required that agencies discuss how materials incorporated by reference were made available to parties (and where those materials are located) and to provide a summary of those materials in the preambles of their rulemaking documents.  These requirements oblige agencies to provide more information on how they make material incorporated by reference available and a summary of the material, so readers can, if they like, find and review the standards.

The revised Circular provides a non-exclusive set of factors to help agencies assess the availability of specific standards for particular regulatory contexts.  These considerations may therefore inform the larger agency decision of whether to request approval for incorporation of those standards in regulation.  As explained in the revised Circular, the basis of these factors for consideration is the Administrative Conference of the United States (ACUS) Recommendation 2011-5, *Incorporation by Reference*, 77 Fed. Reg. 2257 (January 17, 2012).[4]  ACUS adopted the Recommendation through a consensus process in which a broad array of stakeholders participated, including standards developing bodies, academics, public interest groups, regulators, and industry.  Based on the comments, the revised Circular bases its policy on the ACUS Recommendation, modified to enhance clarity.

In general, the factors based on the ACUS Recommendation were well received, particularly the provision by SDOs of read-only access to their standards.  OMB received numerous comments from SDOs highlighting the widespread existence of such a practice.  In response to comments, OMB amended the Circular to recommend that agencies also consider the ease of access, registration, and navigation on those sites.  OMB also received many comments on the option to provide a "freely available, non-technical summary."  Some commenters expressed the need for greater clarity as to what this might entail.  Other commenters questioned the feasibility or utility of a non-technical summary for lengthy, complex, and/or highly technical standards.  To clarify, OMB modified this factor to encourage agency discretion and collaboration with SDOs to enhance practical, impactful improvements to availability on a case-by-case basis.

Additionally, OMB made clarifications emphasizing that: (1) the absence of one or more of such factors should not prevent an agency from using a particular standard; (2) agencies should work closely with SDOs to determine appropriate access to the standards for stakeholders; and (3) agencies should explain the reasoning for their choice of standard, including an explanation of how that standard may be accessed by stakeholders.

**Strengthening Guidance for Agency Participation in the Standards Development Process and the Role of Agency Standards Executives:**  Commenters expressed wide support for increased guidance for agency participation, including in standards development voting and standards body governance.  As a floor, the revised Circular encourages agencies to participate fully in the standards development process—through voting as well as standards body governance—as equal

---

[3] *See* 5 U.S.C. §552(a)(1).
[4] *See* http://www.gpo.gov/fdsys/pkg/FR-2012-01-17/html/2012-621.htm.

parties. OMB, however, defers to individual agencies on their policies for determining to what extent and under what circumstances agency representatives are authorized to engage in particular activities, based on agency requirements and priorities. Additionally, the Circular encourages strong coordination by Agency Standards Executives (ASEs) to allow for effective use of agency resources in the standards development process.

In response to requests for greater notice by agencies of their involvement in the standards development process, the revised Circular provides guidance to agencies on how they should discuss implementation of the Circular in their rulemakings and guidance documents. The revised Circular also encourages each agency to alert the public through the Federal Register and/or its webpage when the agency is considering whether to participate in the standards development process of a particular body, with the intention of using the resulting standard to support significant regulatory action, promote international regulatory cooperation activities, or address issues of national priority. Many of the comments regarding agency participation included agency-specific details that are beyond the scope of the Circular. OMB encourages commenters to contact agencies directly with feedback regarding their voting, travel, or any other policies.

**Ensuring the Timely Updating of Regulations and Other Agency Materials Incorporating Standards:** Many commenters expressed views on whether the most current version of a standard should always be the one used by an agency. OMB recognizes that agencies may have good reasons for not using the most recent version of a standard. For example, if use of a revised standard significantly increases compliance costs that are not justified by the benefits of using the standard, the agency should be free to decline to adopt it.

To ensure the timely updating of standards, the revised Circular requires agencies to utilize the retrospective review mechanism set out in Executive Orders 13563 and 13610. Many commenters voiced strong support for such periodic review, with many agreeing with the suggested three-to-five year review timeframe. OMB believes the use of retrospective review, as outlined by Executive Orders 13563 and 13610, can help ensure (1) the optimal version of a standard is being used by agencies; (2) agencies minimize the impact of conflicting requirements on their shared regulated entities due to references to different versions of standards; and (3), more broadly, the need for the standard and the regulation referencing it still exists.

Additionally, in response to comments, OMB encourages agencies to work closely with SDOs to ensure agencies are aware of, and thus able to consider, updates and alternatives to existing standards. OMB also encourages agencies to work together to reference the same version of standards in regulation and procurements, consistent with statute and agency mission and objectives.

OMB also received comments on specific provisions of the Proposed Circular. Below are the significant comments OMB received and our responses.

**Section-by-Section Discussion**

*Proposed Section 3e—Definition of Voluntary Consensus Standard. Final Section 2d.*

Several clarifications have been made to the definition to increase its technical accuracy (no substantive changes are intended). A commenter suggested that the definition, which states that a voluntary consensus standard needs to be either developed or adopted by a voluntary consensus standards body, be clarified to make clear that the standard at issue was developed or adopted through the use of a voluntary consensus standards development process. OMB agrees and has clarified the final Circular accordingly.

Several other clarifications have been made. We have clarified that it is the voluntary consensus standard bodies, not the standards, which have intellectual property policies. We have also clarified that the Reasonable and Non-discriminatory (RAND) license obligations extend to "implementers of the standard" (this replaces the term "all interested parties," which is a term of art in the rulemaking context).

Lastly, the Federal government does not make a distinction between standards bodies based on where they are domiciled, but rather with respect to the attributes that characterize their processes for standards development. Thus, we have deleted the phrase "both domestic and international." This edit is not intended to make a change in terms of coverage (the Circular includes a discussion of "international standards" at Section 5h and 5i).

*Proposed Section 3f(i)—Definition of Openness. Final Section 2e(i).*

Many commenters expressed concern with the potential burden of the "at all stages" part of the clause requiring SDOs to provide meaningful opportunities to participate. Several commenters noted that, as a practical matter, this need is already covered by the requirements for transparent procedures or processes and for due process. In response, OMB modified the final Circular to omit the reference to "at all stages" and clarify that opportunities to participate in standards development be on a non-discriminatory basis.

*Proposed Section 3f(ii)—Definition of Balance of Representation. Final Section 2e(ii)—Definition of Balance.*

Several commenters questioned the utility of changing this element from "balance of interest," found in the current version of Circular A-119 as well as the American National Standards Institute's (ANSI) Essential Requirements, to "balance of representation." OMB intended for the definition to be consistent with the concepts of both those documents and has simplified the term to "balance" to avoid confusion and to allow for flexibility in how balance is determined during the consensus phase of the development or adoption of the standard.

Additionally, some commenters expressed concern with the ambiguity of "sectors" in this definition. Others commented that a key objective of "balance" is preventing a single interest from dominating the decision-making process. OMB agrees and modified the final Circular, adapting suggested insertions to the text of the definition.

*Proposed Section 3f(iii)—Definition of Due Process. Final Section 2e(iii).*

Several commenters expressed concern with the burden and practicality of requiring "full access" to the views and objections of other participants in standards development. Commenters noted the risks of micromanagement and unnecessary overreach. OMB's intention is to ensure an adequate record of proceedings for the purpose of resolving objections and appeals, so we have modified the final Circular to reflect this intent.

*Proposed Section 6e—When deciding to use a standard, what are some of the factors my agency should consider? Final Section 5a.*

Several commenters expressed a desire for greater clarity in the relationship between agency missions and the preference for voluntary consensus standards over government-unique standards. OMB agrees, and therefore the Circular maintains the preference for voluntary consensus standards, per the NTTAA, while still maintaining flexibility for agencies to best meet their missions.

Additionally, some commenters highlighted the utility of considering the extent to which a standard is already used by a Federal agency, by State and local governments, as well as the prevalence of the standard in the national and international marketplace. These are important considerations precisely aligned with Executive Orders 13563, 13609, and 13610, discussed above. Accordingly, OMB agrees, and modified the Circular to include these considerations.

*Proposed Section 4g—How should my agency determine whether a voluntary standard is "reasonably available" in a regulatory or non-regulatory context? Final Section 5f -- What factors should my agency consider to aid the determination of whether a standard is "reasonably available" in a regulatory or non-regulatory context?*

In general, the factors based on the ACUS Recommendation were well received, particularly SDO provision of read-only access to standards. OMB received numerous comments from SDOs noting they already provide such access. One commenter, however, brought to OMB's attention the disparate capabilities and requirements of various read-only standards websites. OMB agrees that this should be a consideration, and has amended the text to recommend agencies also consider the ease of access, registration, and navigation on those websites.

As referenced above, OMB also received many comments on the option to provide a "freely available, non-technical summary." Some commenters expressed the need for greater clarity as to what this might entail. Other commenters questioned the feasibility or utility of providing a non-technical summary for lengthy, complex, and highly technical standards. To clarify, OMB modified this factor and potential option to encourage agency discretion and cooperation with SDOs to enhance practical, impactful improvements to availability on a case-by-case basis.

Additionally, in response to several comments asking for greater agency consideration of the accessibility of standards incorporated by reference, OMB revised the Circular to recommend that agencies provide, in the preamble of a Notice of Proposed Rulemaking (NPRM) or final rule or guidance document, an explanation of the incorporated materials;

10

how such incorporated standards may be accessed; and how the agency's incorporation by reference of the standard would further the agency's regulatory objective.

*Proposed Section 7—What is the Policy for Federal Participation in Voluntary Standards Bodies? Final Section 6 -- What is the Policy for Federal participation in Voluntary Consensus Standards Bodies?*

Several commenters questioned the reformatting of this section from the existing Circular, specifically the absence of explicit authorization to provide "direct financial support" to standards development activities. Many agencies do so, consistent with applicable law, and here OMB defers to agency policy. To provide agencies with flexibility to meet their missions, the Circular maintains the existing language.

*Proposed Section 8a—What considerations should my agency make when it is determining the type of conformity assessment procedure(s) to use? Final Section 7a—What considerations should my agency make when it is addressing the need for conformity assessment?*

In response to comments, OMB simplified this section. OMB has incorporated the previous Section 8a, "Should my agency consider relying on private sector conformity assessment activities in conjunction with, or where appropriate, in lieu of governmental conformity assessment?" into one question which is now Section 7a, "What considerations should my agency make when it is addressing the need for conformity assessment?"

Additionally several commenters expressed concern over the apparent distinction between using "international conformity assessment schemes" or "private sector conformity assessment activities" as was phrased in the proposed revision. OMB agrees that such international conformity assessment schemes are just one example of private sector conformity assessment activity, and modified the Circular accordingly.

Accordingly, OMB Circular A-119 is revised as set forth below.

Howard Shelanski

Administrator, Office of Information and Regulatory Affairs

EXECUTIVE OFFICE OF THE PRESIDENT
Office of Management and Budget

Washington D.C. 20503

[insert date]

Circular No. A-119

Revised

---

## CIRCULAR NO. A-119, Revised

---

## TO THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

SUBJECT: Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities

**TABLE OF CONTENTS**

**BACKGROUND**

1. What is the Purpose of this Circular?

**DEFINITIONS**

2. What is a Standard?
3. What is Conformity Assessment?

**POLICY**

4. To Whom Does This Policy Apply?
5. What is the Policy for Federal Use of Standards?

  a. When deciding to use a standard, what are some of the factors my agency should consider?
  b. Does this policy establish a preference between voluntary consensus standards and other types of standards?
  c. When must my agency use voluntary consensus standards?
  d. What if no voluntary consensus standard exists?
  e. Should my agency give preference to performance standards?
  f. What factors should my agency consider to aid the determination of whether a standard is "reasonably available" in a regulatory or non-regulatory context?
  g. How should my agency reference standards?
  h. Are there standards-related international trade obligations that agencies must adhere to regarding the use of standards?
  i. When should my agency consider using or recognizing a standard used by a trading partner?
  j. How does this policy affect my agency's regulatory authorities and responsibilities?
  k. How does this policy affect my agency's procurement authority?
  l. What factors should my agency consider when determining whether to allow the use of more than one standard?
  m. How should my agency ensure that standards incorporated by reference in regulation are updated on a timely basis?

12

6.  What is the Policy for Federal Participation in Standards Bodies?

    a.  Must agency participants be authorized?
    b.  Does agency participation indicate endorsement of any decisions reached by standards bodies?
    c.  What forms of support may my agency provide?
    d.  Do agency representatives participate equally with other members?
    e.  How should my agency alert the public of its potential participation in standards development activities that could be used as a basis for rulemaking or other mission-related activities?
    f.  What if a voluntary consensus standards body is likely to publish a suitable standard in time for an agency to use it?

7.  What is the Policy on Conformity Assessment?

    a.  What considerations should my agency make when it is addressing the needs for conformity assessment?
    b.  Are there statutory and international obligations concerning conformity assessment?
    c.  What obligations does my agency have when considering whether to recognize a conformity assessment procedure in use in the market of a trading partner?
    d.  How does this policy affect my agency's regulatory authorities and responsibilities?
    e.  When should my agency utilize the retrospective review mechanism with respect to conformity assessment?

8.  How will the U.S. Government Coordinate Regulatory Policy with Standards and Conformity Assessment Policy?

**MANAGEMENT AND REPORTING OF STANDARDS USE**

9.  How Does My Agency Manage and Report on the Implementation of the Circular?
10. What are the Procedures for Reporting My Agency's Use of Standards in Regulations?
11. What are the Procedures for Reporting My Agency's Use of Standards in Procurements?
    a.  How does my agency report the use of standards in procurements on a categorical basis?
    b.  How does my agency report the use of standards in procurements on a transaction basis?

**AGENCY RESPONSIBILITIES**

12. What are the Responsibilities of the Secretary of Commerce?
13. What are the Responsibilities of the Heads of Agencies?
14. What are the Qualifications and Responsibilities of Agency Standards Executives?

**SUPPLEMENTARY INFORMATION**

15. When will this Circular be reviewed?
16. What is the Legal Effect of this Circular?
17. Do You Have Further Questions?

13

---

## BACKGROUND

---

### 1. **What is the Purpose of this Circular?**

This Circular establishes policies to improve the internal management of the Executive Branch with respect to the U.S. Government's role in the development and use of standards and conformity assessment.  Consistent with section 12(d) of P.L. 104-113, the "National Technology Transfer and Advancement Act of 1995," as amended (hereinafter "the NTTAA"), and U.S. Government executive orders, this Circular directs agencies to use standards developed or adopted by voluntary consensus standards bodies rather than government-unique standards, except where inconsistent with applicable law or otherwise impractical.  The policies in this Circular are intended to facilitate agencies' compliance with obligations under U.S. trade statutes and trade agreements.  U.S. Federal law (19 U.S.C. § 2532) specifically prohibits any U.S. Government agency from engaging in standards-related activities that create unnecessary obstacles to the foreign commerce of the United States.

This Circular provides guidance for agencies participating in the work of voluntary consensus standards bodies and describes procedures for satisfying the reporting requirements of the NTTAA. The policies in this Circular are intended to minimize the reliance by agencies on government-unique standards.  The Circular also provides policy guidance to agencies on the use of conformity assessment in procurement, regulatory, and program activities.  This Circular replaces Office of Management and Budget (OMB) Circular No. A-119, dated February 10, 1998.

Many voluntary consensus standards are appropriate or adaptable for the Federal government's purposes.  The use of such standards, whenever practicable and appropriate, is intended to achieve the following goals:

(i)    eliminating the cost to the Federal government of developing its own standards and decreasing the cost of goods procured and the burden of complying with agency regulation;

(ii)   providing incentives and opportunities to establish standards that serve national needs, encouraging long-term growth for U.S. enterprises and promoting efficiency, economic competition, and trade; and

(iii)  furthering the reliance upon private sector expertise to supply the Federal government with cost-efficient goods and services.

This Circular will also help agencies meet the five fundamental strategic objectives for Federal engagement in standards activities set out in Memorandum M-12-08, "Principles for Federal Engagement in Standards Activities to Address National Priorities" (http://www.whitehouse.gov/sites/default/files/omb/memoranda/2012/m-12-08_1.pdf), which was issued on January 17, 2012.

While M-12-08 applies to Federal engagement in standards activities in those exceptional circumstances where the U.S. Government is playing a leading or convening role, OMB believes that the objectives are generally applicable to Federal engagement in standards and conformity assessment activities, absent contrary statutory requirements.

In addition, the Circular seeks to support efforts by the Federal government to ensure that:

a. the benefits of regulations justify their costs, consistent with Executive Orders 12866, "Regulatory Planning and Review," and 13563, "Improving Regulation and Regulatory Review," and OMB Circular A-4, "Regulatory Analysis";

b. agencies modify, streamline, expand, or repeal regulations that may be outmoded, ineffective, insufficient, or excessively burdensome through the retrospective review process, consistent with Executive Orders 13563 and 13610, "Identifying and Reducing Regulatory Burdens";

c. agencies work with their regulatory counterparts in other countries to address common health, safety, labor, security, or environmental issues, as well as unnecessary differences between the regulatory approaches of U.S. agencies and those of their foreign counterparts that may impair economic growth, innovation, competitiveness, and job creation, consistent with Executive Order 13609, "Promoting International Regulatory Cooperation"; and

d. agencies consider  the cumulative effects, including the cumulative burdens, of regulation, consistent with Executive Order 13610.

------------------------------------------------------------

**DEFINITIONS**

------------------------------------------------------------

**2. <u>What is a Standard?</u>**

a. The term "standard," or "technical standard," (hereinafter "standard") as cited in the NTTAA, includes all of the following:

    (i) common and repeated use of rules, conditions, guidelines or characteristics for products or related processes and production methods, and related management systems practices;

    (ii) the definition of terms; classification of components; delineation of procedures; specification of dimensions, materials, performance, designs, or operations; measurement of quality and quantity in describing materials, processes, products, systems, services, or practices; test methods and sampling procedures; formats for information and communication exchange; or descriptions of fit and measurements of size or strength; and

    (iii) terminology, symbols, packaging, marking or labeling requirements as they apply to a product, process, or production method.

b. The term "standard" does not include the following:

    (i) professional standards of personal conduct; or

    (ii) institutional codes of ethics.

c. "Government-unique standard" is a standard developed by and for use by the Federal government in its regulations, procurements, or other program areas specifically for government use (*i.e.*, it is not generally used by the private sector unless required by regulation, procurement, or program participation). The standard was not developed as a voluntary consensus standard as described in Sections 2d and 2e.

d. "Voluntary consensus standard" is a type of standard developed or adopted by voluntary consensus standards bodies, through the use of a voluntary consensus standards development process as described in Section 2e. These bodies often have intellectual property rights (IPR) policies that include provisions requiring that owners of relevant patented technology incorporated into a standard make that intellectual property available to implementers of the standard on non-discriminatory and royalty-free or reasonable royalty terms (and to bind subsequent owners of standards essential patents to the same terms). In order to qualify as a "voluntary consensus standard" for the purposes of this Circular, a standard that includes patented technology needs to be governed by such policies, which should be easily accessible, set out clear rules governing the disclosure and licensing of the relevant intellectual property, and take into account the interests of all stakeholders, including the IPR holders and those seeking to implement the standard.

e. "Voluntary consensus standards body" is a type of association, organization, or technical society that plans, develops, establishes, or coordinates voluntary consensus standards using a voluntary consensus standards development process that includes the following attributes or elements:

(i) Openness: The procedures or processes used are open to interested parties. Such parties are provided meaningful opportunities to participate in standards development on a non-discriminatory basis. The procedures or processes for participating in standards development and for developing the standard are transparent.

(ii) Balance: The standards development process should be balanced. Specifically, there should be meaningful involvement from a broad range of parties, with no single interest dominating the decision-making.

(iii) Due process: Due process shall include documented and publically available policies and procedures, adequate notice of meetings and standards development, sufficient time to review drafts and prepare views and objections, access to views and objections of other participants, and a fair and impartial process for resolving conflicting views.

(iv) Appeals process: An appeals process shall be available for the impartial handling of procedural appeals.

(v) Consensus: Consensus is defined as general agreement, but not necessarily unanimity. During the development of consensus, comments and objections are considered using fair, impartial, open, and transparent processes.

See Section 5h of this Circular for a discussion of "international standards."

16

A-16

**3. <u>What is Conformity Assessment?</u>**

Conformity assessment" is a demonstration, whether directly or indirectly, that specified requirements relating to a product, process, system, person, or body are fulfilled. Conformity assessment includes sampling and testing, inspection, supplier's declaration of conformity, certification, and management system assessment and registration. Conformity assessment also includes accreditation of the competence of those activities.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**POLICY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**4. <u>To Whom Does This Policy Apply?</u>**

This Circular applies to all agencies and agency representatives who use standards or conformity assessment and/or participate in the development of standards. "Agency" means any executive department, independent commission, board, bureau, office, government-owned or controlled corporation, or other establishment of the Federal government. It also includes any regulatory commission or board, except for independent regulatory commissions insofar as they are subject to separate statutory requirements regarding the use of voluntary consensus standards. It does not include the Legislative or Judicial branches of the Federal government.

**5. <u>What is the Policy for Federal Use of Standards?</u>**

Consistent with Section 12 (d)(1) of the NTTAA, all Federal agencies must use voluntary consensus standards in lieu of government-unique standards in their procurement and regulatory activities, except where inconsistent with law or otherwise impractical. In these circumstances, your agency must submit a report describing the reason(s) for its use of government-unique standards in lieu of voluntary consensus standards as explained in Sections 9-11.

    **a. When deciding to use a standard, what are some of the factors my agency should consider?**

        (i)    In evaluating whether to use a standard, which should be done on a case-by-case basis, an agency should consider the following factors, where applicable:

        (1) Whether the standard is effective and otherwise suitable for meeting agency regulatory, procurement, or program needs, including as applicable:

           (a) the nature of the agency's statutory mandate and the consistency of the standard with that mandate;
           (b) the level of protection the standard provides or is expected to provide for public health, welfare, safety, and the environment;
           (c) the clarity and detail of the standard's language, as the wording of a standard may contain too much detail as well as too little;

17

(d) the costs and benefits of implementing other available standards that may also meet the agency's needs;

(e) the costs and benefits to the Federal government and the regulated public of the agency developing its own standard;

(f) the ongoing use of the standard by other agencies for the same or a similar requirement, the use of which in a particular instance would increase consistency across the Federal government;

(g) the ongoing use of the standard by State and local governments for the same or a similar requirement, the use of which in a particular instance would increase consistency across jurisdictions;

(h) the prevalence of the use of the standard in the national and international marketplaces;

(i) the problems addressed by the standard and changes in the state of knowledge and technology since the standard was prepared or last revised;

(j) the extent to which the standard establishes performance rather than design criteria, where feasible;

(k) the ability of small- and medium-sized enterprises (SMEs) to comply with the standard; and

(l)  the agency's ability to use, and enforce compliance with, the standard in its regulatory process.

(2) The extent to which, when preparing the standard, the standards body reflected the attributes of a voluntary consensus standards body set out in Section 2e of the Circular.  The procedures related to these attributes (*e.g.*, openness, balance, due process, appeals process, and consensus) should be easily accessible, clear and unambiguous.

(3) The extent to which the standard is an international standard (see Section 5h).

(4) Any barriers to membership and participation in the standards development process, given that fee structures, modes of participation, and other factors can impact the ability of SMEs, public interest groups, and the general public to participate.

(5) Whether the standard is "reasonably available."  See Section 5f of the Circular for additional information.

(6) The standards maintenance process used by the relevant standards developing body or bodies.

(ii)   If an agency is proposing to use a standard in a proposed or final rulemaking, the agency must comply with the "Principles of Regulation" (enumerated in Section 1(b) of Executive Order 12866, "Regulatory Planning and Review"), the analytical requirements of other relevant executive orders, and other documents as applicable, including those described in Section 1 of the Circular.

(iii)    As a general matter, standards being considered for use in regulation that specify

18

A-18

nomenclature, basic reference units, or methods of measurement or testing, and that are primarily empirical in their formulation, will ordinarily warrant less scrutiny by an agency than standards that embody factors that are less objective.

(iv)    An agency should, to the extent permitted by law, take account of the effect of using the standard on the economy, and of applicable Federal laws and policies, including laws and regulations relating to antitrust, national security, small business, product safety, environment, metrication, technology development, international trade, intellectual property and copyright, privacy and security, and conflicts of interest.

(v)    An agency should take into consideration the standards developer's intellectual property rights (IPR) policies. Many standards developing bodies have policies requiring participating IPR holders to commit to license any relevant patented technology incorporated into a standard on non-discriminatory and royalty-free or reasonable royalty terms and to bind subsequent owners of standards-essential patents to the same terms. Such policies should be easily accessible, set out clear rules governing the disclosure and licensing of the relevant IPR, and take into account the interests of all stakeholders, including the IPR holders and those seeking to implement the standard.

**b.** **Does this policy establish a preference between voluntary consensus standards and other types of standards?** Consistent with Section 12(d)(1) of the NTTAA, this policy establishes a preference for the use of voluntary consensus standards in lieu of government-unique standards. The Circular does not preclude the use of other standards in rulemaking, procurement, or other program activities in cases where voluntary consensus standards do not exist or use of existing voluntary consensus standards would be inconsistent with law or otherwise impractical, including where use of a voluntary consensus standard would not be as effective at meeting the agency's regulatory, procurement or program needs. The Circular also recommends that the agency consider allowing the use of other standards as alternative means for complying with agency regulatory, procurement, or program requirements that incorporate voluntary consensus standards, where such other standards are also found to be suitable under the agency's analysis. See Section 5l concerning the selection of multiple standards.

**c.** **When must my agency use voluntary consensus standards?** Your agency must use voluntary consensus standards in its regulatory, procurement, and program activities in lieu of government-unique standards, unless use of such standards would be inconsistent with applicable law or otherwise impractical. In all cases, your agency has the discretion to decline to use existing voluntary consensus standards if your agency determines that such standards are inconsistent with applicable law or otherwise impractical, and instead to use a government-unique standard or other standard.

In addition to consideration of voluntary consensus standards, this Circular recognizes the contributions of standardization activities that take place outside of the voluntary consensus standards process. Therefore, in instances where use of voluntary consensus standards would be inconsistent with applicable law or otherwise impracticable (*e.g.*, no voluntary consensus standard would be effective in meeting agency regulatory, procurement, or

19

program needs), agencies should consider, to the extent consistent with applicable law – as an alternative to using a government-unique standard – other standards that meet the agency's regulatory, procurement or program needs, deliver favorable technical and economic outcomes (such as improved interoperability) and are widely utilized in the marketplace.

In those circumstances where an agency elects to use or develop a government-unique standard in lieu of using a voluntary consensus standard, Section 12(d) of the NTTAA requires the agency to submit a report describing the reason(s) to OMB.  Under the Circular, this report is submitted to OMB through the National Institute of Standards and Technology (NIST).  For more information on reporting, see Sections 9 -11 of this Circular.

(i) "Use" means incorporation of a standard in whole, in part, or by reference for procurement purposes; inclusion of a standard in whole, in part, or by reference in regulation(s); or inclusion of a standard in whole, in part, or by reference in other mission-related activities.

(ii) "Impractical" includes circumstances in which such use would fail to serve the agency's regulatory, procurement, or program needs; be infeasible; be inadequate, ineffectual, inefficient, or inconsistent with the agency mission or the goals of using voluntary consensus standards; be inconsistent with a provision of law; or impose more burdens, or be less useful, than the use of another standard.

**d.  What if no voluntary consensus standard exists?**  In cases where no suitable voluntary consensus standards exist, an agency may use suitable standards that are not developed by voluntary consensus bodies.  In addition, an agency may develop its own standards or use other government-unique standards, solicit interest from qualified standards development organizations for development of a standard, or develop a standard utilizing the process principles outlined in Section 2e of the Circular.  As explained above (see Section 5c of the Circular), Section 12(d) of the NTTAA provides that an agency may use a government-unique standard in lieu of a voluntary consensus standard if the use of a voluntary consensus standard would be inconsistent with applicable law or otherwise impractical.  In such cases, the agency must file the statutorily required report (see Section 10).

**e.  Should my agency give preference to performance standards?** Yes.  Pursuant to Section 1(b)(8) of Executive Order 12866 and 19 U.S.C. § 2532(3), your agency should give preference to performance standards where feasible and appropriate.  The term "performance standard" refers to a standard that states requirements in terms of required results, but without stating the methods for achieving the required results.  A performance standard may define the functional requirements for an item, operational requirements, and/or interface and interchangeability characteristics.  A prescriptive standard, by contrast, may specify design requirements, such as materials to be used, how a requirement is to be achieved, or how an item is to be fabricated or constructed.  It is important to recognize that, in many instances, a standard may contain both performance and prescriptive elements.  In such cases, agencies should select standards that provide the most flexibility for achieving the desired results.  In most instances, these will be standards that rely more heavily on performance-based criteria.

**f.  What factors should my agency consider to aid the determination of whether a standard**

20

A-20

is **"reasonably available" in a regulatory or non-regulatory context?**  In determining whether a standard is "reasonably available" to regulated and other interested parties, agencies should take into account the following factors, given that reasonable availability is context-specific.  The absence of one or more of these factors alone should not be used as a basis for an agency decision not to use the standard.  This section shall also be applied in a manner consistent with U.S. international obligations to use relevant international standards (see Section 5h of the Circular); the "Principles of Regulation" (enumerated in Section 1(b) of Executive Order 12866); and the need to "protect public health, welfare, safety, and our environment while promoting economic growth, innovation, competitiveness, and job creation" (see Section 1 of Executive Order 13563).

Factors to consider include:

(i)  whether the standards developer is willing to make read-only access to the standard available for free on its website during the comment period to facilitate more effective access, because access may be necessary during rulemaking to make public participation in the rulemaking process effective;

(ii)  the cost to regulated and other interested parties to access a copy of the material, including the cumulative cost to obtain incorporated materials, and their ability to bear the costs of accessing such materials in a particular context;

(iii)  the extent particular access is needed to achieve agency policy or to subject the effectiveness of agency programs to public scrutiny; and

(iv)  whether the standards developer can provide a summary that explains the content of the standard in a way that meets agency needs and is understandable to a member of the public who lacks relevant technical expertise.

When considering incorporation by reference, agencies should include in the preamble of an NPRM, final rule, or guidance document an explanation of the incorporated materials, and how the agency's incorporation by reference of the standard would further the agency's regulatory objective (see 79 FR 66267 published November 7, 2014 entitled Incorporation by Reference).

If an agency incorporates by reference material that is already freely available, the agency should ensure that the material is available electronically in a location where regulated and other interested parties will be able to find it easily by, for example, providing a link to the website of the standards body.  If an agency incorporates by reference material that is copyrighted or otherwise subject to legal protection and not freely available, the agency should work with the relevant standards developer to promote the availability of the materials, consistent with applicable law, such as through the use of technological solutions, low-cost-publication, or other appropriate means, while respecting the copyright owner's interest in protecting its intellectual property.  To this end, the agency should explain, in the preamble of an NPRM, final rule, or guidance document how such incorporated standards may be accessed consistent with OFR's regulations in 1 CFR Part 51.

**g. How should my agency reference standards?**  Where your agency seeks to incorporate a standard by reference, your agency should reference the standard, along with sources from

which a copy of the standard may be obtained, in relevant publications, regulations, and related internal documents. The Office of the Federal Register's regulations at 1 CFR Part 51 govern the use of incorporation by reference in regulation. For all other uses, your agency must determine the most appropriate form of reference. If a standard is used and published in an agency document, your agency must observe and protect the rights of the copyright holder and meet any other similar obligations, such as those relating to patented technology that must be used to comply with the standard.

**h. Are there standards-related international trade obligations that agencies must adhere to regarding the use of standards?** Yes. There are statutory and international obligations governing "standards-related activities." In particular, agencies should be aware of the obligations in 19 U.S.C. § 2532, which provides that "[n]o Federal agency may engage in any standards-related activity that creates unnecessary obstacles to the foreign commerce of the United States…" and that "[e]ach Federal agency shall ensure, in applying standards-related activities with respect to any imported product, that such product is treated no less favorably than are like domestic or imported products…" "Standards-related activity" is defined in 19 U.S.C. § 2571 and covers certain standards and technical regulations as well as conformity assessment procedures. These statutory requirements reflect U.S. international obligations under the World Trade Organization (WTO) Agreement on Technical Barriers to Trade (TBT Agreement). Specifically, Articles 2.1 and 2.2 and Annex 3 of the Agreement commit the United States, with respect to standards and technical regulations, to provide no less favorable treatment to imported products than like domestic products and to avoid unnecessary obstacles to trade.

In addition, the United States is obligated under the TBT Agreement to use relevant international standards, except where such standards would be an ineffective or inappropriate means to fulfill the legitimate objective pursued. In particular, the TBT Agreement, Article 2.4, provides that: "Where technical regulations are required and relevant international standards exist or their completion is imminent, [WTO] Members shall use them, or the relevant parts of them, as a basis for their technical regulations except when such international standards or relevant parts would be an ineffective or inappropriate means for the fulfillment of the legitimate objectives pursued, for instance because of fundamental climatic or geographical factors or fundamental technological problems." In addition, 19 U.S.C. § 2532 directs Federal agencies, in developing standards, to base the standards on international standards if appropriate.

The WTO TBT Agreement defines "technical regulation" as a document which sets out product characteristics or their related processes and production methods, including applicable administrative provisions, with which compliance is mandatory, and states that the definition may include or deal exclusively with terminology, symbols, packaging, marking or labeling requirements as they apply to a product, process, or production method. The WTO TBT Agreement excludes services, sanitary and phytosanitary measures, and government procurement from its scope. These areas are covered by other WTO agreements discussed later in this section.

The WTO TBT Agreement does not provide a list of bodies that develop international standards. However, in 2000, the WTO Committee on Technical Barriers to Trade adopted

22

A-22

a decision setting out principles that standards bodies should follow when developing international standards (the Decision on Principles for the Development of International Standards, Guides and Recommendations with Relation to Articles 2, 5 and Annex 3 of the WTO Agreement on Technical Barriers to Trade, hereinafter the Committee Decision). Please see the annex to this Circular for additional information.

In addition, certain U.S. free trade agreements commit the United States to determine whether an international standard exists based on the principles set out in the Committee Decision. Agencies should, therefore, pay close attention to the Committee Decision and consult with USTR when questions arise as to evaluating whether a standard developed by a particular standards body is "international." A voluntary consensus standard may be an international standard under the WTO TBT Agreement or provisions of U.S. trade agreements applying to technical barriers to trade, if it was developed in accordance with the Committee Decision principles.

The WTO Agreement on the Application of Sanitary and Phytosanitary Measures (SPS Agreement), which applies to sanitary and phytosanitary measures (*e.g.*, food safety regulations), also addresses the use of relevant international standards. Article 3.1 of the WTO SPS Agreement states: "To harmonize sanitary and phytosanitary measures on as wide a basis as possible, [WTO] Members shall base their sanitary or phytosanitary measures on international standards, guidelines or recommendations, where they exist, except as otherwise provided for in this Agreement, and in particular paragraph 3." Article 3.3 of the SPS Agreement also provides that:

> Members may introduce or maintain sanitary or phytosanitary measures which result in a higher level of sanitary or phytosanitary protection than would be achieved by measures based on the relevant international standards, guidelines or recommendations, if there is scientific justification, or as a consequence of the level of sanitary or phytosanitary protection a Member determines to be appropriate in accordance with the relevant provisions of paragraph 1 through 8 of Article 5. Notwithstanding the above, all measures which result in a level of sanitary or phytosanitary protection different from that which would be achieved by measures based on international standards, guidelines or recommendations shall not be inconsistent with any other provisions of this Agreement.

The WTO SPS Agreement includes a detailed definition of "sanitary or phytosanitary measure" and generally covers measures related to food safety and the spread of disease or pests. Unlike the WTO TBT Agreement, the WTO SPS Agreement identifies three bodies, among others, that develop international standards, guidelines and recommendations for purposes of implementing the WTO SPS Agreement. In particular, the SPS Agreement identifies the following as international standards, guidelines and recommendations: for food safety, those established by the Codex Alimentarius Commission; for animal health and zoonoses, those developed under the auspices of the International Office of Epizootics; for plant health, those developed in the framework of the International Plant Protection Convention; and "for matters not covered by the above organizations, appropriate standards, guidelines and recommendations promulgated by other relevant international organizations open for membership to all [WTO] Members, as identified by the [SPS] Committee."

23

The United States also has procurement obligations under the WTO Agreement on Government Procurement (GPA) and a number of Free Trade Agreements (see FAR Subpart 25.4) to base the technical specifications on international standards, where available. Article X.2 of the WTO GPA provides:

> In prescribing the technical specifications for the goods or services being procured, a procuring entity shall, where appropriate:
>
> (i)   set out the technical specification in terms of performance and functional requirements, rather than design or descriptive characteristics; and
>
> (ii)  base the technical specification on international standards, where such exist; otherwise, on national technical regulations, recognized national standards or building codes.

Agencies should consult with USTR on questions regarding international trade obligations relating to regulations, standards, conformity assessment procedures, or procurement or with respect to any requests from countries regarding the establishment of mutual arrangements with respect to standards-related activities. Pursuant to 19 U.S.C. § 2171 and 2541, USTR has statutory authorities and responsibilities in these areas including "for coordinating United States discussions and negotiations with foreign countries for the purpose of establishing mutual arrangements with respect to standards-related activities." Agencies should consult with the Department of State on questions regarding the application of international agreements other than trade agreements.

**i.   When should my agency consider using or recognizing a standard used by a trading partner?**  To the extent a standard used by a trading partner is an international standard or voluntary consensus standard, agencies should consider and use them as described in this Circular (see, *e.g.*, Sections 5a and h). In addition, agencies should consider and use a standard used by a trading partner, where, pursuant to an international agreement, the United States has agreed to do so (*e.g.*, pursuant to a mutual recognition agreement). Agencies should also examine how recognition or use of a standard used by a trading partner would impact the policy objectives set out in Section 1 of Executive Order 13609, "Promoting International Regulatory Cooperation." An agency may have additional obligations to consider a standard used by a trading partner pursuant to Section 3(d) of Executive Order 13609.

In addition, the United States is obligated to adhere to certain international agreements with respect to accepting as equivalent standards used in the regulations of U.S. trading partners. In particular, the WTO TBT Agreement, Article 2.7, requires the United States and other WTO Members to "give positive consideration to accepting as equivalent technical regulations of other Members, even if these regulations differ from their own, provided they are satisfied that these regulations adequately fulfill the objectives of their own regulations."

The WTO SPS Agreement also contains obligations regarding equivalence determinations with respect to foreign country sanitary and phytosanitary measures (SPS measures). Article 4 of the SPS Agreement provides:

24

(i)   Members shall accept the sanitary or phytosanitary measures of other Members as equivalent, even if these measures differ from their own or from those used by other Members trading in the same product, if the exporting Member objectively demonstrates to the importing Member that its measures achieve the importing Member's appropriate level of sanitary or phytosanitary protection.  For this purpose, reasonable access shall be given, upon request, to the importing Member for inspection, testing and other relevant procedures.

(ii)  Members shall, upon request, enter into consultations with the aim of achieving bilateral and multilateral agreements on recognition of the equivalence of specified sanitary or phytosanitary measures. Agencies should consult with USTR regarding entering into any such consultations.

U.S. Federal law, as codified at 19 U.S.C. § 2578a, provides that an agency may not determine that a foreign country's sanitary or phytosanitary measure is equivalent to a sanitary or phytosanitary measure established under the authority of Federal law unless the agency determines the foreign country measure provides the same level of sanitary or phytosanitary protection as the U.S. measure.

See SPS Agreement, Annex A, for the definition of SPS measure.

**j.  How does this policy affect my agency's regulatory authorities and responsibilities?**  This policy does not preempt or restrict agencies' authorities and responsibilities to make regulatory decisions authorized by statute.  Such regulatory authorities and responsibilities include determining the level of acceptable risk and risk-management, and due care; setting the level of protection; and balancing risk, cost, and availability of alternative approaches in establishing regulatory requirements.  However, agencies should consider using voluntary consensus standards, as described in this Circular, to achieve their regulatory, procurement, and program needs, including for test methods, sampling procedures, and protocols, if applicable.

**k.  How does this policy affect my agency's procurement authority?** This policy does not preempt or restrict agencies' authorities and responsibilities to identify the capabilities that they need to obtain through procurements.  Rather, this policy establishes a preference for using a voluntary consensus standard, to the extent a suitable one exists, instead of pursuing an identified capability through reliance on a government-unique standard.

**l.  What factors should my agency consider when determining whether to allow the use of more than one standard?**  In considering whether to allow the use of more than one standard for suppliers to demonstrate that they meet a particular program, procurement, or regulatory requirement, your agency should consider whether doing so meets your agency's regulatory, procurement, or program needs (see, *e.g.*, Section 5a).  It may be appropriate for the agency to allow the use of multiple standards in order, for example, to permit greater flexibility for producers and service providers in meeting program, procurement, or regulatory requirements, enhance competition in the marketplace, provide greater choice to consumers, and enable new innovative solutions to be developed.  Allowing the use of more

25

than one standard may also allow producers and service providers to meet both U.S. requirements and requirements in different markets simultaneously, thereby reducing burdens for manufacturers and service providers while effectively addressing agency objectives.

**m. How should my agency ensure that references to standards incorporated in regulation are updated on a timely basis?** Consistent with Executive Orders 13563, "Improving Regulation and Regulatory Review," and 13610, "Identifying and Reducing Regulatory Burdens," agencies should, on a regular basis, review and if necessary update references to standards that have been incorporated by reference. Each agency should undertake a standards-specific review of such incorporated standards every three-to-five years, or when stakeholders otherwise provide adequate information that a standards-specific review is necessary due to urgent matters of health and safety, the need to remain current with technological changes, or for other compelling reasons. For example, regulated entities may petition agencies to update incorporated standards.

In accordance with the retrospective review provisions of Executive Orders 13563 and 13610, an agency should also consult with stakeholders prior to issuance of an NPRM, for example through an Advanced Notice of Proposed Rulemaking (ANPRM) or an RFI. Such consultations will help the agency identify which updated or new standards would potentially be controversial (if incorporated by reference in regulation) and which ones would not, and also whether incorporation of new or updated standards may warrant substantive changes to the underlying regulation.

(i)   In the case of standards for which updating or substituting a new standard or standards would not be controversial, the agency should, to the extent permitted by law, consider issuing a standards-specific direct final rule.

(ii)   In the case of other standards for which an agency may wish to update or substitute a new standard or standards, the agency should publish a standards-specific NPRM.

(iii)   To promote efficiency, and to the extent feasible and appropriate, an agency is encouraged to consolidate proposals to update or substitute standards, rather than conducting separate rulemakings for each standard the agency wants to update or substitute.

(iv)   In the case of standards for which updating or substituting a new standard would require a substantial re-opening of a rule, such revisions should be addressed in the context of a broader-scope "look-back" NPRM (rather than through a standards-specific NPRM), where such re-opening meets the objectives and criteria set out in Executive Orders 13563 and 13610.

(v)   If an agency decides not to adopt the most recent version of a standard, the agency should explain its reasons in the final rule.

(vi)   Except in urgent circumstances, and where consistent with law and international obligations, agencies must allow a reasonable interval between the publication of final rules and their effective dates, in order to provide affected stakeholders sufficient time

26

to adapt their products and methods of production to comply with the updated or new standard.

**6.  <u>What is the Policy for Federal Participation in Standards Bodies?</u>**

Consistent with Section 12(d)(2) of the NTTAA, agencies must consult with voluntary consensus standards bodies and must participate with such bodies in the development of standards when consultation and participation is in the public interest and is compatible with their missions, authorities, priorities, and budgetary resources.  In voluntary consensus standards development processes, agency participation can be an important contribution to ensuring balance is achieved.

The WTO TBT and SPS Agreements also contain obligations regarding participation in international standards developing bodies:

(i)     TBT Agreement, Article 2.6:  "With a view to harmonizing technical regulations on as wide a basis as possible, Members shall play a full part, within the limits of their resources, in the preparation by appropriate international standardizing bodies of international standards for products for which they either have adopted, or expect to adopt, technical regulations."

(ii)    TBT Agreement, Article 5.5:  "With a view to harmonizing conformity assessment procedures on as wide a basis as possible, Members shall play a full part, within the limits of their resources, in the preparation by appropriate international standardizing bodies of guides and recommendations for conformity assessment procedures."

(iii)   SPS Agreement, Article 3.4:  "Members shall play a full part, within the limits of their resources, in the relevant international organizations and their subsidiary bodies, in particular the Codex Alimentarius Commission, the International Office of Epizootics, and the international and regional organizations operating within the framework of the International Plant Protection Convention, to promote within these organizations the development and periodic review of standards, guidelines and recommendations with respect to all aspects of sanitary and phytosanitary measures."

Each agency should arrange for qualified representatives to participate in standards development activities, as appropriate.  The representatives' function should be to participate in the standards writing and/or, as appropriate, act as a liaison, provide information and expertise, and communicate the views of the agency concerning the standards being developed and the procedures being followed.

**a.  Must agency participants be authorized?**  Agency representatives who, at Government expense, participate in activities of standards bodies on behalf of the agency must do so as specifically authorized agency representatives.  Agency support for, and participation by, agency representatives in standards bodies must be in compliance with applicable laws and regulations.  For example, agency support is subject to legal and budgetary authority and availability of funds.  Similarly, participation by agency representatives (whether or not on behalf of the agency) in the activities of standards bodies is subject to the laws and regulations that apply to participation by Federal employees in the activities of outside organizations.

Additionally, in considering the applicability of 18 U.S.C. § 208, which addresses Federal participation in outside organizations, the Office of Legal Counsel (OLC) of the Department of Justice has determined the following: "When the board of an outside organization plays an integral role in the process of setting standards, it would therefore frustrate the statute [NTTAA] to forbid Federal employees from being on the board. They could not then take the "active" role that Congress mandated. To carry out the statute, therefore, employees may serve on these outside boards without running afoul of 18 U.S.C. § 208, if the boards are engaged in the standard-setting activities in which Congress directed Federal agencies to participate."[5]

Furthermore, in the 2001 amendment to the NTTAA (in Section 1115 of Public Law 107-107 (which enacted a new paragraph of Section 12(d)), Congress expressly exempted application of 5 U.S.C. § 5946 (which prohibits payments for membership and conference fees) with respect to activities of Federal agencies and personnel in carrying out Section 12(d) of the NTTAA (see 15 U.S.C. § 272 note). As noted in the previous Section, active agency technical involvement and leadership in standards activities is encouraged by this Circular and the NTTAA. However, agency representatives should avoid the practice or the appearance of undue influence relating to their participation in standards bodies and activities.

**b.  Does agency participation indicate endorsement of any decisions reached by standards bodies?** Agency participation in standards bodies does not connote agency endorsement or agreement with decisions by such bodies.

**c.  What forms of support may my agency provide to standards development?** The forms of agency support may include:

(i)    direct financial support (*e.g.*, grants, memberships, and contracts);
(ii)   administrative support (*e.g.*, travel costs, hosting of meetings, and secretarial functions);
(iii)  technical support (*e.g.*, cooperative testing for standards evaluation and participation of agency personnel in the activities of standards bodies);
(iv)   joint planning with standards bodies to promote identification and development of needed standards; and
(v)    participation of agency personnel.

Federal agencies should give adequate priority in their budgets to the need for agency officials to participate in standards development.

**d.  Do agency representatives participate equally with other members?** Consistent with agency regulation and policy, agency representatives should participate actively and on an equal basis with other members, consistent with the procedures of standards bodies, particularly in matters such as establishing priorities, developing procedures for preparing, reviewing and approving standards, and developing or adopting new standards. Active participation includes full involvement in discussions and technical debates, registering of opinions and, if selected,

---

[5] *See* OLC's opinion of August 24, 1998, on "Application of § 208 to Service by Executive Branch Employees on Boards of Standard-Setting Organizations," http://oge.gov/DisplayTemplates/ModelSub.aspx?id=1826.

28

serving as chairpersons (or other leadership positions) or in other official capacities.  Agency representatives may vote, in accordance with the procedures of the standards body, at each stage of the standards development process, unless prohibited from doing so by law or their agencies.

e.  **How should my agency alert the public of its potential participation in standards development activities that could be used as a basis for rulemaking or other mission-related activities?**  In the interest of enhancing transparency and information-sharing, agencies should advise the public about ongoing or planned participation in standards development activities, when, for instance, doing so to address issues of national priority, or in support of significant regulatory action or international regulatory cooperation activities.  Methods could include publication of a notice in the Federal Register, providing notice on the agency's public website, or using other appropriate mechanisms.  The information provided could include, for example:

   (i)    which body or organization is developing the standard;
   (ii)   why the agency's participation is relevant to the public; and
   (iii)  methods by which the public can obtain more information.

When an agency is unsure of the nature and extent of standards activity that may be relevant for an upcoming regulation, procurement, or non-regulatory action, the agency is encouraged to request information on standards development through, for example, an RFI or an ANPRM.  Agencies could also use more informal means, such as contacting relevant bodies directly.

Note that agency participation in the standards development process is not a prerequisite for incorporating or otherwise using a standard.

f.  **What if a voluntary consensus standards body is likely to publish a suitable standard in time for an agency to use it?**  If a voluntary consensus standards body is in the process of developing or adopting a voluntary consensus standard that would likely be practical for an agency to use, and would likely be developed or adopted on a timely basis, an agency should not develop its own standard and instead should participate in the activities of the voluntary consensus standards body (or at least monitor the development of the standard) so that the agency is in a position to use the standard at the appropriate time.

7.  <u>**What is the Policy on Conformity Assessment?**</u>

Section 12(b) of the NTTAA requires the NIST to coordinate Federal, State, and local standards activities and conformity assessment activities with private sector standards development and conformity assessment activities, with the goal of eliminating unnecessary duplication and complexity in the development and promulgation of conformity assessment requirements and measures.  The Secretary of Commerce, through NIST, issues guidance to the agencies on conformity assessment (see [www.standards.gov](www.standards.gov)).

Building upon the NTTAA, U.S. statutory and international obligations, and NIST's previous guidance to agencies on conformity assessment, agencies may develop and use conformity assessments procedures that:

29

(i)    are effective and appropriate in carrying out agency missions;
(ii)   minimize the regulatory and/or conformity assessment burden on regulated entities;
(iii)  are in accordance with statutory and international obligations;
(iv)   conserve and leverage agency resources; and
(v)    increase acceptance of U.S. products in domestic and foreign markets.

Agencies should be aware that conformity assessment procedures and systems can be used in many different ways to support their missions. Conformity assessment procedures and systems may be integral to a regulatory agency's compliance and enforcement system, or the results of conformity assessment may be an input to the regulatory system. The agency may have roles and responsibilities related to the development and maintenance of conformity assessment system requirements and/or the conduct of specific activities in these systems. Flexibility is essential when devising an optimal conformity assessment system tailored to the missions of regulatory agencies.

Agencies should also design conformity assessment programs with the objectives of furthering outcomes that are closely aligned with market dynamics and otherwise maximize net benefits to society. In this context, agencies should recognize the possible contribution of private sector conformity assessment activities. When properly conducted, conformity assessments conducted by private sector conformity assessment bodies can increase productivity and efficiency in government and industry, expand opportunities for international trade, conserve resources, improve health and safety, and protect the environment.

Working closely with NIST and OMB, agencies are encouraged to identify their conformity assessment needs in such areas as regulatory compliance and enforcement, procurement, and other programmatic contexts and to assess whether the use of private sector conformity assessment mechanisms in lieu of or in conjunction with government conformity assessment procedures would be beneficial, where such use is feasible and appropriate and not otherwise prohibited by law. Agencies should also consider whether reliance on international conformity assessment schemes would meet their conformity assessment needs.

Agencies will continue to have the flexibility of choosing conformity assessment programs, whether private, public, or some combination thereof, to best achieve the objectives above.

a.  **What considerations should my agency make when it is addressing the need for conformity assessment?** Agencies should consider appropriate agency roles and responsibilities to carry out their missions in a way that protects health, safety, welfare, and the environment, while promoting economic growth, competitiveness, and job creation, and reducing costs and burdens, including the cumulative effects of regulation, on the affected public and the U.S. economy. When an agency is evaluating whether to put in place a conformity assessment program, it should, consistent with statute, resource constraints, and the instruments set out in Section 1 of this Circular, consider certain factors when assessing the effectiveness of conformity assessment options and determining the type(s) of conformity assessment to employ. These include:

(i)    the objective(s) of the underlying regulation, procurement, or program activity;
(ii)   the level of confidence required by the agency to ensure that the agency objective(s)

30

A-30

has/have been achieved, weighing the risk of non-compliance and its associated consequences with the anticipated costs of demonstrating compliance (including time and resources) to the producers, suppliers, consumers, and the agency;

(iii)  whether there are existing private sector conformity assessment activities, acceptance schemes or arrangements, that may work in conjunction with or, where appropriate, in lieu of governmental conformity assessment activities, except where such activities are inconsistent with law, unfit for regulatory or other agency purpose, or otherwise impractical;

(iv)  their consistency with statutory and international obligations;

(v)  consideration of the available scientific and technical information, as relevant to the selection of the appropriate conformity assessment program;

(vi)  relevant industry practice and experience, and the industry's history of compliance;

(vii)  the need to reduce duplication and complexity, and ensure consistency and coordination with the conformity assessment approaches of other agencies, where feasible, appropriate, and consistent with law;[6]

(viii) the appropriateness of recognizing the results of private sector conformity assessment programs being utilized in State, local, and/or foreign government regulation, consistent with subsection (iii); and

(ix)  the degree of transparency to stakeholders and the public of the conformity assessment activity.

**b. Are there statutory and international obligations concerning conformity assessment?**
There are statutory and international obligations governing standards-related activities, which include conformity assessment procedures.  In particular, agencies should be aware of the obligations in 19 U.S.C. § 2532, which provides that "[n]o Federal agency may engage in any standards-related activity that creates unnecessary obstacles to the foreign commerce of the United States…" and that "[e]ach Federal agency shall ensure, in applying standards-related activities with respect to any imported product, that such product is treated no less favorably than are like domestic or imported products…"  Additionally, "[e]ach Federal agency shall, with respect to any conformity assessment procedure used by it, permit access for obtaining an assessment of conformity and the mark of the system, if any, to foreign suppliers of a product on the same basis as access is permitted to suppliers of like products, whether of domestic or other foreign origin." 19 U.S.C. § 2532(4).  Conformity assessment requirements and procedures are also subject to the WTO TBT Agreement, which requires the United States to ensure it does not prepare, adopt, or apply conformity assessment procedures with a view to, or with the effect of, creating unnecessary obstacles to international trade.  Articles 5 through 9 of the WTO TBT Agreement set out detailed obligations on conformity assessment procedures falling within the scope of the WTO TBT Agreement, including the need to use relevant guides or recommendations issued by international standardizing bodies as a basis for conformity assessment procedures, except where ineffective or inappropriate, and to ensure that the conformity assessment procedures are not more strict or applied more strictly than necessary to give adequate assurance that products conform to applicable "technical regulations" or

---

[6] Pursuant to 15 C.F.R. § 287.1, your agency should work with NIST to "coordinate conformity assessment activities with those of other appropriate government agencies and with those of the private sector to reduce unnecessary duplication….This will help ensure more productive use of the increasingly limited Federal resources available to conduct conformity assessment activities…"  Consistent with 15 C.F.R. § 287.4, agencies should also "consider using the results of other agencies' conformity assessment procedures (see also Section 7e)."

31

standards, taking into account the risks non-conformity would create.  Article 9.1 of the WTO TBT Agreement provides:

> Where a positive assurance of conformity with a technical regulation or standard is required, Members shall, whenever practical, formulate and adopt international systems for conformity assessment and become members thereof or participate therein.

The United States has also undertaken additional commitments on conformity assessment in U.S. free trade agreements (FTA).  These include a commitment not to discriminate against conformity assessment bodies located in the territories of U.S. FTA partners when it comes to accrediting, approving, licensing or otherwise recognizing conformity assessment bodies.  Agencies are urged to consult with USTR on questions regarding international obligations regarding conformity assessment.

c.  **What obligations does my agency have when considering whether to use a conformity assessment procedure used by a trading partner?**  Agencies should use voluntary consensus standards and international guides and recommendations issued by international standardizing bodies in their conformity assessment procedures, as described in this Circular, including where such standards, guides and recommendations are used by a trading partner.  In addition, Article 6.1 of the WTO TBT Agreement obligates the United States (and other WTO members) to accept the results of conformity assessment procedures in other WTO member countries, provided it is satisfied that those procedures offer an assurance of conformity equivalent to its own procedures.  U.S. free trade agreements may also have obligations with respect to recognition of trading partners' conformity assessment procedures.  Agencies should consult with USTR regarding compliance with these obligations.  Agencies should consult with the Department of State in the case of other international obligations or to consider what other relevant international agreements may apply.  Agencies should also examine how such use or recognition would impact the policy objectives set out in Executive Order 13609, "Promoting International Regulatory Cooperation."  An agency may have additional obligations to consider such procedures under Section 3(d) of Executive Order 13609.

d.  **How does this policy affect my agency's regulatory authorities and responsibilities?**  This policy does not preempt or restrict agencies' authorities and responsibilities to make regulatory decisions authorized by statute.

e.  **When should my agency utilize the retrospective review mechanism with respect to conformity assessment?**  Pursuant to Executive Orders 13563, "Improving Regulation and Regulatory Review," and 13610, "Identifying and Reducing Regulatory Burdens," and 15 C.F.R. § § 287.1 and 287.4, your agency should integrate meaningful review of its conformity assessment activities into its retrospective review plans on a periodic basis. Consistent with the NTTAA, this Circular (particularly Section 1), and NIST guidance, the review should evaluate alternative approaches to ensure that current conformity assessment schemes are effective and the burden on regulated entities is minimized.

Agencies are encouraged to consider joint rulemaking to reduce redundancy, complexity, and the cumulative effects on the regulated public of needing to comply with different conformity assessment procedures where (1) agencies have the same or similar requirements for

32

A-32

conformity assessment for the same product/service attributes and (2) demonstrating compliance with one agency's requirement is sufficient to demonstrate that a product or service attribute conforms to other agencies' requirements for the same product or service attribute. Consistent with law and the need for agencies to maintain appropriate levels of protection, for example, in regulations affecting health, safety, and the environment, agencies should engage the regulated public and other stakeholders in public consultation as part of the retrospective review process described above before initiating such rulemakings.

**8.** **How will the U.S. Government Coordinate Regulatory Policy with Standards and Conformity Assessment Policy?**

The Interagency Committee on Standards Policy (ICSP) shall coordinate with the Trade Policy Staff Committee (TPSC), its subcommittee on Technical Barriers to Trade, and the designees, or "Seconds," of the Regulatory Working Group (Working Group) created by Executive Order 12866, "Regulatory Planning and Review," with a view to encouraging more strategic and coordinated Federal participation in the development and use of standards and in conformity assessment activities, in accordance with the objectives of the executive orders set out in Section 1 of this Circular. USTR has responsibility under 19 U.S.C. §§ 2171 and 2541 for coordinating the consideration of international trade policy issues with respect to standards-related activities.

While a primary focus of this Circular is to encourage agency reliance on voluntary consensus standards, OMB recognizes Federal agencies also participate in the development of other standards with standards bodies that do not have all of the attributes described in Section 2(e), as well as in regulatory collaboration initiatives and encourages such participation. Under Section 2(a) of Executive Order 13609, "Promoting International Regulatory Cooperation," and subject to Section 6 of that order, the Working Group serves "as a forum to discuss, coordinate, and develop a common understanding among agencies of U.S. Government positions and priorities with respect to: (A) international regulatory cooperation activities that are reasonably anticipated to lead to significant regulatory actions; . . ." Moreover, under Section 3(a) of Executive Order 13609, "if required to submit a Regulatory Plan pursuant to Executive Order 12866, [each agency shall] include in that plan a summary of its international regulatory cooperation activities that are reasonably anticipated to lead to significant regulations, with an explanation of how these activities advance the purposes of Executive Order 13563 and [Executive Order 13609]." Regular discussions between the Working Group Seconds and the ICSP, as well as the TPSC, its subcommittee on Technical Barriers to Trade, and any other relevant interagency groups or committees, will help to coordinate U.S. Government activities relating to standards and conformity assessment, as well as regulation.

**MANAGEMENT AND REPORTING OF STANDARDS USE**

**9.** **How Does My Agency Manage and Report on the Implementation of the Circular?**

Your agency should establish a process to identify, manage, and review your agency's activities pursuant to the guidance in this Circular. At minimum, your agency must have the ability to provide to OMB, through NIST, (1) a report on the agency's use of government-unique standards in lieu of voluntary consensus standards, along with an explanation of the reasons for such

usage, as required by Section 12(d) of the NTTAA and as described in Section 5c of this Circular; and (2) a summary of your agency's activities undertaken to carry out the provisions of this Circular. The summary should contain a link to the agency's standards-specific website(s) where this information is available. This policy establishes two ways – category based reporting and transaction based reporting – for agencies to manage and report their use of standards. Your agency must report uses of government-unique standards in lieu of voluntary consensus standards in one or both ways, pursuant to the following guidance.

As required by the NTTAA, your agency must report to NIST, no later than December 31 of each year, the decisions by your agency in the previous fiscal year to use government-unique standards in lieu of voluntary consensus standards. Your agency must include an explanation of the reason(s) why use of such voluntary consensus standards would be inconsistent with applicable law or otherwise impractical, as described in Sections 5c, 10a(ii), and 11b(ii) of this Circular. Your agency must report in accordance with the instructions issued by NIST.

NIST must maintain the reports received on http://www.nist.gov/standardsgov/ and will report the use of government-unique standards in lieu of voluntary consensus standards, along with the agency's explanations for such use, to OMB on an annual basis.

## 10. **What are the Procedures for Reporting My Agency's Use of Standards in Regulations?**

Your agency should use transaction based reporting – that is, report on each use of a government-unique standard in lieu of a voluntary consensus standard – in your annual report to NIST if your agency issues regulations that use or reference standards. If your agency is issuing or revising a regulation that contains a standard, your agency should follow these procedures:

a. Publish in the preamble of rulemaking notices what steps the agency is taking to follow and implement the Circular. Such information should include the following elements if applicable:

   (i)   When your agency is proposing or has decided to use a standard, provide a statement which identifies such standard and any alternative standards which have been identified.

   (ii)  When your agency is proposing or has decided to use a government-unique standard in lieu of a voluntary consensus standard, provide a statement that identifies such standards and provide an explanation for why using the voluntary consensus standard would be inconsistent with law or otherwise impractical. Such explanation must be also included in the annual report.

   (iii) When your agency is proposing or has decided to use a government-unique standard and has not identified a voluntary consensus standard, your agency should include a statement to that effect in the preamble of the final rule or guidance document. For other rulemaking notices, your agency should invite the public to identify any standard and explain why your agency should use such a standard.

b. For significant regulatory actions, agencies are also encouraged to include in their rulemaking notices a discussion in the regulatory preamble of the following elements:

(i)   which bodies or organizations the agency consulted with to determine whether there are relevant standards in use in the marketplace (or completion of relevant standards is imminent) or if standards that are currently incorporated by reference have been revised;

(ii)  whether agency officials are participating in the work of such bodies or organizations, along with a description of their roles;

(iii) whether the agency has worked with relevant bodies or organizations to try to ensure that the standards meet agency needs, and a description of the agency's interactions with the technical committees and/or technical advisory groups involved; and

(iv)  whether the agency has coordinated its positions in technical advisory groups or technical committees of such bodies or organizations with (1) other interested agencies that are or should be participating in such work and, (2) where appropriate, foreign regulatory agencies that are participating in such work, where the work is relevant to regulatory cooperation council work plans described in Section 3(d) of Executive Order 13609, "Promoting International Regulatory Cooperation."

## 11. **What are the Procedures for Reporting My Agency's Use of Standards in Procurements?**

Your agency must report on either a categorical basis or on a transaction basis to identify, manage, and review the standards used in your agency's procurements.

a. **How does my agency report the use of standards in procurements on a categorical basis?** Your agency must use categorical based reporting when your agency identifies, manages, and reviews the use of standards by group or category. Category based reporting is especially useful when your agency either conducts large procurements or large numbers of procurements using government-unique standards, or is involved in long-term procurement contracts that require replacement parts based on government-unique standards. To report use of government-unique standards on a categorical basis, your agency must:

(i)   maintain a centralized standards management system that identifies how your agency uses government-unique, voluntary consensus, and other standards;

(ii)  systematically review your agency's use of government-unique standards for conversion to voluntary consensus standards and, where appropriate, other standards;

(iii) maintain records on the groups or categories for which your agency uses government-unique standards in lieu of voluntary consensus standards, including an explanation of the reasons for such use, which must be transmitted according to Sections 5c and 9; and

(iv)  enable potential offerors to suggest voluntary consensus standards and, where appropriate, other standards that can replace government-unique standards.

b. **How does my agency report the use of standards in procurements on a transaction basis?** Your agency should report on a transaction basis when your agency identifies, manages, and reviews the use of standards on a transaction basis rather than a category basis. Transaction-based reporting is especially useful when your agency conducts procurement involving mostly commercial products and services, but is occasionally

35

involved in a procurement involving government-unique standards.  To report use of government-unique standards on a transaction basis, your agency must follow the following procedures:

(i)     in each solicitation that references government-unique standards, the solicitation must identify such standards and provide potential offerors an opportunity to suggest alternative voluntary consensus standards (or, where appropriate, other standards) that meet the agency's requirements; and

(ii)    if such suggestions are made and the agency decides to use government-unique standards in lieu of voluntary consensus standards, the agency must explain in its annual report to OMB through NIST, as described in Sections 5c and 9, why using such voluntary consensus standards is inconsistent with applicable law or otherwise impractical.

The requirements in this Section do not apply to those solicitations that are for: (1) commercial-off-the-shelf products (COTS), (2) products or services that rely on voluntary consensus standards or other standards, or (3) products that otherwise do not rely on government-unique standards.

## AGENCY RESPONSIBILITIES

### 12. <u>What are the Responsibilities of the Secretary of Commerce?</u>

The Secretary of Commerce:

a.   coordinates and fosters executive branch implementation of this Circular and, as appropriate, provides administrative guidance to assist agencies in implementing this Circular, including guidance on identifying voluntary consensus standards bodies and voluntary consensus standards;

b.   sponsors and supports the ICSP, chaired by NIST, which considers agency views and advises the Secretary and agency heads on the Circular;

c.   reports to the Director of OMB concerning the implementation of the policy provisions of this Circular; and

d.   issues guidance to the agencies to improve coordination on conformity assessment in accordance with Section 7 of this Circular.

### 13. <u>What are the Responsibilities of the Heads of Agencies?</u>

The Heads of Agencies:

a.   implement the policies of this Circular in accordance with the procedures described;

b.   ensure agency compliance with the policies of the Circular is a top priority and implement appropriate organizational changes as necessary to achieve such compliance;

c.   in the case of an agency that uses standards for regulatory, procurement, or other mission-related activities, designate a senior level official as the Agency Standards Executive who

will be responsible for the agency's implementation of this Circular, including the responsibilities outlined in 15 C.F.R. 287.5; represent the agency on the ICSP; and be situated in the agency's organizational structure such that he or she is kept regularly apprised of the agency's regulatory, procurement, and other mission-related activities and has sufficient authority within the agency to ensure compliance with the Circular; and

d.  transmit the annual report prepared by the Agency Standards Executive as described in Section 9 of this Circular.

## 14. **What are the Qualifications and Responsibilities of Agency Standards Executives?**

An Agency Standards Executive, consistent with applicable law:

a.  Should be a senior level official; have demonstrated knowledge of, and experience in, the areas of standards, standardization processes and procedures, and conformity assessment; be broadly engaged in the agency's standards and conformity assessment related activities so as to ensure intra-agency coordination; and be broadly familiar with how the agency uses standards and conformity assessment in its mission and how it participates in activities of standards bodies and conformity assessment systems, including international systems of conformity assessment.

b.  Promotes the following goals in the context of agency participation in the work of standards bodies and in conformity assessment activities:

(i)    effective use of agency resources and participation in standards bodies;
(ii)   the development of agency positions that are in the public interest and are coordinated across units;
(iii)  the development of agency positions that are consistent with Administration policy;
(iv)   the development of agency technical and policy positions that are clearly defined and coordinated with other Federal participants in a given standards activity; and
(v)    the development of agency policies on conformity assessment to implement the provisions of Section 7 of this Circular, consistent with 15 C.F.R. § 287.

c.  Coordinates the agency's participation in standards bodies by:

(i)    establishing procedures to ensure that agency representatives who participate in standards bodies will, to the extent possible, ascertain the views of the agency on matters of paramount interest and express views and positions that are not inconsistent or in conflict with established agency views and positions;
(ii)   consulting other relevant agencies, as appropriate, to avoid to the extent practicable expressing views or positions in standards bodies that are inconsistent or in conflict with established views or positions of such other agencies;
(iii)  ensuring that the agency's participation in standards bodies is consistent with agency missions, authorities, priorities, and budget resources;
(iv)   coordinating with standards bodies, and notifying such bodies when the agency has incorporated their standards by reference in regulation;
(v)    ensuring, when two or more agencies participate in a given standards activity, that they coordinate their views on matters of paramount importance so as to present, whenever

37

feasible, a single, unified position and, where not feasible, a mutual recognition of differences;

(vi) cooperating with the head of the agency or his or her designee in carrying out his or her responsibilities under this Circular;

(vii) consulting with the head of the agency or his or her designee, as necessary, in the development and issuance of internal agency procedures and guidance implementing this Circular;

(viii) preparing, as described in Sections 9 through 11 of this Circular, a report on uses of government-unique standards in lieu of voluntary consensus standards, and a report on the status of agency standards policy activities;

(ix) establishing a process for ongoing review of the agency's use of standards for purposes of updating or substituting, pursuant to Section 5m;

(x) coordinating with appropriate agency offices (*e.g.*, budget and legal offices) to ensure that effective processes exist for the review of proposed agency support for, and participation in, standards bodies, so that agency support and participation will comply with applicable laws and regulations;

(xi) making agency employees aware of available standards training opportunities and providing training (consistent with an agency's budgetary and other considerations) for agency employees participating in standards and conformity assessment activities so that participation is effective, efficient, and in keeping with the rules of the organizations in which they are participating;

(xii) providing ongoing assistance and policy guidance to agency employees and managers on significant issues in standardization and conformity assessment; and

(xiii) coordinating with the TPSC TBT Subcommittee or other relevant TPSC subcommittees on the trade implications of standardization.

d. Ensures that agency rulemaking, procurement, and other programmatic activities are consistent with this Circular by, for example:

(i) providing ongoing assistance, training, and policy guidance to agency employees and managers on the Circular;

(ii) being engaged in the development of the agency's rulemakings, procurements, and other programmatic activities that have a standards and/or conformity assessment component and providing advice on compliance with the Circular; and

(iii) participating in the ICSP and consulting on a regular basis with NIST, other Agency Standards Executives, USTR (and, if applicable, your agency's representatives to the relevant subcommittee of the TPSC), and the desk officer for your agency in OMB's OIRA.

---

**SUPPLEMENTARY INFORMATION**

---

## 15. <u>When Will This Circular Be Reviewed?</u>

This Circular will be reviewed for effectiveness no later than five years from the date of issuance.

**16. <u>What Is the Legal Effect of This Circular?</u>**

This Circular is not intended to delay the administrative process, and this Circular does not provide new grounds for judicial review, or create new rights or benefits, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, or its officers or employees.  Authority for this Circular is based on 31 U.S.C. § 1111, which gives OMB broad authority to establish policies for the improved management of the Executive Branch.  This Circular is intended to implement section 12(d) of the NTTAA (15 U.S.C. § 272 note) and other instruments set out in Section 1 of the Circular; establish policies that will improve the internal management of the Executive Branch; and, in so doing, improve regulatory and other policy outcomes.

**17. <u>Do You Have Further Questions?</u>**

For information concerning this Circular, contact the Office of Management and Budget, Office of Information and Regulatory Affairs at CircularA-119@omb.eop.gov.

# ANNEX A

**Decision Of The Committee On Principles For The Development Of International Standards, Guides And Recommendations With Relation To Articles 2, 5 And Annex 3 Of The Agreement**

Decision[7]

The following principles and procedures should be observed, when international standards, guides and recommendations (as mentioned under Articles 2, 5 and Annex 3 of the TBT Agreement for the preparation of mandatory technical regulations, conformity assessment procedures and voluntary standards) are elaborated, to ensure transparency, openness, impartiality and consensus, effectiveness and relevance, coherence, and to address the concerns of developing countries.

The same principles should also be observed when technical work or a part of the international standard development is delegated under agreements or contracts by international standardizing bodies to other relevant organizations, including regional bodies.

**Transparency**

All essential information regarding current work programmes, as well as on proposals for standards, guides and recommendations under consideration and on the final results should be made easily accessible to at least all interested parties in the territories of at least all WTO Members.  Procedures should be established so that adequate time and opportunities are provided for written comments. The information on these procedures should be effectively disseminated.

In providing the essential information, the transparency procedures should, at a minimum, include:

(a) The publication of a notice at an early appropriate stage, in such a manner as to enable interested parties to become acquainted with it, that the international standardizing body proposes to develop a particular standard;

(b) The notification or other communication through established mechanisms to members of the international standardizing body, providing a brief description of the scope of the draft standard, including its objective and rationale. Such communications shall take place at an early appropriate stage, when amendments can still be introduced and comments taken into account;

(c) Upon request, the prompt provision to members of the international standardizing body of the text of the draft standard;

(d) The provision of an adequate period of time for interested parties in the territory of at least all members of the international standardizing body to make comments in writing

---

[7] G/TBT/9, 13 November 2000, para. 20 and Annex 4.

and take these written comments into account in the further consideration of the standard;

(e) The prompt publication of a standard upon adoption; and

(f) To publish periodically a work programme containing information on the standards currently being prepared and adopted.

It is recognized that the publication and communication of notices, notifications, draft standards, comments, adopted standards or work programmes electronically, via the Internet, where feasible, can provide a useful means of ensuring the timely provision of information. At the same time, it is also recognized that the requisite technical means may not be available in some cases, particularly with regard to developing countries. Accordingly, it is important that procedures are in place to enable hard copies of such documents to be made available upon request.

**Openness**

Membership of an international standardizing body should be open on a non- discriminatory basis to relevant bodies of at least all WTO Members. This would include openness without discrimination with respect to the participation at the policy development level and at every stage of standards development, such as the:

(a) Proposal and acceptance of new work items;

(b) Technical discussion on proposals;

(c) Submission of comments on drafts in order that they can be taken into account;

(d) Reviewing existing standards;

(e) Voting and adoption of standards; and

(f) Dissemination of the adopted standards.

Any interested member of the international standardizing body, including especially developing country Members, with an interest in a specific standardization activity should be provided with meaningful opportunities to participate at all stages of standard development. It is noted that with respect to standardizing bodies within the territory of a WTO Member that have accepted the Code of Good Practice for the Preparation, Adoption and Application of Standards by Standardizing Bodies (Annex 3 of the TBT Agreement) participation in a particular international standardization activity takes place, wherever possible, through one delegation representing all standardizing bodies in the territory that have adopted, or expected to adopt, standards for the subject-matter to which the international standardization activity relates. This is illustrative of the importance of participation in the international standardizing process accommodating all relevant interests.

41

**Impartiality and Consensus**

All relevant bodies of WTO Members should be provided with meaningful opportunities to contribute to the elaboration of an international standard so that the standard development process will not give privilege to, or favour the interests of, a particular supplier/s, country/ies or region/s. Consensus procedures should be established that seek to take into account the views of all parties concerned and to reconcile any conflicting arguments.

Impartiality should be accorded throughout all the standards development process with respect to, among other things:

     (a) Access to participation in work;

     (b) Submission of comments on drafts;

     (c) Consideration of views expressed and comments made;

     (d) Decision-making through consensus;

     (e) Obtaining of information and documents;

     (f) Dissemination of the international standard;

     (g) Fees charged for documents;

     (h) Right to transpose the international standard into a regional or national standard; and

     (i) Revision of the international standard.

**Effectiveness and Relevance**

In order to serve the interests of the WTO membership in facilitating international trade and preventing unnecessary trade barriers, international standards need to be relevant and to effectively respond to regulatory and market needs, as well as scientific and technological developments in various countries. They should not distort the global market, have adverse effects on fair competition, or stifle innovation and technological development. In addition, they should not give preference to the characteristics or requirements of specific countries or regions when different needs or interests exist in other countries or regions. Whenever possible, international standards should be performance based rather than based on design or descriptive characteristics.

Accordingly, it is important that international standardizing bodies:

     (a) Take account of relevant regulatory or market needs, as feasible and appropriate, as well as scientific and technological developments in the elaboration of standards;
     (b) Put in place procedures aimed at identifying and reviewing standards that have become obsolete, inappropriate or ineffective for various reasons; and
     (c) Put in place procedures aimed at improving communication with the World Trade

42

Organization.

**Coherence**

In order to avoid the development of conflicting international standards, it is important that international standardizing bodies avoid duplication of, or overlap with, the work of other international standardizing bodies.  In this respect, cooperation and coordination with other relevant international bodies is essential.

**Development Dimension**

Constraints on developing countries, in particular, to effectively participate in standards development, should be taken into consideration in the standards development process. Tangible ways of facilitating developing countries' participation in international standards development should be sought.  The impartiality and openness of any international standardization process requires that developing countries are not excluded de facto from the process.  With respect to improving participation by developing countries, it may be appropriate to use technical assistance, in line with Article 11 of the TBT Agreement.  Provisions for capacity building and technical assistance within international standardizing bodies are important in this context.

# Rules and Regulations

**Federal Register**

Vol. 79, No. 216

Friday, November 7, 2014

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

---

## OFFICE OF THE FEDERAL REGISTER

### 1 CFR Part 51

**[Docket Number: OFR–2013–0001]**

**RIN 3095–AB78**

### Incorporation by Reference

**AGENCY:** Office of the Federal Register, National Archives and Records Administration.

**ACTION:** Final rule.

**SUMMARY:** In this document, we are revising our regulations on incorporation by reference to require that agencies seeking the Director of the Federal Register's approval of their incorporation by reference requests add more information regarding materials incorporated by reference to the preambles of their rulemaking documents. Specifically, agencies must set out, in the preambles of their proposed and final rules, a discussion of the actions they took to ensure the materials are reasonably available to interested parties and that they summarize the contents of the materials they wish to incorporate by reference.

**DATES:** This rule is effective January 6, 2015.

**ADDRESSES:** You may find information on this rulemaking docket at Federal eRulemaking Portal: *http://www.regulations.gov.* Docket materials are also available at the Office of the Federal Register, 800 North Capitol Street NW., Suite 700, Washington, DC 20002, 202–741–6030. Please contact the persons listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection of docket materials. The Office of the Federal Register's official hours of business are Monday through Friday, 8:45 a.m. to 5:15 p.m., excluding Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Miriam Vincent, Staff Attorney, Office

of the Federal Register, at *Fedreg.legal@nara.gov,* or 202–741–6030.

**SUPPLEMENTARY INFORMATION:** The Office of the Federal Register (OFR or we) published a request for comments on a petition to revise our regulations at 1 CFR part 51[1] (part 51). The petition specifically requested that we amend our regulations to: (1) Define ''reasonably available'' and (2) include several requirements related to the statutory obligation that material incorporated by reference (IBR) be reasonably available. Our original request for comments had a 30-day comment period. After requests from several interested parties, we extended the comment period until June 1, 2012.[2]

Our current regulations require that agencies provide us with the materials they wish to IBR. Once we approve an IBR request, we maintain the IBR'd materials in our library until they are accessioned to the National Archives and Records Administration (NARA) under our records schedule).[3] NARA then maintains this material as permanent Federal records.

We agreed that our regulations needed to be updated and published a proposed rule on October 2, 2013.[4] However, we stated that the petitioners' proposed changes to our regulations go beyond our statutory authority. The petitioners contended that changes in technology, including our new Web site *www.federalregister.gov,* along with electronic Freedom of Information Act[5] (E–FOIA) reading rooms, have made the print publication of the **Federal Register** unnecessary. They also suggested that the primary, original reason for allowing IBR was to limit the amount of material published in the **Federal Register** and Code of Federal Regulations (CFR).[6] The petitioners argued that with the advent of the Internet and online access our print-focused regulations are out of date and obsolete. The petition then stated that statutory authority and social development since our current

regulations were first issued require that material IBR'd into the CFR be available online and free of charge.

The petition further suggested that our regulations need to apply at the proposed rule stage of agency rulemaking projects and that the National Technology Transfer and Advancement Act of 1995 (NTTAA) and the Office of Management and Budget's (OMB) Circular A–119 distinguish between regulations that require use of a particular standard and those that ''serve to indicate that one of the ways in which a regulation can be met is through use of a particular standard favoring the use of standards as non-binding ways to meet compliance.''[7] In addition, the petition argued that *Veeck* v. *S. Bldg. Code Cong. Int'l,* 293 F.3d 791 (5th Cir. 2002) casts doubt on the legality of charging for standards IBR'd. Finally, the petition stated that in the electronic age the benefits to the federal government are diminished by electronic publication as are the benefits to the members of the class affected if they have to pay high fees to access the standards. Thus, agencies should at least be required to demonstrate how they tried to contain those costs.

The petitioners proposed regulation text to enact their suggested revisions to part 51. The petitioners' regulation text would require agencies to demonstrate that material proposed to be IBR'd in the regulation text was available throughout the comment period: (1) In the Federal Docket Management System (FDMS) in the docket for the proposal or interim rule; (2) on the agency's Web site or; (3) readable free of charge on the Web site of the voluntary standards organization that created it during the comment period of a proposed rule or interim rule. The petition suggested revising § 51.7—''What publications are eligible''—to limit IBR eligibility only to standards that are available online for free by adding a new (c)(3) that would ban any standard not available for free from being IBR'd. It also appeared to revise § 51.7(a)(2) to include documents that would otherwise be considered guidance documents. And, it would revise § 51.7(b) to limit our review of agency-created materials to the question of whether the material is available online. The petition would then revise § 51.9 to distinguish between required

---

[1] 77 FR 11414 (February 27, 2012).

[2] 77 FR 16761 (March 22, 2012).

[3] *http://www.archives.gov/federal-register/cfr/ibr-locations.html* last visited August 11, 2014.

[4] 78 FR 60784 (October 2, 2013). We extended the comment period on this proposal until January 31, 2014. See, 78 FR 69006 (November 18, 2013) and 78 FR 69594 (November 20, 2013).

[5] Public Law 104–231 (1996).

[6] In fact, agencies were incorporating material by reference long before we were assigned the task of normalizing the process.

[7] NARA–12–0002–0002.

standards and those that could be used to show compliance with a regulatory requirement. Finally, the petition would add a requirement that, in the electronic version of a regulation, any material IBR'd into that regulation be hyperlinked.

The petitioners wanted us to require that: (1) All material IBR'd into the CFR be available for free online; and (2) the Director of the Federal Register (the Director) include a review of all documents that agencies list in their guidance, in addition to their regulations, as part of the IBR approval process. We find these requirements go beyond our statutory authority. Nothing in the Administrative Procedure Act (APA) (5 U.S.C. chapter 5), E–FOIA, or other statutes specifically address this issue. If we required that all materials IBR'd into the CFR be available for free, that requirement would compromise the ability of regulators to rely on voluntary consensus standards, possibly requiring them to create their own standards, which is contrary to the NTTAA and the OMB Circular A–119.

Further, the petition didn't address the **Federal Register** Act (FRA) (44 U.S.C. chapter 15), which still requires print publication of both the **Federal Register** and the CFR, or 44 U.S.C. 4102, which allows the Superintendent of Documents to charge a reasonable fee for online access to the Federal electronic information, including the **Federal Register**.[8] The petition suggested that the Director monitor proposed rules to ensure that the material proposed to be IBR'd is available during the comment period of a proposed rule. Then, once a rule is effective, we monitor the agency to ensure that the IBR'd materials remain available online. This requirement that OFR continue monitoring agency rules is well beyond the current resources available to this office.

As for the petition's limitation on agency-created material, the Freedom of Information Act (FOIA), at 5 U.S.C. 552(a) (section 552(a)), mandates approval by the Director of material proposed for IBR to safeguard the **Federal Register** system. Thus, OFR regulations contain a provision that material IBR'd must not detract from the legal and practical attributes of that system.[9] An implied presumption is that material developed and published by a Federal agency is inappropriate for IBR by that agency, except in limited circumstances. Otherwise, the **Federal Register** and CFR could become a mere index to material published elsewhere.

This runs counter to the central publication system for Federal regulations envisioned by Congress when it enacted the FRA and the APA.[10]

Finally, the petition didn't address the enforcement of these provisions. Agencies have the expertise on the substantive matters addressed by the regulations. To remove or suspend the regulations because the IBR'd material is no longer available online would create a system where the only determining factor for using a standard is whether it is available for free online. This would minimize and undermine the role of the Federal agencies who are the substantive subject matter experts and who are better suited to determine what standard should be IBR'd into the CFR based on their statutory requirements, the entities they regulate, and the needs of the general public.

Additionally, the OFR's mission under the FRA is to maintain orderly codification of agency documents of general applicability and legal effect.[11] As set out in the FRA and the implementing regulations of the Administrative Committee of the **Federal Register** (ACFR) (found in 1 CFR chapter I), only the agency that issues the regulations codified in a CFR chapter can amend those regulations. If an agency took the IBR'd material offline, OFR could only add an editorial note to the CFR explaining that the IBR'd material was no longer available online without charge. We could not remove the regulations or deny agencies the ability to issue or revise other regulations. Revising our regulations as proposed by the petition would simply add requirements that could not be adequately enforced and thus, likely wouldn't be complied with by agencies.

In our document announcing that we received a petition to revise our regulations in part 51, we specifically requested comments on nine issues.[12] We received comments on each of those issues and addressed them in our NPRM.[13]

In our NPRM, we stated our concerns regarding several of the petitioners' suggested revisions to our regulations. We stated that while OFR does have the authority to review NPRMs to ensure our publication requirements are met, a substantive review of IBR'd materials referenced in a proposed rule, as implied by the petition, is beyond our authority and resources. We also noted that the OFR has not reviewed IBR'd material in NPRMs for approval because

agencies may decide to request approval for different standards at the final rule stage based on changed circumstances, including public comments on the NPRM, requiring a new approval at the final rule stage. Or, agencies could decide to withdraw the NPRM. These factors make review and approval at the proposed rule stage impractical.

In our discussion of the copyright issues raised by the petitioners and commenters, we noted that recent developments in Federal law, including the *Veeck* decision [14] and the amendments to FOIA, and the NTTAA have not eliminated the availability of copyright protection for privately developed codes and standards referenced in or incorporated into federal regulations. Therefore, we agreed with commenters who said that when the Federal government references copyrighted works, those works should not lose their copyright. However, we believed the responsible government agency should collaborate with the standards development organizations (SDOs) and other publishers of IBR'd materials, when necessary, to ensure that the public does have reasonable access to the referenced documents. Therefore, we proposed in the NPRM to require that agencies discuss how the IBR'd standards are reasonably available to commenters and to regulated entities. One way to make standards reasonably available, if they aren't already, is to work with copyright holders.

We also proposed to review agency NPRMs to ensure that the agency provides either: (1) An explanation of how it worked to make the proposed IBR'd material reasonably available to commenters or; (2) a summary of the proposed IBR'd material. We proposed that agencies include a discussion in their final rule preambles regarding the ways it worked to make the incorporated materials available to interested parties. We stated that this process would not unduly delay publication of agency NPRMs or Final Rules and did not go beyond OFR's statutory authority.

Several commenters were concerned that our NPRM didn't go far enough—specifically noting that the proposed rule wouldn't require agencies to provide free access to standards incorporated by reference into the CFR. The issue of "reasonable availability" continued to elicit comments related to the NPRM and we will discuss this issue, along with other comments, below.

---

[8] See also 44 U.S.C. 4101.

[9] See also 44 U.S.C. 4101.

[10] 47 FR 34107 (August 6, 1982).

[11] 44 U.S.C. 1505 and 1510.

[12] 77 FR 11414 (February 27, 2012).

[13] 78 FR 60784 (October 2, 2013).

[14] *Veeck* v. *Southern Building Code Congress International, Inc.,* 293 F.3d 791 (5th Cir. 2002).

Based on comments to our NPRM, we have modified the regulation text slightly so that we now require that if agencies seek the Director's approval of an IBR request, they must set out the following information in the preambles of their rulemaking documents: (1) Discussions of how the materials are reasonably available and, if they aren't, the actions the agency took to make the materials reasonably available to interested parties and; (2) summaries of the content of the materials the agencies wish to IBR.

**Discussion of Comments**

*Authority of the Director To Issue Regulations Regarding IBR*

One commenter again alleged that the OFR does not have the proper authority to amend the regulations in 1 CFR part 51.[15] As we stated in the NPRM, we disagree with the commenter. Because section 552(a) specifically states that the Director will approve agency requests for IBR and that material IBR'd is not set out in regulatory text, the Director has the sole authority to issue regulations governing the IBR-approval request procedures. We have maintained this position since the IBR regulations were first issued in the 1960's.

The regulations on the IBR approval process were first issued by the Director in 1967 and found at 1 CFR part 20.[16] Even though this part was within the ACFR's CFR chapter, the preamble to the document stated ''the Director of the Federal Register hereby establishes standards and procedures governing his approval of instances of incorporation by reference.''[17] And, while these regulations appeared in the ACFR's CFR chapter, this final rule was issued and signed solely by the Director. These regulations were later republished, along with the entire text of Chapter I, by the ACFR in 1969;[18] however the ACFR stated that the republication contained no substantive changes to the regulations. In 1972, the ACFR proposed a major substantive revision of Chapter I.[19] In that proposed rule, the ACFR proposed removing the IBR regulations from Chapter I because ''part 20. . . is a regulation of the Director of the Federal Register rather than the Administrative Committee.''[20] In that same issue of the **Federal Register**, the Director issued a proposed rule proposing to establish a new Chapter II in Title 1 of the CFR that governed IBR

approval procedures.[21] These proposals were not challenged on this issue, so the final rules removing regulations from the ACFR chapter and establishing a new chapter for the Director were published on November 4, 1972 at 37 FR 23602 and 23614, respectively. Thus, it is appropriate for the Director, not the ACFR, to issue the regulations found in 1 CFR part 51.

As for this commenter's concerns regarding following the rulemaking requirements, we believe that we have followed the proper rulemaking procedures as we are required to do and that we have taken into consideration the impact of our revisions on both federal agencies and the public.

*Class of Persons Affected*

A few commenters suggested that we define ''class of persons affected'' to mean all interested parties. At least one commenter claimed that section 552(a)'s reference to ''class of persons affected'' is broader than just those who must comply with the regulation—that it includes anyone with a ''stake in the content of the IBR materials.''[22] The commenter based this claim on the phrase in the undesignated paragraph, which provides that if the document doesn't publish in the **Federal Register** and the person doesn't have actual notice of the document that person may be ''adversely affected'' by the agency document. This commenter claimed that this provision, along with the provision in 5 U.S.C. 702 (allowing persons who have been ''adversely affected'' by an agency action to seek judicial review), demonstrates that ''class of persons affected,'' as stated in the provision allowing IBR, should be read more broadly ''to require availability to those simply 'affected' by the terms of the incorporated material.''[23]

However, the IBR provision contains a slight language change that modifies ''affected'' by adding the phrase ''class of persons.'' This addition could be read as an indication that the IBR material must be reasonably available to those who must directly comply with the regulation. Under the statute, it is acceptable to have material reasonably available beyond the class of persons affected but it is not required.

We continue to have concerns that any definition will fail because it is either too broad to be meaningful or too restrictive to capture a total class. Therefore we decline to define the phrase ''class of persons affected.'' Thus, agencies maintain the flexibility

to determine who is within the class of persons affected by a regulation or regulatory program on a case-by-case basis to respond to specific situations.

*Reasonably Available*

Several commenters agreed with the petitioners that reasonably available means for free to anyone online, but they provided little or no additional comment on this point. Many of the SDOs supported our proposal and discussed how they are already providing access to their standards that have been IBR'd. One commenter who supported our NPRM noted that reasonably available was highly content-driven and felt the agency issuing the rule should ensure that the standards are reasonably available.[24] Another agreed with our proposal, stating that agency subject matter experts are suited to determine if a standard should be IBR'd.[25]

However, some commenters alleged that the only way for OFR to meet its statutory obligation was to deny IBR approval for all standards there were not available for free online. A couple of commenters modified their stance and claimed that OFR has a duty to deny IBR approval for all standards that were not available at no cost to all interested persons. Another suggested that, because of the internet, reasonably available ''with respect to the law must now be understood to mean available with not more than the minimal cost or effort required to travel to a public or government depository library.''[26]

One commenter commented generally on the U.S. tradition to provide ''inexpensive and widespread access to the law.''[27] This tradition is tied to the current Administration's goal of transparency and accountability. This commenter further stated that the government's decision to regulate by incorporating expensive standards into regulations is similar to charging filing fees and poll taxes and sends a damaging message to the public. Other commenters suggested that our proposal unlawfully delegates the reasonably available determination to agencies. At least one commenter stated that OFR is bound by statute to ensure that materials are reasonably available ''regardless of the effect on the use of voluntary standards.''[28]

Two other commenters vehemently argued that in order to be reasonably

---

[15] OFR–2013–0001–0027.

[16] 32 FR 7899 (June 1, 1967).

[17] *Id.*

[18] 34 FR 19106 at 19115 (December 2, 1969).

[19] 37 FR 6804 (April 4, 1972).

[20] *Id.*

[21] 37 FR 6817 (April 4 1972).

[22] OFR–2013–0001–0029 at page 13.

[23] OFR–2013–0001–0029 at page 13.

[24] OFR–2013–0001–0030.

[25] OFR–2013–0001–0038.

[26] OFR–2013–001–0029 at page 5.

[27] OFR–2013–0001–0036, see also OFR–2013–0001–0029.

[28] OFR–2013–0001–0037 at page 2.

available, IBR'd standards must be accessible to all interested parties.[29] Both suggested that it is not enough to have material available to be examined at the OFR. One commenter was concerned that our proposal merely asks agencies how they worked with SDOs and other publishers on the access issue.[30] This commenter went on to state that this requirement won't provide more consistent availability of standards or ensure that the public has enough information to submit an effective comment. The commenter expressed concern that agencies may, in an effort to save money or time (negotiating with SDOs), decide that despite unsuccessful attempts to make a standard reasonably available, it would still request IBR approval, which we would grant. The commenter further stated "[a]t root then, access to all incorporated matter should be free, if the evils of 'secret law' OFR was established to resist are to be avoided." [31]

These commenters appeared to have a fundamental issue with agencies' ability to IBR materials into the CFR. We decline to address whether or not agencies should be allowed to IBR materials into the CFR. This is beyond our authority. In this rule, we balanced our statutory obligations regarding reasonable availability of the standards with: (1) U.S. copyright law, (2) U.S. international trade obligations, and (3) agencies' ability to substantively regulate under their authorizing statutes. To achieve this balance, this rule requires that agencies discuss how IBR'd materials were made available to parties (and where those materials are located) and to provide a summary of those materials in the preambles of their rulemaking documents. These requirements oblige agencies to provide more information on how they made IBR'd material available and a summary of the material, so the readers can, if they like, find and review the standards. This rule continues to require that agencies provide the OFR with a copy of the standard and maintain a copy at the agency for public inspection; therefore we disagree that this rule is an unlawful delegation of authority to the agencies.

Another commenter adamantly stated that the Director of the Federal Register has the sole authority to set procedures for the approval of agency requests for IBR. This commenter stated that "reasonably available" is the sole statutory criterion for IBR approval so all other considerations must be considered secondarily.[32] This commenter went on to state that it is not enough that agencies are required to simply announce the location of IBR'd material.[33] The commenter added that our proposal won't work, because requiring a summary of the standards in the preamble does nothing for interested parties [34] "and would simply represent another wasteful check-off process in the **Federal Register** publication process." [35]

It is unfortunate that this commenter believed that the publication requirements of the ACFR and Director (found in 1 CFR chapters I and II) are just wasteful check-off processes. The FRA established the ACFR, in part to provide that there was consistency on how agency documents publish in the **Federal Register**. When this Act was amended in 1938 to create the CFR, it provided that the ACFR would issue regulations to carry out the codification of agency documents of general applicability and legal affect.[36] As discussed throughout this rule, the FOIA gave the Director the authority to approve agency requests to IBR materials into their regulations.[37] Both the ACFR and the Director have throughout the years worked hard to ensure that the publication requirements they issue provide the agencies and the public clarity, uniformity, and consistency to maintain an orderly publication system for federal agency documents and minimize busy work for the agencies.

With respect to this commenter's other issues concerning the Director's authority, as we stated in our NPRM, we are a procedural agency. We do not have the subject matter expertise (technical or legal) to tell another agency how they can best reach a rulemaking decision. There must be a balance between procedural requirements and agencies' substantive statutory authority and requirements. To achieve this balance, we are issuing rules that require

agencies to discuss how IBR'd materials were made available to parties (including where those materials are located) and to summarize those materials in the preambles of their rulemaking documents. We added the summary requirement, not as a replacement for access to the IBR'd standard, but to give the public enough information to know if they need access to the standard. We believe the requirements set out in this rule provide flexibility needed for agencies to determine that IBR'd documents are reasonably available.

Some commenters made a distinction between reasonably available at different stages of rulemaking, suggesting that materials need to be more widely available at no cost during the comment period of a proposed rule.[38] These commenters' suggested that reasonably available would be more limited during the effective period of the rule, in part to ease the burden on OFR resources.[39] We disagree; distinguishing between the proposed rule and final rule stages of agency rulemakings will require development of a more elaborate approval process that will place additional burdens on agency and OFR staff. In the late 1970s we attempted a more complex approval process that was too difficult to maintain so we revised the IBR approval process in 1982.[40]

One commenter suggested that we provide a "safe harbor" by declaring that any standards provided for free online are deemed reasonably available by the Director.[41] This commenter would place the burden of proof on the agency to demonstrate that the materials were reasonably available if they were not available for free online. We decline to follow this suggestion; it creates an uncertainty in the law because no one knows whether an IBR is enforceable or not. It is not clear what would happen if the material was no longer available for free online and the agency didn't certify that it was reasonably available. Under ACFR regulations, we cannot amend another agency's CFR provisions, so at best we would need to add an editorial note after each CFR provision that included IBR'd material that was no longer approved. We would also need to monitor all IBR's to ensure that some information regarding the status of IBR'd materials were maintained.

At least 2 commenters complained that the proposed rule didn't address

---

[29] OFR–2013–001–0024 and OFR–2013–001–0029.

[30] OFR–2013–001–0029.

[31] OFR–2013–001–0029 at page 3.

[32] OFR–2013–0001–0004.

[33] Id. At page 1. Citing Senator report No 88–1219 at 4 (1964) and the 1967 Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act (1967).

[34] This commenter goes on to claim that OFR is wrong to assume that agencies would remove online access to IBR'd materials, while in the same comment, stating that the proposal provides agencies no practical incentive to make IBR'd materials reasonably available, implying that without OFR specifically requiring IBR'd materials be available for free online, agencies will do nothing to improve access to standards.

[35] OFR–2013–0001–0004 at page 4.

[36] 44 U.S.C. 1510.

[37] 5 U.S.C. 552(a).

[38] OFR–2013–0001–0022 and OFR–2013–001–0007.

[39] OFR–2013–001–0007 at page 3.

[40] 47 FR 34108 (August 6, 1982).

[41] OFR–2013–001–0007 at page 6.

the reasonable availability of the standards once the final rules were codified in the CFR. One commenter stated that ''the CFR has been transformed from a mechanism to inform citizens into a profit opportunity for a few private organizations.'' [42] Another commenter suggested that agencies post the text of the standards on their Web sites to ensure that text of the IBR'd standards is available while the rule is codified in the CFR.[43] As an alternative, the commenter states that materials could be posted on SDOs Web sites so long as agencies certify, each year, that IBR'd materials are still on the SDOs Web site.

We note that even if agencies decide to repackage the text of standards they wish to IBR, they must ensure that this repackaged text meets the requirements in 51.7 and 51.9 or we will not approve the agency's IBR request. As for the suggestion that agencies annually certify that IBR materials are reasonably available—we have already demonstrated that is not a viable option. From 1979 through 1982, we approved material IBR'd on a yearly basis, as part of a comprehensive review of all material IBR'd and a review of the overall approval process.[44] It soon became clear that a one-year review was neither practical nor efficient. We chose not to extend the program but to return to the original process. As we stated above, the orderly codification requirements of the FRA and the ACFR prohibit us from amending another agency's regulations so it is not clear how the expiration of an IBR approval would be identified in the CFR without undermining orderly codification and without returning to an approval system that has already failed.

*Access*

Several commenters specifically discussed access as part of their comments addressing reasonably available. Many commenters agreed with the petitioners, stating that the law must be accessible and free to use, therefore IBR'd standards should also be freely available to anyone wishing to review them. One commenter stated that free access to IBR'd standards strengthens the capacity of public interest groups to engage in the rulemaking process and work on solutions to public policy issues.[45] Another stated that the public's right to access the content of regulations, including IBR'd material, is ''a critical

safeguard to agency capture and other government issues.'' [46] Other commenters generally agreed with our NPRM, stating that reasonable availability and transparency did not automatically mean free access [47] and supporting the idea that agencies need flexibility to work with the SDOs to provide access to standards.[48]

A number of SDOs commented specifically on access and discussed how they make their standards available online.[49] One stated that access should not require the loss of copyright protection.[50] One SDO board stated that they make standards available in the following ways: Online sales; classes; limited-time, no-cost, no-print electronic access; membership in the organization, and the ability to request fee waivers.[51] Another standards organization stated that its standards are available through third party vendors.[52] It also stated that the headings and outlines of its standards are freely available and that it also provides read-only online access to its standards. Another also stated that it provides no-cost read-only online access to its standards and also provides scopes and summaries of each standard on its Web site.[53] One stated that access is important but shouldn't undermine or dismantle the public-private partnership that currently exists to create high-quality technical standards.[54] To support access and agency efforts to update standards referenced in regulations, it makes immediate past versions of its standards available for review in online in RealRead. Further, older standards can be purchased and it will work with agencies to expand its titles in RealRead.[55]

OFR applauds all the efforts of these private organizations to make their IBR'd standards available to the public. We encourage agencies and SDOs to continue to ensure access to IBR'd standards.

One commenter stated that summarizing the documents isn't enough; regulated entities must have access to the actual documents and these documents must be available free to the public in at least one location as

long as the rule is effective. Since it is hard to access the copies at the National Archives, we require that agencies maintain a copy of the documents they IBR. We retained the requirements in this rule that agencies retain a copy of the IBR'd standard for inspection and provide the OFR a copy of IBR standards.

Another commenter believed that access to standards on SDOs Web sites is insufficient to meet the reasonably available requirement at any stage of the rulemaking process because the SDO can remove the standard or charge for access to it at any time.[56] In addition, this commenter believed that SDOs requirement that individuals sign a release to access the read-only standard may deter the public or small businesses from accessing standards. If the SDO does remove standards from its Web site, the only option, according to this commenter, is to travel to our offices in Washington, DC to review them.

We have no authority to require SDOs to upload and maintain their standards on their Web sites, and while this is one way to demonstrate access, it is not the only way to show reasonable availability. To improve access to standards and provide the public more information on how to access the standards, this rule requires that agencies discuss how the standards were made available during the life-cycle of the rule. We also require that agencies provide a summary of the standard in the preamble to allow readers to make their determination on whether to access a standard to assist in drafting a comment on a particular rulemaking project. We disagree with the commenter's assertion that the only place interested parties can access standards, if they aren't available online, is at our office in Washington, DC. As mentioned above, we kept the requirement that agencies retain a copy of the IBR'd standard for inspection and provide the OFR a copy of IBR'd standards. Further, material remains available through SDOs and usually, if a standard has been discontinued, through resellers.

Another commenter recommended that OFR adopt an IBR approval program based on contingent approvals. The commenter suggested that OFR's IBR approval be effective only as long as the standard is freely available. If the public can't access a standard for free, then the IBR approval ''would

---

[42] OFR–2013–0001–0012 at page 5.
[43] OFR–2013–0001–0024.
[44] 44 FR 18630, as corrected at 44 FR 19181.
[45] OFR–2013–0001–0031.

[46] OFR–2013–0001–0029 at page 11.
[47] OFR–2013–0001–0033.
[48] OFR–2013–0001–0020 and OFR–2013–0001–0018.
[49] See, OFR–2013–001–0017, OFR–2013–001–0020, OFR–2013–001–0027 and OFR–2013–001–0028.
[50] OFR–2013–0001–0018.
[51] OFR–2013–001–0023.
[52] OFR–2013–001–0035.
[53] OFR–2013–001–0025.
[54] OFR–2013–0001–0028.
[55] *Id.*

[56] OFR–2013–0001–0036. The commenter also asserted that the SDO standards development processes doesn't balance all interests reliably so the public needs complete access to the standards to make sure the agencies are ''acting appropriately in relying upon these standards.'' At page 5.

evaporate." [57] The standard would not be legally IBR'd and would be unenforceable. The commenter stated that the statute doesn't prohibit an approval that would be revoked automatically and that revocation could be privately enforced by individuals using the Federal courts. The commenter asserted that these contingent approvals would not drain OFR resources because the revocation of the IBR approval would be automatic and immediate. It would provide an incentive for both the agencies and the SDOs to ensure continued free online access because standards that weren't freely available online would not be enforceable.

We disagree with these commenters' assertion that we can delegate our enforcement authority to private entities without "final reviewing authority over the private party's actions." [58] Even if we could, it would create uncertainty in the law because no one would know whether an IBR is effective and enforceable or not. There is no way we can track and review all Federal court cases for IBR'd material. We also can't resolve conflicts between Circuits. Finally, even with a definitive court decision, we couldn't amend another agency's regulations. So the system this commenter suggested is less transparent and accessible than the current IBR approval process.

*Costs of Standards*

Several commenters discussed the costs of the standards in their comments on our NPRM. [59] Some raised concerns that SDOs were charging monopoly prices for standards [60] or using copyright as a device to make money and fund SDO operations. [61] Others were of the opinion that any charge for an IBR'd standard effectively hides the law behind a pay wall which is illegal and means the standard is not available. [62] At least one commenter stated that while

there was a need to charge a reasonable fee to recover printing costs, this no longer applies where technology now enables the storage and retrieval of large amounts of data at virtually no cost. [63] This commenter suggested that giving the public free access to the standards would not "undermine incentives to participate in the voluntary standards development process." [64]

As we stated in our NPRM, these materials may not be as easily accessible as the commenters would like, but they are described in the regulatory text in sufficient detail so that a member of the public can identify the standard IBR'd into the regulation. OFR regulations also require that agencies include publisher information and agency contact information so that anyone wishing to locate a standard has contact information for the both the standard's publisher and the agency IBRing the standard.

A couple of commenters suggested that OFR needs to proceed with caution and consider the costs of IBR'd standards, including extra compliance costs for small businesses in highly regulated areas. [65] At least 2 commenters suggested that OFR must consider the cost of the standard and the price of access, including the cost of travel to Washington DC to examine the standard, when deciding whether to approve an agency request to IBR standards. [66]

Expanding on this idea, one commenter stated that OFR is allowing agencies to IBR standards that must be purchased, therefore OFR needs to make sure the regulatory requirements are set out in the rule in enough detail that people can understand those requirements. [67] This commenter also insisted that, as part of the approval process, agencies must state the cost of the standard before they receive approval and certify that if the price changes or if the standard isn't available the regulation is unenforceable to ensure the reasonable availability of the IBR's standard during the entire lifecycle of the rule. [68]

Another commenter stated generally that the cost of buying the standard is less than the cost of complying with the regulation. [69] One of these commenters

stated that OFR needs to review the standards for costs to the affected industries and look for any potential conflicts in regulations along with formally defining "reasonably available." [70]

One commenter stated that free and online would compromise the ability of regulators to rely on voluntary consensus standards. [71] This commenter stated that revenue from sales, along with providing salaries, benefits facilities, global development and training, and also supports the broader mission of professional engineering societies and funds research for standards and technology. Finally, this commenter suggested that there may also be a potential downstream impact threatening billions of dollars in global trade and the development of internationally harmonized safety requirements.

Another commenter supported purchasing standards at the final rule stage. [72] This commenter expressed concern that organizations that rely on sales of standards may go out of business if they can't raise revenue from sales of standards. The commenter noted that corporate sponsors could be used to raise the revenue needed but that this might lead to standards that favored the corporate sponsor, whereas obtaining the revenue from the government could lead to the development of standards based on politics.

To address the concerns mentioned in comments from SDOs, one commenter stated that the SDOs whose business models are based on sales of their standards may have some negative economic impact in the short term. [73] This commenter saw no long term negative economic impact on the SDOs, because requiring the standards to be posted as read-only files still allows SDOs to sell hard copies as business will still need to highlight and annotate the standard. [74] Additionally, SDOs exist to fill a business needs that are separate from government regulation and these needs continue to exist even if read-only access is given to standards. In cases where the standard wasn't developed to become part of regulations, agencies should seek a license, although the commenter admitted that the licensing fees could be cost-prohibitive for small agencies.

While technological (and publication) costs continue to decrease, these

---

[57] OFR–2013–0001–0004 at pages 4–5.

[58] *National Park and Conservation Ass'n v. Stanton*, 54 F.Supp2d 7, 18 (D.D.C. 1999).

[59] At least 2 comments stated that FOIA envisioned that IBR'd standards would be commercially available through a subscription service, not held for individual sale, suggesting that purchasing a subscription could be more affordable than purchasing each individual standard, see OFR–2013–001–0024 and OFR–2013–001–0029. We note that we received comments to our initial request for comments on the petition that suggested obtaining access to subscriptions services for certain IBR'd materials is not substantially cheaper and sets up other road blocks for entities wishing to purchase only one particular standard.

[60] OFR–2013–001–0012.

[61] OFR–2013–001–0019.

[62] See generally, OFR–2013–001–0024, OFR–2013–001–0036, OFR–2013–001–0029, OFR–2013–001–0004, OFR–2013–001–0021, and OFR–2013–001–0037.

[63] OFR–2013–001–0034.

[64] OFR–2013–001–0034.

[65] OFR–2013–001–0019 and OFR–2013–001–0319. See also OFR–2013–001–0029, this commenter specifically referenced technical standards, saying they must be available to the public, and stating that the compliance obligations are same.

[66] OFR–2013–001–0021.

[67] OFR–2013–001–0029.

[68] *Id.*

[69] OFR–2013–001–0034.

[70] OFR–2013–001–0023.

[71] OFR–2013–001–0038.

[72] OFR–2013–001–0022.

[73] OFR–2013–001–0029.

[74] *Id.*

commenters addressed only the cost of making something available online and did not address costs associated with creating the standard or providing free access to it. OFR staff do not have the experience to determine how costs factor into development of, or access to, a standard for a particular regulated entity or industry. Thus, this rule doesn't specifically address the costs associated with an IBR'd standard, which allows the agencies flexibility to address cost concerns when exercising their authority to issue regulations.

As we stated in our proposed rule, OFR is a procedural agency. We do not have the subject matter expertise (technical or legal) to tell another agency how they can best reach a rulemaking decision. Further, we do not have that authority. Neither the FRA, the FOIA, nor the APA authorizes us to review proposed and final rulemaking actions for substance. We agree that agencies should consider many factors when engaging in rulemaking, including assessing the cost of developing and accessing the standard. Thus, we are requiring agencies to explain why material is reasonably available and how to get it, and to summarize the pertinent parts of the standard in the preamble of both proposed and final rules.

*Other Issues*

a. Constitutional Issues
b. Copyright Issues
c. Outdated standards IBR'd into the CFR
d. Incorporation of guidance documents and the use of safe harbors
e. Indirect IBR'd standards
f. Data and studies used to create standards
g. Section-by-section analysis of the regulatory text

*a. Constitutional Issues*

A couple of commenters suggested that our proposal was Constitutionally suspect, claiming that it violates Due Process, Equal Protection, and First Amendment rights.[75] They claimed that the public's inability to access standards for free online creates due process concerns, because due process requires notice of obligations before the imposition of sanctions. Having to pay fees for standards creates obstacles and impacts notice, which in turn creates due process problems. They claimed there might be a First Amendment issue because the public can't discuss or criticize regulations if they don't know what they are. Finally they argued that equal protection and due process are jeopardized when some people can purchase the law and others can't. One

commenter stated that access to the standards in Washington, DC is not sufficient when the rule applies nationwide, because people have to travel to DC to view the standard and traveling costs money. Therefore, they argued, OFR needed to take those travel costs into account when approving agency requests to incorporate documents by reference into the CFR.

Constitutional issues were raised in earlier documents as well. Commenters to the request for comments on the petition argued that the government could simply exercise the Takings Clause of the 5th Amendment.[76]

While we don't speak for the Federal Government as a whole, we see no reason why the government would exercise the Takings Clause. However, we note that this rule continues to require that agencies provide us a copy of all documents they wish to IBR into the CFR. Agencies must also maintain at least one copy of all IBR'd standards for public inspection at their agency. They must also provide their contact information along with contact information for the OFR and the standards' publishers in the regulatory text. Anyone can contact any of these 3 groups with questions regarding access to the documents IBR'd by an agency into the CFR, so access is not restricted to the Office of the Federal Register in Washington, DC.

Further, nothing in this rule prevents the public from discussing or criticizing any Federal regulations. By requiring agencies to add to the preamble a discussion of how to examine or obtain copies of standards referenced in their rulemaking documents, along with summaries of those standards, we are ensuring that members of the public have more information for determining if the summary is sufficient or if they need (or just want) to contact the agencies with questions on how to access the IBR'd standards.

*b. Copyright Issues*

Several commenters claimed that once a standard is IBR'd into a regulation it becomes law and loses its copyright protection and, therefore, that IBR'd standards must be available for free online without any further discussion. Other commenters[77] stated that the public is the owner and author of the regulations and thus has the right to know the law, relying on the *Veeck* case.[78] At least one commenter stated that the law is in the public domain and

therefore not "amenable to copyright."[79]

Several commenters appeared to argue that the *Veeck* case demonstrates that SDOs have survived and grown over the years despite not having copyright protection awarded by a court because SDOs still create and charge for standards even after the *Veeck* decision; that the complexity of the modern age requires that agencies standardize across the Federal government, thus compelling the use of standards; and that SDOs can annotate their standards and charge fees for those annotations. These commenters' conclusion seemed to be that SDOs will continue to create standards and push for their incorporation into Federal regulations. Therefore, OFR must require that only standards available for free online are eligible for IBR approval.

One commenter referenced the NTTAA[80] and stated that since this statute says agencies shouldn't use standards in a way inconsistent with applicable law, therefore if agencies can't use the standard without violating copyright law, then the agency shouldn't IBR that standard.[81]

As we stated in our NPRM, recent developments in Federal law, including the *Veeck* decision[82] and the amendments to FOIA, and the NTTAA have not eliminated the availability of copyright protection for privately developed codes and standards that are referenced in or incorporated into federal regulations. Therefore, we cannot issue regulations that could be interpreted as removing copyright protection from IBR'd standards. We recommend that the responsible government agency collaborate with the SDOs and other publishers of IBR'd materials to ensure that the public does have reasonable access to the referenced documents. Therefore, in this final rule we require that agencies discuss how the IBR'd standards are reasonably available to commenters and to regulated entities. One way to make standards reasonably available, if they aren't already, is to work with copyright holders.

One commenter stated that since it is the text of standards that must be available (citing *Veeck* for the proposition that the law is not subject to copyright law), agencies should copy the text of IBR'd standards and place the

---

[75] OFR–2013–0001–0029 and OFR–2013–0001–0036.

[76] 78 FR 60791 (October 2, 2013).
[77] OFR–2013–0001–0029.
[78] *Veeck v. Southern Building Code Congress International, Inc.,* 293 F.3d 791 (5th Cir. 2002).

[79] OFR–2013–0001–0012.
[80] 15 U.S.C. 3701 et seq.
[81] OFR–2013–0001–0004.
[82] One commenter stated that OFR needs to show that the 5th Circuit didn't consider specific arguments, and, that if we don't, we can't reject the decision of the court. See OFR–2013–0001–0021. We disagree.

text online. In a footnote, the commenter suggested that OFR require agencies to place the text of their ''regulatory obligations'' in their online dockets. This way the ''text of the legal obligation and not the standard as such'' is available online for free.[83]

We leave it to the agencies to determine if they should follow this commenter's suggestion. We do note that agencies requesting IBR approval must follow the requirements set out in part 51, including § 51.9, requiring very specific information about the standard, so that the standard and ''regulatory obligations'' can be clearly identified.

### c. Outdated Standards IBR'd Into the CFR

A few commenters again mentioned that some of the standards IBR'd into the CFR were outdated or expressed concern that agencies were failing to update the IBR references in the CFR. The orderly codification requirements of the FRA and the ACFR prohibit us from amending another agency's regulations,[84] so we cannot take unilateral action. Further, we don't have the authority to decide that a newer version of a particular standard serves the same purpose as an older version; that determination is solely for the agency. However, we continue to provide support and assistance to agencies that are implementing or updating regulations with IBR'd material. We contact agencies and let them know if we hear from someone that a standard is difficult to find. We also refer callers to our agency contacts.

One commenter stated that two-thirds of IBR'd standards were published in 1995 or earlier, thus, these standards are no longer available except at the National Archives and Records Administration.[85] The commenter suggested that to address this issue OFR needs to include a sunset provision in part 51 to limit the duration of an IBR approval or to require that agencies certify for each annual edition of the CFR that standards IBR'd are still available. From 1979 through 1982, we approved material IBR'd on a yearly basis, as part of a comprehensive review of all material IBR'd and a review of the overall approval process.[86] We initially established the annual review for only 3 years, but it soon became clear that a one-year review was neither practical nor efficient. We chose not to extend the

program at the end of 3 years but to return instead to the original process.[87]

As we stated above, the orderly codification requirements of the FRA and the ACFR prohibit us from amending another agency's regulations[88] so it is not clear how the expiration of an IBR approval would be identified in the CFR without undermining orderly codification and without returning to an approval system that has already failed.

### d. Incorporation of Guidance Documents and the Use of Safe Harbors

While some of the commenters approved of our proposal and its rejection of the notion that IBR standards should be removed from regulations and incorporated into agency guidance,[89] one commenter modified the argument and suggested that OFR needs to adopt the formal stance that ''incorporated standards do not create legal obligations, as such, rather identify appropriate means for achieving compliance with regulatory requirements that are independently and fully stated in public law.''[90] This commenter suggested that adopting this proposition would bring our requirements in line with the European Union's stance on incorporation by reference. The commenter then went on to describe the way the EU countries develop standards and recommended that the U.S. adopt that model of standards development. However, the OFR has no statutory authority to completely change the way standards are developed in the U.S. We continue to maintain that the explicit statutory language of section 552(a) applies when agencies request to IBR materials into the CFR. Therefore, we have no authority to approve IBRs of standards into agency guidance documents.

The commenter continued by stating that OFR cannot, in its regulations, allow materials that are copyrighted to become binding legal requirements through IBR. They also stated that OFR needs to accept the IBR of guidance documents that are not legally binding and limit the IBR'ing of required standards to ones that are available for free online.[91]

This commenter went on to state that section 552(a)(1) clearly allows for the IBR of guidance documents, stating that ''part 51's refusal to consider these IBRs is unprincipled and unjustified.''[92] This

commenter then listed the merits of IBR'ing of guidance documents, for example, no copyright issues and ease for agencies to update the reference when the standards are updated.

Agencies are not required to request IBR approval for guidance documents referenced in their regulations. Currently, if materials that are published elsewhere are referenced as guidance documents in regulatory text or a CFR appendix, agencies are not required to submit an IBR request; they must simply add information on how to obtain the guidance material in the regulatory text. This requirement is less stringent than IBR approval and we see no reason to change our policy at this time. While this commenter is correct that in the past we have approved IBR in limited instances for guidance documents, there has never been a requirement in our regulations that guidance documents must obtain IBR approval; that is because not all agency guidance documents or the materials referenced in those documents are published or referenced in the **Federal Register**. Regardless, any requests for IBR must still meet the requirements of part 51 and any changes to the CFR or a CFR appendix must publish in the Rules and Regulations section of the **Federal Register**. That publication requirement will increase the time it takes to update IBR'd guidance documents and may not provide the flexibility to update guidance the commenter hoped for.

This commenter also suggested that we don't understand the law and that we believe that guidance documents aren't regulatory.[93] However, we do understand the concept that guidance documents are not requirements and if agencies try to enforce them as binding, private entities can sue the agency.

Both the FRA and the APA require that documents of general applicability and legal effect be published in the **Federal Register** and codified in the CFR. In general, agencies are not required to codify their guidance documents, policy letters, or directives in the CFR and thus, they might not be published in the **Federal Register**.[94] Nor

---

[83] OFR–2013–001–0024 footnote 23 at page 8.

[84] 44 U.S.C. 1510 and 1 CFR part 21.

[85] OFR–2013–001–0024.

[86] 44 FR 18630, as corrected at 44 FR 19181.

[87] 47 FR 34108.

[88] OFR–2013–001–0024.

[89] OFR–2013–001–0030.

[90] OFR–2013–001–0024 at page 2.

[91] Id. at page 2, OFR–2013–001–0004.

[92] Id. at page 3.

[93] Id. at page 8.

[94] ACUS Recommendation 76–2 (41 FR 29653, July 19, 1976) recommends that agencies publish their statements of general policy and interpretations of general applicability in the **Federal Register** citing 5 U.S.C. 522(a)(1)(D). This recommendation further recommends that when these documents are of continuing interest to the public they should be ''preserved'' in the CFR. 41 FR 29654. The recommendation also suggests that agencies preserve their statements of basis and purpose related to a rule by having them published in the CFR at least once in the CFR edition for the year rule is originally codified. Many agencies have

are they required to formally request approval for standards referenced in the CFR that are not binding requirements. OFR has long interpreted section 552(a)'s use of the term "affected" to be related to binding requirements that have an effect on parties. Thus, we haven't required that references in the CFR to standards for guidance purposes go through IBR approval. We do not have the staff or other resources needed to approve IBR requests for documents that are guidance rather than documents that are requirements. As we mentioned above, agencies can already reference those documents in the CFR without going through the formal IBR review process. Thus, is not clear why agencies would need IBR approval for these non-regulatory documents.

One commenter stated that there is no distinction between a regulatory standard and a safe harbor.[95] This commenter stated that a safe harbor in regulatory text will bind the agency to accept actions that are within the safe harbor as compliance. Thus, the safe harbor will dominate as the compliance method. Therefore, this commenter believed that all requirements suggested for IBR'd standards (most importantly that they must be available for free online) also apply to safe harbors. We agree that this is a concern, however we don't see that this specific issue is covered by part 51.

*e. Indirect IBR'd Standards*

At least 4 commenters raised the issue that some of the IBR'd standards also reference other standards in their text. A couple of these comments suggested that the OFR deny IBR approval unless all standards are available for free online, including those referenced within the standard the agency is seeking IBR approval for. At least, one of the commenters stated that obtaining IBR'd material can cost several thousands of dollars a year.

As we stated in our proposed rule, our regulations have never contained any provision to allow for IBR of anything but the primary standards and, as a practical matter, we have no mechanism for approving anything but those primary standards. The OFR is a procedural agency and we do not have subject matter or policy jurisdiction over any agency or SDO. We must assume that agencies have fully considered the impact of any document (including material IBR'd) that they publish in the **Federal Register**. In many

instances, agencies reference third-party standards in their NPRMs, so both the general public and the regulated public can review and comment on those standards before they are formally IBR'd in the CFR. We do not review material submitted for IBR to determine if that material also has other materials included; we look only at the criteria set out in our regulations. Determining that an agency intends to require some type of compliance with documents referenced in third-party standards is outside our jurisdiction; similarly, we cannot determine whether or not the subject matter of a third-party standard is appropriate for any given agency.

What these commenters suggested would require that OFR substantively review each standard IBR'd to determine if it references other standards and then determine if those standards are required to comply with the IBR'd standard and the agency's regulations. That is beyond the authority and subject matter expertise of this office and would increase the review time required to process IBR approval requests. Therefore, we continue our practice of reviewing approval requests only for standards directly IBR'd into the CFR.

*f. Data and Studies Used To Create Standards*

At least 2 commenters suggested that a condition of IBR approval must be that data and studies relied on to create the standard must be available for free online during the comment period of the NPRM, citing *Portland Cement Ass'n* v. *Ruckelshaus* 486 F.2d 375 (DC Cir 1973). They also stated that agencies should be required in their NPRM preambles to "include specification of the means by which would-be commenters can gain access to the studies and data on which the standard proposed to be incorporated is based" without incurring a significant fee.[96] They claimed that without this requirement interested persons cannot meaningfully comment on an agency's NPRM.

The APA, other statutory authorities, and case law have continually stood for the proposition that the publishing agencies, not the OFR, are responsible for ensuring that the public has appropriate information to provide comments on their proposed rules. The task of ensuring agencies provide access to data and to the studies that were used to develop materials incorporated by reference is beyond our statutory authority and resources. Therefore, we

decline to revise the regulations to require that the materials used to develop standards be available for free online.

*g. Section-by-Section Analysis of the Regulatory Text*

Several commenters had comments on specific sections set out in our NPRM. We address those comments by section below.

Section 51.1(b)

Some commenters suggested that we add the E–FOIA and the E-Government Act[97] to our list of authorities in § 51.1(b), claiming that our refusal to do so "reveal[s] OFR's regrettable indifference to the realities of the Information Age."[98] It is not clear where these commenters would have us reference these statutes. Our statutory authority appropriately references section 552(a), which grants the Director the authority to approve agency requests for IBR into the CFR. If the commenters were focusing on the text of § 51.1(b), what they fail to take into account is that this section specifically lists authorities that directly relate to the requirement that certain documents be published in the **Federal Register**. Paragraph (b)(4) allows for us to review based on Acts other than the FRA that require publication in the **Federal Register**. Since this paragraph (b)(4) can be read broadly to include many different statutes, we do not believe we need to specifically reference these statutes.

Section 51.1(e)

One commenter stated that paragraph (e) of § 51.1 was confusing because it states that use of the phrase "incorporation by reference" by itself does not mean the Director has approved an agency request for incorporation by reference. The commenter suggested that this paragraph be removed.

The CFR uses the phrase "incorporation by reference" throughout its titles even when this phrase does not mean incorporation by reference pursuant to section 552(a). For example, the Federal Acquisition regulations in Title 48 of the CFR and 40 CFR 1502.21 (which discusses incorporating materials by reference into agency environmental impact statements) both use the phrase "incorporation by reference" in ways unrelated to the use of the "incorporation by reference" described, in section 552(a). Paragraph (e) clarifies that if the Director's

---

not followed this recommendation, most likely because some of the material is published in the United States Government Manual or they find the cost prohibitive.

[95] OFR–2013–0001–0029.

[96] OFR–2013–0001–0024 and OFR–2013–0001–0029.

[97] Public Law 107–347 (2002).

[98] OFR–2013–0001–0029.

approval language is not linked to the IBR reference in the CFR, that use of the term IBR has not been approved by the Director and may be unrelated to section 552(a) and the regulations found in part 51. Therefore, because this phrase is used in multiple ways in the CFR, we decline to remove paragraph (e) from § 51.1.

Section 51.5

One commenter, when discussing §§ 51.3 and 51.5, stated that our proposal would reduce ''reasonably available'' to formality that doesn't encourage agencies to comply with section 552(a) or with 5 U.S.C. 553. They argued that OFR is not paying enough attention to the public's ability to comment on NPRMs (other commenters also suggested that the OFR should require rulemaking documents be understandable without the need for the reader to rely on the IBR'd material [99]). The commenter believed that a citation of how the agency made the material reasonably available doesn't go far enough. This commenter recommended that we change the text to require that agencies explain what they propose to require in their rulemaking. Along this same line, another commenter wanted a detailed abstract of the IBR'd materials.

It is the responsibility of the agency issuing the regulations to ensure that it complies with the requirements of the APA. Our intent with these changes is to provide the public more information regarding standards IBR'd, both how to access these standards and to get a summary of what the standard is about. The OFR can't ensure that every agency complies with the requirements of the APA; we are not subject matter experts in all areas of federal law so we can't make a determination on whether an agency's preamble provides enough information for the public to thoughtfully comment on agencies' proposals. This commenter's suggested language would require OFR to do a substantive review of all preambles in rulemakings where the agencies propose to IBR materials into their regulations. This is beyond our authority; we can't do it for documents without IBR and nothing in section 552(a) gives us special authority to perform substantive

reviews of rulemaking documents with IBR.

One commenter expressed concerns that the requirement to summarize standards in preambles is not specific enough. This commenter wanted more specificity on what constitutes reasonable availability. The commenter said that requiring too much detail is a problem, because the summary doesn't replace the actual text of the standard and agencies shouldn't be placed in a position to argue or litigate whether there was enough detail in the summary. The summary should alert readers to go to the standard. We agree that this summary of the standard needs to give readers enough information to decide if they need to read the standard for more detail or not, thus we kept the regulatory text flexible to allow agencies to write these summaries in ways that best meet the needs of their readers.

Another commenter, while agreeing that ''reasonably available'' might not mean free online, stated that it does mean more than the agency simply having a copy available for examination in its Washington, DC headquarters.[100] This commenter stated that the OFR needs to define reasonably available and let the public comment on that proposed definition. It also stated that OFR needs to provide agencies with guidance on how we expect them to comply with this requirements. This commenter further urged that OFR define ''reasonably available'' differently, depending on where in the rulemaking process the regulation is. Thus, this commenter recommended that ''reasonably available'' be defined at the proposed rule stage to mean the material proposed to be IBR'd be available to review for free online. At the final rule stage, and while the rule is effective ''reasonably available'' would mean that IBR'd material could be purchased from the publisher.

We decline to define ''reasonably available.'' Much like the request to define ''class of persons affected,'' we are concerned that any definition will fail because it is either too broad to be meaningful or too restrictive, impeding agencies' ability to work with SDOs and other publishers to make the material available to wide audience either during the comment period of a proposed rule or while a regulation is in effect. The absence of a too-broad or too-narrow definition allows agencies to maintain flexibility in making IBR'd materials ''reasonably available'' during the life-cycle of a regulation and their regulatory programs on a case-by-case basis to respond to specific situations.

Another commenter stated that the proposed regulatory text in § 51.5 was too focused on the reasonable availability issue. This commenter claimed that the NPRM suggests that there are ''varying degrees'' of reasonable availability when in reality material is either reasonably available or it is not.[101] The commenter objected to the proposed language in § 51.5 because, the commenter claimed, that by requiring agencies to discuss how they worked with publishers to make material reasonably available, we are suggesting a link between reasonably available and free online. This commenter recommended changing the focus of the text from the reasonably available requirement to instead require that agencies discuss all the factors they considered, including availability, when proposing to IBR a standard. The commenter believed that this language better articulates federal policy.

Section 552(a) specifically mentions reasonable availability without addressing other factors agencies used to determine if they wished to request IBR approval for particular standards. Therefore, this section properly focuses on a discussion of how the materials are available. Nothing in this rule prohibits agencies from discussing, in their preambles, what factors they considered when determining if and what materials they would request approval for. Thus, we decline to revise this section to make this commenter's suggested changes.

One commenter stated that using the term ''or'' instead of ''and'' in the proposed rule text violates the statute because the material must be made reasonably available under the statute.[102] The commenter continued, stating that it's the Director who determines reasonable availability and not the agencies. Therefore, the proposed language puts the reasonable availability determination on the wrong party. The commenter assumes agencies will develop different criteria for determining whether something is reasonably available. The NPRM stated that agencies might not be able to IBR SDO standards if we require that they be available for free; the commenter disagreed with this statement.

We disagree with the commenter's assessment of this proposal. The OFR (including the Director) does not have the subject matter expertise or the familiarity with the affected parties to make a case-by-case analysis of ''reasonable availability.'' We must rely on the analysis of the agency. The revisions to this section now require

---

[99] See, OFR–2013–0001–00024 and OFR–2013–0001–00032. One commenter alleges that it is a ''mere phantasm if the agency can meet the requirement by stating that a copy of the publication has been placed at the bottom of a locked filing cabinet . . .'', see OFR–2013–0001–0037. We can't assume, as this commenter appears to do, that agencies will willfully obstruct access to the standards they've IBR'd.

[100] OFR–2013–0001–0022.

[101] OFR–2013–0001–0026.

[102] OFR–2013–0001–0021.

that agencies provide at least part of that analysis instead of simply asserting that the material is "reasonably available." Nothing in the proposal removes the requirement that IBR'd materials be maintained at the agency and at the OFR. And, the summary provides information to people so they can determine if they want to review the IBR material at the agency or the OFR or elsewhere.

One commenter supported our revisions to § 51.5 because these requirements will bring attention to the availability issue and suggested that agencies will "proactively seek to improve the availability of IBR materials throughout the rulemaking process." [103] This commenter recommended that OFR strengthen this provision by removing the "or" and replacing it with an "and." This would require agencies to discuss both the substance of the standard and how they worked to make the standard reasonably available. This recommendation is also consistent with ACUS' recommendation 2011–5.[104]

We agree that this provision should be strengthened so we replaced the "or" with an "and." And, we have removed the requirement that the agency discuss, in the final rule, how the incorporated material was reasonably available at the proposed rule stage. We require, at both the proposed and final rule stages, that agencies include language in their rulemaking preambles that both discuss the availability of the standards and provide a summary of the standards themselves.

Section 51.7

At least 2 commenters suggested that we remove the requirement that standards be technical in nature to receive IBR approval in an attempt to limit the number of printed **Federal Register** and CFR pages.[105] One commenter also expressed a concern that by removing the requirement that IBR'd standards must be technical in nature, OFR is allowing agencies to remove essential requirements from the regulatory text so that the legal obligation is hidden within the IBR'd standard merely to save printed pages in the **Federal Register**. This commenter argued that agency regulations need to be sufficiently and adequately set out to allow the reader to know and be able to meet the regulatory obligations. This commenter claimed that OFR needs to add a provision to part 51 requiring that the IBR material be technical in nature

and that it supplement the regulatory text, not be a substitute for it. The commenter also stated that OFR must review both the regulatory text and the standards to ensure the IBR material doesn't replace the requirements set out in regulatory text.

This commenter was, in effect, suggesting that OFR conduct a substantive review of both the regulatory text and the standards. A review of this nature would require a substantive review of agency regulations, something that is beyond our authority, so, while we clarified § 51.7(a)(2) to require that standards IBR'd be technical standards, we decline to make these suggested changes that would require us to review the materials to ensure that they didn't include regulatory obligations not set out in the regulatory text.

Another concern raised by some of the commenters was that completely removing the requirement that IBR standards be technical in nature "will spur further inappropriate incorporations by reference." [106]

At least one other commenter specifically referenced § 51.7(a) and expressed concern that the proposal removed the requirement that IBR'd standards be technical in nature. The commenter stated that this requirement reduces the risk that agencies will IBR standards that are regulatory in nature. This commenter suggested that the requirement was the public-private equivalent of our prohibition on agencies IBR'ing their own publications.

We understand these concerns regarding the proposed language, so we modified the language in § 51.7(a)(2) to retain the original language of this paragraph, while modifying the structure to emphasize that standards cannot detract from the **Federal Register** publication system. So, much like our provision addressing agency-produced documents, these changes allow us the flexibility to work with agencies on the types of materials IBR'd.

There were a couple of commenters who specifically referenced proposed revisions to § 51.7, explaining what types of documents are eligible for IBR approval. One commenter objected to the language in § 51.7(a)(3) claiming that OFR does not need to include requirements for usability in the regulations because the requirements seem print-focused and are irrelevant in the age of the Internet.

Despite the commenter's attempt to show that the OFR is out-of-touch with the information age, we still receive hard copies of the materials agencies

IBR into the CFR. Thus, we decline to remove this paragraph entirely. We have modified the language slightly with the phrase "as applicable" to indicate to agencies that submit hard copies of their IBR'd material this requirement still applies. Further, the numbering and ordering requirement may still apply to electronic material. We are not unduly focused on print publications, but until no standards are available in print, we have to consider both print and electronic publications.

Finally, we restructured paragraph (a) into a more logical order.

**Regulatory Analysis**

We developed this rule after considering numerous statutes and Executive Orders related to rulemaking. Below is a summary of our determinations with respect to this rulemaking proceeding.

*Executive Orders 12866 and 13563*

The rule was drafted in accordance with Executive Order 12866, section 1(b), "Principles of Regulation" and Executive Order 13563 "Improving Regulation and Regulatory Review." We sent the rule to OMB under section 6(a)(3)(E) of Executive Order 12866 and it was determined to be a significant regulatory action as defined under section 3(f) of Executive Order 12866.

*Regulatory Flexibility Act*

This rule will not have a significant impact on small entities since it imposes requirements only on Federal agencies.[107] Members of the public can access **Federal Register** publications for free through the Government Printing Office's Web site. Accordingly, the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.

*Federalism*

This rule has no Federalism implications under Executive Order 13132. It does not impose compliance costs on state or local governments or preempt state law.

*Congressional Review*

This rule is not a major rule as defined by 5 U.S.C. 804(2). We will

---

[103] OFR–2013–001–0030.

[104] 77 FR 2257 (January 17, 2012).

[105] OFR–2013–0001–0024 and OFR–2013–001–0029.

[106] OFR–2013–0001–0029.

[107] One commenter suggests that OFR needs to do a complete regulatory flexibility analysis on the issues surrounding IBR within the federal government, see OFR–2013–0001–0024 footnote 10 at page 4. Because the only new action in this rule is to require that agencies provide more information in their preambles regarding IBR'ing of standards we do not believe that it has a monetary impact on small businesses or increases their burden. Therefore, we decline to follow the commenter's suggestion.

submit a rule report, including a copy of this rule, to each House of the Congress and to the Comptroller General of the United States as required under the congressional review provisions of the Small Business Regulatory Enforcement Fairness Act of 1986.

**List of Subjects in 1 CFR Part 51**

Administrative practice and procedure, Code of Federal Regulations, **Federal Register**, Incorporation by reference.

For the reasons discussed in the preamble, under the authority at 5 U.S.C. 552(a), the Director of the Federal Register amends chapter II of title 1 of the Code of Federal Regulations as set forth below:

**PART 51—INCORPORATION BY REFERENCE**

■ 1. The authority citation for part 51 continues to read as follows:

   **Authority:** 5 U.S.C. 552(a).

■ 2. Revise 51.3 to read as follows:

**§ 51.3   When will the Director approve a publication?**

(a)(1) The Director will informally approve the proposed incorporation by reference of a publication when the preamble of a proposed rule meets the requirements of this part (See § 51.5(a)).

(2) If the preamble of a proposed rule does not meet the requirements of this part, the Director will return the document to the agency (See 1 CFR 2.4).

(b) The Director will formally approve the incorporation by reference of a publication in a final rule when the following requirements are met:

(1) The publication is eligible for incorporation by reference (See § 51.7).

(2) The preamble meets the requirements of this part (See § 51.5(b)(2)).

(3) The language of incorporation meets the requirements of this part (See § 51.9).

(4) The publication is on file with the Office of the Federal Register.

(5) The Director has received a written request from the agency to approve the incorporation by reference of the publication.

(c) The Director will notify the agency of the approval or disapproval of an incorporation by reference in a final rule within 20 working days after the agency has met all the requirements for requesting approvals (See § 51.5).

■ 3. Revise 51.5 to read as follows:

**§ 51.5   How does an agency request approval?**

(a) For a proposed rule, the agency does not request formal approval but must:

(1) Discuss, in the preamble of the proposed rule, the ways that the materials it proposes to incorporate by reference are reasonably available to interested parties or how it worked to make those materials reasonably available to interested parties; and

(2) Summarize, in the preamble of the proposed rule, the material it proposes to incorporate by reference.

(b) For a final rule, the agency must request formal approval. The formal request package must:

(1) Send a letter that contains a written request for approval at least 20 working days before the agency intends to submit the final rule document for publication;

(2) Discuss, in the preamble of the final rule, the ways that the materials it incorporates by reference are reasonably available to interested parties and how interested parties can obtain the materials;

(3) Summarize, in the preamble of the final rule, the material it incorporates by reference;

(4) Send a copy of the final rule document that uses the proper language of incorporation with the written request (See § 51.9); and

(5) Ensure that a copy of the incorporated material is on file at the Office of the Federal Register.

(c) Agencies may consult with the Office of the Federal Register at any time with respect to the requirements of this part.

■ 4. In § 51.7, revise paragraph (a) to read as follows:

**§ 51.7   What publications are eligible?**

(a) A publication is eligible for incorporation by reference under 5 U.S.C. 552(a) if it—

(1) Conforms to the policy stated in § 51.1;

(2)(i) Is published data, criteria, standards, specifications, techniques, illustrations, or similar material; and

(ii) Does not detract from the usefulness of the **Federal Register** publication system; and

(3) Is reasonably available to and usable by the class of persons affected. In determining whether a publication is usable, the Director will consider—

(i) The completeness and ease of handling of the publication; and

(ii) Whether it is bound, numbered, and organized, as applicable.

*      *      *      *      *

■ 5. In 51.9, revise paragraphs (a) and (c) to read as follows:

**§ 51.9   What is the proper language of incorporation?**

(a) The language incorporating a publication by reference must be precise, complete, and clearly state that the incorporation by reference is intended and completed by the final rule document in which it appears.

*      *      *      *      *

(c) If the Director approves a publication for incorporation by reference in a final rule, the agency must include—

(1) The following language under the **DATES** caption of the preamble to the final rule document (See 1 CFR 18.12 Preamble requirements):

The incorporation by reference of certain publications listed in the regulations is approved by the Director of the Federal Register as of _____.

(2) The preamble requirements set out in 51.5(b).

(3) The term "incorporation by reference" in the list of index terms (See 1 CFR 18.20 Identification of subjects in agency regulations).

Dated: November 3, 2014.

**Amy P. Bunk,**
*Acting Director, Office of the Federal Register.*
[FR Doc. 2014–26445 Filed 11–6–14; 8:45 am]
**BILLING CODE 1505–02–P**

**OFFICE OF PERSONNEL MANAGEMENT**

**5 CFR Part 843**

**RIN 3206–AM99**

**Federal Employees' Retirement System; Present Value Conversion Factors for Spouses of Deceased Separated Employees**

**AGENCY:** Office of Personnel Management.

**ACTION:** Final rule.

**SUMMARY:** The Office of Personnel Management (OPM) is adopting its proposed rule to revise the table of reduction factors for early commencing dates of survivor annuities for spouses of separated employees who die before the date on which they would be eligible for unreduced deferred annuities, and to revise the annuity factor for spouses of deceased employees who die in service when those spouses elect to receive the basic employee death benefit in 36 installments under the Federal Employees' Retirement System (FERS) Act of 1986. These rules are necessary to ensure that the tables conform to the economic and demographic assumptions adopted by the Board of

| 94TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| 2d Session | | No. 94-1476 |

## COPYRIGHT LAW REVISION

SEPTEMBER 3, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. KASTENMEIER, from the Committee on the Judiciary, submitted the following

## REPORT

together with

## ADDITIONAL VIEWS

### [To accompany S. 22]

The Committee on the Judiciary, to whom was referred the bill (S. 22) for the general revision of the copright law, title 17 of the United States Code, and for other purposes, having considered the same, report favorably thereon with an amendment in the nature of a substitute and recommend that the bill as amended do pass.

The amendments are as follows:

Strike all after the enacting clause and insert in lieu thereof the following:

SEC. 101. Title 17 of the United States Code, entitled "Copyrights", is hereby amended in its entirety to read as follows:

### TITLE 17—COPYRIGHTS

| Chapter | Sec. |
|---|---|
| 1. Subject Matter and Scope of Copyright | 101 |
| 2. Copyright Ownership and Transfer | 201 |
| 3. Duration of Copyright | 301 |
| 4. Copyright Notice, Deposit, and Registration | 401 |
| 5. Copyright Infringement and Remedies | 501 |
| 6. Manufacturing Requirement and Importation | 601 |
| 7. Copyright Office | 701 |
| 8. Copyright Royalty Commission | 801 |

### Chapter 1.—SUBJECT MATTER AND SCOPE OF COPYRIGHT

Sec.
101. Definitions.
102. Subject matter of copyright : In general.
103. Subject matter of copyright : Compilations and derivative works.
104. Subject matter of copyright : National origin.
105. Subject matter of copyright : United States Government works.
106. Exclusive rights in copyrighted works.
107. Limitations on exclusive rights : Fair use.
108. Limitations on exclusive rights : Reproduction by libraries and archives.
109. Limitations on exclusive rights : Effect of transfer of particular copy or phonorecord.
110. Limitations on exclusive rights : Exemption of certain performances and displays.
111. Limitations on exclusive rights : Secondary transmissions.
112. Limitations on exclusive rights : Ephemeral recordings.

Sec.
113. Scope of exclusive rights in pictorial, graphic, and sculptural works.
114. Scope of exclusive rights in sound recordings.
115. Scope of exclusive rights in nondramatic musical works: Compulsory license for making and distributing phonorecords.
116. Scope of exclusive rights in nondramatic musical works: Public performances by means of coin-operated phonorecord players.
.117. Scope of exclusive rights: Use in conjunction with computers and similar information systems.
118. Scope of exclusive rights: Use of certain works in connection with noncommercial broadcasting.

## § 101. Definitions

As used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate off-spring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of pre-existing materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more pre-existing works, such as a translation, musical arrangement, dramatization, fictionalization, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", "machine", or "process" is one now known or later developed.

To "display" a work means to show a copy of it, either directly or by means of film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially. 

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

The terms "including" and "such as" are illustrative and not limitative.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

of the U.S. Code, to operate a clearinghouse for the collection and dissemination of scientific, technical and engineering information. Under its statute, NTIS is required to be as self-sustaining as posisble, and not to force the general public to bear publishing costs that are for private benefit. The Department urged an amendment to section 105 that would allow it to secure copyright in NTIS publications both in the United States and abroad, noting that a precedent exists in the Standard Reference Data Act (15 USC § 290(e)).

In response to this request the Committee adopted a limited exception to the general prohibition in section 105, permitting the Secretary of Commerce to "secure copyright for a limited term not to exceed five years, on behalf of the United States as author or copyright owner" in any NTIS publication disseminated pursuant to 15 U.S.C. Chapter 23. In order to "secure copyright" in a work under this amendment the Secretary would be required to publish the work with a copyright notice, and the five-year term would begin upon the date of first publication.

### Proposed saving clause

Section 8 of the statute now in effect includes a saving clause intended to make clear that the copyright protection of a private work is not affected if the work is published by the Government. This provision serves a real purpose in the present law because of the ambiguity of the undefined term "any publication of the United States Government." Section 105 of the bill, however, uses the operative term "work of the United States Government" and defines it in such a way that privately written works are clearly excluded from the prohibition; accordingly, a saving clause becomes superfluous.

Retention of a saving clause has been urged on the ground that the present statutory provision is frequently cited, and that having the provision expressly stated in the law would avoid questions and explanations. The committee here observes: (1) there is nothing in section 105 that would relieve the Government of its obligation to secure permission in order to publish a copyrighted work; and (2) publication or other use by the Government of a private work would not affect its copyright protection in any way. The question of use of copyrighted material in documents published by the Congress and its Committees is discussed below in connection with section 107.

### Works of the United States Postal Service

The intent of section 105 is to restrict the prohibition against Government copyright to works written by employees of the United States Government within the scope of their official duties. In accordance with the objectives of the Postal Reorganization Act of 1970, this section does not apply to works created by employees of the United States Postal Service. In addition to enforcing the criminal statutes proscribing the forgery or counterfeiting of postage stamps, the Postal Service could, if it chooses, use the copyright law to prevent the reproduction of postage stamp designs for private or commercial non-postal services (for example, in philatelic publications and catalogs, in general advertising, in art reproductions, in textile designs, and so forth). However, any copyright claimed by the Postal Service in its works, including postage stamp designs, would be subject to the same conditions, formalities, and time limits as other copyrightable works.

| 113TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPT. 113–152 Part 1 |

AMENDING TITLE 49, UNITED STATES CODE, TO MODIFY REQUIREMENTS RELATING TO THE AVAILABILITY OF PIPELINE SAFETY REGULATORY DOCUMENTS, AND FOR OTHER PURPOSES

JULY 16, 2013.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. SHUSTER, from the Committee on Transportation and Infrastructure, submitted the following

# R E P O R T

[To accompany H.R. 2576]

[Including cost estimate of the Congressional Budget Office]

The Committee on Transportation and Infrastructure, to whom was referred the bill (H.R. 2576) to amend title 49, United States Code, to modify requirements relating to the availability of pipeline safety regulatory documents, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

## CONTENTS

| | Page |
|---|---|
| Purpose of Legislation | 2 |
| Background and Need for Legislation | 2 |
| Hearings | 3 |
| Legislative History and Consideration | 3 |
| Committee Votes | 3 |
| Committee Oversight Findings | 3 |
| New Budget Authority and Tax Expenditures | 3 |
| Congressional Budget Office Cost Estimate | 4 |
| Performance Goals and Objectives | 4 |
| Advisory of Earmarks | 4 |
| Duplication of Federal Programs | 4 |
| Disclosure of Directed Rule Makings | 5 |
| Federal Mandate Statement | 5 |
| Preemption Clarification | 5 |
| Advisory Committee Statement | 5 |
| Applicability of Legislative Branch | 5 |
| Section-by-Section Analysis of Legislation | 5 |
| Changes in Existing Law Made by the Bill, as Reported | 5 |

29–006

2

### PURPOSE OF LEGISLATION

H.R. 2576 amends title 49, United States Code, to modify requirements relating to the availability of pipeline safety regulatory documents. The bill corrects an unintended consequence of the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011.

### BACKGROUND AND NEED FOR LEGISLATION

For many years, government agencies have used standards and other materials published by standards development organizations (SDOs) as one means of satisfying regulatory objectives. In 1982, the Office of Management and Budget (OMB) promulgated OMB Circular A–119, which required federal agencies to use privately developed voluntary consensus standards in lieu of government-unique standards in their procurement and regulatory activities, except where inconsistent with law or otherwise impractical. The use of such standards, whenever practicable and appropriate, was intended to achieve the following goals: (1) eliminate the cost to the government of developing its own standards and decrease the cost of goods procured and the burden of complying with agency regulation; (2) provide incentives and opportunities to establish standards that serve national needs; (3) encourage long-term growth for U.S. enterprises and promote efficiency and economic competition through harmonization of standards; and (4) further the policy of reliance upon the private sector to supply government needs for goods and services.

In 1996, Congress passed the National Technology Transfer and Advancement Act, codifying the requirements contained in the OMB Circular into law. Therefore, by law, federal agencies are required to use such voluntary consensus standards, instead of expending resources to create their own, unless use of such standards would be inconsistent with applicable law or otherwise impractical. Oftentimes, instead of reprinting the standards into the federal regulations, agencies simply reference the voluntary consensus standards by name, a practice more commonly known as "incorporation by reference." SDOs maintain that the practice of incorporation by reference has a number of benefits, including dramatically reducing costs to the government of developing its own standards, preventing duplicative and conflicting government-imposed standards, and allowing agencies to use standards that are already recognized and accepted in the United States and around the world, which result in a public-private partnership that enhances public safety and health while saving government agencies and taxpayers money. Many safety advocates, universities, researchers, and state and local communities, however, have raised concerns about the lack of transparency and openness in reviewing the voluntary consensus standards, particularly when incorporated into federal safety regulations.

In 2011, the bipartisan Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011 (Pipeline Safety Act) became law. In an effort to ensure public access to pipeline standards, section 24 of the Pipeline Safety Act included a provision, codified at section 60102(p) of title 49, United States Code, that requires the Pipeline and Hazardous Materials Safety Administration (PHMSA) to make

3

any document, or portion thereof, incorporated by reference into PHMSA regulations or guidance publicly available, free of charge, on an internet website. Acting in good faith, the intent was to ensure transparency and openness in government regulation, but an unintended consequence arose with regard to some SDOs whose business model could be jeopardized by allowing internet access to its standards. H.R. 2576 will ensure that the provisions of the Pipeline Safety Act support broader public availability of voluntary consensus standards and related information to the general public for non-commercial purposes—consistent with existing law and regulations—while also maintaining the invaluable public-private partnership between the private sector and government agencies. H.R. 2576 provides PHMSA with the flexibility necessary to continue to work with SDOs to improve regulatory outcomes and ensure that materials incorporated by reference are made available to the public.

HEARINGS

No hearings were held on H.R. 2576.

LEGISLATIVE HISTORY AND CONSIDERATION

On June 28, 2013, Representatives Bill Shuster, Jeff Denham, Nick Rahall, and Corrine Brown introduced H.R. 2576 to ensure the protection of intellectual property and copyrights of standard development organizations while providing public access to documents incorporated by reference into pipeline safety regulations. On July 10, 2013, the Committee on Transportation and Infrastructure met in open session and ordered the bill reported favorably to the House by voice vote.

COMMITTEE VOTES

Clause 3(b) of rule XIII of the Rules of the House of Representatives requires each committee report to include the total number of votes cast for and against on each record vote on a motion to report and on any amendment offered to the measure or matter, and the names of those members voting for and against. There were no record votes taken in connection with consideration of H.R. 2576.

COMMITTEE OVERSIGHT FINDINGS

With respect to the requirements of clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee's oversight findings and recommendations are reflected in this report.

NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 3(c)(2) of rule XIII of the Rules of the House of Representatives does not apply where a cost estimate and comparison prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974 has been timely submitted prior to the filing of the report and is included in the report. Such a cost estimate is included in this report.

A-61